1     **UNITED STATES DISTRICT COURT**
      **EASTERN DISTRICT OF MICHIGAN**
2       **SOUTHERN DIVISION**

3 **UNITED STATES OF AMERICA,**

4      Plaintiff,   **Case No. 16-20098**
  **-v-**
5

 **KHALIL ABU-RAYYAN,**
6

      Defendant.
7 _____/

8    **MOTION AND DETENTION HEARING**

9   BEFORE THE HONORABLE **R. STEVEN WHALEN**
    United States Magistrate Judge
10  Theodore Levin United States Courthouse
   231 West Lafayette Boulevard
11    Detroit, Michigan
    **February 16, 2016**
12

 **APPEARANCES:**
13

 FOR THE PLAINTIFF: RONALD W. WATERSTREET
14       U.S. Attorney's Office
        211 W. Fort Street
15       Suite 2001
        Detroit, MI 48226
16

 FOR THE DEFENDANT: TODD SHANKER
17       Federal Defender Office
        613 Abbott Street
18       5th Floor
        Detroit, MI 48226
19

20

 **Transcribed by:**
21 Christin E. Russell
 RMR, CRR, FCRR, CSR
22 (248) 420-2720

23

24

25

```
 1                         I N D E X

 2   Motion Hearing                                   Page
         Argument by Mr. Waterstreet                  7
 3       Argument bu Mr. Shanker                       12
         Ruling of The Court                          16
 4
     Detention Hearing
 5       Proffer by Mr. Waterstreet                   20
         Proffer by Mr. Shanker                       32
 6       Response by Mr. Waterstreet                  41
         Response by Mr. Shanker                      45
 7       Ruling of The Court                          46

 8

 9

10

11

12                         E X H I B I T S

13   Government's Exhibit 3-5                          25
     Defense Exhibit A                                 39
14   Defense Exhibit B                                 40

15

16
     CERTIFICATE OF REPORTER                           51
17

18

19

20

21

22

23

24

25
```

```
 1   Detroit, Michigan
 2   February 16th, 2016
 3   2:19 p.m.
 4           (Transcribed from audio recorded proceedings.)
 5                   *           *           *
 6           THE CLERK:  Calling case No. 16-30039.  United States
 7   of America vs. Khalil Abu-Rayyan.
 8           MR. WATERSTREET:  Good afternoon, your Honor.  Ronald
 9   Waterstreet appearing on behalf of the United States.
10           MR. SHANKER:  Good afternoon, your Honor.  Todd
11   Shanker on behalf of Khalil Abu-Rayyan, who is standing to my
12   left.
13           THE COURT:  Good afternoon.
14           THE DEFENDANT:  Good afternoon.
15           THE COURT:  Okay.  This is the date set for a
16   detention hearing.  Are we ready to proceed?
17           MR. WATERSTREET:  Yes, your Honor.  May we come to
18   side bar for just one moment, please?
19           THE COURT:  You may.
20           (Side bar off the record, 2:19 p.m. - 2:29 p.m.)
21           THE CLERK:  Recalling case 16-30039, the United States
22   of America vs. Khalil Abu-Rayyan.
23           MR. WATERSTREET:  Good afternoon, again once your
24   Honor.  Ronald Waterstreet appearing on behalf of the United
25   States.
```

1            MR. SHANKER:  And, your Honor, Todd Shanker on behalf

2    of Khalil Abu-Rayyan who stands to my left.

3            THE COURT:  Okay.  We had a side bar conference, Mr.

4    Waterstreet I believe you had some concern about competence?

5            MR. WATERSTREET:  Yes, your Honor.

6            THE COURT:  Okay.  And I want to the specific statute

7    that deals with that, and I've been provided with some case law

8    as well.  I'd like to look at that material.

9            Mr. Shanker, if you don't object, I'd like to ask your

10   client a couple of questions.

11           MR. SHANKER:  I have --

12           THE COURT:  Not regarding the facts of this case.

13           MR. SHANKER:  All right.  I have no objection, your

14   Honor.

15           THE COURT:  Okay.  And, Mr. Abu-Rayyan, you're

16   represented by Mr. Shanker here; is that right?

17           THE DEFENDANT:  Yes, your Honor.

18           THE COURT:  Do you know where he works?

19           THE DEFENDANT:  I believe he works in the federal, the

20   federal defense.

21           THE COURT:  Okay.  Do you know what his job is?

22           THE DEFENDANT:  A defense attorney.

23           THE COURT:  Okay.  And do you understand why you're

24   here today?

25           THE DEFENDANT:  Yes, your Honor.

```
 1              THE COURT:  Why are you here?
 2              THE DEFENDANT:  Well, I'm here for --
 3              THE COURT:  Don't go into the facts.  Do you know the
 4   --
 5              THE DEFENDANT:  The circumstances?  Yeah.  I'm here
 6   for a possession of a firearm while being an unlawful user of
 7   narcotics, sir.
 8              THE COURT:  Okay.  I don't want to know anything that
 9   you've talked to Mr. Shanker about, because that's, do you
10   understand that's privileged?
11              THE DEFENDANT:  Yes, sir.
12              THE COURT:  Do you understand that anything you say to
13   your attorney is protected?
14              THE DEFENDANT:  Yes, sir.
15              THE COURT:  Okay.  But have you in fact -- let's see.
16   You were here on February 4th.  Between then and now, have you
17   had the chance to talk to Mr. Shanker?  I don't want to know
18   what you talked about.
19              THE DEFENDANT:  Yes, your Honor, I have.
20              THE COURT:  Okay.  Do you have any trouble
21   understanding him?
22              THE DEFENDANT:  No, not at all, your Honor.
23              THE COURT:  Okay.  Were you able to discuss these
24   charges, what the Government would have to show?
25              THE DEFENDANT:  Yes, your Honor.
```

1           THE COURT:  Mr. Shanker, do you want to follow up with
2   any questions?
3           MR. SHANKER:  I mean, just to orient that, orient the
4   time and place, who is the president of the United States?
5           THE DEFENDANT:  The president of the United States is
6   President Barack Obama, sir.
7           MR. SHANKER:  And we had a holiday a couple days ago.
8   What holiday was that?
9           THE DEFENDANT:  Valentine's day, sir.
10          MR. SHANKER:  Your Honor, I really, I have no other
11  questions.
12          THE COURT:  All right.  Let's do this.  We're going to
13  take a break.  We'll be back at, on the record at 3:15.
14          MR. SHANKER:  Okay.
15          THE COURT:  Okay.
16          THE CLERK:  All rise.  Court is now in recess until
17  3:15 p.m.
18      (Recess taken, 2:32 p.m. -3:25 p.m.)
19          THE CLERK:  Now calling case No. 16-30039.  United
20  States of America vs. Khalil Abu-Rayyan.
21          MR. WATERSTREET:  Good afternoon, your Honor.  Ronald
22  Waterstreet appearing on behalf of the United States.
23          MR. SHANKER:  Your Honor, Todd Shanker appearing on
24  behalf of Mr. Rayyan, who is standing to my left.
25          THE COURT:  Okay.  Thank you.  We're back on the

1    record.

2         So, Mr. Waterstreet, I understand that the Government

3    is moving for a competency evaluation?

4         MR. WATERSTREET:  Yes, your Honor.

5         THE COURT:  I have had the opportunity to review the

6    statute, as well as reviewing the case law that you provided

7    me.  We do have to make something of a record in this.  What's

8    your basis for me to find reasonable cause?

9         MR. WATERSTREET:  Well, your Honor.

10        THE COURT:  And I don't want to say reasonable cause.

11   Reasonable cause to believe that the defendant suffers from

12   mental disease or defect that results in, either his inability

13   to understand the nature of the proceedings against him, or to

14   assist his counsel in his defense.  What's your, what's your

15   basis?

16        MR. WATERSTREET:  Your Honor, based upon his own

17   statements that he's made concerning his mental health.

