UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,                  Cr. No. 16-20098

 v.

                                        Hon. George Caram Steeh

KHALIL ABU RAYYAN,

               Defendant.

_____/

## MOTION FOR DISCOVERY

Khalil Abu Rayyan, by his attorneys Todd Shanker and Benton Martin of the Federal Defender Office, respectfully asks this Court to direct the government to provide the defense with discovery in compliance with Federal Rule of Criminal Procedure 16 without requiring a protective order. The government and its agencies have publicly disclosed terrorism allegations against Mr. Rayyan, a U.S. citizen, despite no formal charges and have portrayed Mr. Rayyan as a mentally ill terrorist with excruciating detail.[1]  Nonetheless, the government now refuses to turn over all of the interactions between the undercover employee (and likely other confidential informants and/or undercover employees/agents) and the defendant. And with

_____

[1] Despite the Government's portrayal, Dr. Lyle D. Daniloff, Ph.D., P.C., who has examined Mr. Rayyan, found that he does not exhibit symptoms of any psychological disorder or deficit, and possesses a "very low" level of dangerousness. See Summary of Report Conclusions, 3/25/2016, R. 48-2, Pg ID 208.

extraordinary audacity, the Government has essentially asked defense counsel to conduct his client's defense in secret, with all filings under seal, as a quid pro quo for the release of unredacted discovery.

What is clear from the communications received thus far is that the undercover agent held herself out to be a 19 year-old Sunni Muslim named Jannah Bride, who was depressed, suicidal, and prepared to engage in a martyrdom operation. Her background story was that she had a former husband, Ahmad, who was killed in an airstrike while engaged in combat on behalf of ISIL in Syria; she also claimed to have had two cousins killed in Iraq by the Shia Militia. The defendant naively said things—untrue statements and boasts in which he tried to exhibit similar convictions as the young girl—that he thought would further a love relationship with her and eventually a marriage.

As the government knows, and as the charges in the case reflect, Mr. Rayyan never took any steps to actually hurt anyone or to materially support a terrorist group, and Mr. Rayyan's words were prompted by the manipulation of the UC. The government's refusal to provide timely discovery – we are now well over a month past Mr. Rayyan's arraignment, as well as its request for a protective order without providing any basis for such, is unreasonable, unnecessary, and contrary to the law.

In support of the motion, Mr. Rayyan states the following:

1.     Mr. Rayyan is charged in a two-count Indictment with making a false statement to acquire a firearm, 18 U.S.C. § 922(a)(6), and possession of a firearm by a prohibited person, 18 U.S.C. § 922(g)(3). (R. 23, Indictment, Pg ID 43–44.)

2.     Mr. Rayyan is not charged with any terrorism-related charges, but the complaint makes numerous mentions of Mr. Rayyan's social media postings and communications related to ISIL. (R. 1, Compl., Pg ID 2–8.) Mr. Rayyan's comments during these communications were already used against him at the detention hearing in this case and in the government's two motions for a competency examination of the defendant.

3.     Counsel's investigation has revealed that the FBI used extraordinary tactics to manipulate Mr. Rayyan during its surveillance of him from May 2015 to February 2016. During this surveillance, the FBI contacted Mr. Rayyan through the aforementioned undercover employee posing on Twitter as a 19 year-old Sunni Muslim who was depressed, suicidal, and prepared to engage in a martyrdom operation. Mr. Rayyan repeatedly asked the undercover employee to marry him and professed his love to her numerous times.

4.     As part of its discovery obligations, the government has turned over the redacted content of some of the conversations between Mr. Rayyan and the undercover employee. But a large amount of information remains undisclosed. In particular, the records provided to defense counsel date back only to December 23,

2015, and they appear to have been conducted on a single service named "Surespot." But Mr. Rayyan's communications with the undercover FBI employee pre-dated December 23, 2015, and were not limited to Surespot. During this period of surveillance, Mr. Rayyan may have also communicated with the undercover FBI employee using his personal telephone accounts with AT&T and Metro PCS, and the electronic-messaging services on websites Skype, Facebook, Twitter, and Telegram.

