UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,
            Plaintiff,

                                          Case No. 16-20098
v.                                        Hon. George Caram Steeh

KHALIL ABU-RAYYAN,

            Defendant.
_____/


GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTION FOR BOND

        The defendant's motion seeking release from detention should be denied as there is clear and convincing evidence that he is a danger to the community based on his expressed support of a designated foreign terrorist organization, his continually voiced desire to engage in a martyrdom operation, his fascination with death and killing, particularly beheadings, his on-going mental health issues, his possession and attempted possession of firearms, his drug use, and his prior assaultive conduct. In addition, there is a preponderance of evidence that the

defendant is a risk of non-appearance because of his ability to obtain a foreign passport, and his statements that he will not go to jail.

## BACKGROUND

On February 4, 2016, the defendant was charged in a complaint with one count of being an unlawful user of a controlled substance in possession of a firearm, in violation of 18 U.S.C. § 922(g)(3). On February 16, 2016, a grand jury returned an indictment charging the defendant with one count of violating § 922(g)(3), and one count of making a false statement to acquire a firearm, in violation of 18 U.S.C. § 922(a)(6). On that same day, Magistrate Judge Whalen held a detention hearing and ordered the defendant detained pending trial on the ground that there was clear and convincing evidence that the defendant was a danger to the community. Among the evidence cited by Magistrate Judge Whalen was: (1) the weight of the evidence of the defendant's gun possession, (2) the defendant's mental health issues, including "that Satan speaks to him and tells him to commit violent acts," (3) the defendant's "expressed support for ISIL" and his "willingness to commit violent acts of jihad, including a mass shooting at a church and beheadings," and his "desire to kill the police officer who arrested him." (R. 22: Detention Order Pending Trial, PgID 42). The defendant did not appeal. Over a month later, the defendant filed the present motion, which requests that this Court release the defendant on bond pending trial.

2

ANALYSIS

The Bail Reform Act (18 U.S.C. §3142) allows the Court to detain a defendant pending trial after the United States demonstrates: 1) by clear and convincing evidence that no release conditions will reasonably ensure the safety of the community, or 2) by a preponderance of the evidence that the defendant poses a risk of flight. *United States v. Stone*, 608 F.3d 939, 945 (6th Cir.), *cert. denied*, 131 S. Ct. 485 (2010). "The factors to be considered are (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the person; (3) the history and characteristics of the person, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *United States v. Sandles*, 2008 WL 345520, *1 (E.D.MI 2008) (Steeh, J.). When the District Court is asked to review a magistrate judge's order of detention, the Court's review is *de novo*. *Stone*, 608 F.3d at 945. The Federal Rules of Evidence do not apply at a detention hearing, *see* 18 U.S.C. §3142(f); *United States v. El-Hage*, 213 F.3d 74, 82 (2d Cir. 2000), and the parties can proceed by proffer. *Stone*, 608 F.3d at 948-49 (conducting a bail hearing by proffer is acceptable under the law); *United States v. Webb*, 238 F.3d 426 (table), 2000 WL 1721060, at *2 (6th Cir.2000) ("[T]he government may proceed in a detention hearing by proffer or hearsay.").

I.   There is Clear and Convincing Evidence that the Defendant
     is a Danger to the Community.

    A.   The defendant supports a designated terrorist organization and has
          continually voiced the desire to engage in a martyrdom operation.

Abu-Rayyan has been expressing his support for ISIL (the Islamic State of Iraq and the Levant) for several years.[1] During the search of the defendant's home, the FBI seized several of his phones. A search of one of the defendant's phones revealed that, as early as July of 2014, he discussed conducting jihad because he believed that Israel was "killing everyone" and that he could not be a bystander to the "genocide."  The defendant sent a text message stating that "the prophet said jihad is what sets you and your family free, the soilders [sic] of Islam is guaranteed [a] place in paradise."  The defendant went on to express that he had a duty to do something in that "I have [a] contract with Allah."

Later, in August of 2014, it appears that a family member warned the defendant about expressing his views online.  Not long after, and clearly contrary to that advice, the defendant sent a message from his phone proclaiming "DAWLAT Al ISLAM …BAQIYAH" (The Islamic State Everlasting) on several occasions. In addition, a review of the defendant's Twitter account, @KhalilRay21, revealed that he was taking an active interest in terrorist organizations such as ISIS

---

[1]  The Islamic State of Iraq and Levant (formerly al-Qa'ida in Iraq), commonly abbreviated as ISIL, is a foreign terrorist organization.  The terrorist organization is also known as ISIS, IS, Islamic State, Daesh, and Dawlah. The U.S. Department of State designated ISIL as a terrorist organization on April 10, 2014.

and Jabhat Al-Nusra, and actively sought out links to their videos and audio recordings.

