UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,
                Plaintiff,

                                    Case No. 16-20098

v.                                   Hon. George Caram Steeh

KHALIL ABU-RAYYAN,

                Defendant.

_____/

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION FOR UNREDACTED DISCOVERY

The United States of America, by and through its undersigned attorneys, files this opposition to Defendant's Motion for Unredacted Discovery. The defendant's motion for unredacted copies of communications between the defendant and an undercover government employee should be denied because the redacted portions of the communications – which pertain to the identity of the undercover employee – contain no exculpatory information. Moreover, the government possesses a common law privilege that precludes the disclosure the redacted information and places the burden on the defense to explain a compelling need for the information – a burden the defense has failed to meet. Lastly, the

government requests that the Court review the redactions itself in an *in camera* and *ex parte* proceeding so that the government can demonstrate the material's sensitive nature and the Court can determine whether disclosure is necessary.

BACKGROUND

This case began when the Federal Bureau of Investigation became aware of threats made by the defendant Khalil Abu-Rayyan to commit acts of terror and martyrdom – including attacks against police officers, churchgoers and others – on behalf of the foreign terrorist organization the Islamic State of Iraq and Levant ("ISIL").  One of the primary goals of this investigation was to determine the defendant's intentions, particularly given that he actively sought out gruesome ISIL videos, posted them on his Twitter accounts and then made positive comments about the videos online. For example, in an instance in July of 2015, the defendant engaged in a Twitter conversation with another apparent ISIL supporter. After the supporter tweeted "Wallaahi ([I promise] by God) Ive never smiled so much in my life watching a video than I have when I just watched the new 'Kill them where ever you find them,'"  the defendant replied "same here akhi (brother)."  The defendant went on to comment to another individual regarding this same video that "this Gona be my fifth time watching it" and expressed to yet another individual that "the video was probably the best one yet … Not a dull moment."

2

As time proceeded, the FBI became aware of the fact that the defendant purchased a firearm on October 3, 2015, took possession of it on October 5, 2015 (the substance of the current federal charges) and was arrested by the Detroit Police Department on October 7, 2015, for Carrying a Concealed Weapon and Possession of Marijuana.[1]

Concern about the defendant's intentions was escalated when the FBI learned that, not long after he had been arrested and released by the Detroit Police Department, the defendant attempted to purchase a second firearm, tried to get authorization to carry a concealed firearm and went to a shooting range to practice shooting AK-47 and AR-15 assault rifles. On November 29, 2015, the defendant posted on a new Twitter account a profile photo showing him standing in the driveway of his residence in Dearborn Heights, Michigan, raising one index finger vertically.[2] On the same day, the defendant posted a photograph of himself holding an AK-47 and holding his index finger vertical with his right hand. He also posted a comment under the photo "Sahwat hunting." The term "Sahwat" describes Iraqis who oppose ISIL. All of these intentional acts were committed by

---

[1] The FBI was aware that prior to October 2015, the defendant had posted on his Twitter account a photo of three individuals wearing camouflage. The photo showed the defendant, holding what appeared to be a semi-automatic pistol in his right hand, and holding his index finger vertical with his left hand. Based upon the background depicted in the photograph, it appears that the photograph was taken inside of the business at which the defendant was employed.

[2] "For followers of ISIS, a single raised index finger has become a sign of their cause, and it is increasingly common in photographs of militants." *Foreign Affairs*, "ISIS Sends a Message, What Gestures Say About Today's Middle East," September 3, 2014.

the defendant well before he began talking to anyone associated with the government.

On December 8, 2015, an individual who was not involved with the FBI's investigation of the defendant began talking to the defendant through his on-line Twitter account. This individual subsequently informed the FBI of the individual's contact with the Twitter account. After determining that the individual was communicating with the defendant, the FBI had this individual end communications with the defendant, and subsequently, on December 15, 2015, an undercover employee ("UCE") and the defendant began to communicate with each other through the defendant's Twitter account. The recorded communications that the individual and the UCE had with the defendant were provided as part of discovery.

During the conversations with the UCE, the defendant expressed more of his violent views, he articulated his continued support of ISIL, and provided detailed descriptions of his plans to behead people, "skin them like sheep," travel to fight with ISIL or stay in the United States to commit terrorist acts, and revealed his plans to shoot innocent women and children.

