UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


**UNITED STATES OF AMERICA,**

           Government,

         v.

**KHALIL ABU-RAYYAN,**

           Defendant.
_____/

**HONORABLE GEORGE CARAM STEEH**

**No. 16-20098**


**BOND HEARING**

**Monday, April 18, 2016**

-   -   -

APPEARANCES:

For the Government:           RONALD W. WATERSTREET, ESQ.
                              Assistant U.S. Attorney


For the Defendant:             TODD SHANKER, ESQ.
                              BENTON MARTIN, ESQ.

-   -   -

*To Obtain Certified Transcript, Contact:*
*Ronald A. DiBartolomeo, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 238*
*Detroit, Michigan  48226*
*(313) 962-1234*

*Proceedings recorded by mechanical stenography.*
*Transcript produced by computer-aided transcription.*

1                        I   N   D   E   X

2   _____Page

3   **DR. LYLE D. DANULOFF**
    Direct examination by Mr. Martin                        4
4   Voir Dire examination by Mr. Waterstreet               7
    Voir Dire cross examination by Mr. Martin             30
5   Direct examination continued by Mr. Martin            39
    Cross examination by Mr. Waterstreet                  50
6   Redirect examination by Mr. Martin                    93

7

8

9

10

11

12                       E   X   H   B   I   T   S

13  Identification_____Offered   Received

14

15                    N       O       N       E

16

17

18

19

20

21

22

23

24

25

                    *16-20098; USA v. KHALIL ABU-RAYYAN*

1                                    Detroit, Michigan

2                                    Monday, April 18, 2016

3

4                                -   -   -

5              **THE CLERK:**  Case Number 16-20098, United

6       States versus Khalil Abu-Rayyan.

7              **THE COURT:**  Good morning.

8              **MR. WATERSTREET:**  Good morning.

9              **MR. SHANKER:**  Good morning.

10             **THE COURT:**  Would you like to state your

11      appearances?

12             **MR. WATERSTREET:**  Good morning.  Once again,

13      Ron Waterstreet on behalf of the United States.

14             **THE COURT:**  Okay.  Welcome.

15             **MR. SHANKER:**  Good morning, your Honor.  Todd

16      Shanker on behalf of Khalil Abu-Rayyan who is seated to my

17      left, and we also have Benton Martin from our office as

18      well.

19             **THE COURT:**  All right.  Welcome.

20         The Court has two matters to address today; first

21      a request to release the defendant pretrial, and the

22      second motion by the government to order an examination,

23      psychiatric examination of the defendant for competency.

24         We'll address the bond motion first.

25             **MR. SHANKER:**  All right.  Thank you, your

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    Honor.

2            Your Honor, we intend to call Dr. Danuloff to the

3    stand, and I assume we'll take arguments after he has made

4    his presentation and testify.

5            THE COURT:  All right, Mr. Shanker.  That's

6    fine.  Call your witness.

7            MR. SHANKER:  We would call Dr. Lyle

8    Danuloff.

9

10                   L Y L E   D A N U L O F F

11

12   being first duly sworn by the Court to tell the truth, was

13   examined and testified upon his oath as follows:

14

15            THE COURT:  I'm going initially ask you to

16    state your name and spell your last name for us.

17            THE WITNESS:  Lyle, L-y-l-e, Dennis,

18    D-e-n-n-i-s, Danuloff, D-a-n-u-l-o-f-f.

19            THE COURT:  Thank you.  You may proceed.

20

21                      DIRECT EXAMINATION

22

23   BY MR. MARTIN:

24

25      Q.  Dr. Danuloff, can you tell us how you are employed?

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    **A.**   I'm a fully licensed clinical psychologist, and I've

2    been in practice in the state of Michigan for 44 years.

3    **Q.**   What are your responsibilities as a general

4    practitioner?

5    **A.**   I'm call myself a general practitioner, but my

6    practice involves psychotherapeutic treatment of adults

7    and adolescence.  I also do marital work, and a

8    significant portion of my practice involves forensic work,

9    which is the application of psychological principles as to

10   matters of law.

11   **Q.**   Do you also have experience with treatment of

12   chemically dependent individuals?

13   **A.**   Yes, I do.

14   **Q.**   You also work as a consultant, is that right?

15   **A.**   That's correct.

16   **Q.**   What are some of the agencies that you work with as

17   a consultant?

18   **A.**   Well, in addition to the couple of school districts

19   that I consult with, I consult with eight local police

20   departments, and in that consultation work I do critical

21   incident stress debriefings, fitness for duty evaluations,

22   and preemployment psychological evaluations.

23   **Q.**   Could you explain what is involved in the fitness to

24   duty evaluation?

25   **A.**   In a fitness for duty evaluation, an officer is

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    mandated by usually the chief of the department, to come

2    to me for psychological evaluation in order to determine

3    his or her fitness to return to duty, and when I do those

4    kinds of evaluations, I offer one of four conditions:

5              One, completely fit to return to duty without

6    restrictions; two, fit to return to duty under certain

7    circumstances; three, unfit to return to duty unless

8    certain circumstances are met, and four, unfit for duty.

9    **Q.**   All right.  How many individuals could you estimate

10   that you have evaluated psychologically?

11   **A.**   In my career do you mean or fitness for duty

12   evaluation?

13   **Q.**   In your career?

14   **A.**   In 44 years, I don't have an exact count.  I imagine

15   I have evaluated 250-300 people.  Maybe a little bit more.

16   **Q.**   Have you ever worked with our office?

17   **A.**   No, I have not.

18   **Q.**   Do you have affiliations with professional

19   psychological organizations?

20   **A.**   Yes, I do.

21   **Q.**   What are some of those?

22   **A.**   I am member of the American Psychological

23   Association.  I'm member of the Michigan Psychological

24   Association, and I was past president -- I am past

25   president.  I was president in 1996.  I was also a member

*16-20098; USA v. KHALIL ABU-RAYYAN*

1       until the organization unfortunately wasn't able to

2       maintain itself, the Michigan Association of Forensic

3       Psychology, and I'm -- those are the organizations.  I

4       think there is one more, but I don't have my C.V. with

5       me -- Institute of Continuing Legal Education.

6           Q.   And you have given presentations in the field of

7       psychology as well?

8           A.   Yes, sir, I have.

9               MR. MARTIN:   Your Honor, I move to have Dr.

10      Danuloff testify as an expert in the field of

11      psychologist.

12              MR. WATERSTREET:   May I voir dire?

13              THE COURT:   Sure.

14

15                      VOIR DIRE EXAMINATION

16

17   BY MR. WATERSTREET:

18

19          Q.   Doctor, this was not asked of you, but have you

20      testified on forensic psychology before?

21          A.   Yes, many times.

22          Q.   Many times.  Have you ever been certified as a

23      forensic psychologist --

24          A.   Well, if certification --

25          Q.   -- by the court?

1    **A.**  You mean, the court allowing me to testify, yes,

2    sir.

3        **Q.**  Well, no, as a forensic psychologist?

4        **A.**  Certified as a forensic psychologist, specific

5    certification, no, sir.

6        **Q.**  So there have been times in which you have sought to

7    give your forensic opinion, and the court has denied

8    recognizing you as a forensic psychologist?

9        **A.**  I can't think of one, but perhaps there has been.

10       **Q.**  Well, do you remember the Kulka case?

11       **A.**  Kulka?

12       **Q.**  Yes, K-u-l-k-a?

13       **A.**  Yes, I testified in this case.

14       **Q.**  Right.  And you were in front of a Macomb County

15   judge?

16       **A.**  Yes, sir.

17       **Q.**  You were called as a defense witness?

18       **A.**  Yes, sir.

19       **Q.**  And the attorney for Ms. Kulka, your client,

20   proffered you to be a qualified forensic psychologist, and

21   the court denied that, correct?

22       **A.**  I don't have any memory of that.  I do remember that

23   I testified in that matter, and the court heard my

24   testimony, but I don't have any specific memory of those

25   words.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1        **Q.**  Let's see if I can refresh your memory.

2               And you were hired by Mr. Catalando or Mr.

3     Freers?

4        **A.**  You know, Mr. Waterstreet, I really don't remember.

5     It was years ago.  I know it was an insanity case, but I

6     don't remember who hired me.  Freers sounds more familiar.

7        **Q.**  Okay.  And when you were asked to be qualified as a

8     forensic psychologist, the court says, it would appear

9     that he's qualified as a psychologist.  Forensic

10    psychology is not his forte, is that correct?

11       **A.**  Well, if you say that's what the court said, then

12    certainly the court said it.

13       **Q.**  Okay.

14       **A.**  I'm only saying that I don't remember.

15              **MR. MARTIN:**  Do you have a copy of that?

16              **MR. WATERSTREET:**  Yes.

17              **THE WITNESS:**  Yes, I see this, and it's

18    obviously what was said.

19

20    **BY MR. WATERSTREET:**

21       **Q.**  Okay.  And this is after you testified under oath

22    that you really don't have any certification in forensic

23    psychologist, correct?

24       **A.**  I'm not aware that there is certification for

25    forensic psychology in the state of Michigan, but if there

1   is such a certification, which I don't believe there is, I

2   don't have it.

3      Q.  And you indicated that when asked if you have any

4   expertise in forensic psychology, you said well, I've

5   studied the terms of criminal responsibility elements of

6   the law on my own.  So I haven't had any specific courses

7   concerning that, no, correct?

8      A.  If that's what I said, then that's what I said, yes,

9   sir.

10     Q.  Are you aware that the Kulka matter was brought up

11  on a habeas, brought in front of Judge Byrd, and he too

12  agreed that you are not a qualified forensic psychologist?

13     A.  I'm not aware of that, but I'm sure that happens

14  since you're bringing it to me.

15     Q.  Now forensic psychology is -- well, how many

16  times -- how many other times have you been disqualified

17  giving an opinion as a forensic psychologist?

18     A.  If I didn't remember this one, I can't answer that

19  question.  I don't know.

20     Q.  How many times has the court rejected your opinion

21  because it determined that it was bias?

22     A.  Bias?

23     Q.  Yes.

24     A.  I don't know the answer to that question either.

25  Bias frequently comes up in family law cases.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    **Q.**  Has your opinion ever been rejected by the court

2    because the court determined that your opinion was bias?

3    **A.**  Not to my knowledge.

4    **Q.**  Have you ever been sued because you provided a bias

5    opinion?

6    **A.**  No.  I have been sued because the allegation was

7    that I provided an inaccurate opinion and failed to meet

8    standards.

9    **Q.**  All right.  Has the court ever outright rejected or

10   refused to consider your opinion because it believed that

11   you were bias or not presenting all the facts to the

12   court?

13   **A.**  Not to my memory.

14   **Q.**  Now you said that you were member of the American

15   Psychological Association?

16   **A.**  Yes, sir.

17   **Q.**  What is required to be a member of the American

18   Psychological Association?  You have to be qualified as a

19   forensic expert to be a member of the American

20   Psychological Association?

21   **A.**  No, you have to have a Ph.D. in psychology, and

22   follow ethic guidelines and pay your dues.

23   **Q.**  Right.  So anybody who has a Ph.D., whether they are

24   studying Rhesus monkeys or forensic psychologist or a

25   clinical psychologist, you can be member of the American

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    Psychological Association, correct?

2        A.   Absolutely.

3        Q.   And the American Psychological Association has

4    broken down into more than 50 different divisions --

5        A.   Yes.

6        Q.   -- of areas of practice?

7        A.   That's correct.

8        Q.   And it is identified that forensic psychology is a

9    specialized discipline of psychology, correct?

10       A.   I believe so.

11       Q.   With its own professional organizations, training

12   programs, certification, research journals, and so that as

13   a forensic psychologist, it is the application of science

14   in the profession of psychology to question of issues

15   relating to the law in the legal system, correct?

16       A.   Correct.

17       Q.   Now you are not a member of the American Association

18   for Forensic Psychologists, are you?

19       A.   No, I'm not.

20       Q.   And you're not a board certified forensic --

21   criminal forensic psychologist, are you?

22       A.   No, I am not.

23       Q.   Okay.  You're not even trained specifically in

24   forensic psychology, are you?

25       A.   Well, trained specifically?  I'll answer your

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    question with the use of your words, no.

2        Q.  So -- but you have held yourself out as forensic

3    psychologist?

4        A.  No.  I have held myself out as a psychologist who

5    practices forensic psychology, and I hold myself out as a

6    fully licensed clinical psychologist in the state of

7    Michigan.

8        Q.  If I look up under a Google search under CDAM, which

9    is the Criminal Association -- excuse me -- Criminal

10   Defense Attorneys of Michigan, I would not find an

11   advertisement for you claiming to be a forensic

12   psychologist?

13       A.  I ran an ad three or four years ago for a year.  I

14   don't remember the specifics of the ad.

15       Q.  Let me see if I can refresh your memory on that too.

16       A.  All right.

17       Q.  Does that refresh your memory at all?

18       A.  Forensic psychological services, yes, sir.  It does

19   refresh my memory.  It was a few years ago.  I don't

20   remember when.

21       Q.  And in that advertisement, you claimed to be able to

22   provide information on all law related mental health

23   issues?

24       A.  Yes, sir.

25       Q.  Claiming to be a forensic psychologist -- I'm

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    sorry -- you've been practicing more than 38 years, and

2    you're able to provide information on competency, criminal

3    responsibility and sentence mitigation, correct?

4        A.  Yes, sir.  I don't believe in that ad, as I saw it,

5    I called myself a forensic psychologist, but I certainly

6    said I perform forensic psychological services, yes.

7        Q.  In there, did you say I have been denied being able

8    to testify in the state courts?

9        A.  Did I put that in the advertisement?

10       Q.  Yes.

11       A.  No, sir, I did not.

12       Q.  And to be certified -- have you ever tried to be

13   certified as a board certified forensic psychologist?

14       A.  No, sir.

15       Q.  Because that would require you to not only be

16   trained on the specialized area, but you would be tested

17   on that as well, correct?

