```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA,

 4             Plaintiff,
                                       HONORABLE GEORGE CARAM STEEH
 5
     v.                                No. 16-20098
 6
     KHALIL ABU RAYYAN,
 7
                  Defendant.
 8   _____/

 9

10        RENEWED MOTION FOR REVOCATION OF DETENTION ORDER

11                  Tuesday, August 30, 2016

12                          2:09 p.m.

13

     APPEARANCES:
14
          For the Plaintiff:        RONALD W. WATERSTREET
15                                  U.S. Attorney's Office
                                    211 West Fort Street
16                                  Suite 2300
                                    Detroit, Michigan  48226
17                                  (313) 226-9100

18
          For the Defendant:        TODD SHANKER
19                                  BENTON MARTIN
                                    Federal Defender Office
20                                  613 Abbott Street
                                    Fifth Floor
21                                  Detroit, Michigan  48226
                                    (313) 967-5542
22

23

24           To Obtain Certified Transcript, Contact:
             Leann S. Lizza, CSR-3746, RPR, CRR, RMR
25                          (313) 965-7510
```

**TABLE OF CONTENTS**

Motion Hearing                                                    Page

  Argument by Mr. Shanker                                           3

  Argument by Mr. Waterstreet                                      14

  Further argument by Mr. Shanker                                  28

  The Court's ruling                                               31


Exhibits:                                                     Received

 (None offered.)

RENEWED MOTION FOR REVOCATION OF DETENTION ORDER

1                                        August 30, 2016

2                                        Detroit, Michigan

3                          -    -    -

4        (Call to order of the Court, 2:09 p.m.)

5        (Court, Counsel and Defendant present.)

6            THE LAW CLERK:  This is Case Number 16-20098, *United*

7    *States versus Abu Rayyan*.

8            THE COURT:  You can all take a seat.

9            Okay.  This is the date and time for consideration of

10   a motion for revocation of detention order.  We have

11   Mr. Waterstreet for the government, Mr. Shanker for the

12   defense.

13           MR. SHANKER:  That's correct, Your Honor.  I also have

14   Mr. Benton Martin with me as well today.

15           THE COURT:  Welcome.

16           Mr. Shanker, would you like to step up to the podium?

17           MR. SHANKER:  Certainly.  And Defendant's here as

18   well.

19           THE COURT:  And the Defendant's here as well, thank

20   you.

21           MR. SHANKER:  Yes.

22           THE COURT:  And do we have Pretrial Services here?

23   Apparently not, but go ahead, Mr. Shanker.

24           MR. SHANKER:  All right.

25           Your Honor, we are here today requesting a bond

```
 1   because there has been a substantial change of circumstances in
 2   this case.  And the question on bond is are there conditions
 3   that will reasonably assure the safety of the community and the
 4   Defendant's appearance at trial.  And I think based on the
 5   government's expert's report, Dr. Tilbrook, I think it's quite
 6   clear that there are conditions available for his release.
 7           First of all, he is not charged with a violent crime.
 8   The government has charged him with being a prohibited person
 9   in possession of firearm.  There's no terrorism charge, there's
10   no true threat charge, there's no violent offense charge, none
11   of that.  The guideline here is 10 to 16 months, and that's not
12   just my calculation, it's the government's as well.  We agree
13   on that.
14           And what happened, Your Honor, I know you're aware,
15   but I just want to briefly discuss this.  Back in April there
16   was an order for Khalil to have a in-custody competency
17   examination, and Khalil spent over two months, from May 4th to
18   July 11th, isolated from his family and from his attorneys,
19   hundreds of miles, multiple states away so that the government
20   could get their examination.  They describe this as a
21   long-term, around-the-clock psychological evaluation, and they
22   did that.  And we now have a report from the doctor that
23   evaluated him.  He has found that Khalil is not a substantial
24   danger to himself or others.  He's found that Khalil did not
25   make any statements or exhibit any behavior that was indicative
```

ARGUMENT BY MR. SHANKER

```
1    of a risk to himself or others.  These are quotes.
2    Dr. Tilbrook found that Khalil was also reliable as a historian
3    and as for his explanations about what happened in this case.
4    I think that's very important.  On top of that, Dr. Tilbrook
5    did a battery of psychological tests of Khalil that were
6    designed to, quote, screen for invalid self-reporting.  And
7    Dr. Tilbrook found that Khalil did not attempt to portray
8    himself in a more positive or virtuous manner.
9         Dr. Tilbrook also included in his report that the
10   Defendant was releasable.  He suggested dual diagnosis
11   treatment for mental health and substance abuse.  He described
12   as ideal a community treatment program, whether that be in a
13   residential setting or an outpatient setting.  And, again, it's
14   clear that he's not just talking about inpatient mental health
15   custodial status because he's recommending these other
16   possibilities of community treatment.
17        Your Honor, Dr. Tilbrook was given all the transcripts
18   in this case.  He was given discovery.  He was given appellate
19   briefs.  He's heard the government's arguments about Khalil
20   being a danger, and he found he's not a danger.  He's not a
21   substantial danger.
22        THE COURT:  If I can interrupt for a minute,
23   Mr. Waterstreet argues that in connection with all of these
24   findings that basically there's a tagline due to his mental
25   condition, and the -- and so the government's theory, as of
```

ARGUMENT BY MR. SHANKER

1    today, it would appear, is he may be completely clear-headed

2    and rational and have a clear-headed addiction to violence and

3    sadistic behavior and the idea of martyrdom and all of those

4    underlying attachments to ISIL.  So my impression is that the

5    government would agree with everything you've said except that

6    it is only useful for assessing his mental condition and not

7    the -- not his potential for violence.

