UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

            Plaintiff,          CR. NO. 16-20098

  v.

                                 HON.  George Caram Steeh

KHALIL ABU RAYYAN,

            Defendant.

_____/

**SENTENCING MEMORANDUM
ON BEHALF OF MR. RAYYAN**

**I put myself in this situation.  I was selfish, foolish, and ignorant. I am so, so, so sorry everyone.  Please forgive me.**
**-Letter to Family, 4/21/2016.**

**I will keep saying sorry until the end of times.  Please forgive me.  This will stick with me for the rest of my life. I will never forget about the stress, the embarrassment and the heartache I caused.**
**-Letter to Family, undated.**

**The days spent in jail allowed me to clear my mind… I will look at my life as a blessing from now on.  I want to go back to college and get a degree, I want to get married. I took a lot for granted.**
**-Letter to Family, undated**

**Absolutely I condemn [ISIS].  My father taught me from day one we are Americans.  That we came to this country to live the American Dream in a way. And I am proud to live in a country where we are able to open up our business, we are able to go to school, to become successful, to support our family – all these are blessings and I thank America for allowing them.**
**-Rayyan's Video Statement to this Honorable Court**

1

## INTRODUCTION

In the late fall of 2016, much to counsel's surprise, at a meeting with Khalil Abu Rayyan's family in Dearborn, his father and step-mother revealed that Rayyan had been sending letters to family members each week, starting in the very first days after he was arrested and detained in this case and continuing throughout the majority of his incarceration. (Ex. A)  These letters, and the accompanying video, (Ex. B), reveal Rayyan's metamorphosis from an immature, addicted boy to a self-reflecting, remorseful, and grateful man.  As demonstrated by these letters, and for the reasons set forth in this Memorandum, Rayyan respectfully submits that a guidelines sentence of 15 months is sufficient, but not greater than necessary, to satisfy the goals of 18 U.S.C. § 3553(a).

## I.     How did he get here?

Rayyan was 21 years of age at the time of the offense.  He celebrated his 22nd birthday while incarcerated.  He will turn 23 soon after his sentencing in this case.  He is the eldest of six brothers and sisters, the youngest three of whom are his step-siblings.  When his parents divorced, his mother relinquished custody of the children to his father, despite her love for them, believing that their father would be able to provide a more stable home, given their mother's unemployment and new status as a divorced Muslim woman.  Rayyan's father, Ray, remarried soon after and Rayyan's youngest three siblings were born.  Despite his position as eldest child by as many as 20 years, in many ways, Rayyan did not exhibit the

normal maturity of an eldest child until well after his detention in this case.

Rayyan is a graduate of Star International High School, with over a year of college credits at Detroit Henry Ford College. He also played on his high school baseball team. Rayyan also began working during his sophomore year at his father's pizzeria, gradually adding hours and responsibility and eventually working as many as 70 hours, 7 days a week. Rayyan remembers days when, in the middle of baseball practice after school, his father would drive-up and he would immediately have to leave to get to work and keep the family business afloat.

Rayyan's time in high school was marked by attention-seeking behavior, a few suspensions, and the beginning of his drug use. He was known as the class clown and gravitated toward the outcasts, who accepted him for who he was. He began experimenting with marijuana at this young age and quickly became addicted, as the drug both calmed his anxiety and masked his insecurities. Within a matter of two years, one blunt became 10-15 blunts, and this trend continued until he was incarcerated in this case, with a pause of several months after his initial arrest on October 7, 2016.

After graduation, Rayyan began working exclusively at the pizzeria, where he had little time for friendships or other social activities. His brother Adam, who was still in school, helped out at the pizzeria, but did not maintain the same rigorous schedule. As a result, Rayyan was often jealous of the greater leniency

Adam was afforded by their father.