18        THE COURT:  HIS post-custody statements?

19        MR. WATERSTREET:  Excuse me?

20        THE COURT:  Post-custody statements?

21        MR. WATERSTREET:  No.  Pre-custody.

22        THE COURT:  Pre-custody.  Okay.

23        MR. WATERSTREET:  Pre-custody statements.

24        Your Honor, I know the Court looked over the case law,

25   and it says once a good faith motion is raised, the Court has a

MOTION HEARING - 2/16/2016

8

```
 1    duty to consider this.  And I'll go through the reasons why and
 2    statements he has made that give the Government concern.  And
 3    one of them took place on January 20th of 2016, when having a
 4    conversation with the undercover agent about what Shaytan, a
 5    Shaytan, S-H-A-Y-T-A-N, wants him to do.
 6           He says, the defendant says "it's like Shaytan is
 7    talking to me."  And the undercover says, "What is he saying?"
 8           "I don't want to say.  It's too evil.  Very bad
 9    thoughts.  I don't even believe it sometimes.  He's taking over
10    my brain.  He whispers to me a lot.  He's in my head.  One day,
11    I told him he's my friend and after that, he never left me
12    alone.  I stay up at night talking to him.  He tells me I'm
13    your friend, your brother.  We can" -- and since he was typing
14    this, he typed it C-A-B, but, "it's we can be happy together"
15    or he typed, "we cab be happy together."
16           The undercover says, "Well, what does he sound like?"
17    "Honestly, he has a deep voice like me."
18           THE COURT:  This is a personal conversation or an
19    electronic conversation?
20           MR. WATERSTREET:  This is a texting back and forth.
21           THE COURT:  Texting.  Okay.
22           MR. WATERSTREET:  "Honestly, he has a deep voice like
23    me.  He tells me let's have fun and hurt people.  He talks to
24    me every night before I go to sleep."
25           And the undercover then says, "When you say Bislama --
```

1    Bislama (phonetic) -- excuse me.

2              MR. SHANKER:  Bismillah.

3              MR. WATERSTREET:  Bismillah.  Thank you.  Bismillah,

4    which apparently is in the name of Allah, like, you know, in

5    the name of Allah, leave, does he go away?  "He tells me not to

6    say those words.  He talks to me every night, ever since I left

7    jail for the first time."

8              And to put this into context, your Honor, the

9    defendant had been in custody in Wayne County Jail as a result

10   of his arrest for carrying a concealed weapon.

11             "Did he show you what he looks like," was the question

12   that was asked to the defendant.  He says he looks like me, but

13   happier.  He says wakes me up at night to do bad things.  He,

14   he was talking to me.  I was talking to him.  He tells me to

15   burn people alive, tie them up, cut their tongues.  He said

16   you're doing my work.  He only talks to me at night."

17             Later in the conversation, between the undercover and

18   the defendant, he says, he's talking to me right -- "He's

19   talking to me now.  He tells me to stop telling our secrets."

20   "You have to say in the name of Allah."  "He says he's my

21   friend, though."

22             As to some other things that give the Government

23   concern is a statement he made on January 22nd.  The defendant

24   texts, "Shooting and death makes me excited.  I love to hear

25   people scream and beg.  I wish I had my gun."  And again, to

1    put this in context, your Honor, when he was arrested on

2    October 6th, 2015, excuse me, October 7, 2015, he was arrested

3    by the Detroit Police Department.  In his possession, he had a

4    6-shot .22 caliber handgun, which he concealed in his car.

5         Later in the conversation, he said, "I'd gladly behead

6    people if I needed to."  And then he, he gave his explanation

7    of why he thought he was thinking this way.  "I think because

8    my parents divorced I'm like this.  It's my dream to behead

9    someone."

10        Later in the conversation, he was talking about some

11   videos that he had watched concerning beheadings.  I'll get to

12   that in a moment, your Honor.  "I see a lot of videos like

13   that.  They always make me happy."

14        Now, this is a question that the undercover asked.  It

15   says, "do you do it, do you want to do it for Dawlah?"  Which

16   is the state or ISIS.  Do you want to do this for ISIS, or and

17   the question is, "or just for no cause?"

18        "Just for me.  I want to hear the persob" --

19   P-E-R-S-O-B is how he spelled it, he meant person -- "I want to

20   hear the person scream.  Doesn't matter who he is."

21        He also indicated that he has thoughts of suicide in

22   addition to blowing himself up as part of a martyrdom to kill

23   other people.  He also states, "I think I'm depressed again.  I

24   have suicidal thoughts.  It seems like I'm all alone and nobody

25   understands me.  When I say something to them, they tell me to

11

```
 1    stop complaining.  Maybe I'll hang myself.  Maybe Allah will
 2    understand.  I don't know if I can deal with this anymore.  I'm
 3    all alone."  And then on February 22nd, he says, "I think I
 4    might kill myself today."  And then he also indicated in
 5    addition to wanting to hurt the people in the church, which is
 6    laid out in the affidavit, which is in paragraph 23 of the
 7    affidavit, he also says he wants to hurt people another way.
 8              On January 10, 2016, regarding his anger issues, he
 9    says, "I think I do need help because I want to hurt people.  I
10    want to do bad things to people, like stab them, shoot them,
11    choke them, skin them like a sheep.  Even set them on fire."
12              Your Honor, that's the basis for many of the
13    Government's concerns of his mental health at the time in which
14    he was involved in this, this activity.
15              THE COURT:  Mr. Shanker?
16              MR. WATERSTREET:  Additionally --
17              THE COURT:  I'm sorry.  Go ahead.
18              MR. WATERSTREET:  Additionally to that, your Honor,
19    not only the defendant's own statements, but speaking with
20    family members --
21              THE COURT:  I'm sorry, speaking with whom?
22              MR. WATERSTREET:  Family members.
23              THE COURT:  Okay.
24              MR. WATERSTREET:  A family member indicated that -- I
25    just want to make sure I don't misquote -- that he thinks his
```

MOTION HEARING - 2/16/2016

12

```
 1    brother is a little off.  And that his brother has never been
 2    seen by a mental health professional, and that he's been
 3    concerned about the defendant's mental health and told the
 4    defendant to seek mental health -- to see a mental health
 5    professional.  The family member thinks the defendant may be
 6    bipolar, as he gets really sad, then really happy.  He goes
 7    from mopey-looking, looking depressed, then becomes the life of
 8    the party making jokes.  He has had mood swings since he was a
 9    teenager or even earlier and acts out of emotion, gets
10    frustrated.  And he, he was hoping that the FBI would get him
11    the help that he needs.  He thinks he needs mental health
12    screening because he's off, socially awkward, may be ADD,
13    Asperger's or bipolar, and that this family member worries
14    about the defendant's mental health and indicated that,
15    believes that his brother has not gotten -- excuse me, the
16    family member has not gotten the help that he needs because of
17    it's taboo in the Middle-Eastern community to talk about it.
18            So those are the statements of the defendant himself,
19    and family members, that leads the Government to be concerned
20    the defendant may not be competent.
21            THE COURT:  Mr. Shanker?
22            MR. SHANKER:  Your Honor, first of all, when we have
23    this detention hearing, I'm going to address the extraordinary
24    seduction, manipulation, and attempt to radicalize this young
25    man by the undercover, and there's no question that he's been
```

1    depressed.  But competency is a very narrow legal issue.  And

2    nothing that was just mentioned on the record goes to his

3    ability to understand the charges against him and to assist in

4    his own defense.

5           And, your Honor, he has been -- we have had numerous

6    conversations.  He has been able to assist in his defense.  He

7    has been clear.  And there should -- there is no concern from

8    our end on that.  And that evidence is un-rebutted.  And I'm

9    not the only attorney that has had no problem with him.

10   Another attorney from our office represented him on his first

11   appearance and said he was clear, able to answer all the

12   questions, understood the charges.

13          So I really, I don't think that competency is an issue

14   here.  And even if it was, I would point out that Judge Patti,

15   there was recently a case before him just a few weeks ago, the

16   name of the defendant is Ms. Farquharson, she was charged with

17   assaulting a crew member on a flight from New York to Chicago.

18   And she actually assaulted crew members and persons on the

19   plane.  She had been diagnosed bipolar.  She was mentally ill.