5.     Moreover, there appears to be problems with the integrity of the portions of these conversations that have already been turned over. In particular, there are two copies of one of the exchanges between Mr. Rayyan and the undercover employee. Messages that are contained in one of the copies are missing in the other. This discrepancy raises serious concerns about the integrity of the other discovery, since there is no obvious way for counsel to discern what content might be missing.

6.     The records of these conversations are clearly material to preparing Mr. Rayyan's defense and are in the custody and control of the government. *See* Fed. R. Crim. P. 16(a)(1)(E). Yet the government has indicated that it will turn over the unredacted contents of these communications only if the defense agrees to conduct this portion of the case under protective order.

7.     Additionally, the Government has stated repeatedly to defense counsel that the undisclosed discovery (as opposed to the unredacted discovery) is not being

released from the case agents to the prosecutor himself, yet another important concern that may warrant a court order.

8.      To justify entry of a protective order, the government must show good cause. *United States v. Stone*, No. 10-20123, 2012 WL 137746, at *2 (E.D. Mich. Jan. 18, 2012). The government fails to meet this burden. It has not put forth any national security concerns or contended that this case involves "classified information" under the Classified Information Procedures Act. Rather, the government simply states that some of this discovery is "sensitive," without clarifying the harm that would be caused by its disclosure. In fact, at no time has the Government contended that a protective order was necessary due to a danger to any witness or person.  It appears that the government merely wants to avoid the embarrassing revelation of the full extent of the undercover employee's extraordinary efforts to manipulate Mr. Rayyan. "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning do not support a good cause showing" to support a protective order.  *Stone*, 2012 WL 137746, at *2 (quotation omitted).

9.      As a basic, fundamental aspect of required disclosure under Rule 16, counsel respectfully requests the court to order the Government to turn over all interactions between all undercover agents or informants (UC or CI) and the defendant, no matter the medium or the social network platform, and all other discovery in accord with Rule 16.

10.     Counsel for the defense sought the concurrence of the government yesterday evening but had not heard back from the government by the time of filing of this motion.

Accordingly, Mr. Rayyan respectfully asks that this Court to require the government to produce the discovery in this case, including unredacted copies of any and all communications between Mr. Rayyan and undercover law-enforcement employees, whether agents or informants, pursuant to Rule 16 without a protective order.

Respectfully submitted,

FEDERAL DEFENDER OFFICE
LEGAL AID & DEFENDER ASSN., INC.

/s/ Todd Shanker
TODD SHANKER
todd_shanker@fd.org
(313) 967-5879

/s/ Benton C. Martin
BENTON C. MARTIN
benton_martin@fd.org
(313) 967-5832

Attorneys for Khalil Abu Rayyan
613 Abbott, Fifth Floor
Detroit, MI  48226

Dated:   March 29, 2016

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,                    Cr. No. 16-20098

 v.                                        Hon. George Caram Steeh

KHALIL ABU RAYYAN,

               Defendant.

_____/

**BRIEF IN SUPPORT OF**
**<u>MOTION FOR DISCOVERY</u>**

**Background**

The government and its agencies have publicly disclosed terrorism allegations against Defendant Khalil Abu Rayyan despite no formal charges. Throughout its filings, and in open court, the government has portrayed Mr. Rayyan as a mentally ill terrorist with excruciating detail.[2] In particular, in the complaint and at the detention hearing, the government emphasized inflammatory social media postings and communications related to ISIL.

Counsel's investigation has revealed, however, that the FBI used extraordinary tactics to manipulate Mr. Rayyan during its surveillance of him from

---

[2] Despite the Government's portrayal, Dr. Lyle D. Danuloff, Ph.D., P.C., who has examined Mr. Rayyan, found that he does not exhibit symptoms of any psychological disorder or deficit, and possesses a "very low" level of dangerousness. See Summary of Report Conclusions, 3/25/2016, R. 48-2, Pg ID 208.

1

May 2015 to February 2016. During the surveillance, the FBI contacted Mr. Rayyan through an undercover employee posing on Twitter as a 19 year-old Sunni Muslim who was depressed, suicidal, and prepared to engage in a martyrdom operation.[3] Her background story was that she had a former husband, Ahmad, who was killed in an airstrike while engaged in combat on behalf of ISIS in Syria; she also claimed to have had two cousins killed in Iraq by the Shia Militia.