During the FBI's interview with the defendant's brother on February 4, 2016, the defendant's brother disclosed that the defendant has followed and supported ISIS. The brother revealed that the defendant is emotionally invested in the Syrian conflict. The defendant's brother further stated that the defendant has talked to him about ISIL and expressed his desire for the Assad regime to be overthrown. The defendant's brother also admitted that the defendant spent time on social media following people who could be in foreign terrorist organizations, including Al-Nusra, ISIL, Hezbollah, and an Iraqi group backed by Iran. The brother went on to say that the defendant became hateful of the Kurds, Christians, and Assyrians in the Middle East, and the defendant voiced disdain for certain governments in the Middle East. The brother disclosed that the defendant also dislikes Shiites. The defendant's brother mentioned that the defendant would also watch ISIL beheading videos. The defendant's brother stated that he and the defendant have talked about foreign fighters and how the defendant wanted to go overseas to become a foreign fighter for ISIL.[2] Ignoring warnings from his brother

---

[2] The defendant's brother opined that despite the defendant's interest in ISIL and their activities, he does not think the defendant would travel overseas because he believes that his brother does not speak Arabic very well and because of his limited resources.

5

and family not to watch and post things on line concerning the Middle East, the defendant continued to communicate with others on-line.

Additionally, the FBI discovered information that appears to verify the defendant's brother's disclosure that the defendant wants to be involved with ISIL. From the defendant's telephone, the FBI recovered a text message with the image of the ISIS flag that was sent from the defendant to various people on October 22, 2015. The defendant also sent a message to his brother on December 12, 2015, wherein the defendant stated "This would be a perfect time to do a istishadi operation."[3]

The defendant was consistent in his support of ISIL when he began talking with an FBI undercover employee (UCE) around December 15, 2015.  The defendant stated he wanted to commit acts of terror and martyrdom – including attacks against police officers, churchgoers and others – on behalf of ISIL. For example, in one conversation with the UCE the defendant stated: "I tried to shoot up a church one day. I don't know the name of it, but it's close to my job. It's one of the biggest ones in Detroit. Ya, I had it planned out. I bought a bunch of bullets. I practiced a lot with it. I practiced reloading and unloading. But my dad searched my car one day and he found everything. He found the gun and the bullets and a mask I was going to wear." The defendant further explained that he targeted the

---

[3] The term "istishhad" is the Arabic word for "martyrdom," "death of a martyr," or "heroic death."

church because "a lot of people go there," "people are not allowed to carry guns in church," and "it would make the news." The defendant said that "Honestly I regret not doing it. If I can't go do jihad at the Middle East, I would do my jihad over here." The defendant also provided the UCE with detailed descriptions of his plans to behead people, "skin them like sheep," travel to fight with ISIL or stay in the United States to commit terrorist acts, and revealed his plans to shoot innocent women and children.  Attached is a small sample of some of the violent statements that the defendant made to the UCE.  *See* Attachment A.

> **B.**    Abu-Rayyan's fascination with death and killing, especially his fixation with beheadings.

The defendant has had a long-standing fascination with death and killing, and he has had a particular fixation with beheadings and severed heads. As the FBI began to investigate the defendant, they found the defendant's Twitter account. The FBI discovered that the defendant had been re-tweeting, liking, and commenting on ISIL propaganda on his Twitter account at least as early as November, 2014. This included him actively seeking out the internet links to gruesome ISIL videos, posting them on his Twitter accounts and then commenting after viewing the executions and killing depicted in the ISIL videos.  One such comment was:  "thanks akhi [brother] that made my day."