Not surprisingly, investigations into possible terrorist attacks involve matters related to the national security of the United States and as such, can involve

4

information that is of a sensitive nature or is classified.[3]   Before producing

discovery to defense counsel, it is important that counsel for the government

coordinate with the FBI and/or other government agencies to ensure that: (1)

sensitive or classified information is discoverable in the first instance; (2) sensitive

or classified information is not inadvertently disclosed in discovery; and (3)

discoverable sensitive or classified information is adequately protected prior to its

disclosure.

Government counsel has been diligently conducting this coordination

process. In an effort to provide the materials in an expeditious manner, the United

States stated to defense counsel that it can provide certain information to defense

counsel if the defense would agree to a limited protective order for discovery.[4]

The defense refused to agree to any protective order, and as such, necessitated the

---

[3] Classified Information has been defined by the Classified Information Procedures Act (CIPA),
18 U.S.C. App III, as "any information or material that has been determined by the United States
Government pursuant to an Executive order, statute, or regulation, to require protection against
unauthorized disclosure for reasons of national security."

[4]  The proposed limited protective order sought to: 1) prevent the parties from making the
discovery materials available to the public, including the media; 2) ensure the identity of the
undercover employee and the individual were not revealed; and 3) the materials be returned to
the Government after the conclusion of the criminal matter. Importantly, the proposed protective
order did not place any restriction as to either parties' use of sensitive discovery materials, or
information contained therein, during counsel's investigation of the allegations and preparation
of defenses or introduction as evidence at trial.  However, the proposed order did place a
limitation on the use of the sensitive discovery materials in pleadings.  The limitation required
that any pleading that quotes directly from sensitive discovery materials; summarizes or refers to
the contents of sensitive discovery materials; or attaches copies of sensitive discovery materials
be done under seal prior to trial.

United States to redact a discrete number of items from the communications between the defendant and the UCE in order to protect the identity of the UCE.

To date, the government has provided the defense with a steady stream of discovery, has responded to requests for additional materials when asked by defense counsel, and has provided over 6,000 pages of scanned documents on at least 18 CD's and DVD's to defense counsel. The United States has also exceeded its discovery obligations by providing numerous Jencks Act materials to defense well in advance of trial, and has provided other items well in excess of what is required under Federal Rule of Criminal Procedure 16. Additionally, the United States believes that the vast majority of the conversations between the UCE and the defendant, which are the subject of the defendant's motion, as well as additional discovery, have been supplied to the defendant prior to the filing of this response. Further, as with all criminal cases, discovery is an on-going process and the United States will continue to provide additional discovery as it becomes available.

I.     The Redacted Information is Not Exculpatory

It is important to note at the outset that while the communications between the UCE and the defendant fall within the edicts of Rule 16, they do not fall within the dictates of *Brady v Maryland*, 373 U.S.83 (1963) or it progeny. The defendant is currently charged in a two count indictment with making false statements to acquire a firearm and possession of a firearm by a drug user. The Indictment

alleges that the defendant committed the criminal conduct on October 3, 2015 (false statements) and October 5, 2015 (possession of the firearm).   The first conversation that took place between the defendant and any agent of the government took place at least two months after the dates alleged in the indictment.

While the defendant periodically admitted ownership of the charged firearm at various times during his discussions with the UCE, the vast majority of the conversations between the UCE and the defendant centered upon the defendant's desire to engage in terrorist acts.   None of the redactions to any of the conversations between the defendant and the UCE touch upon the defendant's drug usage or gun possession, and therefore are not exculpatory by any measure.   In addition, the defendant was a participant to the conversations at issue. He is therefore already aware of the content of the conversations, which means that those conversations cannot be exculpatory under *Brady*. *Abdur'Rahman v. Colson*, 649 F.3d 468 (6th Cir. 2011) (information does not constitute *Brady* material when "a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information").

    II.    The Government Has a Common Law Privilege That Precludes Discovery of the Sensitive Material

In his motion, the defendant demands the government produce "unredacted copies of any and all communications between Mr. Rayyan (sic) and the

7

undercover law-enforcement employees…pursuant to Rule 16 without a protective order" (Motion at 6) suggesting he is entitled to such as "[t]he government has not moved for a protective order,…" (Brief at 12).   Defendant's argument is misplaced. The government has sought to protect the sensitive material by redacting it from the documents that have been produced in discovery. By doing so, the government has asserted – and asserts again here – that the sensitive material is precluded from discovery because of the government's common law privilege over this material. This privilege places the burden on the defendant to establish that he is entitled to the disclosure of the sensitive materials – a burden the defendant has failed to meet.