18       A.  Tested as in testimony?

19       Q.  Tested as in a written examination, oral

20   examination, your opinions and testing styles subject to

21   peer review?

22       A.  I believe so.

23       Q.  You chose not to do that?

24       A.  That's correct.

25       Q.  And that it would require you to make sure that

*16-20098; USA v. KHALIL ABU-RAYYAN*

1   you're opinions follow the ethical rules of the APA,

2   correct?

3       **A.**  Yes.

4       **Q.**  That you follow the correct protocol as part of the

5   testing process to be board certified?

6       **A.**  Yes, sir.

7       **Q.**  That you would provide a fair and balance report?

8       **A.**  Yes, sir.

9       **Q.**  And that the test that you use or actually testing

10  for the issue that you're seeking to provide testimony on?

11      **A.**  Yes, sir.

12      **Q.**  And that you would be able to establish that you

13  have had specialized training in forensic psychology,

14  correct?

15      **A.**  Yes, sir.

16      **Q.**  All of these things would be required of you,

17  correct?

18      **A.**  Yes, sir.

19      **Q.**  But you chose not to do that?

20      **A.**  Well, I have attended numerous --

21      **Q.**  It's a straightforward question.  You have chosen

22  not to have your -- your practice subjected to peer review

23  to be able to determine that you are, in fact, qualified

24  as a forensic psychologist, correct?

25      **A.**  By that organization, that's correct.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    **Q.**  But there's more than one organization, is there

2    not?  There are several?

3    **A.**  Yes, sir.

4    **Q.**  And you never attempted to become certified in any

5    of those, whether it be the American Association of

6    Forensic Psychologists, American Forensic Psychology

7    Board, American Board of Professional Psychology, none of

8    those, correct?

9    **A.**  That's correct.

10    **Q.**  Now you have not been involved in any significant

11    article on forensic psychology in any recognized treatise,

12    have you?

13    **A.**  No, sir, I have not.

14    **Q.**  Have you not engaged in any clinical studies in the

15    area of forensic psychology at all, have you?

16    **A.**  No, sir, I have not.

17    **Q.**  And have you ever been qualified in the Eastern

18    District of Michigan to provide an opinion as a forensic

19    psychologist regarding competency and dangerousness?

20    **A.**  I have testified in federal court a couple of times,

21    but I don't remember that.  I would have to probably say

22    no.

23    **Q.**  And frankly doctor, it would be fair to say if I did

24    a Google search of you, you would be recognized as an

25    expert in bedwetting?

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    **A.**  No.

2    **Q.**  All of the articles that you have written concerning

3    that all the videos concerning bedwetting, that's not your

4    area of expertise?

5    **A.**  No.  I am a consultant for an organization that does

6    than, and that is frequently misconstrued as you have

7    misconstrued it.

8    **Q.**  Now you have gained a reputation in the legal

9    community, have you not, by judges that you are less than

10   honest in giving a fair and balance opinion?

11   **A.**  I'm not aware of that reputation, sir.

12   **Q.**  Do you remember the matter Schoeder versus Schoeder,

13   Michigan Court of Appeals?

14   **A.**  That was a custody case.  That had to be 15 years

15   ago.  It went to the court of appeals if I'm not mistaken.

16   **Q.**  It was in 2005?

17   **A.**  2005?

18   **Q.**  Yes.

19   **A.**  Okay.

20   **Q.**  Do you remember a judge finding particular fault

21   with your methods and your one sided opinion?

22   **A.**  I remember the case.  Are you talking about -- it

23   went to appeals if I'm not mistaken.

24   **Q.**  Right.

25   **A.**  Yes, I think that decision was two to one, and the

*16-20098; USA v. KHALIL ABU-RAYYAN*

1     minority opinion alleged that I was bias, et cetera.

2         Q.  And she, as a matter of fact, said that in her

3     opinion, the trial court, the lower court, unjustly denied

4     the wife a real opportunity for that -- for his wife to

5     parent the child, correct, because of an one sided opinion

6     of Dr. Lyle Daniloff, the psychologist who evaluated the

7     parties?

8         A.  If that's what was written, because I don't have a

9     specific memory.

10        Q.  You labeled the wife as delusional?

11        A.  Uh-huh.

12        Q.  Paranoid?

13        A.  Uh-huh.

14        Q.  And hypomanic due to her incredible accusation that

15    her husband, the plaintiff had committed adultery and

16    placed her under surveillance?

17        A.  It's been a long time Mr. Waterstreet.  If that's

18    what I said, then that's what I said.

19        Q.  However, there was evidence that was presented to

20    you specifically before you came up with that opinion that

21    showed that you're totally incorrect by claiming for her

22    to be delusional or paranoid, correct?

23        A.  I have no memory of that.

24        Q.  Let me see if I can refresh the memory.

25        A.  All right.

                    *16-20098; USA v. KHALIL ABU-RAYYAN*

1     **Q.**   The husband admitted that at one time that the wife

2     found a bra in his suitcase after coming back from a

3     business trip, and his explanation to you was that

4     apparently housekeeping must have subsequently placed the

5     garment in the luggage, and you made a determination that

6     you thought that her opinions were unrealistic because her

7     suspicions regarding his infidelity was not based in fact.

8          You testified that she -- as a matter of fact

9     testimony was provided that she found -- discovered

10    unexplained charges for flowers on the credit card

11    belonging to her husband, a woman answered the phone in

12    the plaintiff's hotel room, and another woman often paged

13    him, and the defendant also testified that over one

14    summer, her husband frequently went to a home of an

15    unmarried nurse who administered allergy shots to him on

16    an unpaid basis, and you rejected all these allegations

17    based upon her husband's statement alone, correct?

18    **A.**   Mr. Waterstreet, I have to look at this case within

19    its context.  I have very little memory of it.  So with

20    that caveat in mind, I will answer it yes to that

21    question.

22    **Q.**   And I'll tell you what?  I'll hold the court's

23    finding over your shoulder, and you can read with me --

24    **A.**   I believe you.  I believe you.  I didn't say I

25    didn't believe you.  I said to you that you're picking a

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    particular case which is fine, that I participated in 16

2    years ago.  I believe that what you're writing -- what

3    you're reading there is what I wrote.  I'm not questioning

4    that.

5        Q.  And you rejected all of these allegations based upon

6    the husband's statement alone.  You had -- in fact, when

7    the husband had, in fact, secretly taped private

8    conversations with the defendant regarding this emotional

9    charged subject about his infidelity --

10                  MR. MARTIN:  Your Honor?

11                  MR. WATERSTREET:  -- and provided tapes to

12   Mr. Danuloff as proof of her instability, and that

13   apparently the allegation that she was under surveillance,

14   in which you found to be delusional and paranoid was true

15   that, in fact, her husband had provided proof that she was

16   not delusional, and that she wasn't paranoid because, in

17   fact, she had been subject to surveillance and recordings

18   by her husband, correct?

19       A.  I have no memory of that.  I can only tell you what

20   you're reading to me.

21                  MR. MARTIN:  I object on the basis that I

22   believe Dr. Danuloff testified that he agrees that was his

23   testimony in the case, and rehashing all the details of

24   his opinion of the case is not relevant to the case here.

25                  MR. WATERSTREET:  Well, it goes to his

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    credibility and his ability to testify in this matter,

2    your Honor.  He is claiming to be a forensic psychologist,

3    and then providing a one sided opinion.

4              **THE COURT:**  All right.  You have covered that

5    territory now?

6              **MR. WATERSTREET:**  Well, actually Judge, there

7    are a number of cases that I was going to go through.

8

9  BY MR. WATERSTREET:

10    **Q.**  As a matter of fact, even the Court found that you

11    engaged in a rather unusual practice that you claim to

12    administer by yourself, a polygraph examination of the

13    husband?

14    **A.**  I am not a polygraph expert.  How would I

15    possibly --

16    **Q.**  That's exactly what the court said.

17    **A.**  Well, sir, then the court was in error.

18    **Q.**  Okay.  Rather you accepted the plaintiff's

19    manipulative proofs and even administered him your own

20    polygraph examination.

21    **A.**  One more time sir, that's a judge's opinion in the

22    appeals court?

23    **Q.**  Yes.

24    **A.**  I have never under oath administered a polygraph

25    test to anyone.  With all due respect to the court it was

1    a gross error.

2                    **MR. MARTIN:**  Your Honor, I would ask for a

3    citation of the case.  We don't have --

4                    **MR. WATERSTREET:**  Yes.  Actually I was just

5    about to did that.

6                    **MR. MARTIN:**  And also this line of

7    questioning is continuing to rehash the same matter

8    opinion that he has given in the past.  I think his point

9    has been made.

10                   **MR. WATERSTREET:**  I'm -- your Honor, they

11   offered him as expert, and I'm voir diring to show that he

12   is not qualified to give this Court an opinion as a

13   forensic psychologist, because he has no qualifications,

14   and he's previously admitted under oath that he is not so

15   qualified in another matter.

16              He's also -- his opinion is bias, and I was asking

17   whether he's aware of fact that he's has a reputation in

18   the legal community of presenting one sided bias opinions,

19   and I imagine the whole reason he is brought here to

20   testify is so they are going to offer his opinion in this

21   matter.

22              So I think the Court should be made well aware of

23   the serial number of times in which he has engaged in this

24   type of behavior.

25                   **THE COURT:**  All right.  I think I'll direct

*16-20098; USA v. KHALIL ABU-RAYYAN*

1   you to save the rest of your case examples until you have

2   your full cross examination if there is going to be a full

3   cross examination of the witness.  In the meantime though,

4   you should probably give the citation.

5              MR. WATERSTREET:  I will give the citation.

6   Schoeder versus Schoeder, Michigan Court of Appeals Number

7   263422.  It's found at 2OO5 Westlaw 3304569.

8

9   BY MR. WATERSTREET:

10     Q.  As a clinical psychologist, not board certified in

11   forensic psychology, you're aware that different tests are

12   provided to individuals for forensic examinations versus

13   clinical examinations?

14     A.  Well, my understanding of this case is --

15     Q.  I'm not asking about this case yet.

16     A.  Okay.  Question again please?

17     Q.  Question is, the type of tests that are conducted in

18   a clinical setting versus a forensic setting are different

19   types of tests, correct?

20     A.  The MMPI-2 is an instrument that is used both in

21   clinical and forensic settings.

22     Q.  And since -- I imagine since you are not board

23   certified, are you familiar with the latest literature

24   concerning how forensic examinations using MMPI should not

25   be used in a forensic examination because they are

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    completely different standards than in a clinical setting?

2        A.   No, sir, I'm not aware of that.

3        Q.   So you would not be familiar with those?

4        A.   I'm not familiar with that, no, sir.

5        Q.   You said that you were, in fact, and acknowledged

6    being a member of the American Psychological Association,

7    correct?

8        A.   Yes, sir, currently a lifetime member, but I am

9    still a member.

10       Q.   And they issue journaled articles?

11       A.   Many journals.

12       Q.   Are you familiar with the journal article entitled

13   The Use and Misuse of Psychological Testing?

14       A.   Yes, sir.

15       Q.   Okay.  And that in that article it said,

16   psychologists, such as yourself, clinical psychologist,

17   must keep in mind that the standard psychological test,

18   such as the MMPI-2, were not developed for forensic

19   purposes.  Are you familiar with that?

20       A.   I'm not familiar with that statement.  I am quite

21   familiar with fact that the MMPI-2 other forms of it have

22   been used extensively in forensic work.

23       Q.   Other forms, absolutely correct, but not the MMPI-2?

24       A.   MMPI-2 and other forms, absolutely.

25       Q.   Because simply put, most psychologists, such as

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    yourself --

2      **A.**  Uh-huh.

3      **Q.**  -- lack the adequate training to conduct forensic

4    examinations.  Are you familiar with that article?

5      **A.**  I'm not familiar with those words, no.  It's been

6    awhile since I read it, but since you are reading directly

7    from the article, I'm assuming it is in there.

8      **Q.**  As a result, they fail to differentiate the role of

9    a forensic examinator from that of a clinician.  In turn,

10   they are likely to adopt procedures familiar to them, and

11   you indicated you're a fully licensed clinical

12   psychologist?

13     **A.**  That's correct.

14     **Q.**  And most have been in part due to the graduate

15   training and their ongoing clinical practice.  In too many

16   cases, this pattern results in indiscriminate and

17   thoughtless use of testing, and also results in opinions

18   of legal matters that are totally irrelevant to the tested

19   data, correct?

20     **A.**  If that's what the article says, yes, sir.

21     **Q.**  And you're also familiar with an another article

22   just written in July by a criminal defense attorney on the

23   issue of MMPI, indicating that MMPI is a broad band test

24   for general diagnosis.

25     **A.**  Did you say broad band, b-a-n-d?

*16-20098; USA v. KHALIL ABU-RAYYAN*

1     **Q.**  Yes, b-a-n-d.  Am I correct?

2     **A.**  I don't know that I would call it a broad band test.

3     I don't know what the author meant, but it was extensively

4     accepted across a variety of standards and across a

5     variety of courtrooms in the country.

6     **Q.**  It is my understanding in his particular case you

7     only chose to do one test?

8     **A.**  That's correct.

9     **Q.**  And that was the MMPI-2?

10    **A.**  That is correct.

11    **Q.**  Are you also familiar as a result of in the manual

12    for administration and scoring of the MMPI-2, that the

13    MMPI-2 was not specifically designed for the purposes of

14    evaluating individuals in the context of custodial parent

15    risk assessments, suitability for parole, nor to assess

16    whether someone will succeed in the community, supervised

17    release program or -- nor for the determination of whether

18    the individual will commit a crime if released?

19    **A.**  I'm not aware of those words, but since you are,

20    then I'm assuming those words exist, and I guess that's

21    all I can say to answer that.  Yes.  You read the words.

22    So somebody said that.

23    **Q.**  And there is a whole host of other tests that would

24    have been more specific as to what the -- what you were

25    testing for, is there not?