8          MR. SHANKER:  Well, I think that their own expert

9    disagrees with that.  Even though he's talking about mental

10   health, that is the essence of dangerous.  Let's step back and

11   think about what the government has said.  The quote that

12   really stood out to me was where they described Khalil as a

13   clear-minded individual who had a heartfelt desire to commit

14   violence and mayhem on people in the streets.  Your Honor, that

15   is a sociopath.  That is somebody with an antisocial

16   personality disorder, and that is something that Dr. Tilbrook

17   would have noted in his report.

18          It is incredible to me that the government this entire

19   time has made this argument that basically Khalil is mentally

20   ill and that's why he was making the statements he was making.

21   And then when everything comes back against them, they try to

22   turn him into a sociopath with no qualifications to do that,

23   with no expert basis to do it and with their own expert filing

24   a report that is contrary to that claim.  So my feeling on that

25   is that it has no basis in this record.  He clearly had talks

ARGUMENT BY MR. SHANKER

1    about dangerousness --

2         THE COURT:  Let's back up for a second because, again,

3    I don't see the government using these labels at all.  I don't

4    see them attempting to label the Defendant as a sociopath.  But

5    what I have seen in their pleadings is a list of behavior,

6    behaviors that occurred in this case that would give any

7    reasonable person pause, and I haven't seen any real dispute

8    with the list of behaviors that have been identified by the

9    government.  Is there a dispute?  For example, he talks about

10   when Defendant was 12 years old, he was referred to counseling

11   because he told his teacher he dreamed that he had a gun and

12   shot everyone in class.  He is said to have engaged in a number

13   of assaultive events during school, that he expressed his

14   support for ISIL and violence for several years and long before

15   he met this person he believed was a woman on the Internet,

16   that he has been tweeting, liking and commenting on ISIL

17   propaganda, actively seeking out Internet links to gruesome

18   ISIL videos, posting them on his Twitter accounts and then

19   posting positive comments after viewing executions and killings

20   depicted in those ISIL videos.  I mean, these are things -- and

21   the list just goes on and on.  They are things that I think

22   anybody reading them would certainly be frightened of the

23   statements that are attributed to your client and that seem to

24   predate -- I know that Dr. Tilman -- Tilbrook says that this

25   may be misguided, immature behavior for someone who is awkward

ARGUMENT BY MR. SHANKER

1     around women, but most of the conduct that gives me concern

2     occurred apparently well before any interaction with the

3     undercover employee who posed as a woman in their Internet

4     communications.  So can you comment on that?

5            MR. SHANKER:  Yeah.  Yes, I can, Your Honor.  First of

6     all, we don't deny that there was this incident when he was 12

7     years old, and that was taken into account by Dr. Tilbrook.

8     Certainly he has admitted to Dr. Tilbrook that he got into

9     fights involving a busted lip in school.  I don't think that

10    these things make him a danger to the public now.

11            When it comes to what was going on on Twitter and in

12    that activity, he is not charged with any of that, and all of

13    that is protected speech, and most of the time what he was

14    doing was basically retweeting something that was posted

15    elsewhere.  So he wasn't making threats to anybody.  He was

16    posting this stuff, and he was watching violent videos, and

17    Dr. Tilbrook found that his explanation of why he did this was

18    credible in that he watched the videos in the same way he

19    watched pornography as something so different from his

20    day-to-day life, his 70-hour work week that was interesting to

21    him.

22            And, frankly, it's amazing to me because we live in

23    the United States, not only is this protected speech, but we

24    live in a country that is obsessed with violence and sex.

25    There are people watching violent videos all over the place.

ARGUMENT BY MR. SHANKER

 1     Game of Thrones is a show that is centered around beheadings.

 2              THE COURT:  I'm not familiar with that but...

 3              MR. SHANKER:  Yeah.

 4              THE COURT:  But it's not just the viewing of this

 5     material; it's he's -- the government says that he is

 6     practicing on shooting an AR-15.  This is an assault weapon

 7     that is the weapon of choice, apparently, for mass murders that

 8     have already occurred in the country.  I mean, it's just --

 9     that goes well beyond looking at the Internet.  And that he was

10     making attempts to buy a second firearm.  This, I mean, just --

11     I mean, that's obviously a lot more concern than getting into a

12     fist fight in high school or something.

13              MR. SHANKER:  Right.  And I'd like to address that

14     sequence of events because Khalil initially purchased, as

15     somebody with no felony background, he purchased a gun that we

16     have described in detail.  It was basically a .22.  It is a

17     single bullet loading.  You have to load one at a time and

18     unload one at a time.  It's often referred to as a cowboy gun

19     used by Boy Scouts and people who are out to shoot rabbits.

20     It's about the opposite of any kind of assault rifle.  He could

21     have, when he walked in there, if he really wanted to be a

22     danger, you know, if he wanted to fit this profile, he could

23     have just bought an AR-15.  He didn't do that.