More specifically, from Rayyan's perspective, he was jealous of Adam's seemingly unpunished defiance of the family's dictate against personal relationships with women. While Rayyan adhered to the prohibition, Adam did not, and yet did not appear to suffer any substantial familial consequences. As a result, Rayyan has never experienced a romantic relationship of any sort. Knowing that the only way he could have such a relationship was through marriage, he was more vulnerable than the average person when approached online by women he believed to be interested in him.

This vulnerability similarly manifested itself in an interest in violent propaganda. Rayyan's life did not mirror his expectations of himself—instead of living the American dream, he was stuck in a rut of 70-hour work weeks with no romantic prospects, no time for socializing, and no expectation of upward mobility. Twitter, Facebook and other social media platforms have become the backbone of the millennial generation's social fabric, and quickly became Rayyan's only real connection to any social group. His social media persona—and his viewing of ISIS twitter feeds, violent photographs and pornography —were the culmination of his need for both control over, and escape from, his life. See Ex. D, Dr. Tillbrook/BOP Psychological Report at p. 9. These adverse behaviors also demonstrated his desire for social status, "shock and awe" entertainment, and his

immature and misguided judgment.  *Id.*  People like him are a target for the type of propaganda that ISIS disseminates.

And that propaganda did temporarily fulfill this void in Rayyan.  Given that he was raised as an American first and a Muslim second, Rayyan had an inadequate historical understanding of his religion, and was unable to filter the ISIS propaganda from what his religion really taught about tolerance, love and acceptance.  He found a sense of acceptance and status in being followed by other individuals on his Twitter account when he redistributed these images, without appreciating the full scope and consequences of such actions.[1]

Rayyan's statements to the informant, similarly, were never intended to hurt anyone, but rather, made in an effort to impress. For example, informant Jannah's "story" was that she was ready and willing to commit Jihad; that her husband had been killed in Syria by anti-ISIS forces; and that another family member was killed by Shiite (anti-ISIS) forces in Iran. See R. 61 and filed exhibits. Rayyan's parroting of occasionally threatening "tough guy/radical guy" statements lacked

---

[1] Rayyan's "support" of ISIS on-line never derived from an anti-Western or anti-USA perspective.  His support was centered in the group's purported defense of Sunnis, an illusory rationale that Rayyan now recognizes was in large part a sham intentionally perpetrated by the organization through Twitter propaganda.  See *Fields v. Twitter*, 2016 WL 4205687 (W.D. Cal. 2016) (ISIS had an astonishing 70,000 separate Twitter accounts which "posted at least 90 tweets per minute" to "nearly 20,000 followers" as of June 2014.).

any basis in fact, and were merely an attempt to win over the affection of these women, and at times, merely to hold their attention.  Most importantly, when push came to shove in their conversations, not only did Rayyan refuse to agree to any act of violence, he pleaded with Jannah not to hurt herself or others.  See R. 61 and filed exhibits.

## II.    Metamorphosis

Rayyan's 403 days of incarceration to date have served as a wake-up call to his life.[2]  As evidenced by the myriad letters submitted to this Court, Rayyan has had the opportunity to reflect on his actions, his motivations and his goals for the future.  He now sees how far afield he had strayed from the life of which he had always dreamed, the life that his parents dreamed of for him when they came to this country.

Rayyan fully and completely understands why the FBI targeted him, and their concern about his threatening statements and behavior, particularly his social media messaging and statements supporting ISIS.  Rayyan now unequivocally denounces ISIS – its predations, brutality, and terrorism. He now has a more informed understanding of his faith and the bastardization of the religion by radical elements (like ISIS).  His letters demonstrate this new understanding, as they

---

[2] Rayyan has also earned an additional minimum of 54 days of "good time" under the Bureau of Prisons' calculation method.  See *Barber v. Thomas*, 560 U.S. 474 (2010). In addition, "credit for the last year or portion of a year of the term of imprisonment shall be prorated and credited within the last six weeks of the sentence." *Id*. at 490-91.

verbalize and adopt Islam's peaceful, respectful tenets, long-practiced by his family.