20   But even in that situation, Judge Patti did a voir dire like

21   your Honor did, and realized that she understood the charges

22   and she was able to assist in her defense.  And as part of, as

23   a condition of bond, she was ordered to get a mental health

24   examination, and to go through those, all of the mental health

25   aspect of the, of the bond.  But the Court found that she was

1    competent.  And there should be no question here, that Khalil

2    is competent.

3            THE COURT:  Okay.  Mr. Waterstreet, how do you respond

4    to the question that, well, assuming that you've shown that

5    there's at least reasonable cause to believe that there is a

6    mental problem, a mental defect or a mental disease, whatever

7    that may be, the second prong is whether that affects his

8    ability to understand the nature of the proceedings and assist

9    in his defense, which is the definition of incompetency.

10           MR. WATERSTREET:  Well, I think that's precisely why

11   we have the statute written the way it is, your Honor, under

12   4241, 18 USC 4241.  It says, under that statute, if the Court

13   finds there is reasonable cause to believe that the defendant

14   is incompetent, it has a duty, and as a matter of fact, it's

15   the *United States vs. White*, specifically says "the Court not

16   only has the prerogative but has a duty to inquire into the

17   defendant's competency whenever there is reasonable cause to

18   believe the defendant is incompetent to stand trial."

19           Under *United States vs. Jackson*, which is the Sixth

20   Circuit case, one of the more recent cases concerning this

21   issue, the Sixth Circuit said, lacking the definition of what

22   is reasonable cause, it says, "Once the motion is made

23   pursuant, unless the motion is frivolous or not made in good

24   faith, the district, the district judge must appoint a

25   psychiatrist to examine the accused."

MOTION HEARING - 2/16/2016

15

```
 1              The reason the statute is written the way it is, is
 2    because frankly, your Honor, all of us here are not
 3    psychiatrists or psychologists.  We're just giving our own lay
 4    person's opinion.  While I believe counsel is trying to give
 5    him his, this Court his best impression, that's all it is, his
 6    best impression as a lay person as to whether the defendant is
 7    competent or not.
 8              If the Court had serious doubts concerning the
 9    defendant's competence based upon his own statements and family
10    members' own statements, the Court shall issue an order to
11    determine his competency.  Then at that point, he is evaluated
12    by people who know what to look for.  Who do understand their,
13    their role to give this Court some guidance as whether he's
14    competent or not, and then a hearing is conducted thereafter to
15    determine if he's competent or not.
16              So we're not deciding his competency at this point.
17    That's why it's a two-step process.  If there's an issue, he
18    has a due process right to not go forward in any criminal case
19    until the issue of competency is resolved.  And that's why we
20    have this two-step process.
21              So I am not asking this Court to make a determination
22    of his competency.  The question is, is based upon the facts
23    that are presented to the Court, is there a good faith basis,
24    and it's not frivolous, to question the defendant's competency.
25              MR. SHANKER:  Your Honor, I would just like to add
```

1   that, you know, the comments by the family members and the

2   quotes that were read from the recordings, while these may

3   reflect mental illness, but mental illness, under the statute,

4   is not enough.  There has to be an inability to understand the

5   charge and an inability to assist in his own defense.  And none

6   of, none of -- there is no evidence from the Government's side

7   that supports that.

8            And I am saying, as an officer of the court, there may

9   be -- there may or may not be mental health issues, but one

10  thing is for sure, he understands the charges and he has been

11  able to assist in his defense.

12           MR. WATERSTREET:  Your Honor, frankly, his delusional

13  thinking and his hearing voices -- I mean, I'm sure he may be

14  competent at one point, and then if he hears Shaytan talking to

15  him, and saying no, don't listen to your attorney anymore, how

16  will we know that?  We're lay persons, plain and simple.

17           THE COURT:  Okay.  And I'm --

18           MR. SHANKER:  Your Honor, could I just add one thing?

19           THE COURT:  No, because I'm ready to rule.

20           MR. SHANKER:  All right.  All right.

21           THE COURT:  And I want to be real clear about this.

22  It's true that I'm not making a competency determination as in

23  the sense that it would be made after a full competency hearing

24  under 18 U.S. Code, Section 4247(d).  However, Section 4241,

25  which is the operative statute, does indicate when the

MOTION HEARING - 2/16/2016

1    Government makes the motion or if I made my own motion, or Mr.

2    Shanker, if you made the motion -- we'll get to the *Jackson*

3    case in a minute, because that was a situation where defense

4    counsel had made the motion.  It says the Court shall grant the

5    motion, "If there is reasonable cause to believe that the

6    defendant may presently be suffering from a mental disease or

7    defect, rendering him mentally incompetent to the extent that

8    he is unable to understand the nature and consequences of the

9    proceeding against him or to assist properly in his defense."

10            I have had the opportunity to read the *U.S. vs.*

11   *Jackson* case, which Mr. Waterstreet provided, and that citation

12   is 179 Fed. Appx. 19, or excuse me, 921.  It's a 2006

13   unpublished decision.  And among other things, *Jackson*

14   reaffirms the principle that under Section 4241, the question

15   of reasonable cause is entrusted to the Court's discretion.

16            Now, in *Jackson*, you had a situation where it was the

17   defense counsel that requested a competency exam, and a

18   competency exam was held.  And then a trial ensued and there

19   was some other issues in the case.  But nonetheless, the

20   question in *Jackson* was whether the Court erred in granting the

21   defense request for a competency exam.

22            And the Court pointed out certain facts.  First of

23   all, it was, as I say, the defense motion.  There was a history

24   of mental health treatment and the defendant was taking some

25   drugs that, that indicated -- that were consistent with mental

MOTION HEARING - 2/16/2016

18

```
 1   illness that would be to an extent that competency would be a
 2   question.  I also note that Jackson is an unpublished case.
 3   And I did cite the section where it said that unless the motion
 4   was frivolous or not, made in good faith, the judge must grant
 5   the motion.  And in doing that, it cited a 1962 case, United
 6   States vs. Walker.  Walker actually had construed the former
 7   version of the statute, which was then Section 4244, which is a
 8   little bit different from 4241, which sets out a much more
 9   detailed procedure.
10        But the point is it's entrusted in my discretion.  And
11   if I'm going to find reasonable cause to order a competency
12   exam, I have to find two things.  I have to find reasonable
13   cause that the defendant is suffering from a mental disease or
14   defect.  I think that Mr. Waterstreet has offered -- has
15   provided reasonable cause.  I'm not making that finding, as you
16   said, I'm not a psychiatrist, but he certainly presented facts
17   that would indicate that.
18        The more troubling question is whether there is
19   reasonable cause to believe that as a result of any mental
20   disease or defect, he would be unable to assist his counsel, or
21   understand the nature of the proceedings against him.
22        I conducted a brief voir dire.  And I've also heard
23   the proffer of Mr. Shanker, who has, you know, represented the
24   defendant and has had interactions with him.  And I don't find
25   that the Government has shown, proffered sufficiently facts or
```

MOTION HEARING - 2/16/2016

19

1    any facts for me to make a finding that the defendant doesn't

2    understand the nature of the proceedings, or that he can't

3    assist his counsel.

4          He hasn't had any previous mental health issues, I

5    understand.  I understand that there have been statements made,

6    and they are troubling statements.  And I think those

7    statements can properly be considered in the context of a

8    detention hearing.  And many of those were complained in the --

9    contained in the criminal complaint.

10         *Jackson* isn't controlling.  It's an unpublished case.

11   *Walker*, 1962, was based on a different statute.  But even, even

12   so, and I don't -- I want the record to be clear that I'm not

13   suggesting that Mr. Waterstreet is acting in bad faith.  I'm

14   not.

15         Is the request frivolous?  "Frivolous" is sort of a

16   loaded term, and it has a colloquial meaning and it has a legal

17   meaning.  It's a case out of the U.S. Supreme Court, *Neitzke's*

18   *vs. Williams*, 490 U.S. 315 at page -- 319, excuse me, page 325,

19   1989 case, which says a case is frivolous -- this was in the

20   context of a civil case.  I think it's applicable here.  "A

21   case is frivolous if it lacks arguable basis in either law or

22   fact."