The defendant naively said things—untrue statements and boasts in which he tried to exhibit similar convictions as the young girl—that he thought would further a love relationship with her and eventually a marriage. He repeatedly asked the undercover employee to marry him and professed his love to her numerous times. Even after the defendant tried desperately to prevent "Jannah" from killing herself or hurting others, and making clear that he wanted no part of such activities – that what he wanted was a wife and family – the Government continued to use "Jannah" to manipulate the defendant emotionally.  The Government even fabricated sudden, tragic killings in "Jannah's" family at the hands of the Shia Militia in a cold, cynical attempt to radicalize Mr. Rayyan to act on behalf of ISIL.

As part of its discovery obligations, the government has turned over the redacted content of some of the conversations between Mr. Rayyan and the undercover employee. But a large amount of information remains undisclosed.

_____

[3] The Government has refused to disclose whether other undercover employees or confidential informants were used against the defendant.

In particular, the records provided to defense counsel date back only to December 23, 2015, and appear to start in the middle of a conversation. It is clear Mr. Rayyan's communications with the undercover FBI employee pre-dated December 23, 2015.

The discovery also only reveals communications on a single service named "Surespot." But Mr. Rayyan's conversations with the undercover employee were not limited to Surespot. During this period of surveillance, Mr. Rayyan communicated with the undercover employee using the electronic-messaging services on Skype and Twitter and may have also used Facebook and Telegram. The government has indicated that it will not turn over unredacted copies of these communications without a protective order.

Despite publicly portraying Mr. Rayyan as a mentally ill terrorist, the government now seeks for his defense to be conducted in secret. In particular, the government refuses to provide Mr. Rayyan's counsel with the unredacted communications between the undercover employee and Mr. Rayyan without a protective order requiring that all pleadings including sensitive information be filed under seal in their entirety. The government has proffered no reason for this broad request apart from the bare assertion that some of the discovery contains "sensitive" material. This request is unreasonable, unnecessary, and contrary to the law.

The importance of full discovery is shown by the communications already disclosed to defense. Throughout the conversations, the undercover employee

promotes jihad and made efforts to get Mr. Rayyan to agree with her plans. She made

frequent mention of Ahmad, her fictitious deceased husband. Early on, on December

23, 2015, she begged Mr. Rayyan to promise not to tell anyone about her and warned

him he would "burn in hell" if he broke that promise. (Exhibit A, Bates Stamp 3150–

55.) These conversations show Mr. Rayyan attempting to alleviate the undercover

employee's expressions of severe depression and suicidal thoughts. As an example,

on December 26, 2015, the following conversation took place (the undercover

employee is designated as "UC"):

> Rayyan:   Are you still depressed
> If your happy i am happy..if you are sad i am sad
> Have sabr *[patience]*...good things are coming to you Inshallah *[if God is willing]*
>
> UC:   It comes an goes
> But mostly I'm sad
>
> Rayyan:   ☹ it will be ok..i wish i could take you away from this sadness
> I think about you alot wallah *[I promise]*
> I make dua *[prayers]* for you..i pray alot for your happiness
> Sometimes i think i see you in my dreams
> Everything needs sabr
> Its a test for you.
>
> UC:   I have sabr inshallah
> How about you what do you want from this Dunya *[temporal world]*?
>
> Rayyan:   **Honestly to get married i think if i get married i will be happy**
> **Im just lonely sometimes**
> **I want to start a family**
>
> UC:   What about the akhera *[afterlife]*

Rayyan:  What about you?

UC:      ?
         I want to leave this Dunya I don't want to get married

Rayyan:  Inshallah i want to be in
         [Redacted] its going to be fine..you cant just give up
         Shaytan wants us to be depressed
         I know your life must be hard
         But i think if you found someone who will make you happy your life will change
         Its sounds to me your lonely

UC:      Yea and **I have no desire for life**
. . . .

Rayyan:  Dont you want to have children and watch them grow up
         Thats probably the best feeling

UC:      Honestly no

(Exhibit B, Bates Stamp 3203–09, 3218 (emphasis added).)