In another instance in July of 2015, the defendant engaged in a Twitter conversation with another apparent ISIL supporter regarding an ISIL video. After the supporter tweeted "Wallaahi [I promise by God] Ive never smiled so much in my life watching a video than I have when I just watched the new 'Kill them where ever you find them,'" the defendant replied. "same here akhi [brother]." The defendant went on to comment to another individual regarding this same video that "this Gona be my fifth time watching it" and expressed to yet another individual that "the video was probably the best one yet … Not a dull moment."[4]

The phone that defendant was using at the time of his arrest was found to contain a multitude of disturbing photographs that the defendant downloaded to his telephone. These images appear to be screen shots of some of the ISIL videos that he watched, as was verified by the defendant's brother and the review of his Twitter posts. Some of these saved images include the ISIL flag, people with firearms with the ISIL flag, people dressed in orange jumpsuits who appeared to being burned alive, a handcuffed captive in an orange jumpsuit who was placed in front of a tank and run over, handcuffed people being thrown from buildings, and several images of prisoners/people being beheaded or images of severed heads. One image in particular, which he had installed as his cell phone wallpaper (a

---

[4] The video they were discussing was a 22 minute video prepared and issued by ISIL. The undersigned watched a portion of the video and can confirm that it contains extreme acts of graphic violence.

background image that is openly visible on the home screen of the phone) was that of a camouflaged-clad smiling man holding his index finger vertical with his left hand while holding a severed head of a woman by the hair with is right hand.[5]

Additionally, the defendant's phone contained text messages and images that were sent to various people, including his brother. For example, on October 25, 2015, the defendant sent a photograph from his phone to his brother's phone which contained an image of an individual using a knife to cut off a person's head.

Consistent with the defendant's interaction with his family and his online activities, the defendant confirmed with the UCE that he enjoyed watching others being killed and was interested in conducting beheadings himself. For example, the defendant told the UCE that: "I would gladly behead people if I needed to," "Its my dream to behead someone" and that "I seen a lot of videos like that. It always make me happy." (Abu-Rayyan 1/22/2016). The defendant told the UCE: "I get these violent thoughts," "I have a real anger problem like its in my brain . . . Its a sickness," and "I'm basically a ticking time bomb." (Abu-Rayyan 1/10/2016).

C.     Abu-Rayyan's on-going mental issues.

During the defendant's communications with the UCE, he admitted that he had anger problems and needed psychological help. The defendant also told the

---

[5] "For followers of ISIS, a single raised index finger has become a sign of their cause, and it is increasingly common in photographs of militants." *Foreign Affairs*, "ISIS Sends a Message, What Gestures Say About Today's Middle East," September 3, 2014.

2:16-cr-20098-GCS-RSW   Doc # 59   Filed 04/12/16   Pg 10 of 32   Pg ID 335

UCE that the devil had befriended him and was telling him to hurt people. According to the defendant, Shaytan (Satan) "whispers to me a lot He is in my head. One day I told him he is my friend and after that he never left me alone I stay up at night talking to him." The defendant explained how Satan "talks to me every night before I sleep," and "tells me to burn people alive. Tie them up and cut out their tongues He said you are doing my work." *See* Attachment A, January 20, 2016.

Further investigation has revealed that the defendant has a history of mental health issues. For example, the defendant's step-mother told the FBI that the defendant had undergone counseling in the past.[6]  According to his step-mother, when the defendant was attending the Star International Academy (in Dearborn Heights, Michigan), he was referred to counseling.  His step-mother stated that while attending school, the defendant told his teacher that he dreamed he had a gun and shot everyone in the class.  Understandably, the teacher reported the matter and the defendant was removed from school.  According to his step-mother, the defendant was required to see "a specialist" before he could return to school.   The defendant saw a doctor, but she could not recall the name of the doctor who treated the defendant. The defendant's step-mother tried to convince the agents that the defendant was "just being silly" when he told the teacher about his dream.

---

[6] The defendant's father refused to speak to the FBI about his son.

In addition to the step-mother, the defendant's sister described the defendant as having "anger issues," and being "moody." The defendant's sister went on to state that her relationship with the defendant was complicated. She mentioned that despite the fact they all lived together in one house, she really did not speak with the defendant. She related that they pass each other in the house, but do not acknowledge each other.  She also described how the defendant was moody. She noted that the defendant says one thing and does another, clarifying that he is not responsible.  She confided that if there was a family issue her father would come to her or her other brother to help, but would not go to the defendant because her father does not consider the defendant a responsible adult.