In federal courts, the application of evidentiary privileges is generally governed by the common law. Fed. R Evid. 501.  The government possesses a common law privilege regarding sensitive and classified information.  This privilege is similar to that adopted for confidential informants by the Supreme Court in *Roviaro v. United States*, 353 U.S. 53 (1957).  In *Roviaro*, the defendant sought the identity of a confidential informant who was the "sole participant, other than the accused, in the [drug] transaction charged," in the indictment. 353 U.S. at 64.  The Supreme Court recognized the government's privilege in protecting the identity of the confidential informants, but held that "[w]here the disclosure of an informer's identity, or of the contents of the communication, is relevant and

8

helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. " *Id.* at 60-61.  The Court explained that determining whether the privilege should be breached ultimately "calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstance of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id* at 62.

The Sixth Circuit has explained that under *Roviaro*, the government is required to disclose information "only upon a showing by the defendant that disclosure is essential to a fair trial." *United States v. Moore*, 954 F.2d 379, 381 (6th Cir. 1992). "[T]he mere speculation that any eyewitness may have some evidence helpful to defendant' case is not sufficient to show the specific need required by *Roviaro*." *United States v Sharp*, 778 F.2d 1182, 1186 (6th Cir, 1985), *cert. denied*, 475 U.S. 1030 (1986).  In short, the privileged information must be "necessary," "essential," or "critical" to the defense in order for the privilege to be breached.  *Badley v. United States*, 48 Fed. Appx. 163, 167 (6th Cir. 2002)(unpublished); *Untied States v Coffelt*, 960 F.2d 150 (6th Cir. 1992) *cert. denied*, 506 U.S. 1083 (1993) (unpublished). This standard has been "repeatedly required" by the Sixth Circuit. *Badley,* 48 Fed. Appx. at 167.

9

Courts have applied the *Roviaro* standard in cases involving sensitive and classified information. *See United States v Hanna*, 661 F.3d 271, 295 (6th Cir. 2011) (the court must first determine whether the material in dispute is discoverable, then whether the material is privileged, but then determine if the information is "at least 'helpful to the defense'" – citing *Roviaro*); *Untied States v. Moussaoui*, 382 F.3d 453, 471-72 (4th Cir. 2004) (" we have adopted the standard articulated by the Supreme Court in *Roviaro* for determining whether the government's privilege in classified information must give way.").

The defense cannot carry its burden of establishing that the redacted information from the communications between the defendant and the UCE are "necessary," "essential," or "critical" to his defense.  The redacted portions of the materials do not have any impact upon the determination of defendant's guilt for his charged conduct because: (1) they have nothing to do with whether he possessed a firearm on the day in question, or whether he was a user of controlled substances, and (2) the communications took place months after the defendant completed the charged crimes.

Moreover, the government has a legitimate reason for redacting the information, namely, protecting the identity of the UCE. The UCE has been involved in prior investigations, is involved in other investigations and is anticipated to continue to be involved in other investigations regarding criminal

10

activities, including terrorism related crimes. In particular, the public dissemination of this information would alert other subjects of other investigations (including terrorism investigations) that they are the subject of an investigation. Current investigations involving the other targets would be significantly impacted if the UCE's identity was revealed as a result of the pre-trial disclosure. Denial of disclosure is appropriate when the source is continuing to assist law enforcement. *United States v. Carter*, 520 F. App'x 377, 382 (6th Cir. 2013).

The UCE may testify at the trial, and the UCE's identity will be revealed to the public at that time. If, however, the defendant enters into a pre-trial plea agreement, a public "outing" of UCE will be avoided. Because the defendant can still enter a pre-trial guilty plea at this juncture, the disclosure of the UCE's identity is premature. Moreover, it is important to note that *Roviaro* was decided in 1957, long before the internet age or even widespread use of photocopiers. Confirmation of an undercover identity, a source's name or the pretrial disclosure of information regarding such now has much greater ramifications than it did in 1957. It exposes a source of information to much greater potential for obloquy, harassment, intimidation and retaliation than does indirect disclosure to the defendant himself. The potential for such continued exposure and public obloquy can have a substantial chilling effect on future informants, and this source in particular, which is the very situation the privilege is intended to prevent. The

11

government's concern about wide spread dissemination of information regarding the UCE is not an unrealistic concern as the media has already uploaded portions of the UCE's communications with Abu-Rayyan, to the world-wide web. *See* http://www.mlive.com/news/detroit/index.ssf/2016/03/text_messages_reveal_unde rcove.html .