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    **A.**   No, sir.  I was testing -- I was evaluating the

2    defendant in terms of his current psychological and

3    emotional status, relevant to his suitability for release

4    from custody, and that, in my opinion, required a clinical

5    assessment involving the methods that I used in my report

6    and the MMPI-2.

7    **Q.**   Okay.  But you -- because -- despite the fact that

8    you were hired to say whether he is eligible or you

9    thought he was suitable for release, you rendered an

10   opinion regarding his competency, did you not?

11   **A.**   I was asked to render an opinion about that by

12   defense, yes, sir.

13   **Q.**   So you were asked to do both?

14   **A.**   Initially, I was asked to do the evaluation that I

15   just described to you.  In the course of the evaluation,

16   defense suggested to me that the government was motioning

17   for a competency hearing -- can I continue?

18   **Q.**   Yes.

19   **A.**   It was motioning for a competency hearing, and

20   defense said to me, on the basis of my work with the

21   defendant, could I offer an opinion regarding his

22   competency, which I translated to, of course, competency

23   skills, did he have competency skills, and on the basis of

24   my work with the defendant, I opined that I thought he was

25   competent, yes, sir.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1  **Q.**  But to come to that opinion, what test did you

2  conduct?

3  **A.**  Straight clinical work.  I asked him specific

4  questions about his competency skills:  Was he aware of

5  charges against him?  Was he aware of the judge's

6  function?  Was he aware of the prosecuting attorney,

7  defense attorney, a jury?  Was he able to relate in a

8  meaningful way with his attorney, et cetera, et cetera,

9  and when he answered all of those, which I believe was in

10  the affirmative, which is the essence of a competency

11  examination, I offered my opinion to defense.

12  **Q.**  But as an untrained, unqualified, uncertified

13  forensic psychologist, were you aware that there is a

14  specific test that forensic psychologists do, in fact,

15  conduct --

16  **A.**  There are several tests like that, yes.

17  **Q.**  Let me finish my question, please.

18  **A.**  My --

19  **Q.**  Let me finish my question, please.

20  **A.**  I'm sorry.

21  **Q.**  There is a specific test that trained forensic

22  psychologists employ in trying to determine somebody's

23  competency to stand trial.  Are you aware of that?

24  **A.**  I'm aware that tests like that exists, yes, sir.

25  **Q.**  Can you name that test?

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    **A.**  No, I cannot.

2    **Q.**  Have you ever heard of the examination of Competency

3    to Stand Trial Revised, the ECST-R?

4    **A.**  Yes, I have it many my home.

5    **Q.**  You didn't decide to use it?

6    **A.**  No, because the essence of that instrument is an

7    instrument addresses --

8    **Q.**  Simple yes or no.

9    **A.**  No.

10   **Q.**  Even though you were asked?  Even though you were

11   asked by defense to give an opinion on competency, you

12   chose not to give the one test that is specifically

13   designed to examine competency to stand trial, is that

14   correct, yes or no?

15   **A.**  Yes, that's correct.

16   **Q.**  You chose not to give an intelligence test to see if

17   the defendant had the correct mental aptitude to be able

18   to even perform the MMPI-2, correct?

19   **A.**  No, I interviewed the --

20   **Q.**  I appreciate you wanting to answer a different

21   question.  My question was, you did not even employ an

22   intelligence test to see if he met the requirements to

23   even employ the MMPI?

24   **A.**  That's correct.

25          **MR. WATERSTREET:**  Now I guess the rest, if

*16-20098; USA v. KHALIL ABU-RAYYAN*

1     the Court is to going to qualify him as a forensic

2     psychologist to give an opinion, I have a number of other

3     questions concerning the ultimate opinion that this

4     individual gave?

5           **THE COURT:**  Okay.  Why don't I hear from

6     Mr. Martin.

7           **MR. MARTIN:**  Could I ask some follow up

8     questions?

9           **THE COURT:**  Yes.

10          **MR. MARTIN:**  And to be clear, we are asking

11    him to qualified in the field of psychology and not

12    psychiatry for the record.

13

14                **VOIR DIRE CROSS EXAMINATION**

15

16  BY MR. MARTIN:

17

18    **Q.**  Dr. Danuloff, have you ever testified as a forensic

19    expert in court?

20    **A.**  I have not put myself forward as a forensic expert

21    no, sir.  I have put myself forward as answering questions

22    regarding forensic, but I have never put myself forward as

23    a certified forensic psychologist.

24    **Q.**  Is it common for a clinical psychologist to speak to

25    forensic issues?

*16-20098; USA v. KHALIL ABU-RAYYAN*

1      **A.**   Yes, sir, it is.

2      **Q.**   Could you explain why that is so?

3      **A.**   Clinical psychologists in certain circumstances are

4      asked to provide their skills in areas that are relevant

5      to clinical psychology, and when those areas are covered

6      or examined, in my experience courts have then made

7      determinations on the basis on that.

8            In this case this was a matter of my assessing

9      the defendant in terms of his current psychological and

10     emotional status, relative to the Court's determination of

11     whether or not he should be released from custody.  I

12     construe that as a clinical issue and provided --

13     approached it as a clinical issue.

14     **Q.**   Would you also say that the matter of competency has

15     an element of clinical psychology that could speak to that

16     issue as well?

17     **A.**   Yes, sir, as long as the psychologist addresses the

18     issue of competency skills, and whether or not the

19     individual in question is of a state of mind that those

20     competency skills are not compromise.

21     **Q.**   The government noted that you were not certified as

22     a forensic psychologist.  Why is it that you've chosen not

23     to?

24     **A.**   I never saw the absolute relevance of it in terms of

25     what the requirements are versus what a clinical

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    psychologist does, and what I have done in the past, and

2    the many, many, many, times that my testimony has been

3    accepted in courtrooms in the state of Michigan.

4        Q.   The specific case that the government brought out

5    Schoeder versus Schoeder, that was not a criminal case?

6        A.   That was a custody case, and I remember now who the

7    judge was that rendered that opinion, and it was a two to

8    one opinion.

9        Q.   The issue of training in forensic psychology, you do

10   have some training?

11       A.   Yes, I've attended numerous workshops, et cetera in

12   the application of psychological principles to issues of

13   law, yes, and in particular criminal law, criminal

14   responsibility, competency to stand trial, pre-sentencing

15   evaluations, et cetera.

16       Q.   Could you go through some of the recent trainings

17   that you've gone through?

18       A.   Oh, geez, it's been awhile.  I can't come up with a

19   list.  I apologize.

20       Q.   That's okay.

21       A.   It has not been recently.

22       Q.   Your work in forensic psychology, you have done work

23   with criminal responsibility?

24       A.   Yes.

25       Q.   And competency before?

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    **A.**  Yes, sir.

2    **Q.**  Sentencing mitigation?

3    **A.**  Yes, sir.

4    **Q.**  You have done pre-sentence evaluations?

5    **A.**  Yes.

6    **Q.**  That's been in state court and federal court or just

7    state court?

8    **A.**  State court, mostly in Macomb County. I did a great

9    deal of work for the late Lido Bucci who has been gone for

10   quite awhile now.

11   **Q.**  You are familiar with the American Psychiatric

12   Association I believe it is, their specialty guidelines?

13   **A.**  The American Psychological Association.  I'm not

14   familiar with the American Psychiatric --

15   **Q.**  Excuse me.  American Psychological Association has

16   specialty guidelines on forensic psychology?

17   **A.**  That's correct.

18   **Q.**  Are you familiar with those?

19   **A.**  Yes, sir.

20   **Q.**  In terms of talking about the MMPI, is there a

21   reason why you chose that test?

22   **A.**  Yes, because in my clinical opinion over the years,

23   it is well-documented, well-validated instrument that

24   provides an assessment of an individual's current ongoing

25   psychological functioning, and any vulnerability that

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    individual might have, and I'm frankly stunned at opposing

2    counsel's evidence that he brought to me, although I'm

3    sure it exists, I rely on the MMPI.  I use the MMPI, and

4    I've testified in court where the MMPI has been part of

5    what I've done, and I believe it's always been accepted.

6    I might have forgotten one, but to my experience, it has

7    always been offered and accepted in the Court of Law.

8        **Q.**  Was that the sole basis of your evaluation of Mr.

9    Rayyan?

10       **A.**  Absolutely not.

11       **Q.**  What other things do you normally look at if you're

12   doing this type of evaluation?

13       **A.**  Well in direct reference to those guidelines that

14   you mentioned in order for a thorough and competent

15   evaluation to occur, a psychologist has to take

16   information from a variety of sources, psychological

17   testing, if appropriate, direct examination of the

18   individual, and any kind of auxiliary information that is

19   relevant to the clinical question.

20           So in this matter I interviewed his father and

21   stepmother, and I reviewed various documents that I

22   mentioned in my report, and then, of course, saw the

23   defendants on two separate occasions.

24       **Q.**  In regards to competency, I believe defense asked

25   you when the government made the initial request for -- to

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    be sent for a psychiatric evaluation, for you to offer

2    your opinion, not a full report on whether you thought he

3    was competent?

4        A.   Yes.

5        Q.   Why is it that you did not do any testing at that

6    point?

7        A.   Because the defendant showed me clinically that he

8    had competency skills, skills that I just mentioned to you

9    and, in fact, when defense asked me for that

10   determination, in my second interview, I asked those

11   questions, and the defendant's answers were thorough and

12   complete.

13       Q.   What were some of the questions that you went

14   through with him?

15       A.   Are you aware of charges against you?  Are you aware

16   of the role of the defense attorney?  Are you aware of the

17   role of the prosecuting attorney?  Are you aware of what a

18   verdict means?  Are you aware of what a plea means?  Are

19   you aware of the role of the judge?  Are you aware of the

20   role of a jury?

21       Q.   And what was your sense of Mr. Rayyan?

22       A.   My sense of him was that he was competent and

23   confident in the answering those questions.

24            MR. WATERSTREET:  Your Honor, is he giving

25   opinion now, because I'm not sure if he's tendered and the

*16-20098; USA v. KHALIL ABU-RAYYAN*

1      Court found that he is qualified to render an opinion.

2                  **MR. MARTIN:**   I have one other question on

3      just the testing that's not going to ask about his

4      opinion.

5                  **THE COURT:**   Go ahead.

6

7  **BY MR. MARTIN:**

8      **Q.**   In terms of the intelligence test, you said you

9      didn't see the need to issue -- or you didn't give an

10     intelligence test?

11     **A.**   Correct.

12     **Q.**   Why is that?

13     **A.**   There was nothing presented to me that indicated

14     that intelligence was an issue.  Had the instrument been

15     such that he showed an inability to understand the

16     questions which are written, if I'm not mistaken on a

17     sixth or seventh grade level, then I would have done

18     something to reassess his intellectual abilities.

19                 **MR. MARTIN:**   I have no further questions in

20     terms of his asking about his qualifications.

21                 **THE COURT:**   All right.  You're asking to

22     elicit opinion testimony from this witness on both

23     competency and the safety of potential release?

24                 **MR. MARTIN:**   Yes, your Honor.

25                 **THE COURT:**   All right.  Did you have any

*16-20098; USA v. KHALIL ABU-RAYYAN*

1   other argument, either side?

2            **MR. MARTIN:**  Well, your Honor, I believe Dr.

3   Danuloff has been working since 1972 as a clinical

4   psychologist, and he's also done forensic work for a

5   number of courts, and qualified by a number of courts to

6   give that testimony.  I think his comments about not being

7   certified in forensic, your Honor may take that into

8   account when you're evaluating his opinion, but I do think

9   he's qualified to give an opinion of Mr. Rayyan's current

10  psychological state.

11           **THE COURT:**  All right.  Anything

12  Mr. Waterstreet from the government?

13           **MR. WATERSTREET:**  Your Honor, I have

14  additional questions of him.

15       Your Honor, I don't believe he has established

16  that forensic psychology is the using psychology and

17  presented in a court case in a legal proceedings.  By the

18  defendant's own statements, previous testimony and today,

19  he's indicated to the Court that he is not qualified.

20       The fact that he may have gotten qualified in the

21  past, because perhaps it was not challenged, the parties

22  agreed to it or whatever, does not establish his

23  competency at this time, and his expertise in the area.

24       It's their witness.  It's their burden to show

25  that he is qualified, and frankly, your Honor, I think

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    they have fallen way short of establishing that.

2              **THE COURT:**  All right.  Well, there are two

3    issues that the defense counsel has sought to have this

4    witness address:  One, is the competency of the defendant

5    as it relates to that -- well, and other, of course, is

6    the propriety of a release with conditions as a matter of

7    a bond determination.

8              As it relates to the question of competency, the

9    testimony here is obviously of limited value, given the

10   witness' -- given that the witness is not a board

11   certified forensic psychologist.  He is -- had a --

12   there's obviously some question about the testing that

13   took place as part of the preparation of this hearing, and

14   yet, the showing that is required for the Court to assess

15   this motion for referral for testing that's been filed by

16   the government is a very modest showing.

17             The Court is directed to consider the statements

18   of defense counsel based on the interaction between

19   defense counsel and the defendant, directed to consider I

20   think the interaction between the defendant and others

21   that may be occurring at any given time to assess

22   competency.

23             This witness had interaction with the defendant in

24   his interview.  Whether the professional opinion of

25   competency is taken as such by the Court or not, whether

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    his limitations as an expert by knowledge, skill,

2    experience, training or education is sufficient for the

3    Court to consider his opinion testimony as a general

4    proposition or not, I don't think it comes into

5    significant play for the Court's own assessment of the

6    government's motion, and so I will allow the parties to

7    explore the interaction why the witness believes the

8    defendant is not in need of additional testing as it

9    relates to his competency.

10           And as it relates to the potential risk posed by

11   the defendant if released, the Court is persuaded that the

12   witness lacks the training and educational background to

13   offer opinion testimony on that issue, and so I'll limit

14   the testimony he does offer here today to the question of

15   competency, and not to the question of potential risk to

16   the safety of the community that he may or may not pose.

17           So you want to address questions?

18                 **MR. MARTIN:**  Yes, your Honor.

19                 **THE COURT:**  Go ahead.