24              So then he gets arrested a day later, and they don't

25     charge him.  They take him in and they say, look, if you want

ARGUMENT BY MR. SHANKER                    10

```
 1    to get a carry, concealed weapon license, you have to do it the
 2    right way.  And his dad says, "I agree, you need to do that."
 3    And so Khalil, he enrolls in a class and tries to get his CPL.
 4    That's what he tries to do, and that is the day that you see
 5    him shooting the AR-15.  It's after the class, I believe, or
 6    maybe, I don't know if it was part of the class, but he -- they
 7    rented it and they shot it afterwards.  It's not a gun that he
 8    owned.  You know, it was a gun that he did possess, but he
 9    wasn't charged with any crime at that time.  And when he -- you
10    know, I would point out he's not getting this stuff off the
11    black market.  He bought the gun at Dunham's, you know.  And
12    when he goes -- when he tries to buy the second gun, again,
13    it's not an AR-15.
14          THE COURT:  What is it, a 9 millimeter?
15          MR. SHANKER:  I believe it was a 9 millimeter, and he
16    doesn't know that he can't purchase a gun at that point.  He's
17    not charged with anything.  As far as he knows, his big issue
18    was he's -- he was carrying it in the car when he wasn't
19    supposed to be.  So nothing really falls into place until
20    November 29th -- or November 30th.
21          So the day after you see that photo of him shooting
22    the AR-15, that's when he gets arrested on gun charges by the
23    State.  And there's been no other activity since then.  He was
24    actually already sentenced at the state level for the same gun
25    involved here to probation.  He was on bond on that case.  He
```

ARGUMENT BY MR. SHANKER

1    made every court date.  If he's released now, not only will he

2    deal with any conditions that you have, he has to deal with his

3    probation at the state level.  They're going to be supervising

4    him.  They actually contacted Mr. Rayyan when they heard about

5    my motion and said that, look, if he gets released, he needs to

6    see us day one to discuss the conditions of his probation.

7          So, Your Honor, I think that some of this is being --

8    it's being blown out of proportion and -- by the government.

9    So I'm not denying that that happened, but I think it's being

10   blown out of proportion and taken out of context of what was

11   going on in this case.

12         THE COURT:  So what possible context is there for

13   having a photograph of yourself taken holding a head -- severed

14   head of a woman?

15         MR. SHANKER:  Well, that wasn't him.  That wasn't him

16   holding that.  It's a video from online --

17         THE COURT:  Okay.

18         MR. SHANKER:  -- that millions of people have viewed,

19   that's available.  It's been viewed by hundreds of thousands of

20   people, if not millions.

21         THE COURT:  But what kind of person seizes on that

22   photograph and then posts positive comments in support for the

23   idea, these murders?

24         MR. SHANKER:  Well, I don't think that -- I don't know

25   if he actually made positive comments about the murders.

ARGUMENT BY MR. SHANKER                    12

1          THE COURT:  We'll find out.

2          MR. SHANKER:  I think he retweeted it.  But what I do

3    know is, you know, this is -- we see a lot of this.  You know,

4    we see people who have different personas when they are online

5    and exploring what's out there on the Internet.  And I think

6    that, you know, much of this is addressed by Dr. Tilbrook.  You

7    know, Dr. Tilbrook saw this -- saw all the arguments that the

8    government has made.  He reviewed that.  He sat with Khalil,

9    you know, for these lengthy -- these lengthy examinations.  And

10   there was surveillance on him the entire time all of his

11   communications were reviewed by Dr. Tilbrook, and I think that

12   as disturbing as it is, and I concede it is disturbing, it

13   doesn't make him a danger to the public, it doesn't.

14          And we are now months removed from all of that, where

15   he has just gone through the wringer in this case, and the

16   question is are there conditions and, Judge, I mean, we can --

17   you can put a GPS on him, you can confine him to his home, you

18   can -- anything.  Mr. Rayyan is -- has filed an affidavit with

19   this court early in the case.  He will be a third-party

20   custodian.  If you would like the Internet removed from that

21   home, Mr. Rayyan has said he will do that.  And the only place

22   that Khalil could go is to meet with me and to see his

23   therapist.  And we've had, on our end, we've had our mitigation

24   specialist, Dana Mertz, she's been out looking for a fit for

25   him as far as getting dual diagnosis treatment as recommended

ARGUMENT BY MR. SHANKER

1   by Dr. Tilbrook, and, you know, we have somebody.  We've got it

2   all set to go.  In fact, I believe he has an appointment on

3   September 7th or 8th if he's released.  And she has basically

4   said, you know, that her treatment would last at least a year.

5   And she would handle both the substance abuse and the mental

6   health treatment.

7        So we have a situation where he's got a place to go.

8   He would be restricted to his home, except to do those two

9   things, meet with me and get treatment.  And he needs

10  treatment.  I think everybody -- I mean, it's not like he

11  was -- I didn't like the description clear-eyed because he

12  clearly wasn't clear-eyed at the time that these things were

13  happening.  And he feels terrible about the activity on

14  Twitter.  Looking back on it now, he knows that was foolish.

15  But we're in a different place now, and I think that there are

16  conditions of release that are available for him.  And he's got

17  a very supportive family.  The government executed search

18  warrants at that home.  They seized every piece of electronic

19  equipment in there, and they have reviewed it.  And there's

20  nothing to indicate that anybody in that house is trouble.

21  They're going to be supportive of Khalil, and I don't think

22  there's any question about it.

23        And, again, Your Honor, he, on top of all that, he's

24  also going to be supervised by the State probation for the same

25  gun that's involved in this case.