Rayyan wrote these letters as a therapeutic way to cope with his incarceration.  He documents his anxiety, his sadness, his regret, and his coming-to-terms with his mistakes and the lasting impact they will have on himself, his family and his community.  As Rayyan stated in a letter to his step-mother Hanadi, "**it's all me and my poor choices**" that caused his incarceration and the negative repercussions for his family and community. (Ex A) Emphasis added.  In the same letter Rayyan states "I can't bealive (sic) the amount of shame I brought to the family.  I will carry this burden with me for the rest of my life…  I am not the same kid anymore.  I am a man and a greatful (sic) man...  It's been a wake up call for me and I am answering it…  Now I see and realize the blessings that matter in life… I was lost. But now I am found." *Id.*

In a letter to his father, Rayyan writes, "I thought you were old fashioned and I thought you were trying to run my life.  Oh how stupid I was.  I kick myself for it every second.  Probably none of this would [have] happened if I just listened to you… I am makeing (sic) this promise to you Dad that the day I get out I will leave the old Khalil behind and I will be the best son I can be.  I have learned a huge lesson that I will never forget."  A letter that followed summarized:  "[N]ow I am locked up.  **I have nobody to blame but myself.**" *Id*. Emphasis added.

Rayyan's letters also coalesce to present a picture of a young American man, who loves and misses the daily trappings of American life, which he had

previously taken for granted.  For example, the letters repeatedly discuss how much he misses his family, and how he longs to attend Detroit Tigers, Pistons and Lions games with his sisters, and his longing for both home cooked meals and McDonald's.  He reminisces about the joys of playing catch with his father and jumping on a trampoline with his little sister.  These statements, which tightly embrace both family and American culture, could never be the writings of a terrorist.

Overall, the letters reveal a young man who has been humbled;  has used the travails of incarceration to reflect on his mistakes, his crimes, and his blessings; and has cultivated a greater respect for his family and the structure it provides. Rayyan has emerged with a life-affirming, forward-thinking vision for his future.

### III.   A Sentence of 15 Months' Incarceration Is Sufficient But Not Greater Than Necessary to Satisfy the Goals of 18 U.S.C. § 3553(a).

Courts must impose the minimally-sufficient sentences to achieve the statutory purposes of punishment—justice, deterrence, incapacitation, and rehabilitation: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]."  18 U.S.C. § 3553(a).

Rayyan pled guilty on September 13, 2016, to the charges of false statement to acquire a firearm and unlawful possession of a firearm. The parties both initially calculated a guideline range of 12-18 months. The Probation Department has

8

calculated a slightly higher guideline range of 15-21 months. 3

Given the above-stated legal mandate, counsel agrees with the Probation Department's conclusion in the PSI:  "A sentence that is within the guideline range would reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense."  PSI, ¶97, page 20.  See 18 U.S.C. §3553(a)(2)(A).  More specifically, Mr. Rayyan submits that a 15-month sentence, is sufficient but not greater than necessary to achieve these goals.

### A.    Nature and Circumstances of the Offense/Unwarranted Sentencing Disparities

A 15-month sentence in this case would appropriately account for the seriousness of the offense of conviction because it is within the guidelines range for the instant offense, and covers the same conduct accounted for in Mr. Rayyan's state conviction and sentence of two-years probation with 80 hours of community service.

---

3       Counsel incorporates by reference in this Memorandum his prior filings in this case, including all corresponding filed exhibits, including R. 15 (Affidavit of Ray Rayyan); R. 48 (Response to Gov. Motion for Psych. Examination); R. 50 (Motion for Bond); R. 61 (Supp. Brief in support of Motion for Bond); R. 86 (Renewed Motion for Bond); R. 90 (Reply re: Renewed Motion for Bond).