23         I haven't heard any facts that would lead me to

24   conclude, reasonably conclude that the defendant doesn't

25   understand the nature of the proceedings against him, or is

 1    unable to assist in his defense.  So I'm going to deny a

 2    competency exam at this point, and will go forward with the

 3    detention hearing.

 4          Competency is an ongoing situation, and the statute,

 5    particularly Section 4241(a) states that, "at any time after

 6    the commencement of a prosecution if the facts arise."  So if

 7    this is a fluid situation, and if other facts arise, either

 8    from the Government or Mr. Shanker, if you become aware of

 9    facts, you have a duty to bring that to the Court's -- or if

10    the Court, based on what happens in court has a question.  But

11    at this point in time, I don't find sufficient facts that would

12    lead me to reasonably conclude that, of the second prong of the

13    competency statute.  So I'll deny the motion for a competency

14    hearing.

15          With that, with that, let's go forward with the

16    detention hearing.

17          And, Mr. Waterstreet, are you going to be proceeding

18    by live testimony or by proffer?

19          MR. WATERSTREET:  Proffer, your Honor.

20          THE COURT:  Mr. Shanker, is that okay?

21          MR. SHANKER:  That's -- I'll be proceeding by proffer

22    as well.

23          THE COURT:  Okay.  All right.  Go right ahead, Mr.

24    Waterstreet.

25          MR. WATERSTREET:  Your Honor, in addition to the

```
 1     issues that I've outlined already, I just want to indicate to
 2     you the defendant was placed on suicide watch when he was first
 3     arrested and been on that ever since.  Additionally, once the
 4     FBI began to hear some of the troubling --
 5              THE COURT:  So right now, at this point in time, he's
 6     on a suicide watch?
 7              MR. WATERSTREET:  Yes.
 8              MR. SHANKER:  No, he is not.  He was for a few days at
 9     the old jail on a suicide watch, and he is not anymore.  And
10     your Honor, the reason that --
11              THE COURT:  Wait.  Before we get into --
12              MR. SHANKER:  Okay.
13              THE COURT:  -- the reasons, I just want to know the
14     status.
15              MR. SHANKER:  All right.
16              THE COURT:  Who put him on a suicide watch?
17              MR. WATERSTREET:  We, we told them because of his
18     statements saying he wanted to kill himself.
19              THE COURT:  Okay.  I understand.  Okay.
20              MR. SHANKER:  He is not on suicide watch now.
21              THE COURT:  Okay.  In any event.  If he's detained, do
22     you want him on a suicide watch?
23              MR. WATERSTREET:  Absolutely, your Honor.
24              THE COURT:  Okay.  Go ahead.
25              MR. WATERSTREET:  Because some statements he has made
```

DETENTION HEARING - 2/16/2016

22

```
 1    is that he -- I'll, I'll wait until it becomes the appropriate
 2    time.
 3              THE COURT:  Okay.
 4              MR. WATERSTREET:  When he started making the
 5    disturbing comments about wanting to go out and kill, kill
 6    people, the FBI placed him under 24-hour surveillance.
 7              I also wish to note that Probation Department
 8    recommends detention as well, because they have come to the
 9    conclusion no condition or combination of conditions can assure
10    the safety of the community.  And also, your Honor, the
11    Government has reason to believe that the defendant would be a
12    flight risk based upon some factors I'll get into in a few
13    moments.
14              As I indicated, the defendant's own statements, some
15    of which appear in the criminal complaint, some of which I've
16    read to the Court already, are very troubling about what he
17    intends to do or what he would like to do with other people,
18    choke them, kill them, stab them, skin them alive -- I mean,
19    skin them like sheep.
20              And one of the things he, was rather troubling
21    appeared on paragraph 23 of the affidavit, when he had a
22    conversation with the undercover agent on January 8th, 2016,
23    this was the one in which he indicated that he tried to shoot
24    up a church one day.  "I don't know the name of it, but it's
25    close to my job.  It's one of the biggest ones in Detroit.
```

1    Yeah, I planned it out.  I bought a bunch of bullets.  I

2    practice a lot with it.  I practice reloading and unloading.

3    But my dad searched my car one day and found everything.  He

4    found the gun, found the bullets, and the mask I was going to

5    wear."  And he indicated that, "targeting a church would be

6    easy because a lot of people go there.  Plus, people are not

7    allowed to carry guns in church.  Plus, it would make the news,

8    everyone would have heard.  Honestly I regret not doing it.  If

9    I can't do jihad in the Middle East, I would do my jihad over

10   here."

11        And when asked well, why didn't, if your father took

12   your gun, and I'm paraphrasing, your father took your gun, took

13   your bullets, why didn't you use the new gun that you just

14   bought?  Because the defendant had said that he had bought

15   another gun.  And he said because it only held six shots and

16   I'd have to keep reloading.  And this was the gun that was

17   seized by the Detroit Police Department on November the 7th,

18   2000 -- excuse me, October the 7th, 2015.

19        It's interesting to note, your Honor, that the

20   defendant went out and bought that gun and he applied for that

21   gun in October 3rd of 2015.  He filled out a form which he

22   claimed that he had no, no conditions that would prevent him

23   from being able to lawfully possess that when, in fact, by the

24   defendant's own admission, I think admission by family members,

25   the defendant was using, using marijuana at the time.

1          So he eventually bought that gun on October the 5th,

2    2015.  And interesting to note is this was at least a month

3    before he had any contact with the undercover agent, which

4    means he was out buying a firearm on his own volition, not

5    because somebody suggested it to him or anything of that

6    nature.

7          He was then stopped when he was speeding by the

8    Detroit Police Department on October the 7th, 2015 in which he

9    admitted ownership of the firearm, admitted he was trying to

10   hide the gun underneath his seat.  And he had additional

11   marijuana in the car.  The dog found the drugs in the car.  But

12   the interesting thing is, is that the defendant was undeterred

13   by the fact that he couldn't have a gun.  And on November the

14   15th, he went to another sporting goods store and tried to buy

15   another gun.  This time, he bought a 9 -- he tried to buy a 9

16   millimeter gun.

17         Well, at this point in time because of his prior

18   arrests, he was denied being able to purchase that gun.  But

19   also, he did on that day is he tried to carry -- he tried to

20   sign up for a concealed weapons class, which he did take the

21   class, and he shot a handgun that he rented.  And he also went

22   shooting with two other guns he rented, an AR-15, and an AK-47.

23   And he took pictures of that, of those, him shooting those guns

24   and posted them on the Internet.

25         And one of those -- on his Twitter account.  And one

1   of those pictures he posted was one in which he indicated that

2   he, I think the way he termed it, he was Sahwat hunting.  And

3   to give you a little background into what that means is that

4   those have been identified as individuals who oppose ISIS.  He

5   then posted those pictures, one as a profile photo, which is

6   Government's Exhibit Number 4.  Number 4 is the one he posted

7   as his profile photo and Number 5 is the one picture indicating

8   that he was hunting for the enemy of ISIS, Sahwat hunting.

9         Interestingly enough, it was the exact same gun that

10  he was practicing with, was the same gun that he indicated that

11  he was going to use in the church shooting.  On that same day,

12  he attempted to purchase a high point 9 millimeter handgun,

13  that's been referred to as Government's Exhibit Number 3, which

14  is a semi-automatic 8-shot round handgun.

15        One of the other things he indicated was that he

16  wanted -- because it became very clear in the conversations he

17  had with the undercover, is that he was very concerned about

18  serving jail time.  He did not want to serve any jail time on

19  this, this case.  And every time his Wayne County case came

20  closer and closer going to trial, he became very upset.  And at

21  one point, he even said he wanted to go kill the officer who

22  arrested him in October.  And he said that because the trial

23  was delayed because the officer had a heart attack and was in

24  the hospital, the defendant explained what he wanted to do as a

25  martyrdom operation at the hospital, killing the police officer

1    in the process.