As an example of the undercover employee expressing her desire to die for the sake of Allah, the following conversion took place on January 25, 2016:

UC:      I didn't love Ahmad like that Khalil I loved what he did and how brave he was I loved the daily life and I wanted to be the woman sharia police it was my dream
         And now uqsem Be Allah **if dawlah asks for my life I would give it up in a heart beat** *[ISIS is also referred to as ad-Dawlah al-Islamiyah]*

Rayyan:  Your young and confused

UC:      This is truly how I feel and I never told anyone but Ahmad and sister um Maria and now you

Rayyan:  I don't think you know what you want

5

UC:      **I want to die for the sake of Allah** I don't want this dunya *[temporal world]*
I don't want to be a munafiq *[hypocrite]*
Seeing my sisters and brothers and young women die in Syria and Iraq like that

Rayyan:  You want these things..but how are you going to do it is the question
One person cant change the Ummah *[term for community]*

UC:      I don't know yet
But I want to do it with you

Rayyan:  You probably will never do these things [REDACTED] im being honest

. . . .

Rayyan:  If we cant go will you leave me

UC:      No

Rayyan:  Easier said than done i guess

UC:      May Allah help us both to do what's right and what he asks of us inshallah
😄

Rayyan:  I think you need someone in your life..you are alone and sad...you sit at the house all day and you mind goes crazy

UC:      I'm not crazy Khalil it's my iman *[faith]*
It's what I believe in
**Jihad is my dream**
Are feeling okay?
I will go to sleep and wake up at fajr *[dawn]* to make salat and du'a *[prayers]* for us
😄

Exhibit C, Bates Stamp 3029–34, 3061–70 (emphasis added).

Mr. Rayyan repeatedly hinted at or asked the undercover employee to marry him and made up stories that he thought would impress her. One example is conversation from December 27, 2015, during which the two discussed Rayyan's earlier engagement to a women he met online, and during which Rayyan made up a story about being wrongfully accused of murder:

UC:       First time I talk to a guy after ahmad

Rayyan:  Its like i knew you all my life
         I will ask you [to marry me] but not now

UC:       Please don't rush me
         I'm depressed and very scared

Rayyan:  Im not thats why i will wait..

UC:       Of this dunya *[temporal world]*

Rayyan:  Dont be scared its fine to feel like that
         But i can promise you that i would make you happy in this dunya
         And the akhira
         Depression is real..but dont let it run your life
         Imagine sitting in jail for 3 months for something you didn't do.that
         is what happened to me

UC:       Wow
         That's very hard

Rayyan:  And nobody is taking you against your will
         I look at people's problems and i tell them they have if it easy
         I didn't do it Jannah..
         They thought i killed someone they just put me in jail with no court
         or anything..then they let me go

UC:       Subhanallah alhamdulelah *[Praise God]* they let you out

Rayyan:  That ruined my life..the things i seen no eyes should see it

That's why your problem is not that big of a deal [REDACTED] i
was all alone in there
I am here for you
Thats why you will be ok

UC:     You are very tough
        Mashallah *[thankfulness for person or event]*

Rayyan: Dont be sad..its not like you are in jail for something you didn't do
        🙂

UC:     Lol
        You're right

Rayyan: Just stay positive...Everything will work out

(Exhibit D, Bates Stamp 3272–79.)

Another problem is that the limited discovery already provided to the defense appears to have disturbing integrity problems. As discussed, the defense has received screen shots of the conversations that took place on Surespot on and after December 23, 2015. But portions of these conversations appear to be missing – portions that are obviously favorable to the defendant. For example, the defense received two copies of a December 26, 2015 conversation between the undercover employee and Mr. Rayyan. As shown in attached Exhibit E, crucial messages from the conversation are missing from one copy, without any indication that they have been deleted.

Below are transcripts of the two conversations. In the second transcript, the portions missing from the first copy of the conversation are bolded.

**Incomplete Copy:**

UC:        So you don't want to do anything of what we talked about together?

Rayyan:  No [REDACTED] i cant

UC:        Inshallah *[if God is willing]* may Allah help me

Rayyan:  Like what

UC:        When the time is right inshallah

Rayyan:  Dont do anything

UC:        Inshallah will talk another time

Rayyan:  Ok [REDACTED] i pray for you

(Exhibit E, Bates Stamp 3253.)