The defendant's brother, with whom the defendant shares a bedroom, told law enforcement officers that he has been concerned about the defendant's mental state and has told the defendant to see a mental health professional.   The defendant's brother opined that the defendant could be "bipolar" and the defendant "gets really sad and then really happy." He gets "mopey looking, looking depressed and then becomes the life of the party" and that the defendant has had these mood swings "since he was a teenager or even earlier."  The defendant's brother indicated that he worries about the defendant's mental health. The defendant's brother stated that it is considered taboo in the Middle Eastern community to talk about mental health and getting help for the defendant.  Further,

11

he stated that the defendant's father would not approve of referring the defendant for mental health treatment.

On February 4, 2016, the FBI arrested the defendant, and he was ordered temporarily detained until a detention hearing could be conducted on February 8, 2016. At a mental status screening at the Wayne County Jail during the evening of February 4, 2016, the defendant reported "suicidal ideation." When asked if he had a plan (to kill himself) he stated "I wouldn't tell you if I did to be honest with you." However, the intake report indicated that the defendant stated that he is currently hearing voices telling him to hurt/kill himself.

After appearing in court on February 4, 2016, the defendant's counsel was told by the undersigned that the United States had concerns regarding the defendant's competency to stand trial. After having the opportunity to speak with his current counsel over the weekend, and before the hearing on February 8, 2016, the defendant claimed to jail officials that he was not suicidal. He stated that "honestly I want to apologize, I don't want to hurt myself or anyone else, I'm not mentally insane, I don't hear voices or anything like that I was just bored online and started a conversation." On February 9, 2016, the defendant stated that he lied about the suicidal thoughts because he did not want to be placed in general population.

D.   Abu-Rayyan's continued possession and attempted possession of firearms.

The evidence also shows that the defendant has possessed, or attempted to possess, firearms on multiple occasions. For example, on February 19, 2015, a photograph was uploaded to the defendant's Twitter account. In this photograph, a camouflage-clad Khalil Abu-Rayyan, in the presence of two other similarly dressed individuals, is holding what appears to be a semi-automatic hand gun in his right hand, while holding up his left hand with his index finger extended upward. The defendant also purchased a firearm on October 3, 2015, took possession of it on October 5, 2015 (the substance of the current federal charges), and was arrested by the Detroit Police Department on October 7, 2015, for Carrying a Concealed Weapon and Possession of Marijuana.

Not long after he had been arrested and released by the Detroit Police Department, the defendant attempted to purchase a second firearm, a 9mm magazine-fed 8 shot semi-automatic handgun and tried to get authorization to carry a concealed firearm. In addition, the defendant went to a shooting range to practice shooting AK-47 and AR-15 assault rifles. On November 29, 2015, the defendant posted on a new Twitter account a profile photo showing him standing in the driveway of his residence in Dearborn Heights, Michigan, raising one index finger vertically. On the same day, the defendant posted a photograph of himself holding an AK-47 and holding his index finger vertical with his right hand. He also posted

a comment under the photo "Sahwat hunting." The term "Sahwat" describes Iraqis who oppose ISIL.

During his conversations with the UCE, the defendant stated that he had a passion for guns, and that he missed the gun that the police had seized from him. Further, when the UCE stated that the defendant no longer had his gun, the defendant stated that it was very easy to obtain a firearm. The defendant told the UCE, "I can get one. People come to  .. its like buying candy over here. People from the street want to sell me guns everyday it not hard to get." In another discussion, he expressed that it was his belief that "when someone see you with a gun they can't mess with you."

E.    The Defendant's Drug Use.

The defendant has an on-going drug abuse problem. This has been confirmed by the defendant on numerous occasions, the defendant's father, the defendant's brother and even the defendant's hired doctor. For example, the defendant admitted during his arrest on October 7, 2015, that the "weed" and pills found in his car belonged to him. In his brother's statement on February 4, 2016, he stated that the defendant has been involved in smoking marijuana for a long time. He stated that the defendant has "always been with drugs, weed, pills" since high school. In particular he stated that the defendant began using drugs such as marijuana and Xanax at age 14, and used marijuana daily after school up to three

14

times per day. After some time, the defendant increased his marijuana use to four to five times per day after graduating high school. The brother admitted that, eventually, the defendant was smoking marijuana at least six to seven times per day until he was arrested in October, 2015. Furthermore, the defendant's father verified that the defendant has used marijuana. In his filed affidavit with the court that was used in the detention hearing, he stated that he had searched the defendant's car in the past and found marijuana inside.