III.   The Redacted Information Should Be Reviewed by This  Court
       *In Camera* and *Ex Parte*

Federal Rules of Criminal Procedure 16(d)(1) provides that "[a]t any time, the court may, for good cause, deny, restrict or defer discovery or inspection, or grant other appropriate relief," and that "[t]he court may permit a party to show good cause by a written statement that the Court will inspect *ex parte*." According to the Advisory Committee Notes, "[a]mong the considerations to be taken into account" when deciding a motion under Rule 16(d)(1) is "the protection of information vital to the national security." Rule 16 Advisory Committee Notes 1966 Amendments, Subdivision (e); *see also In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93, 122 (2d Cir. 2008) (noting that Rule 16(d) grants district courts the discretion to establish conditions "under which the defense may obtain access to discoverable information"); *United States v. Delia*, 944 F.2d 1010, 1018 (2d Cir.1991) (noting that because the language of Rule 16(d)(1) "is ... permissive," the district court may "limit or otherwise regulate discovery had pursuant to the Rule"); *United States v. Bulger*, 283 F.R.D. 46, 51

12

(D.Mass.2012) ("Where ... a defendant seeks unlimited access to discovery that is subject to a protective order, the federal rules provide the framework to adjudicate the disclosure and dissemination issue."); *United States v. Lindh*, 198 F.Supp.2d 739, 741 (E.D.Va.2002) ("Analysis of the government's request for a protective order ... appropriately begins with Rule 16(d)....").

The *ex parte* nature of the proceedings is extremely important as "it would defeat the purpose of the protective order if the government were required to make its showing in open court.  The problem arises in its most extreme form where matters of national security are involved." Rule 16 Advisory Committee Notes, 1966, Subdivision (e).  In addition, courts have recognized that although Rule 16(d)(1) speaks only of the government submitting a written statement, an "*ex parte, in camera* hearing in which the government counsel participates to the exclusion of defense counsel are part of the process that the district court may use," particularly "if the court has questions about the confidential nature of the information or its relevancy."  *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1261 (9th Cir. 1998) *cert. denied*, 528 U.S. 842 (1999); *see also United States v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008).

In light of the defendant's objection to the redactions, the government believes it is prudent for the Court to conduct an *in camera*, *ex parte* review of the redacted material in order to confirm whether, as the government believes, the

13

material can be protected by the *Roviaro* privilege.  The government further requests that Court hold an hearing *in camera* and *ex parte* with government counsel on this issue. At this hearing, the government will present the Court with additional information regarding the sensitive nature of the redacted material.

## CONCLUSION

The redacted material at issue is precluded from discovery by the government's common law privilege and is not discoverable under Rule 16. The defendant has failed to carry his burden of establishing that the redacted information is "necessary," "essential," or "critical" to Abu-Rayyan's defense. Despite this fact, the government requests that the Court hold an *in camera* and *ex parte* hearing so that it can review the redactions itself.

Respectfully submitted,

Barbara L. McQuade
United States Attorney


*s/Ronald W. Waterstreet*
RONALD W. WATERSTREET
Assistant U.S. Attorney
211 W. Fort St., Ste. 2001
Detroit, MI 48226
(313) 226-9100
ronald.waterstreet@usdoj.gov

Dated: April 12, 2016

CERTIFICATE OF SERVICE

I hereby certify that on Tuesday, April 12, 2016, I electronically filed the

foregoing document with the Clerk of the Court using the CM/ECF system which

will send notification of the filing to the counsel for the Defendant:

Todd Shanker

> *s/Ronald W. Waterstreet*
> RONALD W. WATERSTREET
> Assistant U.S. Attorney
> 211 W. Fort St., Ste. 2001
> Detroit, MI 48226
> (313) 226-9100
> ronald.waterstreet@usdoj.gov