20                 **MR. MARTIN:**  Thank you.

21

22                 **DIRECT EXAMINATION CONTINUED**

23

24   **BY MR. MARTIN:**

25

                    *16-20098; USA v. KHALIL ABU-RAYYAN*

1      **Q.**  Dr. Danuloff, can you go through the things that you

2      did in terms of looking defendants and evaluating him

3      psychologically?

4      **A.**  I'm confused now.  Are you asking me about

5      competency or general work?

6      **Q.**  Well, did the work that you did in terms of when the

7      defense first asked you evaluate Mr. Rayyan for his

8      psychological state, could you go through the things that

9      contributed to your eventual opinion in terms of his

10     competency?  Did you -- met with --

11     **A.**  I met with him on two occasions.

12     **Q.**  Where did you meet with him?

13     **A.**  In the Wayne County Jail.  I met with him for two

14     clinical interviews, approximately 2.25 hours, something

15     like that, and psychological testing was done with the

16     MMPI-2.  I interviewed his mother (sic) and stepmother in

17     my office and examined various documents that are

18     mentioned in my report.

19     **Q.**  In particular, defense asked you to look at the

20     statements that the government had put in the initial

21     complaint in this case --

22     **A.**  Yes.

23     **Q.**  -- that Mr. Rayyan had made to an undercover agent?

24     **A.**  Yes.

25     **Q.**  And also to look at the statements that's been used

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    at the initial detention hearing in this case?

2        **A.**  Yes, sir.

3        **Q.**  When you met with Mr. Rayyan, did you address those

4    messages between him and the undercover agent?

5        **A.**  Yes.

6        **Q.**  You also discussed his drug usage?

7        **A.**  Yes, sir, I did.

8        **Q.**  You went over his family background?

9        **A.**  I did.

10       **Q.**  And education?

11       **A.**  I did.

12       **Q.**  What was your -- what was your take away from that,

13   and why he might have made these statements that have been

14   used in the initial complaint as a basis for to the

15   competency request?

16           **MR. WATERSTREET:**  Is this only for

17   competency, whether he understands the nature of the

18   charges?  I think the doctor has already gone over that,

19   and the Court accepted that.  I don't know where this is

20   going to, unless perhaps they're trying to  get in

21   something the Court said that he's not qualified to

22   testify about.

23           **MR. MARTIN:**  If I may, your Honor, the motion

24   for psychiatric testing makes numerous mention of the

25   comments that Mr. Rayyan made to undercover agent.  It

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    also goes through these ideas with him having heard

2    voices.  I think that's relevant for Dr. Danuloff to

3    mention and discuss.

4              **THE COURT:**  Go ahead.

5

6    **BY MR. MARTIN:**

7       **Q.**  Dr. Danuloff, could you comment on what your opinion

8    is in regards to the -- the comments made by Mr. Rayyan to

9    the undercover?

10      **A.**  Well, the comments that he made to the undercover

11   agent were egregious and horrendous, and taking on their

12   face, just on their face, they are very, very disturbing.

13   You take the comments and put them within the context of

14   those comments, the context being Mr. Rayyan's state of

15   mind at the time, the history of his life, and in

16   particular the history of a very lonely isolated young man

17   who has had absolutely no relationship with women

18   whatsoever, and take into consideration essentially a

19   negative history for any acts of violence.  He did have a

20   fight with his brother at one point.  No history of any

21   attempts of radicalization or any attempts or any type of

22   violent behavior, and his extensive use of marijuana since

23   18 years of age.

24              When I put all of those findings together, and I

25   put Mr. Rayyan's comments to the undercover in that

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    context, it is my view that those horrendous comments were

2    made in his effort to maintain the affection and the

3    contact from the, quote, girl, the female who was the FBI

4    agent, who was communicating to him, both sometimes by

5    telephone and mostly by text, and as I examined Mr.

6    Rayyan, it became very clear to me that what we had here

7    was a drug adol young man who was very, very shy, who's

8    living his life in a very isolated way working for the

9    family pizzeria for 60-70 hours a week, had no successful

10   contact with a female, and who, upon getting contact,

11   especially with the first female, was smitten by the

12   contact, and continued to do what he did in order to

13   maintain her statements of affection and statements of

14   love -- both contacts actually.

15          I remember asking the defendant well, what was

16   going to happen here?  What was going to happen when it

17   was pushed comes to shove -- and that I think the second

18   contact's name was Ghaada -- what was going to happen if

19   you ever met her and she said it is time for us to do

20   jihad, and Mr. Rayyan said in a way that I believe was

21   genuine, I wouldn't have done it.  I never wanted to do

22   it.  What I wanted to do was to convince her that I

23   reliable and safe so I could save her from what she was

24   doing, and so that we could marry, and I could show her

25   the world in a way so that she could -- she would no

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    longer be so bent on -- this is my word -- so bent on the

2    destruction that she spoke about.

3         When I put all of this in the clinical context,

4    the horrendous nature of his comments, and they were

5    horrendous, it changes the nature of the context of those

6    comments.

7    **Q.**  You mentioned just to clarify --

8         **MR. WATERSTREET:**  Your Honor, for what

9    purpose?  Is this for the purpose of deciding his

10   competency?

11        **THE WITNESS:**  Are you asking me, sir?

12        **MR. WATERSTREET:**  Yes.

13        **THE WITNESS:**  I'm answering defense's

14   question.  It's up to attorneys -- I think the Court to

15   determine where I'm going with this.

16        **MR. WATERSTREET:**  That's the question, your

17   Honor.  Is this for competency, or is this an attempt to

18   try to get in the information this Court said he is not

19   qualified to testify about?

20        **MR. MARTIN:**  Your Honor, I am not trying to

21   get as an attempt to subvert your Honor's ruling.  I do

22   believe all of these comments are very relevant to at

23   least the way the government has presented its competency

24   request.

25        **THE COURT:**  The interaction again between the

*16-20098; USA v. KHALIL ABU-RAYYAN*

1     defendant and this witness, and the manner of his

2     responses to these questions might lead -- might lead to a

3     consideration of the bond release conditions that are

4     possible to set, but they are offered here not for that

5     purpose.  They are offered for the Court's ability to

6     assess whether he is oriented to the case in a fashion

7     that would lead to a competency.

8                    **MR. WATERSTREET:**  Thank you.

9                    **THE COURT:**  Go ahead.

10

11    **BY MR. MARTIN:**

12       **Q.**  Dr. Danuloff, there's been comments that defendant

13    made about hearing voices, and he made these comments to

14    the undercover.  Did you address those in any way during

15    your meeting with him and your review of his file with the

16    family?

17       **A.**  Yes.

18       **Q.**  What opinion can you give on that?

19       **A.**  He reported to me those were his efforts to gain

20    more contact and securance from the girl that he was

21    talking to, and that he was not hallucinatory in any way,

22    but wanted to continue to gain more and more of her

23    attention.

24       **Q.**  Dr. Danuloff, some of these things that he discussed

25    about these voices that he wants to shoot up a church,

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    behead, skin people, those don't give rise of concern to

2    you?

3        A.   If you just listen to the comments without any

4    context, absolutely they give rise to concern to me, but

5    within the context of my examination, my view of them in

6    terms of the seriousness and what they mean is diminished.

7        Q.   Can you go through some of the things that you think

8    diminished that concern?

9        A.   He has no history to my knowledge of any violence

10   towards society or any other person.  There is a fight

11   that he had with his brother apparently.  There is no

12   evidence in the family in my interview with the dad and

13   step mom and with the defendant of any efforts of

14   radicalization.  I asked him with regards to

15   radicalization, why did you start looking at these

16   websites in the first place?  What was the draw, and he

17   said that he found them interesting, and I pursued that a

18   little bit.  What do you mean you found it interesting?

19   They are pretty horrendous, and he said, yes, they are,

20   and I found them interesting.  It was fascinating that

21   this kind of thing could happen in the world.

22            It was also my opinion that during the time that

23   he was examining some of these, he was also under the

24   influence of excessive amount of marijuana that he was

25   smoking.  So I wanted to know about that, and I wanted to

*16-20098; USA v. KHALIL ABU-RAYYAN*

1   know in particular did these horrendous websites generate

2   desires toward radicalization, desires toward taking out

3   violence against society, and in terms of my careful

4   examination of him, I believe that they were simply that.

5   He was really interested.

6           This is not a 21 year old adult.  Mr. Rayyan,

7   unfortunately, psychologically is still an adolescent and

8   his judgment is that of an adolescent, compromised by his

9   life experience, and compromised by his excessive use of

10  marijuana since he was 18 years of age.

11  **Q.**  To clarify, you also mentioned earlier that you said

12  that there were two women that he mentioned, that he

13  discussed with you that he was talking to?

14  **A.**  Yes.

15  **Q.**  Could you go into that a little bit more?  There was

16  a woman from --

17  **A.**  He told me that there was a woman from Pakistan, a

18  Pakistani woman who he -- first contacted him, and he said

19  that he immediately fell in love with her, and that he had

20  all kinds of thoughts and fantasies that they were going

21  to have a life together.

22          As I remember, he asserted they were going to

23  meet in Cleveland, and he may have even asked his dad if

24  they could go to Cleveland to meet her, and upon that

25  question, has I understand, the contact with her -- and I

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    think her name was Ghaada or something like that --

2    immediately ended, and he was devastated at that loss,

3    because he thought again he found answers to his lonely

4    life with relations to females.

5       Q.   How is it possible that someone can make it to 21

6    without having a relationship with a girl?

7       A.   Well, that's a very good question.  He's painfully

8    shy.  While he was somewhat active in high school in

9    sports, he didn't hang around with girls, and his -- he

10   grew up in a very -- a fairly orthodox Muslim family, and

11   according to Muslim tradition and culture, you don't

12   pursue a girl unless you're interested in marriage.  So it

13   made sense to me, and again from the time -- I don't

14   remember when his dad opened the pizzeria -- I think Mr.

15   Rayyan was in his senior year of high school, maybe junior

16   year -- his life was spent going to school and working at

17   pizzeria seven days a week.

18      Q.   Sometime has past between the time of these comments

19   that the government has raised, the comments that he made

20   to the undercover, and between the time you interviewed

21   and evaluated Mr. Rayyan.  Do you believe that his mental

22   state changed from the time he initially made these

23   comments and when you interviewed him?

24      A.   No, sir.  If, in fact, his mental state at the time

25   that he made those comments were as deteriorated -- in all

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    due respect as the government is trying to show -- I don't

2    know how clinically Mr. Rayyan could have recovered and

3    basically function the way he did with me in the

4    interviews and in the onerous environment of a jail.

5        **Q.**   When he say that, did you talk to him about his

6    experience in the jail?

7        **A.**   Yes.  What do you do?  I read.  I don't get in any

8    trouble.  I did not talk to the jail people about that,

9    but I know that he was on suicidal watch at first.

10   Perhaps defense told me that he was not on any suicidal

11   watch and there didn't seem to be any special precautions.

12       **Q.**   In terms of Mr. Rayyan understanding the case

13   against him, what was, in your interactions was him, his

14   understanding of this case?

15       **A.**   Well, he was thoroughly familiar with the events

16   that took place that led to the original state charges.

17   He took full and total responsibility for them.  He denied

18   any intent whatsoever and asserted that he had some

19   misunderstanding of the concealed carry law that was

20   involved in the initial charges.

21            Again, he was deeply ashamed of what happened,

22   and deeply ashamed that he brought this kind of shame to

23   his family.  He said that he spoke with Mr. Shanker in

24   very productive ways, and Mr. Shanker understood him, and

25   that he understood Mr. Shanker, and he was aware of why he

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    was mandated -- or into the Wayne County Jail, and that

2    there were issues about terms of the condition of his

3    release by virtue of not so much the marijuana charge and

4    gun charge, but because of the texts and communication

5    with the two girls, and he was deeply ashamed that he was

6    taken in that way.

7        Q.   In terms of his ability to assist his defense, do

8    you see a concern there?

9        A.   On the basis of his performances with me, without

10   taking into consideration comments from Mr. Shanker that

11   he and client seemed to get along well, on the basis of

12   his clinical presentation to me, I saw no evidence that

13   Mr. Rayyan's competency is an issue.  He did not appear to

14   be suffering from an ongoing psychological disorder that

15   would compromise his competency skills, and he manifested

16   those competency skills to me in relation to the questions

17   that I asked.

18           MR. MARTIN:  I have no further questions.

19           THE COURT:  All right.  Thank you.

20       Mr. Waterstreet?

21           MR. WATERSTREET:  Thank you, your Honor.

22

23                    CROSS EXAMINATION

24

25   BY MR. WATERSTREET:

                  *16-20098; USA v. KHALIL ABU-RAYYAN*

1      **Q.**  Now that you have given your opinion concerning this

2      matter, I do want to get into the situations on which you

3      have knowingly ignored facts in the past, and as a matter

4      of fact, you have been called out on that on more than one

5      occasion by the courts.

6            Are you familiar with People versus McCall?

7      **A.**  McCall?

8      **Q.**  M-c-C-a-l-l.

9      **A.**  No, sir, I am not.

10     **Q.**  Found at 2005 Westlaw 2679689.  You were called to

11     testify on behalf of a person who was charged with murder.

12     **A.**  I'm sorry McCall, M-c-C-a-l-l?

13     **Q.**  Yes.  This is a man who beat his girlfriend

14     senseless two weeks before she was murdered, and you were

15     called in to testify that he should really be convicted of

16     manslaughter because he had no prior violent acts towards

17     her?

18     **A.**  I have no memory of that, sir.  I am sure you have

19     the documents.

20     **Q.**  Let's see if I can refresh your memory.

21     **A.**  Sure.

22            **MR. MARTIN:**  Your Honor, I would object to

23     marching through another litany of cases that Dr. Danuloff

24     testified to in the past.  I believe it is fair to

25     question him on testimony that he's already given with

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    regard to Mr. Rayyan, but in terms of his what he has done

2    in the past as to his qualifications, your Honor has ruled

3    on that matter.