ARGUMENT BY MR. SHANKER

14

1          Your Honor, there isn't clear and convincing evidence
2    that he's a danger.  If there was, we would have a charge.  All
3    they need is probable cause to get grand jury indictment.  We
4    don't have it here.  So we don't have clear and convincing
5    evidence especially right now in this case after the
6    government's own expert has really given -- it's an
7    extraordinary report, an extraordinary examination and an
8    extraordinary amount of surveillance and supervision and
9    watching this young man, and I think it's time for him to at
10   least be able to get treatment.
11          And that's all for now, Your Honor.  Thank you.
12          THE COURT:  All right.  Thank you, Mr. Shanker.
13          Mr. Waterstreet.
14          MR. WATERSTREET:  Thank you, Your Honor.
15          Mr. Shanker started off his argument suggesting that
16   there was a substantial change in circumstances and, frankly,
17   Your Honor, I'm -- I must be missing it because what they've
18   sought to do is to have this court reconsider the bond hearing
19   that took place in front of Magistrate Judge Whalen, and
20   Magistrate Judge Whalen found the Defendant competent to stand
21   trial.  So there's no change of circumstances today having
22   another doctor say he's competent to proceed.  As a matter of
23   fact, the statute is quite clear that it's only "if the
24   judicial officer finds that information exists that was not
25   known to the movant at the time of the hearing and has a

ARGUMENT BY MR. WATERSTREET

1    material bearing on the issue whether the conditions of release

2    will reasonably assure appearance such person as -- appearance

3    of such person as required and the safety of the persons of the

4    community."

5           So nothing has changed, I suggest to the Court,

6    because the argument that was made in front of Magistrate Judge

7    Whalen and has been made before you in a previous bond hearing

8    is the Defendant is not charged with terrorism.  That's

9    correct, he's not.  Both times the Court said that that is not

10   necessary to be charged with terrorism.  Both times argued the

11   Defendant was influenced by the government employee to commit

12   the crime, and the Court has now pointed out that there's not

13   one factor that the government has alleged in its response that

14   has any reference to do whatsoever as involvement with the

15   government employee.  That was a factor that was argued, raised

16   and denied.  And that he is now competent.  There's nothing

17   that's different.  But I will assume for the sake of argument

18   that somehow something is different and I'll respond.

19          THE COURT:  Well, certainly some of what he writes in

20   his report would seem to go to -- I mean, he does talk about

21   the Defendant's current mental state and condition which the

22   statute can make references and I think Mr. Shanker makes

23   reference to those provisions that talk about danger --

24   dangerousness arising from --

25          MR. WATERSTREET:  Mental illness.

ARGUMENT BY MR. WATERSTREET

1          THE COURT:  -- mental state.  So that's certainly

2     relevant to the question of bond.

3          MR. WATERSTREET:  I'm not suggesting it's not

4     relevant, Your Honor.  And if the Court took it that way, that

5     was not my suggestion.  I'm saying there was a change of

6     information that wasn't available at the time and available at

7     the time was that he was competent and that he didn't have a

8     mental illness and that was what was decided by the Court, and

9     Judge Whalen specifically pointed that out in his findings.

10          And I think counsel is trying to make a little bit

11     more out of this opinion of Dr. Tilbrook than is really there.

12     Dr. Tilbrook was never asked by this court and this court did

13     not abdicate its responsibilities to Dr. Tilbrook to determine

14     dangerousness to the community under the 3142.  He was asked to

15     do something completely different.  Is he competent to stand

16     trial?  That was his determination.  He had to make certain

17     findings in order to do that.  Is when this person is talking

18     to me, can I trust what he's saying to me in this conversation?

19     Not do I trust him that he's dangerous sometime in the future

20     or dangerousness in the past.  He's asking can I trust this

21     person when he's talking to me today.  And that's fundamentally

22     different than making a determination of risk of flight or

23     danger to the community.

24          The combination of guns and drugs that are very

25     prevalent in Defendant's life up to the time he was arrested

ARGUMENT BY MR. WATERSTREET

1   are very important.  As a matter of fact, the cases are legion
2   that that lethal combination of drugs and guns is enough to
3   detain somebody and find there's no combination of conditions
4   that can reasonably assure safety of the community.  Well, we
5   have more than that.  As the Court has pointed out, in addition
6   to his drug problems, in addition to attempting to obtain
7   firearms after one was seized from him by the police, he's
8   expressed his support for terrorist organizations, and he's
9   fascinated with that and killing, and he's made that clear in
10  his -- several of his postings and his prior assaultive
11  conduct.  So we have those additional factors that the Court's
12  already pointed out.
13          And I had broken this down, in my mind, to three
14  different stages, and I hope -- I'm going to walk the Court
15  through that.  Three different stages is pre-CCW and drug
16  arrest which was prior to October 7th of 2015 and then after
17  his arrest and what he did up to the time he started talking
18  with the undercover employee and then what he said and did
19  after he started talking to the undercover employee.  And as
20  you look at each one of those different sections, you see
21  something that's consistent, his consistent support of ISIS,
22  consistent support of assaultive conduct, his consistent
23  support of beheadings and his ideations of wanting to join
24  ISIS.  And as you see it, it becomes more and more prevalent.
25          For example, as the Court's already started out, even

ARGUMENT BY MR. WATERSTREET

1  as far back as 12 years old, he had a dream of taking a gun to

2  school and shooting people.  Approximately a year and a half

3  beforehand he was sending out e-mails and about he believed

4  that Israel is killing everybody and he couldn't stand by to

5  see the genocide.  A year and a half before, another year

6  before he met the UCE or spoke to the UCE, he started

7  downloading, liking, making comments about the ISIL propaganda.