In addition, counsel has submitted as Exhibit C an additional affidavit from Ray Rayyan regarding a photograph of himself holding a gun that the Government submitted at the hearing on the second bond motion on 8/30/2016.  The Government implied that the gun may have been possessed by the defendant at some point.  However, Ray Rayyan swears under oath that the photo is approximately seven years-old, and depicts a gun owned by his brother, Baker. The defendant has never had access to or handled the weapon.

As Rayyan explained at his state sentencing, he wanted a gun for self-defense purposes only because he and other employees at the store had been robbed while delivering pizzas. (*See also* Exhibit B to R. 48, photos and police reports after Rayyan's cousin Bashar was robbed and beaten while delivering pizza for the family restaurant).[4]  Although he was a prohibited person at this time in October of 2015, due to his daily marijuana use, he was unaware of the precise law at the time of his purchase.  Thereafter, he quit using marijuana for over two months in an attempt to obtain is CPL.  During the October arrest, Rayyan's gun was found in his car during a traffic stop, and he was arrested for a concealed carry violation and marijuana possession.

When Rayyan was arrested for this offense in October 2015, he immediately told the officer he had a gun, and he admitted that he did not have a concealed pistol license (CPL).  The gun was seized.  However, he was not charged with the CCW until November 17, 2016.  In the interim, his father advised him that, to lawfully carry a weapon outside the home, he needed to obtain an appropriate permit.  His dad found a CPL class in Southfield for Rayyan to attend in November. Rayyan tried to purchase a handgun prior to the class on November

---

[4] Pizza delivery in Detroit is a dangerous job. Early this year, the U.S. Attorney in this district brought charges for a string of robberies of Detroit pizza delivery drivers who were robbed at gunpoint during their delivery runs. *United States v. Walker*, 17-mj-30036, ECF Doc. 1, Complaint (E.D. Mich., Jan. 26, 2017).

15th at a sporting goods store, but his application was denied due to the open arrest on the CCW (although, as previously stated, Rayyan had not yet been charged with any offense).

At the class that day, at Action Impact gun range, he and his cousin Bashar rented and fired military-type rifles after the class itself was complete.  Action Impact co-owner Sam Dalaly told Investigator Greg Morris that he rents the military type weapons 10 to 15 times a week on average. The renter must be over 21 years old and be accompanied by a friend or family member.  Mr. Dalaly said there is also a range officer present during the entire use of the weapon, both for instructional purposes and safety regulations.

Mr. Rayyan acknowledges that during this period he was engaged in viewing and downloading the propaganda, and that in December he began communicating with FBI informants about ISIS.  Rayyan believes that, taking all of the relevant sentencing factors as a whole, including his extraordinary maturation process while in jail under difficult conditions, a 15-month guidelines sentence remains an appropriate sentence in this case.

Moreover, counsel agrees with the Probation Department that "[a] sentence within the guideline range would avoid unwarranted sentence disparities among defendants with similar records."  See PSR, ¶103.

**B.     History and Characteristics of Mr. Rayyan**

While it may appear difficult to comprehend how Rayyan began engaging in these self-destructive behaviors, his youth and immaturity, along with this drug use and depression, at the time of his conduct is a significant factor and warrants consideration when fashioning an appropriate sentence.

As discussed above, at the time of the offense, Rayyan was a 22-year-old marijuana addict with very little social life other than online.  A consensus of experts now agree that the human brain does not reach full maturity until at least the mid-20s and more likely into the 30s. [5] Brain Changes in Young Adulthood, Massachusetts Institute of Technology (MIT), Young Adult Development Project, http://hrweb.mit.edu/worklife/youngadult/changes.html (2017).  As noted by both psychologists who evaluated Rayyan, he is immature, even for his age. Ex. D, Forensic Report, Dr. Chad Tillbrook (FILED UNDER SEAL); Ex. E, Psychological Report, Dr. Lyle Danuloff (FILED UNDER SEAL).