2           And not only did he indicate that he wanted to shoot

3    somebody, but he also, as he indicated, his dream was beheading

4    somebody.  And I think I already read that, that portion of the

5    transcript to you, but it bears noting that I've -- let me see

6    -- that, that I want to -- "it's my dream to behead somebody."

7           Later in the conversation he had with the undercover

8    agent when he was talking about wanting to hurt people and kill

9    people, he indicated that when they are talking about the

10   church, the undercover brought up, "What about the women ask

11   children who are at the church?  Did you think of them?"

12          And this was his response:  "Do you want the truth?  I

13   would have killed every last one of them, especially the women

14   and children.  The only reason I didn't do it was my dad found

15   the gun."

16          And then the undercover suggested that, "Well, the

17   children are so young, they maybe could become Muslims when

18   they got older and so you may be killing future Muslims."  And

19   his answer was "I can't tell the future.  I would have shown no

20   mercy.  You said what if one of them wanted to be a Muslim?  I

21   can't tell if they wanted to or not.  It would have been a

22   blood bath."

23          Now, the FBI did execute a search warrant at his home,

24   did search his car.  They did not find the gun he claims that

25   his father found in his car, they did not find the bullets.

```
 1   They did find the mask that he indicated that he, he had.  We
 2   have no idea where that gun may or may not have been taken.
 3   But there was some other interesting things that the defendant
 4   said well in advance, because I gather from what Mr. Shanker
 5   has suggested, is that this undercover officer somehow
 6   manipulated this poor, innocent person into engaging in this
 7   kind of conversation, for him to direct the conversation was
 8   somehow directed by the undercover.
 9        There was some very troubling things that happened
10   back in July of this year the defendant was involved in, and
11   that had to do with tweets that he was sending out and
12   re-tweeting documents and viewing videos.  And this was several
13   months, approximately a half a year before the undercover was
14   ever involved in any communication whatsoever with the
15   defendant, which leads to the question who was trying to
16   inspire whom.
17        And one took place on July the -- excuse me, July the
18   1st, 2015.  And what the video was, at least how it was
19   described was it was throwing people off of a building.  And
20   during -- he re-tweeted somebody else's comment.  And I, I'm
21   hesitant to say how, how callously people talk about human life
22   on the Internet.  But the person he was responding to said the
23   video they made -- "in the video, they made," which apparently
24   these humans being thrown off a building, "a loud sound each
25   time and ended with a guy with a pistol finishing the
```

```
 1   twitchers."  In response to that, the defendant says, "well, do
 2   you have the link?"  And this is an ISIS made video, your
 3   Honor.  And the person provided him with the link.  And then he
 4   posted that video on his website -- I mean, on his Twitter
 5   account.  And he says, "Thanks, brother, that made my day,"
 6   after he had enough time to watch the video.
 7          Then a few days later on July 11th, it was another
 8   video in which somebody had posted, when somebody said, "I've
 9   never smiled so much in my life watching a video than I have
10   when I just watched the new," and this is another new ISIS
11   video, and he put in quotes, "kill them wherever you find
12   them."  And the defendant said, "same here, brother."  And
13   then, after getting the link to the video, he tweets out on
14   July 11th, 2015, "This is going to be my fifth time watching
15   it."
16          Now, your Honor, unfortunately, I was able through the
17   agents to look at that 22-minute video.  And frankly, with all
18   due respect, I couldn't last more than a few minutes watching
19   that.  I could not believe the inhumanity -- man's inhumanity
20   to man on what they did to people in that video.  Yet, the
21   defendant said, "This is going to be my fifth time watching
22   it."  And he says, "The video is probably the best one yet.
23   Not a dull moment."  So these are his tweets that he is
24   tweeting out to the public long before any undercover agent
25   became involved.
```

DETENTION HEARING - 2/16/2016

```
 1            And I don't know how the Court wishes to proceed.
 2   I've been provided a copy of an affidavit that was, that was
 3   filed by the defendant's father.  I don't know if the Court
 4   wishes me to address that at this time, or wait until Mr.
 5   Shanker proffers it to the Court and then respond.
 6            THE COURT:  Mr. Shanker, do you have that affidavit?
 7            MR. SHANKER:  I do, your Honor.
 8            THE COURT:  Is that going to be part of your proffer?
 9            MR. SHANKER:  Yes, that will be part of my proffer.
10            THE COURT:  We'll wait and let Mr. Shanker.
11            MR. WATERSTREET:  Okay.  Okay.  Lastly, your Honor,
12   one thing, the only reason -- the one reason I bring it up is
13   in the proffer, the defendant's father says I'm a citizen of
14   the United States.  He fails to mention that he's also a
15   citizen of Jordan.  And I went on the --
16            THE COURT:  The father is or the defendant is?
17            MR. WATERSTREET:  The father is.
18            THE COURT:  Okay.
19            MR. WATERSTREET:  And I went onto Jordanian Embassy
20   website.  And I, I am always hesitant to say this, your Honor,
21   but I figure if a very simple-minded person as myself can find
22   this, somebody else who may be a little bit more motivated can
23   find this as well, but it's very clear that the website says
24   that if you are a Jordanian citizen and you have a son, you can
25   apply for a passport for your son.
```

DETENTION HEARING - 2/16/2016

30

1           As a United States government, we have no authority

2     over the Jordanian government to prevent them from issuing a

3     passport to the defendant, a Jordanian passport.

4           THE COURT:  By the way, is Mr. Abu-Rayyan a citizen of

5     the United States?

6           MR. WATERSTREET:  He is, yes, he is a citizen of the

7     United States.

8           THE COURT:  You're saying by virtue of the fact that

9     his father is a Jordanian citizen, his son, regardless of his

10    U.S. citizenship, can obtain a Jordanian passport?

11          MR. WATERSTREET:  Correct, your Honor.

12          THE COURT:  Okay.

13          MR. WATERSTREET:  And it says under Jordanian National

14    Law as amended, No. 6 of 1954, Article 9 indicates, children of

15    a Jordanian nationality father are Jordanians wherever they

16    were born.  To obtain a Jordanian passport for the first time,

17    please submit the following.  And they have to prove that the

18    father is Jordanian, and that -- and a passport.  I mean, and a

19    birth certificate.

20          And this is interesting -- it's important to note for

21    two reasons.  Not only county defendant potentially frustrate

22    the Government's ability to prosecute him by fleeing the

23    jurisdiction, but within the conversations he had with the

24    undercover, he has indicated his desire to travel in order to

25    do a martyrdom operation in the Middle East.  As a matter of

1    fact, suggested that right now, it's very difficult to get into
2    Syria, but he had been talking to somebody else who is not a
3    government agent about how to get into Libya.  Because right
4    now, ISIS in Libya, it's easier to get in there than it is to
5    get into Syria.
6         I do have some things to respond to as to the
7    affidavit itself that, in addition to the fact that his father
8    failed to disclose that he was a Jordanian citizen.  And I'll
9    leave that until Mr. Shanker proffers it.
10         THE COURT:  Mr. Shanker?
11         MR. SHANKER:  Yes, your Honor.  And I do want to point
12   out, it's true that we didn't put that in there, but I never
13   even asked him that.  All I asked him was are you a U.S.
14   citizen.  So it's not like he left anything out.  It was --
15   that was drafted with my help, and I just wanted to know that
16   he was a U.S. citizen.  So it's not that he was failing to
17   disclose anything.
18         But your Honor, what's really -- I think we really
19   need to focus on what the charge is here.  The probable cause
20   in the complaint is for possession of a firearm while being an
21   unlawful user of marijuana.
22         This complaint contains these statements, and they are
23   offensive.  And Khalil feels horrible about this, and I'll
24   explain some of the things.  But there is no question that the
25   Twitter liking things on the Twitter, it's awful material, no

DETENTION HEARING - 2/16/2016

```
 1   question, but nothing in here rises to probable cause for any
 2   terrorism offense.  And if --
 3           THE COURT:  I don't, I don't -- that's not the
 4   question in front of me.  He's not charged with a terrorism
 5   offense.
 6           MR. SHANKER:  That's right.  That's right.
 7           THE COURT:  But there is a question whether he pose --
 8   regardless of what the charge is, whether he poses a danger to
 9   the community.
10           MR. SHANKER:  Right.  That's what I'm getting to, your
11   Honor.  This is not a presumption case.  And the Government
12   must establish by clear and convincing evidence that the
13   defendant is a danger to the community and that there are no
14   conditions or combination of conditions that, for release, that
15   will reasonably assure the safety of the community.
16           And I want to tell you a little bit more about Khalil.
17   He's 21 years old.  He's lived his life, for the most part,
18   within the bounds of the law.  He was a marijuana user and he
19   does have the state case now for the gun, so there's no
20   question about that.  But he has no criminal background beyond
21   that.  He's the oldest of six brothers and sisters.  They all
22   live in the home with, with his dad, Ray, who is here in court.
23   And Ray's wife, Hannadi.
24           Khalil is a high school graduate.  He, when he was in
25   high school, he played for the basketball, baseball, football
```

1    team.  He is an extraordinarily -- extraordinary hard worker.