**Copy with Additional Information:**

UC:        So you don't want to do anything of what we talked about together?

Rayyan:  No [REDACTED] i cant

           **I want us to be together**

UC:        **I have other plans**

           Inshallah may Allah help me

Rayyan:  Like what

UC:        When the time is right inshallah

Rayyan:  Dont do anything

           **That will hurt u**

**Yourself or other people**

UC:       **I want to go right now please**

Inshallah will talk another time

Rayyan:  Ok [REDACTED] i pray for you

(Exhibit E, Bates Stamp 3237–3239.)

The first conversation not only gives no indication that parts are missing, it also fails to include messages that are helpful to Mr. Rayyan's defense. In particular, the deleted messages show the undercover employee proposing plans, and Mr. Rayyan saying that he wants to be with her. They also show Mr. Rayyan asking the undercover employee not to hurt herself or others. The discrepancies between these two copies of the conversation raise serious concerns about the integrity of the remaining conversations, particularly since there is no obvious way for counsel to tell if parts of a conversation might be missing.

## Argument

Federal Rule of Criminal Procedure 16 "is the primary means of discovery in criminal cases." *United States v. Llanez-Garcia*, 735 F.3d 483, 493 (6th Cir. 2013) The rule "delineates the categories of information to which defendants are entitled in pretrial discovery in criminal cases, with some additional material being discoverable in accordance with statutory pronouncements and the due process clause of the Constitution." *Id.* (quotation omitted).

The conversations between Mr. Rayyan and the undercover employee clearly fall under the materials the government is required to turn over under Rule 16. Rule 16 explicitly covers any relevant written or recorded statement by the defendant that is within the government's possession, custody, or control. Fed. R. Crim. P. 16(a)(1)(B). It also covers any books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and the item is material to preparing the defense. Fed. R. Crim. P. 16(a)(1)(E).

Under Rule 16(d), "[a]t any time the court may, *for good cause*, deny, restrict or defer discovery or inspection, or grant other appropriate relief" (emphasis added). The crux of this rule is that a protective order may be entered only upon a showing of "good cause." *See United States v. Stone*, No. 10-20123, 2012 WL 137746, *2 (E.D. Mich. Jan. 18, 2012). Rule 16(d) does not define "good cause," but courts generally borrow the standard from the civil context. *Id.*; *see also United States v. Morales*, 807 F.3d 717, 723 (5th Cir. 2015). In *Stone*, the court explained what is required to meet this high burden:

> Good cause is established on a showing that "disclosure will work a clearly defined and serious injury to the party seeking closure. The injury must be shown with specificity. Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning do not support a good cause showing."

*Id.* (quoting *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994)). "A finding of harm must be based on a particular factual demonstration of potential

11

harm, not on conclusory statements." *United States v. Smith*, 985 F. Supp. 2d 506, 523 (S.D.N.Y. 2013) (quotation omitted).

"Protective orders are the exception, not the rule, and appropriate reasons must be given for their entry." *Id.* at *3. In particular, blanket protective orders "by their nature are 'typically made without a particularized showing to support the claim for protection, but such showing must be made wherever a claim under an order is challenged.'" *United States v. Williams*, No. 15-10145-RGS, 2015 WL 5923551, at *3 (D. Mass. Oct. 9, 2015). "[I]n determining what degree of protection is appropriate, courts should ensure that a protective order 'is no broader than is necessary' to serve the intended purposes." *United States v. Smith*, 985 F. Supp. 2d 506, 545 (S.D.N.Y. 2013) (quoting *United States v. Lindh*, 198 F. Supp. 2d 739, 742 (E.D. Va. 2002)).

Here, the government has simply not provided much of the discovery related to communication between its undercover employees and/or informants, and the portion of the discovery that has been provided is redacted.  The government has not moved for a protective order, but has refused to turn over unredacted discovery related to the details of the undercover employee's communications with Mr. Rayyan without the defense agreeing to a stipulated protective order. No section of the government's proposed protective order explains the government's need to maintain secrecy of these communications. Nor have defense counsel's conversations with government counsel clarified this issue. It appears that the

government merely wants to avoid the embarrassment of the undercover employee's extraordinary efforts to manipulate Mr. Rayyan seeing the light of day.