F.    The Defendant's Assaultive Behavior.

A check with the local police department confirmed that in 2013 an incident took place at the defendant's home. The police had been called to the house as a result of a fight between the defendant and his brother. According to the police report, the defendant acknowledged he was the aggressor and was arrested for domestic violence. The matter was eventually dismissed because the defendant's brother refused to prosecute.

Additionally, on December 22, 2015, the defendant engaged in a series of text messages back and forth with his brother wherein he stated the defendant was involved in an altercation with a group of "Shia" at his gym. Despite his brother's warning to ignore them and to be mature about it, the defendant told his brother it was too late. The defendant first said that it was just a heated argument but later said that "it got kind of physical." The defendant then told his brother that "I am

15

outnumbered" but later related to him that "I had my knife just in case things went south."

In summary, the combination of drugs and guns coupled with the defendant's mental health issues, fascination with death and killings, acknowledged support of a designated terrorist organization, voiced desire to engage in a martyrdom operation and prior assaultive behavior creates a clear danger, and the safety of the community, if the defendant was released on bond, cannot be assured.

II.   <u>There is a Preponderance of Evidence that the Defendant is a Risk of Non-Appearance.</u>

A.    The Defendant is Able to Obtain a Foreign Passport.

Despite the fact that the defendant is a United States citizen, he is still a risk of flight due to his ability to obtain a foreign issued passport.  As was noted during defendant's initial detention hearing before Magistrate Judge Whalen, the defendant's father, Rayyan Abo-Rayyan, is a Jordanian national who became a naturalized U.S citizen. According to Jordanian Nationality Law, as amended, No. 6 of 1954 article 9, children of a Jordanian nationality father, are Jordanian wherever they were born.  As such, the defendant is automatically considered a Jordanian national despite the fact that he was born in the United States. Accordingly, the defendant can, rather easily according to the Kingdom of Jordan embassy website, obtain a permanent Jordanian passport. As  this  Court  is  aware,

the United States cannot prevent the government of Jordan from issuing a passport to a Jordanian citizen. Thus, without any notification to any government agency, the defendant can obtain a valid travel document from Jordan which would allow him to travel to anywhere outside of the United States.

B.      The Defendant Has Vowed That He Will Not Go To Jail.

The defendant has expressed on several occasions when talking with the UCE that he would not go to jail. The defendant told the UCE that he would be changed for the worse if he had to go to jail and would rather die than go back to jail. For example, "They will have to kill me im not going to prison" (Abu-Rayyan 1/21/16).

III.   The Evidence and Arguments Offered by the Defendant Were Either Considered and Rejected by the Magistrate Judge, or are Not Persuasive

In an effort to assure this Court that the defendant does not present a danger to the community or a risk of flight, his defense counsel has offered that the defendant be placed under the supervision of his father and placed on six months house arrest, with the added precaution of a tether. Defendant appears to rely heavily upon the opinion of an individual, hired by the defense, Dr. Lyle Danuloff, to support his request for bond. Defendant asserts that this court should release him because of a change in circumstances from the when he was ordered detained by Magistrate Judge Whalen, in that: (1) the defendant is only charged with firearm-related offenses and not charged with a terrorism offense; (2) the defendant

17

was influenced by a government employee; and (3) the defendant's hired witness says he is not a danger to the community.

A review of the detention hearing transcript reveals that the defendant's claims that he is not charged with a terrorism offense and that he was influenced by a government employee were made and rejected by Magistrate Judge Whalen. As Magistrate Judge Whalen noted, the fact that the defendant is not charged with terrorism is not the issue, rather the issue that the Court is required to determine is whether the defendant, regardless of the charged offense, is a danger to the community. Likewise, when defense counsel argued that defendant was influenced by a government employee, Magistrate Judge Whalen found that even if accepted as true, the defendant's actions before he had contact with the government employee established that he was and remains a danger to the community. In short, the defendant's arguments are not new, and therefore cannot, as a matter of law, support a basis to reopen a detention hearing. *United States v. Watson*, 475 F. App'x 598, 599 (6th Cir. 2012) (stating that a detention hearing may be reopened "if certain conditions are met," one of which is that "new information exists that was unknown to the movant at the time of the hearing").