4              **MR. WATERSTREET:**  It goes directly to his

5    credibility and willingness for the Court to accept

6    whatever he testifies to.

7              **THE COURT:**  I'll allow you to engage in that

8    in a limited way I trust.

9              **MR. WATERSTREET:**  Your Honor, if he

10   remembered these, we would be able to move through this a

11   lot quicker, but I apologize.

12             **THE COURT:**  Okay.

13

14   **BY MR. WATERSTREET:**

15        **Q.**  You are Dr. Lyle Danuloff, clinical psychologist who

16   evaluated the defendant?

17        **A.**  Can I hold this?

18        **Q.**  Are you not?

19        **A.**  I am.

20        **Q.**  Okay.

21        **A.**  This is an unpublished opinion from the court.

22        **Q.**  Yes, it is an unpublished opinion, correct.  Are you

23   familiar with it now?

24        **A.**  No, sir, I'm not.  McCall versus State of Michigan?

25   With all due respect, sir, no, I don't remember this case.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    **Q.**  You don't remember a time in which you were

2    challenged for intentionally forgetting information that

3    was given to you, and testifying to the contrary?

4    **A.**  Intentionally, no, sir, I do not.

5    **Q.**  Okay.  Well, in this particular case is it not true

6    that you were hired by the defense attorney to try to

7    convince the jury that they had no prior physical -- no

8    prior violent past?

9    **A.**  Mr. Waterstreet, I don't know how many times I can

10    say this to you, I don't remember the case.

11    **MR. WATERSTREET:**  I'll ask the Court to take

12    judicial notice of it, and I'll just read in the facts to

13    the Court.

14

15    **BY MR. WATERSTREET:**

16    **Q.**  In this case you testified based solely on what the

17    defendant told you, that he did not have a violent

18    relationship, there was no prior domestic abuse, and the

19    police had never been called as a result of that abuse.

20    Yet, despite that fact, you had been presented with

21    evidence that a month earlier, the police had been called

22    to the residence, the defendant had beaten the victim and

23    threatened to kill her.

24    Introduced into evidence was a 911 call, and

25    pictures of the victim lying on the stretcher, being

*16-20098; USA v. KHALIL ABU-RAYYAN*

1     treated by emergency personnel, having a laceration of her

2     eyes, bruising and redness on her cheeks and forehead, a

3     bite mark on her breast, and photos of blood stain scene

4     of the beating, and eventually this matter was appealed in

5     a habeas to the Eastern District of Michigan, and that's

6     2010 Westlaw 2287435.

7         A.   That was five years ago then roughly.  I don't

8     remember the case.

9         Q.   And Judge Battani provided additional facts that you

10    did not rely -- that you ignored as part of relying solely

11    on what the defendant said.  Are you aware of that?

12        A.   No, sir.  I'm racking my brain.  I don't have any

13    memory of that case.

14        Q.   And upholding that conviction she revealed

15    additional facts that were ignored by you that he, in

16    fact, did kill his girlfriend October 4th, and the victim

17    was lying on a stretcher, and there were bite marks on her

18    breasts.  You don't remember that?

19        A.   No, sir.  I apologize.  I have no memory.

20        Q.   Do you remember Deal versus Danuloff?

21        A.   I do.

22        Q.   That's a published opinion, 242 Michigan Appeals at

23    120, and that was a situation where you were called in as

24    clinical psychologist to render an opinion to the court as

25    to which parent should the children be placed with,

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    whether they be placed with the father or the mother,

2    correct?

3        A.   That's correct.

4        Q.   And in that situation --

5                MR. MARTIN:   Your Honor, if he --

6                MR. WATERSTREET:   -- you ignored evidence

7    that was presented to you in making in that determination?

8        A.   No, sir.

9

10   BY MR. WATERSTREET:

11       Q.   Those were the allegations, were they not?

12       A.   Those are the allegations.  I don't believe --

13               THE COURT:   Hold on.

14               MR. MARTIN:   I object him limiting it to

15   criminal cases where Dr. Danuloff testified as being

16   relevant.  A parent parental custody matter is not

17   relevant to --

18               MR. WATERSTREET:   It goes to his credibility,

19   your Honor?

20               THE COURT:   The Court will overrule the

21   objection.

22

23   BY MR. WATERSTREET:

24       Q.   And that the evidence -- at least the finding of the

25   court was that evidence had been provided by the maternal

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    grandparents.  Before you made your recommendation, and

2    before you made the recommendation that the children

3    should be placed in the father's care solely, was that

4    prior information that the father had a history of sexual

5    deviancy, information was brought that the father had been

6    sexually abusing the children, and having been provided

7    that information, you still recommended custody to the

8    father, and it wasn't just based upon their claims, the

9    father thereafter plead guilty, and admitted to engaging

10   in sexual abuse of the children, taking indecent liberty

11   with the children, and other charges involving minors, and

12   he was sentenced the to prison.

13           Isn't that the facts of that case?

14   **A.**   I became aware of that later on as the Deal family

15   brought suit, yes.  I was not aware of that prior to that.

16   **Q.**   But that's not what the court found.  The court

17   found the reason you were able avoid losing your license,

18   being sued into oblivion was the fact the court made

19   decision that because you were hired by the court, you

20   were given immunity, correct?

21   **A.**   It was a case of first impression, yes, sir.

22   **Q.**   Are you familiar with DiJulie versus the city of

23   Taylor?

24   **A.**   Yes, sir.

25   **Q.**   Okay.  And wasn't that a situation where a police

*16-20098; USA v. KHALIL ABU-RAYYAN*

1   officer from the Taylor Police Department had been

2   originally been placed on medical leave because of a

3   shoulder problem, and then eventually he started to hear

4   voices and started to have delusions, and was sent to

5   another doctor, and that other doctor found them to be --

6   that would cause him not to be able to return to work.  As

7   a matter of fact, he even said that he had voices urging

8   him to hurt himself, and that he wanted to -- visions of

9   viscerating or cutting the guts out of the police chief

10  and others in the police department.  And then you were

11  brought in later and said that he was perfectly okay to

12  return to work, is that correct?

13      A.  Well, the way you described the case is quite

14  different than my memory of the case.

15      Q.  Well, we can find that case at 2014 Westlaw 7338890.

16          And there was even testimony given in that case

17  in which you went up to the current police chief, and said

18  that this is the angriest son of a I ever met in my life,

19  but if you tell anyone I said anything that, I will denied

20  that?

21      A.  I never said that to the chief.  I did say to the

22  chief, if I may, that yes, he's angry, but that anger did

23  not make him dangerous nor did that anger make him unfit

24  to be rehired.  That case was --

25      Q.  Are you aware that the court -- I know you're not a

*16-20098; USA v. KHALIL ABU-RAYYAN*

1     forensic psychologist, so bear with me here.

2              When a court states that the plaintiff -- and

3     the plaintiff in this case was Taylor Police Officer

4     seeking to get his job back -- provided no evidence

5     whatever, which means they provided no evidence, basically

6     totally ignoring your opinion, because they believed it to

7     be bias, did not engage in any analysis of your

8     credibility versus the other, and just basically said, I'm

9     not even going to consider Dr. Danuloff, and found that

10    the city of Taylor was proper in not hiring him back, is

11    that correct?

12    **A.**   I don't know how the case evolved.  I know I was

13    deposed in the case, and past that point I have no

14    knowledge how the case was determined.

15    **Q.**   Now after you were -- now after questioned the

16    defendant and asked him his version of the events, because

17    I think you indicated earlier despite your history of

18    being one sided, that in this case you were going to give

19    a fair and balanced report, correct?

20    **A.**   Mr. Waterstreet, you have alleged many times and you

21    bring documents about the opinion that I've been one

22    sided.  In my career I've attempted to offer objective

23    opinions on the basis of the information that I've

24    collected and evaluations.

25              I remember that case specifically.  I have no

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    memory of what happened afterwards.  So what you're

2    telling me is brand new to me.  In that case, if I may --

3        Q.  So I've moved onto another question.

4        A.  Oh, okay.  I'm sorry.

5        Q.  If your attorney feels it is important that you be

6    able to try to explain why the judge ruled the way he did,

7    that's fine.  He can ask that, okay?

8        A.  Uh-huh.

9        Q.  Is that all right?

10        A.  Go right ahead.

11        Q.  After you talked with the defendant, did you go back

12    to his attorneys and say hey, this is what he told me.  Do

13    you have any evidence that says otherwise?

14        A.  Any evidence --

15        Q.  So he says --

16        A.  I don't understand your question.

17        Q.  Let's say for example, the defendant told me there

18    was some misunderstanding about the charges of where he

19    could carry a concealed weapon or not.  You testified to

20    that a few minutes ago there was --

21        A.  I'm sorry.  You're talking about this case now?

22        Q.  Yes, I am.

23        A.  I'm sorry.

24        Q.  Let me start over.  In your discussions with Mr.

25    Rayyan.

                    *16-20098; USA v. KHALIL ABU-RAYYAN*

1     **A.**  Right.

2     **Q.**  Okay.  Let me back up.

3          You said that you performed the MMPI-2 test?

4     **A.**  That's correct.

5     **Q.**  And that test takes approximately an hour and a half

6     to two hours depending on a person's mental abilities?

7     **A.**  Give or take, yes, sir.

8     **Q.**  You met with him for two hours and 15 minutes?

9     **A.**  Yes, sir.

10    **Q.**  So when he's talking the test -- were you the one

11    that performed the test?

12    **A.**  No, sir.  I have the test to defense counsel because

13    I could not sit in the jail for two and a half hours or

14    whatever the amount of time was.  The test was taken under

15    the supervision of the defense counsel in the jail.

16    **Q.**  Really?

17    **A.**  Yes, sir.

18    **Q.**  Contrary to the dictates of the MMPI that says it

19    should only be given by a trained psychologist, you

20    decided to give it to the defense attorney to do it?

21    **A.**  Yes, sir.

22    **Q.**  And then you use that as part of the basis to give

23    an opinion to this Judge?

24    **A.**  Yes, sir.

25    **Q.**  Okay.  So in the two hours and 15 minutes talking to

1    Mr. Rayyan, he indicated that apparently there was some
2    misunderstanding about the charges where he could keep the
3    gun and things like that?
4        **A.**  Correct.
5        **Q.**  Now after hearing something like that or anything
6    else that he said, did you go back to the attorneys and
7    say, he told me this because I want to be fair and
8    balanced here?  Is there anything that has been provided
9    to you by the government that says otherwise?
10       **A.**  I knew that he --
11       **Q.**  It's a simple yes or no.
12       **A.**  I don't remember.  I think we did discuss it, but I
13   don't have a specific memory of that.  I apologize.
14       **Q.**  So after you sat with Mr. Rayyan, took down
15   everything that you thought was important for your
16   determination, did you go back to the attorneys and say,
17   this is what he told me, and do you have anything that
18   supports or refutes what he told me?
19       **A.**  Did I ask that specific question?  No, sir.
20       **Q.**  Okay.  So you didn't try to verify with the
21   information that the government had presented, whether Mr.
22   Rayyan was being honest with you or whether he was lying
23   to you?
24       **A.**  Well, I discussed my findings with the attorneys.
25       **Q.**  It is a simple yes or no question doctor.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    **A.**  Okay.  The answer is no.

2    **Q.**  So the fact that he confessed to the Wayne County

3    Police and said that he knew he did wrong, and he knew

4    that he was suppose to put the gun in the trunk, you

5    issued a report to this Judge that apparently he had been

6    misled, and that's what Mr. Rayyan had said, he had been

7    misled in believing that he could carrying the gun

8    illegally in the car?

9    **A.**  Correct.

10   **Q.**  So there's a prime example that had you simply

11   checked with the evidence that was presented, you would

12   know that Mr. Rayyan was making up a story, correct?  He

13   was lying to you?

14   **A.**  I'm still not sure that he was lying, but you say

15   that he was, then he was.  Yes, I would have known that he

16   was lying.

17   **Q.**  I will show you the written statement the defendant

18   gave on day of his arrest on October 7th, and there's a

19   highlighted section in that.  Can you read what he said in

20   had a highlighted section?

21   **A.**  I pulled over and remember that I had my gun on me.

22   I tried to hide it under my seat because I panicked.

23   **Q.**  And then he went onto say the next, highlighted

24   section.

25   **A.**  No, but -- I don't know if that's but or not -- I

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    was open carrying it to work, but I knew when I got in the

2    car with it, I was wrong.  I just forgot to put it in the

3    trunk.  I only had it two days.  I just bought it on

4    Monday at Dunham's on Ford Road.

5       **Q.**  So he admitted to the police that he knew he was

6    carrying it improperly, but in your report you indicate

7    that he said something completely different?

8       **A.**  Yes, that he was misinformed by the owner of the gun

9    store as to the definition of open carrying and concealed.

10      **Q.**  And you also indicated that one of the reasons you

11   pretty much discounted the horrific things that he has

12   said, that he heard voices and things of that nature, is

13   because at the time you assert that he had a drug adol

14   mind.  Is that a fair assessment of what you testified to?

15      **A.**  No.  I asserted that I believe what he was saying

16   was an order to contain -- obtain more attention from the

17   woman who he was speaking to.

18      **Q.**  Those were who we all now know are people who were

19   acting on behalf of the United States?

20      **A.**  Correct.

21      **Q.**  But didn't he make similar statements that voices

22   were talking to him to people other than those women?

23      **A.**  I don't remember that he did that.  I don't remember

24   that he did that.

25      **Q.**  Bear with me for a moment.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    **A.**   Sure.

2    **Q.**   Were you provided the copy of the Wayne County Jail

3    intake report dated February 4, 2016?

4    **A.**   I don't believe I was.

5    **Q.**   Okay.  So again that would have been one of the

6    situations that had you asked his attorneys, they could

7    have provided you information that would have been

8    contrary to that?

9    **A.**   I assume.

10   **Q.**   And in that report it says that the defendant said

11   that he was hearing voices to hurt himself.  He was not

12   talking to those women at that time, was he?

13   **A.**   I think those comments were made at the Wayne County

14   Jail?

15   **Q.**   Right, at the Wayne County Jail?