8  About 11 months before he had first contact with the UCE he

9  added to his favorites a Twitter account photograph of a person

10 about to have their throat slit, and I included that as

11 Government's Exhibit A in the government's response.  This was

12 something that he decided that was very important that he

13 wanted the rest of the world to know about.  And about ten

14 months before his first contact with the UCE he's photographed

15 with two other individuals like him wearing camouflage.  He's

16 holding a semiautomatic handgun making a gesture with his left

17 hand, his finger pointed to the sky which is a common ISIL

18 sign, and I included that as Government's Exhibit B, and that

19 was something else that he thought was -- he was very proud of

20 and he put on his Twitter page.

21        But in addition to that, he, as the Court has already

22 pointed out, he's downloaded videos and noted his support of

23 what occurs in those videos.  And this happened in July 1st of

24 2015, more than five months before his -- excuse me, in July,

25 that would have been more than what?  Yeah, five months, five

ARGUMENT BY MR. WATERSTREET

1   months before he first had contact with the UCE.

2        Somebody had posted a video of -- and saying "They

3   were applying hadd," punishments under the Islamic Sharia Law,

4   mandated or affixed by God, "of four men for doing homosexual

5   acts by throwing them off a building."

6        Then somebody else responded to that which he decided

7   to retweet, says:  "In the video they made a loud sound each

8   time ending in 'Takbeer,'" which is a term for the Arabic

9   phrase of "Allahu Akbar."  The Takbeer is the Allahu Akbar,

10  usually translated as "God is great," "with a guy with a pistol

11  finishing the twitchers, referring to the people who had been

12  thrown off the building who somehow were still alive and they

13  were shot."  And he felt that was important to put on his

14  Twitter.

15       And then how does he respond?  "Do you have the video

16  with link?"

17       After hearing that description, it's important for him

18  to get the video link so he can watch it himself.  The person

19  posts the link for that video, and what was his response?

20  "Thanks, akhi," which is thanks, brother, "that made my day."

21       So five months before he begins talking to the UCE,

22  and we've already gone through in the government's response

23  what type of atrocities he wanted to conduct when he was

24  talking to somebody who he thought was like-minded, he's

25  telling people that watching people getting thrown off a

ARGUMENT BY MR. WATERSTREET

1    building and shot with a gun made his day.  It shows where his

2    mind is at, where his thought process is at.

3            There is certain more, similar type of comments like

4    this in other postings that he made, but I want to move ahead

5    to when he was arrested for the carrying concealed weapon on

6    October 7th, just two months prior to his first contact with

7    the UCE.  What we didn't know then what they know now is we

8    found it interesting that he went and bought a brand new cell

9    phone.  It didn't make sense to us as part of the investigation

10   until February 2nd when he was having a conversation with the

11   undercover employee, and that was the conversation in which he

12   told the undercover employee that he wanted to commit suicide

13   because he just couldn't go on living the way his life is.  The

14   undercover employee was trying to talk him out of committing

15   suicide, and he finally got down to it, finally explained why

16   he really wanted to commit suicide, because what his issue was

17   is he knew that his criminal case may not be over in the state

18   court if they found what he had downloaded on his cell phone,

19   his iPhone when he was arrested on October 7th.  And this is

20   what he said:  "You know, when they arrested me the first time,

21   they took my phone.  I had a iPhone.  They took it.  Yeah, I

22   mean, I had videos there, you know, burn the pilot.  I have a

23   bunch of pictures and videos, you know, of beheadings and

24   stuff.  I have pictures of me with guns, with masks and stuff

25   like that."

1    So he's really worried.  He's so worried that his --

2   he's at the point on February 2nd that he wants to kill himself

3   because he's fearful that additional prosecution will come to

4   him.  The undercover says, "Well, you know, that's just

5   watching, that's just watching."

6    But, no, he knows the difference between just watching

7   and supporting, because his response is:  "Watching's one thing

8   but downloading shows interest."  And that's true.  Downloading

9   it does show his interest.  "When you're downloading it on your

10  phone, it shows that you're interested.  It's one thing to

11  watch videos and news or something but..."

12    And then she interrupted him and said, "You downloaded

13  it on your phone?"

14    "Yeah.  Yeah."

15    Now, what the government found and which has already

16  been provided to the defense is what he decided to download

17  onto that new phone that he got, and, Your Honor, I'm going to

18  move to request to seal these documents because they're pretty

19  offensive.

20    I want to talk about the documents that are stapled

21  together first.  These are photographs that were lifted or

22  discovered on his new cell phone, and the dates on the

23  left-hand corner are based upon forensic analysis of

24  identifying when they were downloaded, when these new photos

25  were downloaded.