---

[5] Giedd, J. N. (1999). "Development of the human corpus callosum during childhood and adolescence: A longitudinal MRI study." Progress in Neuro-Psychopharmacology & Biological Psychiatry 23: 571-588.
  Giedd, J. N. (2004). "Structural magnetic resonance imaging of the adolescent brain." Adolecent Brain Development: Vulnerabilities and Opportunities: 77 - 85.
  Giedd, J. N., J. Blumenthal, et al. (1999). "Brain development during childhood and adolescence: A longitudinal MRI study." Nature Neuroscience 2 (10): 861-863.

Dr. Danuloff, for instance, found that Rayyan's "sense of naivete was enormous." Ex. E, at p. 5. Moreover, repeated and long-term marijuana use has devastating effects on formative brain maturation.[6] Dr. Danuloff specifically noted that Rayyan's extreme marijuana usage has "stymied … his overall psychological development." Ex. E, at p. 3.

Rayyan's physiological immaturity coupled with his depression and drug abuse were significant factors in his criminal behavior in this case, and in his non-criminal but reckless conduct on-line and in conversations with the informant. As discussed above, his incarceration has weened him from his drug abuse, and clarified his thinking, allowing him, for the first time, to gain perspective on his behavior and goals.

His immaturity, however, has never held him back from cooperating with law enforcement or apologizing for his conduct. Indeed, Rayyan has apologized directly to this Honorable Court, the prosecutor, the agents, his family and his community for his actions. Rayyan has been thoroughly compliant—as has his family—both on his state case and on this federal case based on the same conduct. Rayyan pled guilty to the charged offenses at both the state and the Federal level and repeatedly confessed to officers and agents. This speaks volumes about his

---

[6] Meier, M. H., Caspi, A., Ambler, A., Harrington, H., Houts, R., Keefe, R. S. E. Moffitt, T. E. (2012). Persistent cannabis users show neuropsychological decline from childhood to midlife. *Proceedings of the National Academy of Sciences, USA, 109*, E2657–E2664.

acceptance of responsibility for his crimes.

Rayyan states over and over in the letters and in his video statement to the court that he was likely an individual that needed to learn "the hard way," and that his detention, in this case, has in a substantial sense "saved" him.  See Ex. A, Letter to Father, May 26, 2016.  As he wrote to his father, "I promise to change and become a better Muslim.  I made everyone look bad.  I made the Muslim people look bad."  Ex. A, p. 13.

### C.    Need for Deterrence

A guideline sentence will sufficiently deter Mr. Rayyan and others from committing future crimes of the sort in this case.  Not only is there no indication that he presents a substantial danger to individuals or the community in the future, but his time in custody to date has had a lasting impact on him, as evidenced by his letters to his family and his statement to this Honorable Court.

As illustrated in the letters submitted to the Court, the time Rayyan has spent in custody has had a significant deterrent effect on him.  See Ex. A.  Through his letters, he has taken the time to document the effect these custodial events have had on him as an individual and as a member of his family and community.

While in custody, he has endured threats and great fear.  He spent extensive time in isolation cells and in detention in a mental health unit at Devens in Massachusetts, all of which is documented in his letters to his family.  Rayyan acknowledges that he has embarrassed his family, community, and the citizenry as

a whole, another powerful deterrent to any future criminal acts.

The consequences for his behaviors will go far beyond any incarceration. Rayyan went from a spotless record to multiple felony convictions at both the state and federal level, which will follow him for the rest of his life through his attempts to better himself through future school and work.

Rayyan's own words are probably the most enlightening:  "This has changed me as a human being.  I will never forget.  In the future, Inshallah, every time I am going to make a decision, I will remember the pain, suffering and embarrassment I put myself and my family in.  I was arrogant and stupid, this whole situation could've been avoided if I listened to my family."

For these reasons, a guideline sentence of 15 months will be more than sufficient to deter Rayyan—and others—from committing these crimes and engaging in reckless on-line behavior.