2    He has been working a minimum of 70 hours a week at his

3    father's pizzeria, Ray's.  And he does pretty much everything

4    there from managing to delivering pizzas, to cleaning, to

5    making the food.  So he, he really is a hard working young man.

6    He also has over a year and a half of college at Detroit Henry

7    Ford College.  There hasn't been any problem with him showing

8    up at his court dates.  He's done that.

9          And, your Honor, I want to point out that he purchased

10   the first gun, the .22, because of the danger that he was

11   encountering at work.  He -- they have no Plexiglass protection

12   shield at their restaurant.  And they have had all kinds of

13   threatening people come in there.  He's also been sent to

14   locations that are completely blacked out and there's no street

15   lights.  And there is -- he's truly afraid of what might

16   happen.  And this was, this was his -- he wanted to get this

17   gun for self-defense purposes.

18         And this is not a gun that is used by a terrorist.

19   This is a, it's a double action -- a single action, six -- it

20   only holds six shots.  Each bullet has to be fed into the

21   chamber individually.  And every shot, you have to cock the

22   hammer back and then pull the trigger.  This is -- it's

23   basically the least effective bullet.  It's the smallest bullet

24   that is made for a gun.  It's the slowest to load, it's the

25   slowest to shoot.  When you look at information on this gun,

1    it's, it's recommended for shooting rabbits, for plinking and

2    for Boy Scout target shooting.  This is not the kind of gun

3    that somebody who is a terrorist gets.

4          Now, he, he -- and I would also add that when he tries

5    to buy the second gun -- he is arrested on October 7th.  That's

6    two days after he gets the gun.  And so that gets, that gets

7    seized.  And his dad says to him, look, if you want to own a

8    gun, you need to know the laws, the concealed carry laws

9    because that's why he had the gun in the car and he shouldn't

10   have had it there.  And so the dad said look, you're going to

11   have to take a class and you're going to have to learn how to

12   do this properly.  And so what happened with the second gun was

13   purely Khalil trying to get a gun and go through the concealed

14   carry class and get the license so that he was properly

15   licensed.

16         Your Honor, what happened after that in December is --

17   and I don't want to underemphasize how important what a huge

18   event it was when Khalil was arrested, in his house.  This is

19   an Islamic family.  You do not smoke marijuana.  He -- the

20   father found out that he was smoking a lot of it.  He was now

21   arrested.  This was a sea change in their household, and he was

22   ashamed.  Khalil was ashamed this had happened.  And he was

23   very depressed about that, and he was very vulnerable at that

24   time.

25         And, and, you know, I think it's interesting that law

```
 1    enforcement talks about trying to build bonds with the Islamic
 2    community here in Detroit.  They talk about it.  But this would
 3    have been a perfect time to simply go to Ray, to the dad, and
 4    say we've seen his horrible Twitter feed; keep an eye on this
 5    and make sure that it stops now.  But rather than doing that,
 6    they took advantage of this young man, and they inserted an
 7    undercover agent.  Her name was Jannah Bride.  Jannah, in
 8    Arabic, means paradise.  Coincidentally, Rayyan, in Arabic
 9    means door to paradise.
10          The entire discussion in the family after his arrest
11    was you need to get married, you need to settle down, you need
12    to have a family.  And so that was what he was intent on doing.
13    And so this undercover agent contacted him and started
14    communicating with him.  Her story was that she was a
15    19-year-old Iraqi Muslim who lived in Detroit, a Sunni Muslim.
16    She said that she was not only an ISIS -- an ISIL supporter,
17    but she was willing to die in a martyrdom operation.  She also
18    said that the Shiite militia in Iraq had killed her two cousins
19    in Ramadi and she was basically suicidal.  She told Khalil that
20    she had had a husband, and that he had fought for ISIS in Syria
21    and was killed by an enemy air strike.
22          And everything, everything that came after that, was
23    about Khalil trying to say what he thought she wanted to hear.
24    All he wanted -- whenever he tried to say, Jannah -- and he
25    said multiple times I don't want to hurt anyone.  And then that
```

1   would be met with silence or basically contempt.  She would say

2   you're a fake.  You're not who you said you were.

3           She told Khalil that her parents had pulled her out of

4   school, that she was very alone and that she basically wanted

5   to kill herself.  And Khalil would say things to, first of all,

6   to talk like a big shot like he was fearless, like he was, you

7   know, a real ISIS warrior, a warrior on behalf of Islam.  But

8   then he would also try, whenever he tried to say that he

9   doesn't want to hurt anyone, he wants to marry her, he wants to

10  -- he loves her, that was when she would give him resistance,

11  and basically call him a fraud.

12          So this, this is a situation where, your Honor, he was

13  truly manipulated over these two months at a very vulnerable

14  period.  And the irony here is, you know, he's seduced, he's

15  manipulated and they tried to radicalize him.  And by

16  "radicalize," I don't mean looking at videos on Twitter.  I

17  mean going out and hurting somebody.  And he never did it.  He

18  never did anything.  He never did it.  And the closest thing in

19  that affidavit is the paragraph about him loading up his car

20  with -- and he told the undercover that it was an AK-47, that's

21  not included in the complaint, but that's what he told the

22  undercover.  He told her that he had ammunition, AK-47 ammo,

23  and a mask, and his dad found it.

24          Well, his dad has submitted this affidavit.  And the

25  point on the affidavit is not whether he's a Jordanian citizen.

DETENTION HEARING - 2/16/2016

37

```
 1    It's that that never happened.  That never happened.  And they
 2    executed, the Government executed search warrants.  And did
 3    they find an AK-47?  No.  Did they find ammo?  Did they find
 4    any ammo?  They found one box of .22 ammunition.  There's no
 5    AK-47 or AR-15 ammo there.  Did they find explosives or
 6    explosive materials, or any of those things?  None of them.
 7    They didn't find any of those things.
 8           The point of this is, your Honor, his words are
 9    horrible.  He feels horrible.  I mean, one of the first things
10    he said to me was I'm so sorry to, to the people in the
11    community, to my family, to, to everybody that I've brought
12    shame on, and for the horrible things that I've said, but they
13    were words, they were words.  And there's a huge divide, a
14    great divide between words and action.  And that's we have the
15    First Amendment.
16           And I'm not saying that this is some high point of
17    First Amendment speech, but he was talking because he was
18    trying to impress her, because he loved her.  He -- I don't
19    know if I've seen this before, but he actually proposed to her
20    multiple times.  And what I think is interesting, in these
21    conversations that have been outlined for the Court, they left
22    off the conversation that was had with Khalil the night before
23    the arrest.
24           The night before the arrest, the undercover brought up
25    the church shooting again.  She said whatever happened to that.
```

1   And Khalil said, I don't want to hurt anybody.  My dad has been

2   on my ass, basically, and I don't want to do it.  I don't want

3   to hurt anybody.  What I want to do is marry you and have a

4   family and -- but just as every other time that he said that,

5   she would say -- she basically said no.  She said you're a

6   fraud.  You're not who you said you were.