A protective order, at a minimum, should delineate the categories of documents that will fall within its purview. *See Tidwell v. Brennan*, No. 14-553, 2015 WL 4092771, *3 (S.D. Ohio July 6, 2015). This principle is important to permit the parties to understand what information is covered by the order, and to challenge the designation of disputed documents. For that reason, courts regularly reject requests for blanket protective orders when, as here, the government fails to pinpoint with particularity the information in need of protection and the harm that would be caused by its disclosure. *See Williams*, 2015 WL 5923551, at *2; *United States v. Garcia*, 406 F. Supp. 2d 304, 307 (S.D.N.Y. 2005) (modifying proposed protective order so it applied only to material raising legitimate witness-safety concern).

Here, the government's proposed order appears to permit the government to designate any discovery as "sensitive" and thus restricted. This broad designation improperly circumvents the government's burden to show good cause, effectively preventing the defense and the court from understanding and challenging the scope of the designation. Moreover, the protective order improperly requires that any pleading that quotes, summarizes, or even refers to the "sensitive" discovery must be filed under seal in its entirety. This requirement runs afoul of the long-established legal tradition of a presumptive right of the public to inspect and copy judicial documents and files. *See In re The Knoxville News-Sentinal Company, Inc.*, 723 F.2d

470, 473–74 (6th Cir. 1983) (citing *Nixon v. Warner Communications*, 435 U.S. 589,

597 (1978)). "Examining a protective order under the framework of Rule 16(d) . . .

does not eliminate the First Amendment as a relevant concern." *Smith*, 985 F. Supp.

2d at 523 (alterations and quotation omitted).

The situation in this case bears striking resemblance to *Stone*. There, the

prosecution alleged, among other things, that the defendants conspired to overthrow

the U.S. government and to use weapons of mass destruction. 2012 WL 137746, at

*1. The government sought a protective order for discovery materials, citing a need

to limit disclosure to third parties and to protect the privacy and security of potential

government witnesses. *Id.* The court rejected the request, emphasizing that the

burden of justifying a protective order rests with the government, and that protective

orders "are the exception, not the rule, and appropriate reasons must be given for

their entry." *Id.* at *2–3. The court then concluded that the government's broad-

stroke security concerns about sensitive information failed to meet "its burden to

show disclosure will cause a clearly defined and serious injury." *Id.* at *2.

In the same way, the government's unarticulated concerns in this case about

potentially sensitive materials fail to meet the good cause standard. Moreover, the

government has indiscriminately thrown damaging information about Mr. Rayyan

into the public record, allowing the media to run wild with the accusations that he is

a mentally ill terrorist sympathizer.  The truth is that the government has subjected

the defendant, a U.S. citizen, to a relentless and cynical emotional manipulation in

an attempt to radicalize a lonely young man who was looking for a wife to start a family.   The government's refusal to turn over unredacted discovery without a blanket protective order covering any material the government labels sensitive is unfounded and in violation of Rule 16(d).

## CONCLUSION

Mr. Rayyan respectfully asks that this Court require the government to produce all of the discovery in this case, including unredacted copies of any and all communications between Mr. Rayyan and undercover law-enforcement employees of any sort, no matter the medium, pursuant to Rule 16 without a protective order.

Respectfully submitted,

FEDERAL DEFENDER OFFICE
LEGAL AID & DEFENDER ASSN., INC.

/s/ Todd Shanker
TODD SHANKER
todd_shanker@fd.org
(313) 967-5879

/s/ Benton C. Martin
BENTON C. MARTIN
benton_martin@fd.org
(313) 967-5832

Attorneys for Khalil Abu Rayyan
613 Abbott, Fifth Floor
Detroit, MI  48226

Dated:   March 29, 2016

## CERTIFICATE OF SERVICE

Counsel certifies that on the above date, the foregoing paper was filed with the clerk of the Court using the ECF system, which will send notification to opposing counsel.

/s/ Benton C. Martin
Attorney for Defendant