Even if the Court were to consider the arguments that the defendant was not charged with a terrorism offense and was influenced by a government employee, they lack persuasive force. The defendant's arguments totally ignore the fact that

18

many of his actions and statements that are grounds for his detention – including his support of ISIL, his gun possession, his drug use, and mental health issues – took place in 2013, 2014 and 2015, well before he first began talking to the UCE in December of 2015.  Nor does the defendant address the fact that many of his actions did not involve the UCE, and many of his statements were made to others, and were therefore wholly independent of his communications with the UCE.[7]

Moreover, the defendant's argument that he should be supervised by his father is simply not realistic. The defendant's father works and cannot supervise the defendant.  Additionally, the defendant committed the instant charged offenses while living at his father's house and during a time in which the defendant's father admitted he knew the defendant was illegally smoking marijuana. While it is understandable that a parent wants to help a child facing criminal charges, the defendant's father cannot be relied on to deter further criminal activity on the part of the defendant or to ensure that the defendant appears in court if released on bond.  Nor is a tether a viable option. A tether would merely alert Pretrial Services that the defendant is not where he is supposed to be. The tether would not stop the defendant from engaging in any illegal conduct if he chooses to do so.

---

[7] Defendant speculates that there were contacts with individuals working with the government dating back to July 2015.  None of this is found in the more than 6000 pages of discovery that has been provided to the defendant or any other information available to the government.

Lastly, the only new information offered by the defendant are two reports from Dr. Danuloff, a psychologist who was hired by the defense for the sole purpose of litigation and is not the defendant's treating psychologist. According to these reports, it is Dr. Danuloff's opinion that the defendant is competent and is not a threat to anyone. Based upon a review of Dr. Lyle Danuloff's work product, his Curriculum Vitae (CV), his claimed basis for his opinions, and his apparent lack of qualification, the United States does not believe this Court should reply upon this witness' opinion.

For example, Dr. Danuloff's opinions regarding the defendant are based upon only a cursory two hour and fifteen minute meeting with the defendant, his review of what the United States can only guess to be the defendant's two video statements to law enforcement, sections of the defendant's text messages with the UCE indicating that he may be suffering from a serious mental disorder and discussions with the defendant's father and step-mother. Dr. Danuloff performed only one psychological testing and did nothing to verify any information supplied to him by the defendant. Moreover, Dr. Danuloff appears to have ignored facts that contradicted his opinion. For example, Dr. Danuloff states that there is "no evidence of anti-social behavior or violent proclivity either currently or in history." However, this ignores the fact that the defendant was arrested for assaulting his

20

brother and the defendant's admission that he was involved in a fight with a group of individuals and armed himself with a knife.

Moreover, Dr. Danuloff appears to not have addressed the fact that the defendant has difficulty telling the truth, and therefore may not be a reliable source of information. For example, at his sentencing on the state gun charge, the defendant told the sentencing judge that he needed the gun for protection because in the last "eight years we have been open I have been robbed at gunpoint, I have been jumped and robbed on deliveries. There are times they pulled up to an abandoned house and ended up getting robbed." However, the FBI has found no police reports wherein the defendant or his business address have been listed as a victim or victims of a robbery in the last eight years prior to defendant's arrest.[8] Add this to the fact that the defendant is charged with making a false statement and admitted to lying about his mental health to jail officials after his arrest in this case, and it appears the defendant has difficulty telling the truth – a factor given absolutely no consideration by Dr. Danuloff.

---

[8] The only record they were able to uncover was a May 2010, Detroit Police Report for malicious destruction of property relating to a broken car window at the defendant's business.

CONCLUSION

There is clear and convincing evidence that the defendant is a danger to the community based on his expressed support for ISIL, his repeatedly stated desire to engage in a martyrdom operation, his fixation with death and killing, his mental health issues, his possession and attempted possession of firearms, his drug use and his prior assaultive behavior.  There is also a preponderance of the evidence that his appearance at future court proceedings cannot be assured based on his ability to obtain a foreign passport, and his statements that he will not go to jail. Accordingly, the government respectfully requests that this court continue to detain the defendant until a full resolution of all matters are made in this case.

Respectfully submitted,

Barbara L. McQuade
United States Attorney


*s/Ronald W. Waterstreet*
RONALD W. WATERSTREET
Assistant U.S. Attorney
211 W. Fort St., Ste. 2001
Detroit, MI 48226
(313) 226-9100
ronald.waterstreet@usdoj.gov


Dated: April 12, 2016

CERTIFICATE OF SERVICE

I hereby certify that on Tuesday, April 12, 2016, I electronically filed the

foregoing document with the Clerk of the Court using the CM/ECF system which

will send notification of the filing to the counsel for the Defendant:

Todd Shanker


*s/Ronald W. Waterstreet*
RONALD W. WATERSTREET
Assistant U.S. Attorney
211 W. Fort St., Ste. 2001
Detroit, MI 48226
(313) 226-9100
ronald.waterstreet@usdoj.gov

Attachment A.