16   **A.**   Right.  Yes.

17   **Q.**   He said that he was hearing voices at the Wayne

18   County Jail.  He wasn't talking to the women, was he?

19   **A.**   That's correct.

20   **Q.**   You have to bear with me.  I have to grab your

21   report because I have some questions about that?

22              **THE WITNESS:**  Your Honor could I get some

23   water?

24              **THE COURT:**  Sure.  Are you ready

25   Mr. Waterstreet?

*16-20098; USA v. KHALIL ABU-RAYYAN*

1              **MR. WATERSTREET:**  If I may have one more

2      moment?  I may have misfiled his report in another file.

3      Now I have to look through all of them.

4              Thank you your Honor.

5              **THE COURT:**  Okay.

6

7  **BY MR. WATERSTREET:**

8      **Q.**  So I want to go over again specifically what you

9      relied on, okay?

10     **A.**  Yes, sir.

11     **Q.**  Two hours and 15 minute contact with the defendant,

12     at least that's what you say in the first report dated

13     May --

14     **A.**  Total contact roughly on March 16th and March 24th.

15     **Q.**  Okay.  You revert to them in your first report of

16     May 25th, you refer them to them as videos of his

17     behavior.  Which specific videos of his behavior?

18     **A.**  In district court when he allocuted to the gun

19     charge and marijuana possession.

20     **Q.**  Okay.

21             **THE COURT:**  Try to keep your voice up,

22     please.

23

24  **BY MR. WATERSTREET:**

25     **Q.**  What is the other one that you watched?

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    **A.**  An interview between Mr. Rayyan and, if I'm not

2    mistaken, an FBI agent.

3    **Q.**  A single FBI agent or two FBI agents?

4    **A.**  There was one in the room with him.  He was

5    discussing his behavior in relation to the gun charge.

6    **Q.**  That was a --

7    **A.**  Video.

8    **Q.**  Detroit Police I believe?

9    **A.**  I apologize.

10   **Q.**  So defense counsel -- did you ask for anything else

11   to be provided to you other than those two videos?

12   **A.**  I asked them.  Defense counsel this is what we have

13   for you.  Please examine it.  Later on defense counsel

14   gave me something else recently.  I'm not recalling what

15   it is.  I apologize, but after this report.

16   **Q.**  So the only thing they provided you to use in your

17   analysis were those two videos?

18   **A.**  No, I have an affidavit.

19   **Q.**  Right.  Right.  I'm talking about the videos at this

20   point.

21   **A.**  I believe so.

22   **Q.**  They did not give you the video in which he made

23   his -- made statements to the FBI?

24   **A.**  I don't believe they did.

25   **Q.**  Okay.  Then you said sections of text

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    communications, transcripts with the U.C. regarding

2    statements he indicated that may be suffering from a

3    serious mental disorder.  Do you have that list of those

4    transcripts?

5        A.  Specific list of the transcripts no, sir.  They were

6    the ones where he mentioned the devil talking to him, et

7    cetera.

8        Q.  And that's when you determined that he was competent

9    in that initial report May 25th (sic) without any

10   indication of any testing whatsoever?

11       A.  I determined that he was competent as a result of my

12   contact with him, and his ability to answer questions that

13   indicated competency skills.

14       Q.  Okay.  My question is that's when you determined

15   competency, and indicated no testing whatsoever, is that

16   yes or no?

17       A.  That's yes.

18       Q.  And then you indicated on May 29th (sic), you issued

19   another report, a second report, correct?

20       A.  Yes, sir.

21       Q.  And this is the first time that you identify that

22   you conducted two interviews, May 16th (sic) and May 24th

23   (sic)?

24       A.  Yes, sir.

25       Q.  And that you interviewed the father and stepmother?

*16-20098; USA v. KHALIL ABU-RAYYAN*

1     **A.**  Yes, sir.

2     **Q.**  And you reviewed the criminal complaint?

3     **A.**  Yes, sir.

4     **Q.**  The video of the law enforcement officer, his

5     allocution, his statements and phone calls between the

6     defendant and U.C.?

7     **A.**  Not the phone calls themselves, but texts of --

8     what's the word I'm looking for?

9     **Q.**  Transcript?

10    **A.**  Thank you.

11    **Q.**  You didn't listen to the tone of the voices to see

12    if one was being sympathetic or one was trying to push

13    somebody into --

14    **A.**  I listened to conversations between the defendant

15    and the second girl.

16    **Q.**  The recordings?

17    **A.**  Yes.

18    **Q.**  How many recordings did you listen to, because you

19    don't have that listed on the items?

20    **A.**  I apologize.  That came after this report.  I

21    listened to various sections of the recordings, and

22    conversations about him wanting to kill himself, the

23    individual working for the government saying don't do

24    that.  You should only die through jihad.

25    **Q.**  That's not exactly what you said.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    **A.**  Well, it may not be, but something like that, and

2    she encouraged him not to kill himself, and as time went

3    on, he said that he felt better, et cetera.

4    **Q.**  That was a phone call on February 2nd, wasn't it?

5    **A.**  I'm not aware of the date.

6    **Q.**  Did you listen to the whole conversation or just the

7    parts that defense counsel wanted you to listen to?

8    **A.**  I did not listen to the entire conversation.

9    **Q.**  Who decided you should only listen to that small

10   part?

11   **A.**  I listened to what defense gave me.

12   **Q.**  They didn't give you the whole conversation so you

13   could understand it, because like you said before, it is

14   important to understand something in context, correct?

15   **A.**  It is important to understand in context.

16   **Q.**  Okay.  So they intentionally limited you so that you

17   would only listen to a small portion?

18   **A.**  I'm not aware of what they intentionally did.

19   **Q.**  Well, did you turn and say, you know what?  There's

20   no way on God's green earth as a ethical doctor, that I

21   can make a determination based solely on this small

22   snippet that you gave me.  I want to listen to the whole

23   conversation.  Did you say that?

24   **A.**  No, I don't believe I needed to.

25   **Q.**  If you listened to that whole conversation, he

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    finally explains why he is so depressed, is because when

2    he was arrested on October 7th, he had in his possession

3    an iPhone, and his biggest fear was that the police had

4    downloaded everything that he saved on his iPhone, all of

5    the beheading photos, all the beheading videos, his text

6    messages in support of ISIS, photos of him with the gun,

7    photo of him with the mask.  Now you heard about the gun

8    and the mask before, haven't you?

9      **A.**  Yes.

10     **Q.**  This was the plan that was foiled by his father when

11   his father took the gun and the mask away, but the

12   defendant was afraid the whole reason he was thinking of

13   killing himself on February 2nd was because he was so

14   worried that the police had already found the evidence

15   that would convict him of the crime that he already

16   disclosed to the undercover, his plans to shoot up the

17   church, correct?

18     **A.**  I'm assume so, yes.

19     **Q.**  And I think even defense filed that with the court,

20   and if anyone wanted to listen it, they could hear the

21   whole thing.

22          And another thing, you said that you had no

23   indication that he was violent in any way, shape or form,

24   had any social behavior, but yet at the end of the

25   conversation, he specifically states that I am not going

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    to be taken alive.  If the police come to arrest me, I --
2    he used Arabic -- but basically, I swear to God, I swear
3    to God, I'll take my knife and stab him kill him.  Did you
4    listen to that part?
5        A.   I'm aware that he said that, yes, sir.
6        Q.   How did you become aware of that from that
7    recording?
8        A.   I think defense counsel told me about that.
9        Q.   And you indicated that he was using six to 10 blunts
10   a day?
11       A.   That's what he reported to me.
12       Q.   That's what he reported.  And then you indicated
13   that you spoke with the mother and the father -- father
14   and stepmother --
15       A.   Stepmother.
16       Q.   Thank you for correcting me.  I appreciate that.
17   Father and stepmother, but when you layout what your
18   findings are to this Judge, you only laid out what his
19   father said.  You did not layout what his stepmother said?
20       A.   His stepmother was very quiet throughout the entire
21   thing.  The conversation was probably 95 percent the
22   father.
23       Q.   And you were aware of -- and I certainly hope they
24   provided to you -- the stepmother's statement that he did
25   have problems in high school.  You said according to the

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    father, he had no problems in high school, correct?

2        **A.**  Correct.

3        **Q.**  But there were a report issued that has been

4    provided to the defense counsel --

5                **MR. MARTIN:**  Objection, your Honor.  We don't

6    have that statement.  We have comments in the motion you

7    filed, but we have no statements from the mother.

8                **MR. WATERSTREET:**  Really?

9                **MR. MARTIN:**  Really.

10               **MR. WATERSTREET:**  I have a signed receipt for

11   it.  Excuse me for a moment.  It maybe a situation where

12   the left hand doesn't know what the right hand is doing.

13   This is a signed receipt of discovery signed by Mr.

14   Shanker for Items 1 through -- what number is that, Mr.

15   Shanker?

16               **MR. SHANKER:**  It doesn't say anything about

17   giving us that interview.  We have not received the

18   interview.  This says that I received certain discovery,

19   which I did.

20               **THE COURT:**  Certain what?

21               **MR. SHANKER:**  Discovery, but I did not

22   receive this interview.  It has not been provided, along

23   with several other things that he refers to in his brief

24   have not employed to us.

25               **MR. WATERSTREET:**  Mr. Shanker, signed that he

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    received Bates Number 1 through 2090.

2              MR. SHANKER:  True.

3              MR. WATERSTREET:  And here Bates Number 1, 2,

4    3, which is the brother's statement, 4, 5, 6, --

5              MR. SHANKER:  You're talking about the

6    stepmother's statement.

7              MR. WATERSTREET:  Stepmother's -- sister's

8    statement, Page 7.

9              THE WITNESS:  Right.

10             MR. WATERSTREET:  Eight, 9, 10, the uncle's

11   statement, Page 11, 12, the mother's statement --

12   stepmother's statement, Pages 13, 14, 15, and 16.

13             MR. SHANKER:  You are referring to the

14   statements of the mother.

15             MR. WATERSTREET:  The stepmother.

16             MR. SHANKER:  No, right now in your brief you

17   refer to the statement of the mother.

18             MR. WATERSTREET:  Stepmother.  My apologizes.

19   Stepmother.  And the stepmother --

20             MR. SHANKER:  And we do not have the

21   interview with the mother that you referred to about the

22   incident when he was 12 years old.  We have not received

23   that discovery.

24             MR. WATERSTREET:  Well, I will read the

25   stepmother's statement then.

                16-20098; USA v. KHALIL ABU-RAYYAN

1           However, when Khalil attended Star International

2      Academy, he was referred to a specialist.  Khalil thought

3      it would be funny or a joke where everybody in class -- he

4      reported -- it was reported to the school principal.  He

5      was removed from school and was required to see a

6      specialist because he said he had a dream that he had a

7      gun and shot everybody in class.

8           Now this was provided.  This statement of the

9      stepmother was provided to the defense well in advance.

10          Did you take that along with you when you went to

11     interview father and the stepmother to find out if the

12     defendant didn't have, in fact, prior mental illnesses,

13     had gone to a specialist in the past or had suggested in

14     engaging in assaultive conduct?

15     **A.**  I not aware of that document.

16

17     **BY MR. WATERSTREET:**

18     **Q.**  So they did not provide it to you?

19     **A.**  I was not aware of that document.

20     **Q.**  Again, I guess it comes back to you having heard

21     whatever you had as part of your information gathering

22     process and not turning to them and saying, do you have

23     any more information so I can make an informed decision?

24     **A.**  I assumed that the information they provided to me

25     was all the information, yes, sir.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1      **Q.**  Okay.  But you were wrong with that assumption,

2    weren't you?

3      **A.**  Apparently so.

4      **Q.**  Did you try to speak to his brother Adam?

5      **A.**  I did not.

6      **Q.**  Why?

7      **A.**  There was nothing that in the report that indicate

8    that I should.  I was told that he and his brother had a

9    fight, and that the government -- that was one of the

10   government's assertions, that they had a fight, and that

11   was one of the government's assertions about prior

12   violence.

13     **Q.**  So the defense did not feel it was important to

14   advise you about what his brother thought of his own

15   brother's mental state?

16     **A.**  I'm not aware that I was advised of that, no, sir.

17     **Q.**  So let's see if it would change your opinion

18   concerning his competency.  If you heard what his

19   brother -- his own brother who he shares a room with said

20   about the defendant, do you think it would change your

21   opinion at all?

22     **A.**  No.  My understanding of a competency determination

23   is such that the individual being examined has to be of a

24   state of mind, whereby his or her competency skills are in

25   question.  An individual can have an ongoing mental defect

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    or disease, but that disease doesn't by definition

2    compromise his or her ability to represent himself or

3    herself in his case and work in his own defense.  The

4    competency regulations or statutes as that I understand

5    them are really two prong.

6        **Q.**  Well, it's interesting because you went into a long

7    factual basis with earlier defense counsel as to all of

8    the things that you took in account that led you to

9    believe that he was competent, when you took into the fact

10   that you had to discount the fact that he heard voices in

11   the past, you had to discount that he was wanting to

12   engage in terrorist activities, and supporting of ISIS,

13   and all of those things because he was using drugs,

14   correct?  You said you needed all of that information

15   earlier, but now that I bring you an additional fact, it's

16   not relevant.  Is that what you're saying?

17       **A.**  That fact being --

18       **Q.**  The fact that the brother said that he believes his

19   brother maybe suffering from bipolarism because he goes

20   from really sad to really happy.  He also indicated his

21   desire to join ISIS, his wanting to travel overseas to

22   become fighter for them.

23       **A.**  Are you asking about the competency issue?

24       **Q.**  I'm confused here, doctor, because earlier you said

25   you had to take all the facts into account to determine

*16-20098; USA v. KHALIL ABU-RAYYAN*

1   competency, but as I'm bringing you more information, you

2   said you don't need that.  I'm trying to understand --

3      **A.**   That's correct because again, the competency issue

4   as I understand it is a two prong issue.