ARGUMENT BY MR. WATERSTREET

```
 1          Now, I just want to stop here for a second.  He just
 2  told the undercover FBI employee on February 2nd how scared he
 3  was that they would find these photos.  Having just been
 4  arrested on October 7th and getting his phone back from the
 5  Detroit Police Department, he had that window.  He had that
 6  window to say, man, I've been given a second chance, you know,
 7  this was a huge mistake on my part to go down this road, I'm
 8  not going down this road again.  But no, what he did is within
 9  six days of being released he starts downloading people with
10  AK-47s, on October 13th and October the 14th.  Then on October
11  the 18th he gets back to things he appears to say he was
12  interested in when he spoke with the UCE.  You can see that
13  picture of somebody being beheaded, a picture of another person
14  about to be beheaded on the 18th, another picture of a person
15  being beheaded, another person of -- picture of a person being
16  beheaded.  Then on the 20th he shows three people riding on a
17  horse carrying an ISIL flag.  Then he takes, sees a picture of
18  somebody who took a selfie of themselves next to a dead body on
19  the 20th.  On the 22nd of October he's got a leader from ISIS,
20  more ISIS flags, people in uniform.  On the 24th, several
21  severed heads.
22          Judge, I'm not going to go on any further, but the
23  Court can note on the dates that are on there, those are the
24  dates he decided to download them to his new phone.  And this,
25  I also wish to remind you, is a point in time in which he's
```

ARGUMENT BY MR. WATERSTREET

```
 1  made it perfectly clear that he stopped using any drugs
 2  whatsoever.  After his arrest he says he swore off drugs, he's
 3  not taken any more drugs.  So within a week after swearing off
 4  of drugs, a week after being given that second chance to no
 5  longer go down this path, he starts down this path again,
 6  starts downloading these videos again to his phone.
 7          Approximately about a month and a half prior to his
 8  first contact on February 22nd, he sends out a photo of the
 9  ISIL flag which was attached as Government's Exhibit C with a
10  redacted phone number.  Then October 25th, approximately a
11  month and a half prior to his first contact with the UCE, he
12  sends out a photo to his brother, and that should be also
13  attached.  I believe that should be attached to the documents I
14  provided to you, is a picture.  Should be on the last few
15  pages, Your Honor.  This is a picture that the FBI took of his
16  cell phone that shows the actual e-mail text message that he
17  sent his brother which was on October 25th, 2015, at 2:02 p.m.,
18  a picture of somebody using a knife to cut off somebody's head.
19  This photo was retrieved not only from the phone itself but
20  from the memory of the phone where the photo appears.
21          Something else I'd like to point out, Your Honor, is
22  a -- something else the FBI found in looking at his new phone.
23  It was described, but a picture is worth a thousand words.
24  That is the photograph of an individual making the ISIS sign
25  holding a head of a severed woman -- a woman's severed head.
```

ARGUMENT BY MR. WATERSTREET

1   And that wasn't a picture that he just decided he wanted to
2   download just because he wanted to watch it once but that's the
3   one that he decided to make his wallpaper on his phone so that
4   every time he opened up his phone and turned it on, he saw that
5   image every single time.  Many of us in the world who may have
6   visited a beautiful place or have a picture of a place they
7   want to go, they put that as their wallpaper on their phone or
8   pictures of their grandchildren, things of that nature.  But
9   this is the one he chose to put on his phone, the phone he
10  purchased after he had his opportunity to go down a different
11  road.  On October 15th, a month before his first contact,
12  that's when he tried to purchase the second firearm and took
13  pictures of himself practicing with the AK-47 and the AR-15
14  assault rifles.

15          On November 29th, more than two weeks before his first
16  contact with the UCE, he posts a comment and posts a picture of
17  himself holding an AK-47 with his index finger vertical with
18  his right-hand, and that was Exhibit D that we presented to the
19  Court in our response.  And in his confession that he made to
20  the FBI after his arrest on February 4th, they didn't have the
21  photograph with them, but they asked him about it and they
22  asked him to describe it.  And he says, "Oh, yeah, that was
23  when I was at the shooting range.  Yeah, you're getting the
24  wrong idea.  See, this is like number one, like you're on a
25  sports team."  That was his explanation.  And then they said,

ARGUMENT BY MR. WATERSTREET

1   "Well, did you write something with that?"  He said, "Yeah,

2   something hunting."  Now he's the one who authored it.  He's

3   the one who posted it.  He's the one who wrote the comment on

4   it.

5           "What do you mean something hunting?

6           "Aw, gee, you know, I really can't remember."

7           Then they said, "You can remember."

8           He goes, "Yeah, it's Sahwat hunting."

9           He goes, "What does Sahwat mean?"

10          "A traitor."

11          "A traitor to who?  Is it traitor to ISIS?"

12          "No, no, no.  That's not what I meant."

13          "Why did you write that?"

14          "I don't want to answer that question."

15          Then on December 12th, 2015, three days before he

16   first starts communicating with his brother, he communicates

17   with his brother and he says here on December 12th, 2015:

18   "This would be a perfect time to do an istishadi" which is a

19   martyrdom, "suicide operation."

20          And then we move on to the comments that he made to

21   the UCE, and I'm not going to belabor the point and go over

22   those, Your Honor.  The Court's heard and read those more than

23   enough.  But it certainly seems that when he finds who he

24   believes to be a like-minded individual, he talks about his

25   planned attack on the church, his martyrdom operation.