### D.    Need to Protect the Public From Further Crimes

In April 2016, this Court ordered Mr. Rayyan to submit to a competency evaluation in the Bureau of Prisons pursuant to 18 U.S.C. § 4241(a), and ordered submission of a report pursuant to § 4241(b), which must comply with the requirements of 18 U.S.C. § 4247(b) and (c), as well as §4241(d). [7]  Dr. Chad

---

[7] **§4241(d) Determination and disposition.**--If, after the hearing, the court finds by clear and convincing evidence that the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial

Tillbrook, BOP psychologist, submitted a complete forensic report, which included not only an opinion about whether Rayyan was competent to stand trial, but also an assessment of his dangerousness and potential success in community-based treatment programs, as required by the Court's Order for "diagnosis and prognosis" (R. 66, Order for Psychiatric or Psychological Examination of Defendant), as well as by statute.

Critically, after reviewing the voluminous discovery in this case and after evaluating and observing Rayyan for a lengthy period of time, Dr. Tillbrook concluded that his diagnoses—adjustment disorder (mixed anxiety and depressed mood) and cannabis-use disorder, do not suggest Rayyan is "a substantial risk of causing bodily harm to others or serious damage to property." Ex. D, *Id.* at 11. Dr. Tillbrook also noted that Rayyan did "not ma[k]e any statements or exhibit[] any behavior . . . indicative of risk to himself or others" during the entire period of observation and examination. *Id.* at 10. [8]  Dr. Lyle Danuloff's findings were similar. See Ex. E.

---

risk of bodily injury to another person or serious damage to property of another, the court shall commit the person to the custody of the Attorney General … until --
 **(2) the person's mental condition is such that his release, or his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would not create a substantial risk of bodily injury to another person or serious damage to property of another**;
whichever is earlier.

[8] A district court's use of competency reports is limited only if the report is

With the mental health counseling and drug addiction treatment recommended by Drs. Tillbrook and Danuloff, and the strong support network that Rayyan has in his immediate and extended family, this Honorable Court can feel confident that a guideline sentence of 15-months would be sufficient to protect the public. Although Rayyan's reckless and at times threatening statements deserved the attention of the FBI, he was never charged with any terrorism or "true threat"-related crime because there was little evidence to support such charges. Neither psychological expert in this case found that Rayyan was a substantial danger to the public, but both found that any residual concerns would be likely ameliorated with mental health counseling and drug treatment/testing.

Just as importantly, Rayyan's letters to his family provide the court with proof that he has developed insight into his crimes and mistakes; they also exemplify powerfully Rayyan's commitment to never, ever return to the criminal justice system. As Rayyan wrote to his father, "My life is forever changed… I learned my lesson. I promise I won't get into any more problems... I am so sorry Dad. However, actions speak louder than words. I can't wait to show you and

---

admitted in violation of the defendant's right against self-incrimination. See *Buchanan v. Kentucky*, 483 U.S. 402, 421-24 (1987). Importantly, the Supreme Court has suggested courts can and should consider the informed opinions of medical professionals when deciding whether a defendant poses a danger to others and the community, particularly where there is no contrary medical/psychological opinion presented to the court. See *Washington v. Harper*, 494 U.S. 210, 231-233 (1990); *Sell v. United States*, 539 U.S. 166, 184 (2003).

everybody else."

### E.   Need for Sentence to Provide Appropriate Rehabilitative Treatment

Imprisonment is "not an appropriate means of promoting correction and rehabilitation."  18 U.S.C. § 3582(a); *Tapia v. United States,* 131 S. Ct. 2382, 2384 (2011).

Earlier in this case, this Honorable Court ordered defendant to undergo a forensic mental health evaluation by an out of state BOP psychologist to determine, in pertinent part, "the examiner's opinions as to diagnosis [and] prognosis." See R. 66, Order for Psychiatric or Psychological Examination of Defendant, 4/18/2016.