7          So, your Honor, when you look at the totality of this,

8   there's a reason why that there is not a complaint for a

9   terrorism charge here.  And I mean this was -- they were

10  talking every day.  This is -- if this is their, this is their

11  greatest hits, and they are bad, believe me, that they have

12  selected here that they have put in front of you.  I agree with

13  that.  But they talked every day either by texting or a few

14  times on the phone.  And I would point out that, in one of the

15  conversations in December, Khalil said, "I don't want to hurt

16  anyone."  And she called him a fraud.  And they basically, in

17  terms of a social, a social media relationship, broke up, for

18  whatever -- I guess that's the best way to put it, they broke

19  up.  They stopped communicating.

20         A few days later, two to three days later, Khalil gets

21  a Twitter message with a broken heart on it and it's from

22  Jannah Bride, and she says, "Why are you abandoning me?"  This

23  is somebody who was suicidal.  And so Khalil felt I've got to

24  get back in and talk with her again.  And so, and so it goes.

25  It continued from that point.

DETENTION HEARING - 2/16/2016

39

```
 1              The mask that was seized was found at the restaurant.
 2    It is a red devil mask made of, I believe it's like rubber.
 3    That mask is -- has been sitting in the store for years.  For
 4    six to seven years, Ray, on Halloween, puts that on and passes
 5    out candy to the kids.  That is not a military style mask for
 6    going to commit a shooting.  He never took any substantial
 7    steps toward, toward doing anything to hurt anybody.
 8              Your Honor, I would like to tender this affidavit,
 9    because it's also, I have it marked as Exhibit A.  In addition
10    to responding to paragraph 23, which I do think is the most
11    damaging in there, Ray, his father, says he will abide by any
12    conditions this Court sets.  They'll remove Internet from their
13    house.  They will take him to any mental health examinations.
14    And I heard the Government say that, well, the impediment to
15    him getting help was his dad.  That's just not true.  He's
16    heartbroken about what's been going on, and he'll do anything
17    to help his son get healthy, to help him get healthy.  So any
18    conditions that this Court set, he would act as a third-party
19    custodian.
20              Your Honor, there is so much to, in this affidavit, to
21    show that he was lying and boasting.  He told her that -- he
22    told Jannah Bride, that he owned an AK-47 with a 40-round
23    magazine.  That's false.  That was never found.  There are no
24    records to substantiate it.  It's not there.  It was made up.
25              He told her that he was going to shoot up the church
```

1    but his dad found all these items.  That's not true.  We know

2    that from the dad, and we know that from what was seized, the

3    result of the, of the search warrants.  And I want to tender

4    those, these are the warrants and the returns.  This is Exhibit

5    B, your Honor.

6          He also said on this whole, this beheading thing that

7    he said that he carries a large knife or sword in his car for

8    the purpose of beheading attackers.  Your Honor, they never

9    found a large knife or a sword.  They found a pocket knife with

10   a blade between 2 to 3 inches.  He was boasting.  He was trying

11   to impress her.  He was trying to help her.  He was trying all

12   these different things.  And, you know, what?  He's a confused

13   young man, but there are conditions that can be set for him to

14   be released on bond in this case, your Honor.

15         THE COURT:  Let me ask you a question before you go

16   onto conditions.  When we were dealing with the competency

17   issue, Mr. Waterstreet proffered some information, it was kind

18   of troubling concerning his mental health, concerning voices,

19   concerning Shaytan telling him to do horrible things.  And how

20   do you answer that in terms of conditions that would satisfy me

21   that he's not going to act on those voices?

22         MR. SHANKER:  I think you could order mental health

23   treatment, again, it can be rigorous and set up through

24   Pretrial Services, both mental health treatment and mental

25   health counseling both.  And his dad can make sure that he goes

DETENTION HEARING - 2/16/2016

41

```
 1    from one place to the other, and then back home.  This can even
 2    be a house arrest situation, if your Honor prefers.  A GPS
 3    would be there to make sure that he is watched every step of
 4    the way.
 5           But he's lived here his whole life, Judge.  He was
 6    born in Detroit.  He's grown up in Dearborn Heights.  He's
 7    lived there -- your whole life?  His whole life.
 8           He's had a -- this has been a troubling path for him,
 9    but locking him up pending resolution of these charges is going
10    to be even more damaging to him.  And I do think that there are
11    conditions available in this non-presumption case for him to be
12    released under those very stringent conditions.
13           THE COURT:  Okay.  Thank you, Mr. Shanker.
14           Briefly, Mr. Waterstreet?
15           MR. WATERSTREET:  Yes, your Honor.
16           If I may, I'd like to respond to the affidavit.  And,
17    you know, whenever anybody ever files an affidavit, I guess the
18    lawyer in me doesn't only read what's in there, but also reads
19    what's not in there when he has the opportunity to sit down
20    with an attorney and go overall the facts and circumstances
21    surrounding the case, what he thinks the Court should know
22    about his son in order to perhaps give a favorable resolution
23    to this case.
24           What he does not say in here, what he does not
25    repudiate in any portions of the affidavit was his son's
```

```
 1    expressed interest to beheading somebody.  Never once says I
 2    read that in the affidavit and I have never heard my son say
 3    anything like that.  Nothing like that has ever been discussed
 4    in our family; that that is --
 5              THE COURT:  I don't think there's a factual issue as
 6    to whether those things were said.
 7              MR. WATERSTREET:  Excuse me?
 8              THE COURT:  I don't think there's a factual dispute as
 9    to whether those things were said.
10              Am I right?
11              MR. SHANKER:  That's right.  I mean, it's either
12    recorded or it's transcribed that that wasn't --
13              THE COURT:  And you're not arguing that he didn't say
14    those things?
15              MR. SHANKER:  No, I'm not.
16              THE COURT:  Okay.  Go ahead, Mr. Waterstreet.
17              MR. WATERSTREET:  And which I guess goes to the,
18    perhaps the question he is suggesting that his father would be
19    a good, good custodian, because apparently if this is something
20    that was in fact said, his dad is not denying it.
21              His father did not repudiate that his son supports
22    ISIS.  And he did not repudiate that his son has watched videos
23    of burning fighter pilots and beheadings and throwing people
24    from high rise buildings, and photos of his son with a gun --
25    his son, with his finger, index finger pointed to the sky
```

1  indicating his support of ISIS.  None of that is in the

2  affidavit.

3        He didn't repudiate his son's desire to attack and do

4  a terrorist or martyrdom operation, or his son's interest in

5  doing a martyrdom operation at a hospital to kill a police

6  officer, his son's interest in killing -- killing people.  He

7  didn't repudiate the fact that his son bought a 6-shot revolver

8  or his son tried to re-arm himself after he was arrested with

9  the Detroit Police Department, and that his son lied when he

10  tried to re-arm himself.

11        He didn't repudiate anything about his son having

12  mental health issues and that the Government had concerns about

13  his mental health, despite the fact I told Mr. Shanker shortly

14  after his arrest that that was a grave concern of the United

15  States.  And I even read the portions in which the defendant --

16  at this point, Defense Counsel has not even repudiated the fact

17  that he is hearing voices of Shaytan talking to him, telling

18  him what to do.  And there's no suggestion whatsoever by the

19  recommendation -- by the argument of defense counsel that this

20  undercover suggested that you have these voices.

21        These are his own thoughts and processes explaining

22  why he thinks the way he does.  And the interesting thing is

23  about is defense suggested that the father found out that he

24  had a drug problem.  Well, according to the defendant himself,

25  and family members, he's been smoking marijuana on a daily

1  basis since he was about 14 years old.  And for dad just to

2  find out just a few months ago is one of two things:  Either

3  dad doesn't want to know or choose -- you know, doesn't want to

4  know or just simply so out of touch what's going on in his own

5  house.

6            Another interesting thing is and, Judge, I'll have to

7  admit I'm getting a little bit older, but I'm trying to think

8  back of when I was dating and trying to pick up women and

9  trying to find the love of my life and my soulmate.  I don't

10  recall suggesting to them how much I loved beheading people,

11  how much I want to kill people, how much I want to skin them

12  like sheep.  If what he, defense counsel says is true, he was

13  looking for -- his family told him he needed to settle down.