Examples of text message conversations between the defendant and the UCE

**January 7, 2016**

*UCE: And what happens when you blow up*

*UCE: What goes through your head?*

**Defendant**: Honestly …I black out  Everything turns red  I just want to break things And hurt people I don't rember (sic) after Its like a sickness

\*\*\*

*UCE: Do you feel the anger more on kafirs (unbelievers)?*

**Defendant**: Ya mostly them

*UCE: Or just all people?*

**Defendant**: I want to behaed (sic) them  Especially shia

**January 7-8, 2016**

The defendant began talking about guns and how the police took his gun from him.

O*CE: But what's a gun for*

*OCE:?*

*OCE: I'm a girl lol I can't relate*

**Defendant:** Gun is to protect myseld(sic) .. when you have a gun its like your pride.

*OCE: I own purses not guns never seen one in my life.  Lol*

1

**Defendant:** its fun to I would go to the  gun range and practice shooting.

*OCE But why do you want it back if it gives you so much headache? Mashallah you know how tonshoot (sic to shoot). That's great*

**Defendant:** I have a passion for guns

**Defendant:** I shot ak-47 .. different type of machine guns

**Defendant:** Its really fun

**Defendant:** Plus when someone see you with a gun they cant mess with you

The defendant disclosed that his father took a gun away from him

*OCE: Why did your dad take it no fair*

**Defendant:** But he took it from me .. he thinks I will do something stupid I tried to shot up a church one day

*OCE: Are you serious Lol What church*

**Defendant:** Ya

*OCE: Like an actual church?*

**Defendant:** I don't know the name of it .. but its close to my job  its one of the biggest ones in Detroit   Ya.. I had it planned out … I bought a bunch of bullets   I practiced a lot with it   I practiced reloading an unloading  But my dad search my car one day and found everything

**Defendant:** He found the gun .. and bulletes (sic)  and a mask I was going to wear

*OCE: When like recent?*

2

**Defendant:** About toward the end of last year

   Later in the conversation

*OCE: But why did you choose a specific church?*

**Defendant:** Its easy .. and a lot of people go there .. plus people are not allowed to carry guns in church   Plus it would make the news Every body would've heard

*OCE: So are you happy it didn't happen? Or you regret not doing it?*

**Defendant:** Honestly I regret not doing it .. if i cant do jihad at the middle (sic) wa .. I would do jihad over here

*OCE: Aren't you afraid of death Khalil?*

**Defendant:** I think Allah SWT would accept it

*OCE: I think I'm scared to die*

**Defendant:** Im not  .. don't yoy(sic) want to see what Allah looks like

*OCE: Yes*

**Defendant:** Don't you want to be in Jannah

*OCE: Yes*

**Defendant:** This dunaya is a prison for us

*OCE: But I'm scared of death*


During this conversation the UCE was testing the defendant to be sure that he was not lying or making up stories to try to impress the UCE.

*UCE: You swear that you are not making it up to impress me?   Like other guys?*

3

**Defendant:** No trust me..i tell this stuff to my brother he says I need help.


The OCE asks the defendant if has told anyone about his plan to kill people at the church

*OCE: your told your. Rotherham about the church?  Brother?*

**Defendant:** No I haven't told anyone    i tell him (my brother) i would like to do a istishadi operation.[9]

*OCE: Good Oh what did he say?*

**Defendant:** He said do what I have to do .. but he will miss me.


The OCE then asks the defendant if he really planned to go through with his plan to kill people at the church

*OCE: I want to ask gou (you)*

**Defendant:** Anything

*OCE: But only because I'm a woman and we have softer hearts*

**Defendant:** What is it

*OCE: Like when you planned to attack the church what about the kids and women in the church?  Like I know they're Kafir (unbelievers) but my human side would feel bad.  Did you think of them?  Is that why you backed up?*

**Defendant:** Do you want to know the truth?

*OCE: Yes teach me*

---

[9] Istishhad is the Arabic word for "martyrdom", "death of a martyr", or "heroic death."  It is important to note that the FBI recovered a text message the defendant sent to his brother on December 12, 2015 indicating that the defendant wanted to do an "istishadi" operation.  See prior section.