5      **Q.**   This is not a situation where we've seen in the past

6   where you ignore facts that are not consistent with your

7   opinion, is it?

8      **A.**   No, sir.

9      **Q.**   Okay.

10     **A.**   Again, my understanding of the competency statute is

11  as I have reported to you.

12     **Q.**   Okay.  In determining his competency, do you take

13  into account any type of psychological problems that maybe

14  manifesting at the time?

15     **A.**   Yes, and I take into account whether or not those

16  are compromising competency skills.

17     **Q.**   Now one of the things that you brought up, you had

18  no proof that he was involved in any type of anti-social

19  behavior, correct, and you have that in your report?

20     **A.**   Correct.

21     **Q.**   Using drugs illegally is an anti-social behavior,

22  correct?

23     **A.**   Yes, it is.

24     **Q.**   Getting in fights and being arrested is anti-social

25  behavior?

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    **A.**  If you use it in the plural like this, yes, sir.

2    **Q.**  Lying in order to purchase a firearm illegally is an

3    anti-social behavior, is it not?

4    **A.**  It is.

5    **Q.**  As a matter of fact, when you -- I'm reluctant to

6    bring this up because you only ran the MMPI-2.  You didn't

7    follow the dictates of how the test should be conducted

8    because you gave it to the defense attorneys, contrary to

9    the express direction that only a trained individual is

10   suppose to be giving the test, and when you finally got

11   the test result, you even ignored what was in the results

12   when giving your opinion to the Judge, didn't you?

13   **A.**  I'm not sure what you're referring to.

14   **Q.**  Well, correct me if I am wrong, if there's markers

15   in the MMPI report that specifically says whether is a

16   clinically significant issue that would render a trained

17   clinical psychologist to believe that the defendant is

18   manifesting certain psychological problems, correct?  One

19   of them like Category 2 is depression, correct?

20   **A.**  Yes.

21   **Q.**  And as a result of the test that you gave, the

22   results are he's clinically depressed, because he was

23   above a T score of 65?

24   **A.**  That's correct.

25   **Q.**  And also had a T score --

*16-20098; USA v. KHALIL ABU-RAYYAN*

1        **A.**   A little over that on Scale 4.

2        **Q.**   What's Scale 4?

3        **A.**   It's called psychopathic deviant.

4        **Q.**   He's a psychopathic deviant?

5        **A.**   No, sir, he is not a psychopathic deviant.  That's

6     the name of the scale.

7        **Q.**   The scoring of a psychopathic deviant, correct?

8        **A.**   That is correct.

9        **Q.**   And an article that was written by the man himself,

10     James Butcher, explaining what is a psychopathic deviant,

11     people who have been engaging in any anti-social behavior

12     or rebellious towards authority figures, show stormy

13     family relationships, and usually blame others for their

14     problems, they show a history of underachievement in

15     school and poor work history, may have marital problems --

16     well, wouldn't apply in this case -- they are considered

17     to be impulsive, and strive for immediate gratification or

18     have impulses.  They do not plan well, and they act

19     without consideration of the consequences of their

20     actions.  They show impatience, limited frustration

21     tolerance, poor judgment, and high risk taking.  They are

22     immature, childish, narcissistic, self-center and selfish.

23     Their behavior is often described as ostentation,

24     exhibitionist and insensitive.  They tend to be interested

25     in other terms like of how they can be used.  They often

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    thought to be likeable and usually create a good first

2    impression, but a superficial relationships, and usually

3    unable to form warm attachments.  They are described as

4    extroverted, outgoing, talkative, active, energetic,

5    spontaneous, intelligent, self-confident, hostile,

6    aggressive, sarcastic, cynical resentful and rebellious.

7    They tend to act out and have an antagonistic behavior and

8    an aggressive outburst.  Some are assaultive and show

9    little guilt over negative behavior.

10              Did I -- is that correct?

11   **A.**   That's what Dr. Butcher wrote, yes.

12   **Q.**   Describing what Dr. Butcher, who is the author of

13   the MMPI says a psychopathic deviant is?

14   **A.**   Yes.  Did you notice in here that --

15   **Q.**   Let's --

16   **A.**   Well, I want to educate you, if I can.

17   **Q.**   I think I'm pretty well educated.

18   **A.**   Okay.

19   **Q.**   I appreciate it.

20   **A.**   Okay.

21   **Q.**   I appreciate your help, and if your attorney who

22   hired you to give your opinion wants to ask you some

23   questions --

24   **A.**   Absolutely.  Absolutely.

25   **Q.**   And you also said that the defendant was very shy.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    Now the last -- the tenth category is what S.I.  What is

2    that?

3        **A.**  Social introversion.

4        **Q.**  And if you're socially introverted, you would have a

5    very high score, would you not, 65 or above, correct?

6        **A.**  That's correct.

7        **Q.**  As a matter of fact, according to the reports, that

8    the defendant is not an introvert.  As a matter of fact,

9    he's normal in every way, shape and form.  So your claims

10   to the Judge that he is a shy individual are not born out

11   even by the test that you decided to run, are they?

12       **A.**  I'll answer that with an asterisk and the answer is

13   that's correct.

14       **Q.**  Okay.  Then I actually -- there is an actual

15   printout.  So it requires no interpretation on your part

16   in this report that identifies those things that the

17   report finds to be important in its MMPI analysis, the

18   computer analysis, right?

19       **A.**  Right.

20       **Q.**  It prints out different things, such as profile

21   validity, systematic patterns?

22       **A.**  Right.

23       **Q.**  Profile frequency, profile stability, interpersonal

24   relationships, diagnostic considerations, treatment

25   considerations, correct?

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    **A.**  Correct.

2    **Q.**  And you even left off parts of those results that

3    were inconsistent with your opinion in this case, did you

4    not?

5    **A.**  I put in those results that I felt were clinically

6    relevant.  Can I explain something?

7    **Q.**  No.

8    **A.**  I guess I can't.  All right.  I understand.

9    **Q.**  Okay.  I appreciate that you do.

10           Let's go over the report and go through it, and

11   let's go over the things that you left out --

12   **A.**  Mr. Waterstreet, I need to ask your indulgence.  I

13   have a 2:00 patient scheduled.  I need to, if you are

14   going to continue to examine me, which is just fine, I

15   need to make calls to cancel the rest of my day.

16           **MR. WATERSTREET:**  Judge, can we take a break

17   for the doctor so we can do that or do you want me to

18   continue on?

19           **THE COURT:**  How much more do you have?

20           **MR. WATERSTREET:**  Frankly, I'm not sure I

21   have all of that much more, but I do want to point out

22   some factual issues.

23           **THE COURT:**  All right.  Let's take a five

24   minute break.

25           **THE WITNESS:**  I will have to go across the

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    street to get my phone, which is in my car, of course, and

2    make certain calls.  So I think it will take more than

3    five minutes.

4              THE COURT:  You can use a phone around here

5    or counsel has a phone.

6              THE WITNESS:  I don't have my patients' phone

7    numbers.  They are in my appointment book, which is in my

8    car.

9              THE COURT:  Well, if Mr. Waterstreet --

10             MR. WATERSTREET:  I will move it along.  I'm

11   hoping I can get him out of here before 2:00.

12             THE COURT:  Go ahead.

13             THE WITNESS:  That's when the patient starts

14   at 2:00.

15             THE COURT:  How long of a drive do you have?

16             THE WITNESS:  Farmington Hills.  So it's 25

17   minutes.

18             MR. WATERSTREET:  Okay.  You're putting me

19   under some pressure here.

20             THE WITNESS:  I'm sorry, sir.  I didn't

21   anticipates my testimony would take this long.  I

22   apologize.

23

24   BY MR. WATERSTREET:

25        Q.  Did you put in the report to the Judge

*16-20098; USA v. KHALIL ABU-RAYYAN*

1  information -- all of the information that the report

2  printed out?

3  **A.**  I did not.

4  **Q.**  And so you did not include that Mr. Abu-Rayyan made

5  a conscious effort to -- distortion to present himself in

6  favorable light?

7  **A.**  I did not.

8  **Q.**  Did you include the clinical profile suggesting a

9  number of psychological problems?  Did you include all the

10  psychological problems?

11  **A.**  I did not.

12  **Q.**  And you already indicated that you did not put down

13  that he is a psychopathic deviant?

14  **A.**  He is not a psychopathic deviant.

15  **Q.**  You did not put that down?

16  **A.**  He is not a psychopathic deviant.

17  **Q.**  You did not put that down?

18  **A.**  That is correct, Mr. Waterstreet.

19  **Q.**  And that he has poor judgment.  Did you include

20  that?

21  **A.**  I knew that he had poor judgment.

22  **Q.**  He has impulsivity?  He's very impulsive?

23  **A.**  He has been impulsive, yes, sir.

24  **Q.**  He acts out in his behavior?  Did you include that?

25  **A.**  He acted out, yes.  I believe that was within the

1    body of my report.

2        Q.   Did you include that he may behave irresponsibility

3    at times?  Did you include that in the report?

4        A.   I believe I did in terms of his use of drugs and the

5    impact that it has on him.

6        Q.   And that he blames other for his problems that he

7    becomes involved with?

8        A.   I saw no evidence of him blaming --

9        Q.   But that was in the report and you did not --

10       A.   That was in the MMPI report.

11       Q.   Yes.

12       A.   What showed to me clinically was that he took full

13   responsibility for his behavior and felt deeply ashamed of

14   it.

15       Q.   That's what he said to you?

16       A.   Yes, sir, that's what he said.

17       Q.   But your report -- the test you decided to run, the

18   report results say otherwise, don't they?

19       A.   Yes, sir, they do.

20       Q.   Okay.  Did you also put in here that the defendant

21   Abu-Rayyan feels that his life is no longer worthwhile?

22       A.   He felt his life was no longer worthwhile, yes.

23       Q.   He also feels that he is losing control of his

24   thought process?

25       A.   I don't think I wrote that he is losing control of

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    his thought process.

2        **Q.**  That's part of the report.

3        **A.**  Can you show me -- you mean the MMPI report?

4        **Q.**  Yes.

5        **A.**  I'm sorry.  When you say the report, I wasn't

6    sure --

7        **Q.**  The MMPI.

8        **A.**  That's what it says.

9        **Q.**  Okay.  But you decided not to provide that

10   information to the Judge?

11       **A.**  Because I found other findings, that's correct.  A

12   psychological test is a sample of behavior, and if I may

13   continue with my answer --

14       **Q.**  No.

15       **A.**  No.  Okay.

16       **Q.**  Because the question is simply, doctor, you decided

17   what report to test him on, correct?

18       **A.**  Correct.

19       **Q.**  You didn't follow the right procedure to do the

20   test, correct?

21       **A.**  Well, that's arguable.  It's arguable.

22       **Q.**  So the written language on how to perform the MMPI

23   says, give it to an untrained attorney to run the test.

24   Is that what it says?

25       **A.**  The MMPI was given --

                    *16-20098; USA v. KHALIL ABU-RAYYAN*

1     **Q.**  Doctor, it is a very straight yes or no.  Does it

2     say it should be given by a qualified individual?

3     **A.**  Yes, it does.

4     **Q.**  So you decided to run one only test and one test

5     only.  You didn't run it correctly.  You got the results,

6     and you didn't provide all the results that you gave to

7     the Judge that you got from the report from the test that

8     you decided to run?

9     **A.**  I did not unilaterally report to the Judge

10    everything that the test said.  That is correct.

11    **Q.**  And do you also include in here that he tends to

12    manipulate relationships for his own end?

13    **A.**  The MMPI report, yes.

14    **Q.**  Yes, but did you report that to the Judge?

15    **A.**  No, because I don't believe that he did or does.

16    **Q.**  Did you say that he is somewhat hedonistic?

17    **A.**  Did I say in my report to the Judge?

18    **Q.**  Yes.

19    **A.**  No, the MMPI said that.  Again, when you say report,

20    I'm assuming you're talking about the MMPI report or take

21    me between the two reports.

22    **Q.**  I will.  In the MMPI report it says, the defendant

23    Abu-Rayyan is not socially isolated or withdrawn.  That

24    was in the report, in the MMPI report, was it not?

25    **A.**  That's correct.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1      **Q.**  But you did not report that to the Judge when you
2   sent it to the Judge?
3      **A.**  Did not report that to the Judge, that is correct.
4      **Q.**  And Abu-Rayyan meets and talks to other people with
5   relative ease?
6      **A.**  Again, are you talking about --
7      **Q.**  MMPI report.
8      **A.**  I did not report that to the Judge.
9      **Q.**  And even though it was in the MMPI report that he is
10   not anxious in social gatherings in the MMPI report, you
11   did not tell that to the Judge?
12      **A.**  That's correct.
13      **Q.**  And did you also fail to report the result of MMPI
14   to the Judge that says, the defendant has long term
15   adjustment problems and he will be resistent to
16   psychological treatment?
17      **A.**  Did I fail to report that?  I did.
18      **Q.**  But then you recommended six months, that's good
19   enough for some type of follow up care in your opinion?
20      **A.**  I think I recommended a year if I'm not mistaken.
21      **Q.**  No, six months.
22      **A.**  I can refer to my report.
23      **Q.**  And that his personality is not easily altered.  Did
24   you say that in the report that you sent to the Judge?
25      **A.**  No, I did not.  That's what the MMPI report said.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1      **Q.**  I want to talk to you quickly about some of the

2   other evidence?

3                    **THE WITNESS:**  Your Honor, I implore you to

4   let me make some calls.  I have an afternoon worth of

5   patients that I have to deal with.

6                    **THE COURT:**  Well --

7                    **THE WITNESS:**  I'll be happy to stay here as

8   long as you need me to but --

9                    **THE COURT:**  How much time is the defense

10  going to require -- could I have a sidebar?

11

12          (Sidebar conference held on the record.)

13

14                    **THE COURT:**  Okay.  This has been helpful.

15  I'm not sure if you understand the phrase beating a dead

16  horse.

17                    **MR. WATERSTREET:**  Okay.

18                    **THE COURT:**  I can't imagine there is

19  significant rehabilitation that can occur here.