ARGUMENT BY MR. WATERSTREET

1          Now, something I wrote down, this is like how bad does
2      it have to be for a family member to say what they say.  And
3      I'm reminded of the statement that his own brother said to the
4      FBI on February 4th when they were executing the search warrant
5      at the Defendant's home.  His brother said that the Defendant
6      is following and supports ISIS, he's emotionally invested in
7      the Syrian conflict in ISIS, he's interested in ISIS, he talks
8      about becoming a foreign fighter, he wants to go overseas to
9      become a foreign fighter for ISIS and he does talk to people
10     online.

11         And one person that did not talk to the FBI, has
12     actually refused to talk to the FBI, was the father.  And it
13     has been recommended that perhaps the father, Mr. Rayyan Abu
14     Rayyan, is a good third-party custodian, and I recommend to the
15     Court that I think that would be a great mistake, and there are
16     several reasons why.  Simply, it's not realistic.  It's unfair
17     to place this burden on the father because, frankly, Your
18     Honor, based upon what has been said by other people in the
19     family the father has been unsuccessful in curtailing the
20     activities of the Defendant.  He -- the father works full time
21     and he can't supervise the Defendant full time.  And he
22     committed this instant offense while he was living in the house
23     and his father knew he was violating the law by smoking drugs
24     illegally.

25         And I understand why a parent would want to be a

ARGUMENT BY MR. WATERSTREET

1    custodian for their child. I understand that love. But we

2    have to be realistic here, Your Honor. He's been unable to

3    successfully curtail the activity of the Defendant. As a

4    matter of fact, during the interview, the mother said that --

5    she told the FBI that the father told the Defendant not to buy

6    a gun. The Defendant liked to always -- didn't like doing what

7    he was told to and bought the gun anyway.

8           And, frankly, Your Honor, I don't know Mr. Rayyan, but

9    based upon what I have read, I believe him to be a person who's

10   been less than honest or candid with the Court and others. He

11   told Dr. Danuloff that the Defendant was responsible. He said

12   his son never got in trouble in high school. Without -- he's

13   never been suspended or had any disciplinary actions. The

14   Defendant himself admitted that he had been suspended from

15   school several times because of fighting.

16          And then the last thing I want to touch on, Your

17   Honor, is on January 8th, 2016, the Defendant was talking to

18   the UCE and he was talking about he had a passion for guns and

19   that he had shot an AK-47 and then "I had an AK-47 but my

20   father took it and it carries 40 bullets."

21          Now, Mr. Shanker has pointed out that the father filed

22   an affidavit in support, but being the lawyer I guess that I

23   am, I look for what the father didn't put in the affidavit.

24   The father simply said "I did not find an AK-47 in my son's

25   car. I found marijuana in the car." Now, this was after he

ARGUMENT BY MR. WATERSTREET

1    had a chance to read over the criminal complaint because he
2    makes reference to it in the -- in his affidavit.  Yeah, he
3    does not -- repeating the fact that in the complaint there's
4    talk about his son's support for ISIS, his son's retweeting of
5    videos.  He doesn't repudiate his son's interest in terror and
6    martyrdom, killing people, having bought a six-shot revolver,
7    none of that, none of that's in there.  And, frankly, Your
8    Honor, through more forensic analysis, I think we found out
9    why.  Because in one of the computers that was found in the
10   home that was deleted, a photograph that was deleted, is a
11   picture of Mr. Rayyan Abu Rayyan holding an AK-47 described
12   exactly by his own son, AK-47 that has a magazine that holds 40
13   rounds.  Mr. Abu Rayyan did not bring that to the attention of
14   any authorities, did not bring that to the attention -- to the
15   Court, of saying I have a gun but I'm going to put it away so
16   my son doesn't get it.  Silence.  And we find it deleted on a
17   computer.
18           I have nothing further, Your Honor.
19           THE COURT:  Thank you, Mr. Waterstreet.
20           Anything further, Mr. Shanker?
21           MR. SHANKER:  Yes, brief rebuttal, Your Honor.
22           THE COURT:  Okay.
23           MR. SHANKER:  Your Honor, what I'm hearing today is
24   they want Khalil detained because he showed an interest in
25   violent videos.  The fact is this.  He never took any steps to

FURTHER ARGUMENT BY MR. SHANKER

1    actually hurt anybody.  He never took any steps to materially

2    support a terrorist group.  All they had to do was go to a

3    grand jury and get those charges.  They didn't get those

4    charges.  They don't have the evidence.  This is protected

5    speech.  It's not pleasant speech.  I agree, it's disgusting,

6    but it doesn't make him a danger to others.  You know,

7    Mr. Waterstreet brought up the undercover agents in this case.

8    Frankly, Your Honor, the inducement that was used by the

9    government in this case was the most extreme, the manipulation

10   the most exploited that I've seen in 25 years as a defense

11   lawyer, using these women as love interests to try to get him

12   to cross that line, to actually make a substantial threat, to

13   actually join a martyrdom operation.  He wouldn't do it.  He

14   repeatedly, when push came to shove and she tried to get him to

15   join, he said "I don't want to hurt anybody, I don't want you

16   to get hurt, I don't want you to hurt anybody."

17        This -- what they presented is protected speech that

18   they know they can't charge him with.  It's not chargeable.  It

19   doesn't show that he's a danger.  They -- when the actual talk

20   about the church and things like that, that came out, as

21   Dr. Tilbrook found, he did that because he was trying to

22   maintain the attention of these undercover women.