In response to the Court's order for a forensic mental health evaluation, Dr. Tillbrook completed an in-depth report based on his thorough psychological testing and evaluation, including his specific review of the discovery, transcripts and arguments with regard to the defendant's alleged dangerousness, not to mention a lengthy period of observation.  See Ex. D, *Id.*  Through that in-depth assessment, Dr. Tillbrook concluded that the defendant was suffering from depression and drug addiction. [9] Dr. Tillbrook specifically recommended as "ideal" the defendant's

---

[9] Dr. Tillbrook's psychological testing revealed that Rayyan "did not attempt to portray himself in a more negative or pathological manner nor did he attempt to portray himself in a more positive or virtuous manner… he 'self-disclosed and demonstrated good insight'… and was not 'malingering.'" Ex D, *Id.* at 10-12.

release into a dual diagnosis community treatment program for mental health and substance abuse.  Ex. D, *Id*. at 11-12.[10]

In sum, Rayyan's depression and drug abuse were significant factors in his criminal behavior in this case, and in his non-criminal but reckless conduct on-line and in conversations with the informants.  As Rayyan wrote in an undated letter to his father, "[m]y mind was full of crap and I didn't want to listen to anyone."  Ex. A.  For these reasons counsel respectfully requests this Honorable Court to sentence Mr. Rayyan to a guideline term of 15 months, with specific conditions of supervised release for both mental health counseling and drug treatment. In accord PSR, ¶¶100-101 (noting both psychologists—Drs. Tillbrook and Danuloff—have recommended mental health counseling).

## IV.    Conclusion

Rayyan has no history of violent crimes.  He has no prior criminal history at all prior to the events of this case.  He is a U.S. citizen and a high school graduate

---

10 Dr. Tillbrook also suggested the BOP's nine-month Residential Drug Abuse Program (RDAP) may be a good option—but only if Rayyan was eligible, which he clearly is not. Ex. D, at 11. An offender must be capable of completing the entire program to be eligible, including the community confinement portion. However, the offense of conviction is a critical factor for the early release portion of the program. The BOP program statement (P5331.02), specifically excludes a number of offenses from early release, and therefore from the required TDAT (community) portion of RDAP. **One of the excluded offenses is the possession of a gun.** *Id.* **at 3. Therefore, Rayyan is ineligible to participate in RDAP.**

and has over a year of college credits at Henry Ford College. He has proven to be an exceptionally hard worker, working 7 days a week, for a minimum of 70 hours at his father's restaurant, Ray's Pizzeria. He has grown up in Dearborn Heights and has lived here his whole life.

Rayyan's letters illustrate what he has focused on during his incarceration and are a true reflection on who he is; a young man who cares deeply for his family, his community, and his Country; a young man who has a keen understanding of his crimes, and the things he needs to do prevent them from ever recurring. He has positive, attainable goals for his future.  And he has a strong, caring family that will provide structure for him and help him reach those goals. Rayyan has also demonstrated his willingness and desire to engage in counseling for both his substance abuse and mental health issues. And most importantly, he has exhibited in extraordinary fashion his unqualified remorse, regret and responsibility for his actions.

For all these reasons, counsel concurs with the Probation Department's conclusion in the PSI:  "A sentence that is within the guideline range would reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense."  PSI, ¶97, p. 20.  More specifically, counsel respectfully requests a guideline sentence of 15 months, a term sufficient but not greater than necessary pursuant to 18 USC §3553(a)(2).

Respectfully Submitted,

**FEDERAL DEFENDER OFFICE**

s/ Todd A. Shanker
Counsel for Mr. Rayyan
613 Abbott St., 5th Floor
Detroit, MI 48226
Phone: (313) 967-5879
Date: February 28, 2017          E-mail: todd_shanker@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2017, I filed the foregoing Memorandum with
the Clerk of the Court, which will deliver a copy of this filing to:

        Ronald Waterstreet
        Assistant U.S. Attorney
        211 W. Fort Street, Suite 2001
        Detroit, Michigan   48226

        Christine Connolly
        U.S. Probation Officer
        Detroit, MI 48226

        s/ Todd A. Shanker