14  He was reaching out to somebody who he thought was a

15  like-minded individual.  Somebody who wanted to do a martyrdom

16  operation.  Someone who wanted to, to kill Shiites.

17            And oddly enough, he showed us that's exactly what he

18  wanted to do, because several months before he had any contact

19  whatsoever with the undercover agent, he was posting to total

20  strangers videos, ISIS videos in which he "liked" them and said

21  made his day, and as a matter of fact he watched it five times.

22            This is not a person who this Court should take a risk

23  with the mixture of mental health issues, guns, ISIS support,

24  and being a drug user.  A combination of those four things, I

25  think, is a horrible mixture for this Court to go on this

```
 1   defendant's word and his father's word, that he'll, he'll make
 2   sure this time I'll keep a good eye on him.  And those voices
 3   that he hears, his dad will stop him from acting on those
 4   voices.
 5           Thank you.
 6           THE COURT:  Okay.
 7           MR. SHANKER:  Your Honor, can I just -- I just want to
 8   respond to two things.
 9           THE COURT:  Very briefly.
10           MR. SHANKER:  Very briefly, your Honor.
11           I just, on behalf of Ray's family, I want to point out
12   they are so anti-ISIS, I don't know how else that I can
13   describe it.  I mean, they think it's disgusting and it's
14   repulsive.  And they are -- they are peaceful Islamic
15   worshippers, and this is not at all what they believe.
16           Secondly, Khalil has never had -- he's never had a
17   girlfriend.  He's never even been touched by a girl in, you
18   know, like a boyfriend/girlfriend situation.  He is clueless,
19   frankly.  And when he was talking with this woman, she was
20   expressing her desire to kill and to be in a martyrdom
21   operation, and that that was the kind of bravery that she was
22   looking for.  And so he joined in.  That's what happened.  But
23   he is not a violent person.  He's not a violent person.  He has
24   a horrible -- he needs help, but he doesn't need to be locked
25   up right now while he is still presumed innocent.  And there
```

```
 1      are reasonable conditions that are out there for his release.

 2              Thank you, your Honor.

 3              THE COURT:  Okay.  Thank you.

 4              All right.  Just to start off, a couple of words about

 5      Mr. Abu-Rayyan's father's affidavit.  I don't think it was

 6      incumbent on his father to confirm or deny various facts.  In

 7      fact, those facts are not in contention, other than the

 8      situation where Mr. Abu-Rayyan said that he wasn't able to

 9      carry out this church shooting because his father found the

10      guns.  He says that didn't happen.

11              Secondly, frankly, I don't have any reason to believe

12      that Mr. Abu-Rayyan's father or his family are anything other

13      than good citizens.  They are not, they are not trial here.

14      They are not charged with anything.  Mr. Shanker, I'll take

15      your representation at face value.

16              What I have to deal with is Mr. Abu-Rayyan.  He's a

17      young man, as you pointed out, no criminal, serious criminal

18      history.  I mean, I suppose you think about the San Bernadino

19      situation, there was an individual who didn't have any criminal

20      history either, who is, to all appearances a good, hardworking

21      member of the community.  And I'm not visiting the sins of San

22      Bernadino on Mr. Abu-Rayyan, but I just point out that that's

23      not -- the fact that he has no criminal record is not

24      dispositive of this case.

25              Let's get to what is dispositive of this case.  And,
```

DETENTION HEARING - 2/16/2016

47

```
 1    you know, whether or not the undercover agent in this, in this
 2    case went off the rails, went overboard, that's -- we can have
 3    another conversation at another time about that.  But we do
 4    have online activity by Mr. Abu-Rayyan that predates the
 5    undercover agent's participation, and it's, it's disturbing.
 6    Is it against the law?  No.  But it speaks to, I think, a
 7    propensity to radicalization that too often we see among young
 8    men like Mr. Abu-Rayyan, who apparently suffers from, I'm not a
 9    diagnostician, but certainly depression, possibly Bipolar,
10    possibly something else.  I'm concerned about the hearing of
11    voices from Shaytan.  I'm concerned about the readiness.
12           And you know, the statements he made to the undercover
13    agent may have been partly to impress a girl he was in love
14    with, I don't know.  If I was going out with somebody and they
15    started talking about killing people and beheading people, I
16    think I would run real fast in the other direction, but that's
17    just me.  But there was a predisposition and there was a real
18    readiness.
19           And then he has some statements, and these are
20    statements from Mr. Abu-Rayyan's own mouth.  Not only the
21    expression of support for ISIL, even before he made the
22    acquaintance of the undercover agent.  The situation about the
23    church.  There was -- maybe there was no gun.  Maybe there was
24    no AK-47, but there was an expression of an intent.  There was
25    an expression of -- I saw these pictures in Government's
```

1    Exhibit 4 and 5, the expression of Sahwat hunting.  There was

2    an expression of an intent to harm to the officer that had

3    arrested him who was in the hospital.  There was the relish

4    with which he views and likes ISIL videos.  There is, again,

5    overlaying this are, what appear to be some psychological

6    issues.

7            So ultimately, I look at all of this and I say, okay,

8    in light of all of this, are there conditions that I could set

9    that would reasonably assure the safety of the community.

10           There's a flight issue in that he expressed some, some

11   interest in possibly joining ISIL; if he couldn't do jihad

12   overseas, he would do it here.  There's a Jordanian passport

13   issue.  Quite frankly, in terms of flight risk, I think that

14   there probably would be conditions that I could set that would

15   assure him to appear as required, however, but that's a close

16   question.

17           What I don't think is a close question is I don't

18   think there are conditions I could set that would reasonably

19   assure the safety of the community.

20           I can't -- Mr. Shanker, you may be absolutely right.

21   You may be -- this all may be a bunch of boloney he was feeding

22   to a girl.  But I go on statements that he made, I go on the

23   facts that are before me.  And based on those facts, I think it

24   would be a mistake for me to find that there were conditions I

25   could set.

 1              I feel that the Government has carried its burden by

 2     clear and convincing evidence that there are no conditions that

 3     would reasonably assure the safety of the community.  On that

 4     basis, I'll order Mr. Abu-Rayyan detained.

 5              Let me also say I feel bad for his family, I do.  But

 6     you have to -- I'm entrusted with these decisions to make sure

 7     our community is safe.

 8              Let me also say this also, Mr. Shanker.  A lot of

 9     discussion, we've got a lot of discussion about mental problems

10     about whether some evaluation and treatment is necessary.  If

11     there is -- if he's going to be in Marshals custody, I'm not

12     sure where he's going to be housed, but he's entitled to, and I

13     believe requires a health evaluation, both a physical health

14     evaluation and a mental health evaluation, and that he requires

15     and is entitled to any treatment that is deemed medically or

16     psychologically necessary.

17              So, Mr. Shanker, you'll follow up on that.  If there

18     is a problem in that regard, let me know and I'll do an

19     appropriate order.

20              MR. SHANKER:  Absolutely, your Honor.  Thank you.

21              THE COURT:  Thank you.

22              Preliminary examination?

23              THE CLERK:  February 18th, Thursday, at one p.m.

24              MR. SHANKER:  Okay.

25              THE COURT:  Oh, and Mr. Abu-Rayyan, I'll also advise

1    you that my decision to detain you is appealable to the

2    presiding judge, which I believe is Judge Lawson.  Am I right?

3              MR. WATERSTREET:  Yes.

4              MR. SHANKER:  Yes, your Honor.

5              THE COURT:  Okay.

6              THE DEFENDANT:  Your Honor, can I hug my father?

7              THE COURT:  I'm going to leave that to the discretion

8    of the Marshals.

9         (Proceeding concluded, 4:44 p.m.)

10

11                         *      *      *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **CERTIFICATE OF REPORTER**

2

3          I certify that the foregoing is a correct transcript

4    from audio recorded proceedings in the above-entitled cause on

5    the date hereinbefore set forth.

6

7

8                         s/ Christin E. Russell

9              CHRISTIN E. RUSSELL, FCRR, RMR, CRR, CSR-5607

10                   Federal Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25