4

**Defendant:** Will you get mad at me

*OCE: No I'm trying to learn from you ya majnooooon.*

**Defendant:** I would've killed every last one of them   Especially the women and children

*OCE: How come? Is that Sunnah?*

**Defendant:** the Only reason I didn't do it because my dad found the gun

*OCE: But what about the other gun?*

**Defendant:** Honestly   .. What about all the woman and children that die every day in Iraq or sham or falastine.  The other gun only carrys six shots

**January 10, 2016**

**Defendant**: I think I do need help. Because I want to hurt people. I want to do bad things to people. Like stab them…shoot them choke them. Skin them like a sheep

*UCE: That's good that you are admitting you need help khalil.*

**Defendant**:  Even set them on fire.

**January 20, 2016**

**Defendant**: Its like Shaytan is talking to me.

***

*UCE: What is he saying?*

**Defendant:**  I don't want to say its too evil. Very very bad thoughts.

*UCE: Let it out so I can help you calm down and help me talk you out of doing anything bad khalil*

**Defendant:** I don't even believe it sometimes he is taking over mt (my) brain.

\*\*\*

*UCE: What are you thinking?*

**Defendant:** He whispers to me a lot
He is in my head.
One day I told him he is my friend and after that he never left me alone
I stay up at night talking to him

*UCE: When*

**Defendant:** He tells me I am your friend, your brother, we cab [can] be happy together

*UCE: What does he sound like?*

**Defendant:** Honestly he had a deep voice like me .. he tells me lets have fun and hurt people

*UCE: How do you know it's shaytan*

**Defendant:** He talks to me every night before I sleep.

*UCE: When you say Bismillah (In the name of Allah),does he go away?*

**Defendant:** He tells me not to say those words.

*UCE: And what do you say?*

6

**Defendant:** He talks to me every night ever since I left jail for the first time.[10]

*UCE: Did he show you what he looks like?*

**Defendant:** He says he looks like me but happier  He says wakes me up at night to do bad things.

*UCE: Like what?*

**Defendant:** He was talking to me and I was talking to him.
He tells me to burn people alive.
Tie them up and cut their tongues
He said you are doing my work.

*UCE: Everyone? Or just kafirs*

*UCE: Because shaytan hate Muslims*

**Defendant:** He only talks to me at night  He says everyone is my enemy especially Muslims

\*\*\*

**Defendant:** He is talking to me now, he tells me to stop telling our

secrets

*UCE: You have to say Bismillah (In the name of Allah)*

**Defendant:** He says he is my friend though

**January 21, 2016**

*UCE: You don't have a gun*

---

[10] As a point of reference the defendant was first arrested by the Detroit Police Department on October 7, 2015.

**Defendant:** I can get one. People come to .. its like buying candy over here. People from the street want to sell me guns everyday it not hard to get.

## January 22, 2016

In this conversation, the defendant was talking about an event that had recently taken place in Canada where people were killed and whether the person involved in the killings had done them on behalf of ISIL:

**Defendant:** If he wasn't it would still be fine to me..i love hearing about this stuff

*UCE: What do you mean?*

**Defendant:** I love to hear about shootings and death  And if it was just some random kid that would still be fine with me.

*UCE: It makes you happy because they're kafirs?*

**Defendant:** Either or .. Shootings and death makes me excited

\*\*\*

**Defendant:** I love ti [to] hear people scream and beg

*UCE: Can you see blood and not faint?*

**Defendant:** No I could eat someone alive if      I wish I had my gun

\*\*\*

**Defendant:** I would gladly behead people if I needed to .  I think because my parents divorced I am like this.

*Later in conversation*

**Defendant:** Its my dream to behead someone.

8

\*\*\*

**Defendant:** I seen a lot of videos like that.  It always make me happy.

*UCE: If you do it do you want to do it for dawlha (ISIL)? Or just for no cause?*

**Defendant:** Just for me… I want to hear the persob (person) scream. It does not matter who he is.

## February 1, 2016

**Defendant:** I think im depressed again. I have suicidal thoughts. It seems like im all alone and nobody understands me. When I say something to them they tell me stop complaining.

\*\*\*

**Defendant:** May be I will hang myself. Maybe Allah will understand. …I don't know if I can deal with this anymore.  Im so alone.

## February 2, 2016

**Defendant:** …I think I might kill myself today.