20                    **MR. SHANKER:**  We have a few follow up

21  questions.  The Judge has made his ruling on this witness'

22  ability to render an opinion on dangerousness.  You said

23  that he is not qualified, and Ron, what I'm prepared to do

24  today is ask the Court to appoint an expert to do that,

25  and we could adjourn this hearing.  That would be my

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    suggestion, because we would be doing that any way.  We

2    have to -- he has to get help at some point, and we have

3    to get an expert who can render an opinion on this issue.

4         So that's what I'm asking the Court to do any way.

5    So I will be asking the Court for an adjournment so we can

6    get an expert.

7         **THE COURT:**  I think as it relates to

8    competency, that you have the opportunity --

9         **MR. SHANKER:**  Yes.

10        **THE COURT:**  -- to have him examined, and

11   certainly consider that, and that may have give rise to an

12   opportunity to revisit the question of release pending

13   trial or not based on what happens there.

14        So yeah, the outcome of both motions today, would

15   not foreclose the opportunity for come back based on

16   whatever the results of the testing that the government

17   obtains and you might obtain in rebuttal to it.

18        **MR. SHANKER:**  Well, Judge, we don't think

19   there is any issue with the competency.

20        **MR. WATERSTREET:**  I understand, that's your

21   point.

22        **MR. SHANKER:**  I have had no problem at all

23   communicating with him.

24        **THE COURT:**  I understand, but there's some of

25   this psychological stuff that he has acknowledged is in

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    the MMPI would call that into question, some of the voices

2    and the other stuff in here.  At a given point he may be

3    perfectly lucid and perfectly helpful in his own defense,

4    but the -- but that doesn't mean that during the course of

5    the case and the defense that you're seeking, some of the

6    other influences may not undermine his ability to assist.

7    It's a very close call on that question, and the question

8    of release at this point at least I don't think it is a

9    close call.

10             MR. WATERSTREET:  I hope I'm reading the tea

11   leaves the right way about being a close call here.

12             THE COURT:  Close call on the question of his

13   competency on the basis that he able to orient himself to

14   the process and understand his role in the process and

15   everybody else's role, but that's not the entire equation.

16   There's a lot of psychological conditions that's been

17   described in the testimony that would -- could potentially

18   undermine that I think given the very low threshold with

19   reasonable cause threshold, he is going to get evaluated,

20   and you'll have the opportunity to get him evaluated with

21   somebody more attune to the forensic.

22             MR. SHANKER:  So just -- so we are clear, I

23   think what we can do here if it's okay with the Court and

24   with you, we would ask to adjourn the bond hearing until

25   we get an expert that we can bring in --

                    16-20098; USA v. KHALIL ABU-RAYYAN

1              **THE COURT:**  Well, I will always be able to

2       consider the testimony here in conjunction with whether

3       there is later testimony, you may or may not come back.  I

4       think based on the information at hand today, the motion

5       for release will be denied, but it's subject to review,

6       and I will tell you explicitly that you will have the

7       opportunity to renew that request and produce other

8       testimony that might lead to me reversing that decision,

9       but based on what we got now, it will be no.

10             **MR. SHANKER:**  Okay.

11             **MR. WATERSTREET:**  All right.

12

13             (Sidebar conference concluded.)

14

15             **MR. WATERSTREET:**  Your Honor, based upon the

16      Court's -- our sidebar discussion, I do have additional

17      questions of the doctor, but I think based upon where we

18      are right now, I will not ask those questions at this

19      time.  If he is proffered again as a witness, I would like

20      to have the opportunity to continue the cross examination.

21             **THE COURT:**  Thank you, Mr. Waterstreet.

22             **MR. WATERSTREET:**  Thank you, your Honor.

23             **THE COURT:**  Anything from defense counsel by

24      way redirect?

25             **MR. SHANKER:**  Just briefly.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1              **MR. MARTIN:**   Just briefly.

2              **THE COURT:**   Sure.   We will get you out of

3      here on time to get you to your clients.

4

5                           **REDIRECT EXAMINATION**

6

7      BY MR. MARTIN:

8

9        **Q.**   Dr. Danuloff, in terms of the MMPI, could you

10     explain how that was administered, why you decided to do

11     it that way, and whether it was the only thing that you

12     relied on?

13       **A.**   I administered that way because it was just not fair

14     for me to -- fair from a cost standpoint, from any

15     standpoint, for me to be sitting there next to the

16     defendant while he answered 567 true or false questions.

17     He was under the observation of his attorney who --

18       **Q.**   Just to be clear, we actually had our investigator I

19     believe.

20       **A.**   I'm sorry, your investigator.

21       **Q.**   And there's no questions asked during that exam?

22       **A.**   None, zero, and I gave the investigator specific

23     directions as to just sit there and allow the defendant to

24     take the exam.   I told him exactly what to say to him in

25     terms of direction.   He was very thorough in my

                      *16-20098; USA v. KHALIL ABU-RAYYAN*

1    understanding of what I told him to do, and it is my

2    belief that given the circumstances of this matter, the

3    MMPI-2 was given appropriately, ethically and competently.

4        With regard to your second question, opposing

5    counsel's questioning of me of the MMPI-2 is a perfect

6    representation of the misuse of psychological testing.

7    Psychological testing and the results of psychological

8    testing is one of the entire sources of information that a

9    clinician uses to make a determination, and if I maybe so

10   bold, thank you for the opportunity, in the last page of

11   MMPI-2 printout which occurs in every MMPI printout at the

12   end of the report, I would like to read this into the

13   record, if I play.

14       This MMPI-2 interpretative can serve as a useful

15   source for hypotheses about clients.  This report is based

16   on objectively derived scale interpretations that have

17   been developed with diverse groups of patients.  The

18   personality descriptions inferences and recommendations

19   contain herein need to be verified by other sources of

20   clinical information, because individual clients may not

21   fully match the prototype.  The information in this report

22   should only be used by a trained and qualified test

23   interpreter.

24       Again, the developers of the tests themselves

25   suggest that absolutely reliance only a test for making

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    determinations, and basically just regurgitating what a

2    computer printout says is an inappropriate use of the

3    test.

4         It is my belief that this instrument,

5    interestingly enough, verifies my clinical findings of

6    this individual and his history.  Whether or not the

7    social introversion scale is high or not is a tiny bit of

8    information compared to the entire clinical picture.

9    **Q.**  Same thing about the deviant --

10   **A.**  Psychopathic deviant question is, with all due

11   respect to counsel, preposterous.  I would never, ever

12   report to a court or make any conclusions on the basis of

13   an individual score on one particular scale item, scale

14   score.

15        In addition to that, individuals who are chronic

16   substance users frequently give you a jump in Scale 4.

17   Scale 2 is depression that the scale indicated is an

18   inaccurate representation.  He's very depressed.  He

19   should be depressed.  He's sitting in jail, and he's

20   facing very serious charges.  If he wasn't depressed, I'd

21   be more concern about his emotional and psychological

22   well-being.

23        And again, if I may, my charge was to evaluate

24   Mr. Rayyan as I saw him today, and I took the information

25   that I was provided, and used it in terms of what I saw of

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    this individual.  Never in my career would I use a

2    psychological instrument or any group of psychological

3    instruments in -- exclusively without use of clinical

4    information and extra outside information to use.

5           It is also my belief and my sad opinion that my

6    entire career has been eviscerated today by counsel, and I

7    certainly know that in a 44 year career in this work, you

8    make enemies.  There's no doubt about it.

9           I would certainly ask the Court to give some

10   determination of the value of some of those.  Certainly

11   people have disagreed with me over the course of my

12   career, and people have agreed with me over the course of

13   my career.

14          Have I made enemies?  I have some attorneys who

15   would not walk across the street to see me, and I have

16   some attorneys who I would not walk across the street to

17   see.  It is the nature of the work.

18          And while there have been issues that counsel

19   brought up to me that I wasn't even aware of like that

20   McCall case or whatever, I can only answer truthfully and

21   honestly to his statements, and I give him credit for his

22   attempt to demolish my credibility, and I appreciate you

23   allowing me to respond to those efforts.

24   **Q.**  One other last thing, you had a chance to read

25   through the government's opposition to the bond motion?

*16-20098; USA v. KHALIL ABU-RAYYAN*

1      **A.**  Yes, sir.

2      **Q.**  And that brings up some of the comments that he was

3    reading in about the stepmother and the brother.  Nothing

4    that you saw in that -- has anything that you saw in that

5    changed your opinion?

6      **A.**  No.  These are lay people who have opinions.  If I

7    had a dollar for every individual who has claimed --

8    untrained individual who has claimed that somebody is

9    bipolar or manic depression or this or that, I would have

10   many, many dollars.  Many dollars.

11     **Q.**  And there was mention of this Wayne County Jail

12   intake report.  I believe that is also mentioned in here,

13   but that would fit with -- if he had done that to get in

14   protective custody, would that fit with your opinion of

15   him?

16     **A.**  Yes, sir, it would because protective custody is

17   different as he saw it in general population.

18          **MR. MARTIN:**  I have no further questions,

19   your Honor.

20          **THE COURT:**  All right.  Thank you.

21       We are going to let you step down, and get to your

22   patients.

23          **THE WITNESS:**  Thank you, your Honor.

24

25          (Witness excused.)


                    *16-20098; USA v. KHALIL ABU-RAYYAN*

1          **THE COURT:**  All right.  As it relates to the

2     competency motion filed by the government, I think I've

3     heard enough and understand the parties positions well

4     enough to make a ruling.

5          As it relates to the bond motion, is there

6     anything in addition that you would like to argue for the

7     Court's consideration?

8          **MR. SHANKER:**  Your Honor, given our

9     discussion at sidebar, and given that the Court did find

10    that Dr. Danuloff was not qualified to render an opinion

11    on dangerousness on risk assessments, I will rely on all

12    of the arguments that I have presented in my briefs to the

13    Court, and I would just ask for the opportunity to return

14    at another time if the opportunity presents itself.

15         **THE COURT:**  Thank you.  Mr. Waterstreet,

16    anything additional on your part?

17         **MR. WATERSTREET:**  If we're -- if this is a

18    push-off to another day, there's nothing that I need to

19    say at this time.

20         **THE COURT:**  Okay.  So as it relates to the

21    competency motion, I indicated to counsel that I thought

22    that question before the Court is fairly a close call,

23    because it's pretty clear that -- that the defendant at,

24    least at multiple junctures when he is talking about with

25    his counsel or in this case Dr. Danuloff or with his

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    family, is well-oriented with respect to the process, what

2    he's facing here, what his role is, what his counsel role

3    is, what the issues are that need to be addressed by the

4    Court, and based upon that acknowledged interaction, which

5    includes the attorneys impressions of their client, would

6    suggest that competency is not sufficiently -- his

7    potential incompetence was not sufficiently established or

8    sufficiently a concern even that further examination is

9    required.

10           But we've also heard Dr. Danuloff talk about the

11   scores that were received in connection with the MMPI.

12   We've heard him indicate kind of a lack of exposure to

13   many of the underlying facts, including the defendant's

14   voices -- hearing voices, and his imaginations, if not

15   hallucinations about mass killings, and his obsession with

16   some of the conduct of jihadists and violent gruesome

17   behavior, inflicting harm, if not taking lives of others,

18   and this test apparently returned scores that were high

19   for depression, deviance, impulsive behavior, irresponsive

20   behavior, and these are all issues that made from time to

21   time render him incapable of providing logical response to

22   his lawyers, and to the decision making that has to occur

23   during the course of the trial.  And I think, again, the

24   standard is relatively low that needs to be met by the

25   government in succeeding to obtain an examination -- well,

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    an examination of the defendant for competency, and I

2    that's met.  I think it's met by the those circumstances

3    that are subject of the briefing on both sides of the

4    case.

5         So the Court will grant the government's request

6    in that regard, and as it relates to whether the defendant

7    can be released safely into the community with conditions,

8    again these same questions make that a no.  I mean, the

9    Court is not -- certainly there's been no evidence alluded

10   to in the pleadings even that would lead to a conclusion

11   that he could be safely released given some of the history

12   that's undisputed between the parties, and the interest

13   that he has had, and the messaging that's been reduced to

14   transcript, and the Court's ruling, of course, that Dr.

15   Danuloff is not qualified by knowledged, skill,

16   experience, training or education to offer opinion

17   testimony to the contrary leaves the defense without

18   significant evidence to offset that which is relied upon

19   by the government.

20        And so I did indicate at sidebar to counsel that

21   the government's expert examination may affect the

22   ultimate determination on release to the community, and

23   even if not, the defense counsel will have the opportunity

24   to identify a suitable examiner who can examine the

25   defendant for competency, as well as his potential risk or

                 *16-20098; USA v. KHALIL ABU-RAYYAN*

1    lack of risk for release with another proffered expert

2    following the examination by the government.

3            So I'm always willing to entertain a renewal of

4    the request by the defense that I fashion a release with

5    conditions, but we're not there yet.

6            So with that, the Court will deny without

7    prejudice the bond motion filed by the defendant, and I

8    think that's all we need to do.

9                        Thank you.

10

11              (Proceedings concluded.)

12                   -    -    -

13

14

15

16

17

18

19

20

21

22

23

24

25

*16-20098; USA v. KHALIL ABU-RAYYAN*

1                    **C E R T I F I C A T I O N**

2              I, Ronald A. DiBartolomeo, official court

3     reporter for the United States District Court, Eastern

4     District of Michigan, Southern Division, appointed

5     pursuant to the provisions of Title 28, United States

6     Code, Section 753, do hereby certify that the foregoing is

7     a correct transcript of the proceedings in the

8     above-entitled cause on the date hereinbefore set forth.

9              I do further certify that the foregoing

10    transcript has been prepared by me or under my direction.

11

12    _____              _____
      Ronald A. DiBartolomeo, CSR                   Date
13    Official Court Reporter

14                          -    -    -

15

16

17

18

19

20

21

22

23

24

25

                     *16-20098; USA v. KHALIL ABU-RAYYAN*