23        He has never touched a woman.  He's never had a

24   girlfriend.  He didn't want to be a part of an arranged

25   marriage.  He was desperate.  And the government's right.  He

**FURTHER ARGUMENT BY MR. SHANKER**

1    did give up marijuana, but he was going through intense

2    withdrawals in that time after they took the first gun, and he

3    was dealing with the situation trying to find a woman to be

4    with.  So, you know, the situation here is we have a bunch of

5    downloaded videos, and we don't have him threatening anybody at

6    that point, nothing.  And any threats that are made were empty

7    because if they were true threats, we'd have a charge under

8    that statute.

9         Secondly, when it comes to a change in circumstances,

10   when Judge Whalen ruled on bond, we didn't even have an

11   indictment.  I mean, he -- we thought that they were going to

12   be coming with a material support charge, and they didn't.  We

13   have an obvious change in circumstances.  The government's own

14   expert goes on for 13 pages describing what -- how -- what a

15   good person Khalil is, how engaged he was in the process and

16   how he's not a danger to himself or others.  And he's -- and

17   when he says no substantial danger to himself or others or

18   property, he's referring to Section 18 U.S.C. 4241(d) which

19   requires at a minimum a conditional release.  So I don't buy

20   the government's argument here.  He never took any substantial

21   steps to hurt anybody.  He never materially supported a

22   terrorist group.

23        I want to also point out, Your Honor, that his

24   interest in ISIS is -- it's based on a cultural conflict in

25   Syria, and never does he say -- is he downloading these videos

1    and saying "I want to kill Americans."  In Syria right now

2    President al-Assad and his armed forces are battling with ISIS

3    armed forces.  ISIS is defending and -- in many situations

4    Sunni Muslims.  Al-Assad's forces are killing Sunni Muslims.

5    His support was tepid and it was based on the old adage "my

6    enemy's enemy is my friend."

7            I'm a Michigan fan.  If Ohio State is playing

8    Northwestern, I'm rooting for Northwestern.  It doesn't mean

9    I'm going to wear their colors, but I'm rooting for

10   Northwestern.

11           So they -- there has not been a true threat in this

12   case.  There has not been any material support in this case.

13   We have the government's own expert with his opinion very

14   clearly saying that there are conditions available for his

15   release, in fact, finding ideal his release to get this

16   treatment.  And so, Your Honor, I ask that with conditions,

17   whatever you find necessary, that you release him so that he

18   can start getting this treatment and return to his family.

19           Thank you, Your Honor.

20           THE COURT:  All right.  Thank you, Mr. Shanker.

21           Well, the presentations on both sides of this issue

22   have been quite extensive, and I don't know that I need to

23   repeat much of the matters that both counsel have addressed.

24   Ultimately, the question is whether the government has

25   presented sufficient information to establish a clear and

THE COURT'S RULING

1   convincing -- that by clear and convincing evidence the

2   Defendant would pose a risk of violence and harm if granted

3   bail.

4        There was a second round addressed by the magistrate

5   judge and affirmed, I think, by the Court's earlier bond

6   hearing that dealt with the Defendant's dual citizenship and

7   risk of flight.  The -- given his potential access to a

8   passport.  And the -- there hasn't really been a -- that matter

9   has not been addressed, but it matters not because the -- what

10  it comes down to is you really don't need a psychologist or a

11  psychiatrist to conclude that the Defendant poses a risk of

12  harm.

13       This -- much of what is identified by the defense is

14  protected speech does represent threatening statements, the --

15  made by the Defendant in his various postings.  And the -- and

16  while these don't derive apparently from a mental illness as

17  such, they are very troubling and frightening statements and

18  behaviors as well.  It's not just what these pictures of

19  killings and dead bodies and heads grouped in a pile that have

20  been severed, it's the sheer volume of the material and the

21  volume of material that was being searched and maintained

22  occurring during the period that he had had other legal issues

23  going.  Just there is a -- the volume of material suggests that

24  the attachment to the ISIS cause and the violence that is

25  intertwined with that and essential part of that loyalty

**THE COURT'S RULING**

1  suggests that the attachment itself is great.  And,

2  fortunately, I don't know that we have a lot of people who have

3  handled and acquired AR-15s, but that along with a whole

4  firearms involvement by the Defendant during this accumulated

5  and growing attachment apparently to ISIS is more than

6  sufficient to demonstrate by clear and convincing evidence that

7  there are no conditions that can safeguard the community at

8  least at this point in time.  And I do agree that the report

9  from Dr. Tilbrook is by itself not -- if it does involve any

10 changed circumstances, which I really don't believe it does, it

11 is not so great a change of circumstances as to justify a

12 release, even a conditional release.

13        So the Court will deny the motion as presented and go

14 from there.  Thank you.

15    (Proceedings concluded, 3:12 p.m.)

16                           -   -   -

17

18

19

20

21

22

23

24

25

**THE COURT'S RULING**

1

2                          CERTIFICATION OF REPORTER

3

4      I, Leann S. Lizza, do hereby certify that the above-entitled

5    matter was taken before me at the time and place hereinbefore

6    set forth; that the proceedings were duly recorded by me

7    stenographically and reduced to computer transcription; that

8    this is a true, full and correct transcript of my stenographic

9    notes so taken; and that I am not related to, nor of counsel to

10   either party, nor interested in the event of this cause.

11

12

13   Leann S. Lizza                          8-31-2016

14   Leann S. Lizza, CSR-3746, RPR, CRR, RMR        Date

15

16

17

18

19

20

21

22

23

24

25