UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,
        Plaintiff,

v.

        Case No. 16-20098
        Hon. George Caram Steeh

KHALIL ABU-RAYYAN,

        Defendant.
_____/

**GOVERNMENT'S SENTENCING MEMORANDUM**

After supporting ISIS for almost two years, defendant Khalil Abu-Rayyan announced that he wanted to "shoot up a church," kill a police officer in a hospital, and "behead someone." The FBI quickly intervened and arrested him. But because that intervention blocked Abu-Rayyan from implementing his ideas, his guideline range is now quite low. And if the Court were to sentence him within it, as Abu-Rayyan requests, he would be immediately released into the public.

The Court need not, and should not, do that. *Booker* and *Gall* require the Court to fashion Abu-Rayyan's sentence using the § 3553(a) factors. Those factors require Abu-Rayyan's sentence to be sufficient to protect the public. *See* 18 U.S.C. § 3553(a)(2)(C). Only an above-guideline sentence can protect the public. The Court

1

should therefore vary above Abu-Rayyan's guideline range and sentence him to at least 96 months in prison.

## Facts and Procedural History

**1. Abu-Rayyan promotes ISIS on Twitter.**

ISIS-inspired attacks have claimed scores of innocent lives—people who wanted nothing more than to go to work, dance at a club, listen to a concert, or relax by the beach.

Over two years ago, defendant Khalil Abu-Rayyan began affiliating with ISIS. (R.59: Govt's. Opp., PgID 329). He started promoting the terrorist organization with his Twitter account, reposting and commenting on ISIS videos. (R. 88: Govt's. Opp., PgID 656). The videos depicted ISIS fighters burning a Jordanian pilot alive, throwing men from a high-rise building, beheading Christians in Egypt, and carrying out other executions. Abu-Rayyan commented that one of the videos "made [his] day" and that he had watched another video ("the best one yet") five different times. (*See* Exhibit B). He also posted a picture of himself wearing camouflage, showing off a semi-automatic pistol, and making a common ISIS gesture. (R. 88: Govt's. Opp., PgID 666, Exhibit B in original filing). His profile picture showed him gesturing in the same way. (*Id.*, PgID 664, Exhibit A in original filing).

Unsurprisingly, Abu-Rayyan's support for ISIS caught the attention of the FBI. The FBI then began investigating Abu-Rayyan—reviewing his Twitter postings and conducting other surveillance. (PSR ¶ 11).

**2.    Abu-Rayyan buys a gun, gets caught with it, tries to buy another gun, and then starts practicing with an AK-47.**

Approximately five months into the FBI's investigation, agents learned that Abu-Rayyan had purchased a .22 caliber revolver. (Govt's. Opp., PgID 338; PSR ¶ 12). Before purchasing the gun, Abu-Rayyan completed and signed an ATF form asking whether he unlawfully used controlled substances. (PSR ¶ 12). He responded "no" to that question—even though he regularly smoked marijuana. (PSR ¶¶ 12–14).

Two days after Abu-Rayyan bought the gun, Detroit police officers pulled him over for speeding. (PSR ¶ 13). Inside his car, the officers found the gun, along with four small bags of marijuana. (*Id.*). Abu-Rayyan admitted that the gun was his. (PSR ¶¶ 13–14). He admitted that he did not have a gun license or medical-marijuana card. (*Id.*). And although he was arrested (and eventually charged) in state court for the marijuana and the gun, he was soon released on bond. (PSR ¶ 14).

Abu-Rayyan then tried to buy another gun from a different store. (R.59: Govt's. Opp., PgID 338; PSR ¶ 15). Once again, he lied on the ATF form about his drug use. (PSR ¶ 15). But this time, because of his pending charges, the store refused to sell him the gun. (*Id.*).

3

So instead, that same day, Abu-Rayyan drove to the gun range, rented an AK-47 and an AR-15, and began practicing with them. (R.88: Govt's. Opp. PgID 658; PSR ¶ 15). Two weeks later, he posted a picture of himself on a new Twitter account, holding the AK-47 and making the same ISIS gesture as before. (R.88: Govt's. Opp. PgID 670, Exhibit D in original filing). Under the picture, he also discussed "Sahwat hunting"—the killing of any Iraqis who oppose ISIS. (*Id.*).

**3.   Abu-Rayyan confides that he wants to "shoot up a church" and "would gladly behead people."**

In late 2015, an undercover FBI employee began messaging with Abu-Rayyan, posing as an ISIS supporter. (PSR ¶ 17). Abu-Rayyan told her that he supported ISIS and wanted to carry out a martyrdom operation. (R.59: Govt's. Opp., PgID 331; PSR ¶ 17). He acknowledged that his .22 caliber revolver would not have held enough ammunition for a mass killing. (R.59: Govt's. Opp., PgID 353; PSR ¶ 17). But he bragged that he had an AK-47, with a 40-round magazine, readily available. (R.1: Compl. Aff., ¶ 22, PgID 6). The FBI later confirmed that one of Abu-Rayyan's family members owned (or had access to) an AK-47. (R.88: Govt's. Opp., sealed document).

Abu-Rayyan also outlined plans "to shoot up a church." (R.59: Govt's. Opp., PgID 331–332). Although he did not know the church's name, he explained that it was "close to [his] job" and "one of the biggest ones in Detroit." (R.59: Govt's. Opp., PgID 350–351). He further explained that he had "planned out" the attack on the

4

church, "bought a bunch of bullets," and "practiced reloading and unloading." (*Id.*). He "regret[ted]" that the attack had been foiled, at least temporarily, by his father. (*Id*). But he stressed that he remained committed to an attack—that "maybe down the line I can try again"—and that if he couldn't "go do jihad [in] the Middle East," he "would do [his] jihad over here." (R.59: Govt's. Opp., PgID 351; *see* Exhibit C). And he gloated that slaughtering churchgoers would be "easy," involve "a lot of people," and "make the news." (*Id.*)

A few weeks later, Abu-Rayyan revealed another idea for martyrdom. He explained that one of the Detroit police officers who had arrested him was in the hospital recovering from a heart attack. (PSR ¶ 17). Abu-Rayyan wanted to attack the hospital—killing the police officer in the process. (*Id.*).

The next day, Abu-Rayyan further confided that "[s]hootings and death" made him "excited," and that videos of beheadings "always [made] [him] happy." (R.59: Govt's. Opp., PgID 356–357, Exhibit A in original filing). He explained that he "want[ed] to hear the [person] scream"—and that "[i]t [did] not matter who he is." (*Id.*). He also stated that he "would gladly behead people if [he] needed to," because it was his "dream to behead someone." (*Id.*).

4. **The FBI arrests Abu-Rayyan and finds more ISIS material on his cell phone.**

FBI agents soon intervened and arrested Abu-Rayyan. Then they searched his cell phone. (R.59: Govt's. Opp., PgID 329). Messages on the phone showed that

5

Abu-Rayyan had been supporting ISIS as early as July 2014. (*Id.*). The phone also contained screen shots of ISIS videos that Abu-Rayyan had watched, showing ISIS prisoners being burned alive, run over by a tank, thrown from buildings, or beheaded. (*Id.*, PgID 333). And for the wallpaper (the background image) on his cell phone, Abu-Rayyan had chosen a photograph of a camouflaged ISIS fighter. (R.88: Govt's. Opp., sealed document). With his left hand, the fighter was making an ISIS gesture; with his right hand, he was holding a woman's severed head. (*Id.*).

**5.     Abu-Rayyan pleads guilty to both counts, without a written plea agreement.**

After Abu-Rayyan was arrested, a federal grand jury indicted him on two counts: making a false statement to purchase a firearm, in violation of 18 U.S.C. § 922(a)(6) (count one), and possessing a firearm while unlawfully using a controlled substance, in violation of 18 U.S.C. § 922(g)(3) (count two). (R.23: Indictment, PgID 43–45). Both of those counts centered on Abu-Rayyan's purchase and possession of the same .22 caliber revolver underlying his state charges. (*See id.*).

In September 2016, Abu-Rayyan pleaded guilty to both counts, without a written plea agreement. (PSR ¶ 8). The probation department calculated his guideline range as 15–21 months. (PSR ¶ 80). His statutory maximum sentence on each count is 120 months. (PSR ¶ 79).

6

**Argument**

**The Court should sentence Abu-Rayyan to at least 96 months in prison.**

Because Abu-Rayyan continues to present a significant threat to the public, the Court should sentence him to at least 96 months' imprisonment. A defendant's sentence "should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). A district court may therefore exercise "wide discretion" in choosing what it relies on at sentencing, and it should base the sentence on "the fullest information possible concerning the defendant's life and characteristics." *Id.* at 246–47. Congress has even codified that principle by statute, providing that a district court faces "[n]o limitation" on "the information concerning the background, character, and conduct" of a defendant that it considers at sentencing. 18 U.S.C. § 3661.

Post-*Booker*, district courts must sentence each defendant using the factors listed in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 49–50 (2007). In each case, the district court must consider those factors and "make an individualized assessment based on the facts presented." *Id.* at 50. Although several factors are tied to "the offense" of conviction, several others encompass the broader purposes behind criminal punishment. *See* 18 U.S.C. § 3553(a). At least two such purposes require an above-guideline sentence here: protecting the public and deterring future terrorist attacks. § 3553(a)(2)(B), (C).

### A.  Only a lengthy sentence is sufficient to protect the public from a defendant who is contemplating mass murder.

The most pertinent § 3553(a) factor, by far, is the need to protect the public. Section 3553(a) does not just permit the Court to consider that factor; it requires it. It states that the Court "*shall* impose a sentence sufficient, but not greater than necessary . . . to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C) (emphasis added). And the Sixth Circuit has regularly upheld above-guideline sentences where necessary to protect the public. *See, e.g.*, *United States v. Baines*, 651 F. App'x 411, 413–144 (6th Cir. 2016); *United States v. Bass*, 785 F.3d 1043, 1051–52 (6th Cir. 2015).

Such a sentence is necessary here. In the weeks before his arrest, Abu-Rayyan gamed out at least two ISIS-inspired terrorist attacks. First, he said he planned to shoot up a church. Later, he said he planned to kill a police officer at a hospital. He pinpointed the location for each attack. And he specified his weapon of choice: an AK-47 with a 40-round magazine.

Shooting up a church would have claimed dozens of innocent lives—men, women, children, anyone who happened to be in the wrong place, at the wrong time, when he opened fire. He would have killed a lot of them—very quickly—using a very powerful firearm. He even admitted as much: "I would've killed every last one of them[,] [e]specially the women and children." (R.59: Govt's. Opp., PgID 353).

Murdering a police officer in a hospital could have caused similar casualties. Killing the officer, even standing alone, would have been horrible enough. But if Abu-Rayyan had carried out the killing in a public hospital, as he contemplated, it could have risked others' lives too—for instance, if law enforcement or a bystander had tried to stop him.

If there were any doubts that Abu-Rayyan was serious, his previous conduct dispelled them. He spent years dedicated to ISIS—promoting and celebrating the terrorist organization's aims. He exulted in some of ISIS's most gruesome violence. He bragged about wanting to behead people. (R.59: Govt's. Opp., PgID 356). And he practiced with an AK-47, even after Detroit police seized the gun that he was carrying illegally and even after he tried (and failed) to buy another gun illegally. Then he posted a picture of himself, holding that AK-47 and making an ISIS gesture—so that everyone would know what had inspired him. Abu-Rayyan's "own words" and actions thus showed "a willingness and readiness to commit a violent [terrorist attack]." *Baines*, 651 F. App'x at 414. And they confirm that a lengthy sentence is necessary "to protect the public from further crimes." *Id.*

Abu-Rayyan's conduct also mirrors the preparation that other ISIS fighters have undertaken before recent terrorist attacks. One example is Mohammad Abdulazeez. Abdulazeez killed five military service members and wounded several others with an AK-47 style weapon at military recruiting centers in Chattanooga, Tennessee.

9

*Chattanooga gunman talked of frequenting gun range,* CBS News, July 18, 2015. Like Abu-Rayyan, Abdulazeez was a loner who used marijuana to self-medicate his depression and began expressing admiration online for anti-American violence. *Chattanooga Shooting: FBI recovers gunman's disturbing diary,* ABC News, July 20, 2015. Like Abu-Rayyan, Abdulazeez was arrested shortly before his shooting rampage and became increasingly agitated as his court date approached. *Answers elusive as different sides of Mohammad Abdulazeez's life emerge,* Chattanooga Times Free Press, July 21, 2015. And like Abu-Rayyan, Abdulazeez drew inspiration from videos of Anwar al-Awlaki, an Al Qaeda cleric who is popular among jihadists. *Compare Mohammad Youssef Abdulazeez downloaded recordings from radical cleric, officials say,* NBC News, July 20, 2015, *and In Chattanooga, a young man in a downward spiral,* The New York Times, July 21, 2015, *with* Exhibit D ("When I listen to [al-Awlaki's] lectures I get goosebumps."). The only difference is that here, unlike with Abdulazeez, the FBI stepped in before Abu-Rayyan could decide whether he would follow through on his martyrdom threats.

The Court should not give him another shot at that decision. Abu-Rayyan cannot be released—at the least in the near future—without seriously endangering the public. Outside of prison, no one can monitor him around the clock. No one can completely prevent him from acquiring an AK-47 or another dangerous weapon. No one can stop him from hatching new ISIS-inspired terrorism plans. And no one can

guarantee the public's safety from him. Abu-Rayyan's conduct thus provides a compelling justification for a 96-month, above-guideline sentence. *Gall*, 552 U.S. at 50; *see also United States v. Lajqi*, 457 F. App'x 246 (4th Cir. 2011) (affirming a 60-month above-guideline sentence in D. Md. No. 8:10-cr-00502 for a defendant whose offense of conviction was visa fraud and whose guideline range was 0–6 months, but who said he wanted to commit a terrorist attack).

> **B.    A lengthy sentence is also necessary to deter others who may be contemplating terrorism or mass shootings.**

Deterrence also demands that Abu-Rayyan receive a significant sentence. A defendant's sentence must "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). And his *sentence*—not merely his conviction or negative publicity—must be what provides that deterrence. *United States v. Robinson*, 669 F.3d 767, 777 (6th Cir. 2012)

A terrorist who has already started shooting or detonating explosives knows full well (and often, intends) that he is going to die. But for anyone, like Abu-Rayyan, who is still contemplating an attack and deciding whether to follow through, deterrence remains valuable. It conveys that even the first steps toward a terrorist attack will carry consequences.

Conversely, if Abu-Rayyan were quickly released—only months after being arrested—it would tell any budding attackers that they need not be concerned if they are caught. They can simply try again, in a year, after they are released. That would

send a wildly inappropriate message—both to Abu-Rayyan and the public at large. Deterrence thus supports a lengthy sentence here.

### C. Abu-Rayyan's guideline range does not account for the threat that he poses to public safety.

Although the Court must calculate and consider Abu-Rayyan's guideline range, that range should receive very little weight here. *Booker* "emphatically 'empowered' the district courts to reject the recommendations of the Sentencing Commission." *United States v. Herrera-Zuniga*, 571 F.3d 568, 585 (6th Cir. 2009). So although a defendant's guideline range remains "the starting point and the initial benchmark," a district court may not presume that a within-guideline sentence is reasonable. *Gall*, 552 U.S. at 49–50. District courts, rather, are "encouraged" to vary upward whenever a defendant's guideline range does not fully reflect his conduct or aggravating circumstances. *United States v. Nunley*, 559 F. App'x 470, 474 (6th Cir. 2014).

That describes this case. Abu-Rayyan's guideline range is based only on possessing guns while being addicted to marijuana. (*See* PSR ¶¶ 24–35). It does not reflect any of his most concerning or dangerous conduct, including anything related to his ISIS-inspired proposals for terrorism. It is quite low: 15–21 months in prison.

And it's only that low by happenstance. The sentencing guidelines "are replete with 'cliffs' that can lengthen—or shorten—a sentence depending on which side of the line a defendant falls." *United States v. Sherer*, 770 F.3d 407, 413 (6th Cir. 2014).

Those "cliffs" worked to Abu-Rayyan's benefit, because he barely missed the cut for adjustments or enhancements that would have significantly increased his guideline range. Abu-Rayyan, for instance, almost qualified for the terrorism adjustment in USSG § 3A1.4. But he narrowly avoided it because the government cannot show that the guns in his offense or relevant conduct were intended to promote a federal crime of terrorism. *See* USSG § 3A1.4; *United States v. Graham*, 275 F.3d 490, 513–18 (6th Cir. 2001). The adjustment in § 3A1.4 would have raised Abu-Rayyan's offense level to 32 and his criminal history category to VI, *see* USSG § 3A1.4(a)–(b), for a resulting guideline range of 210–240 months, *see* USSG ch. 5, pt. A; *id.* § 5G1.2(d). That range would have far better reflected the risks that he poses to the public. The Court may—and indeed, should—consider that reality when imposing sentence. *See Sherer*, 770 F.3d at 413; *Nunley*, 559 F. App'x at 474.

### D. Abu-Rayyan's after-the-fact excuses are contradicted by the facts or settled law—and actually support a lengthy sentence.

Throughout this case, and including in his sentencing memorandum, Abu-Rayyan has put forward several alternating excuses for his conduct. The Court should reject them all.

*First*, no one entrapped Abu-Rayyan into proposing a martyrdom operation. The undercover FBI employee never prodded Abu-Rayyan into outlining his terrorism plans, much less prompted him to say things like, "I would gladly behead people if I needed to." (R.1: Compl. Aff., ¶ 29, PgID 7). And despite Abu-Rayyan's claims

13

that he just wanted to "win over [her] affection" (R.104: Abu-Rayyan Sent. Memo., PgID 803), he could not seriously have thought that his responses qualified as flirting.

Abu-Rayyan also supported ISIS for almost two years before he made those comments. During that time, he extolled some of ISIS's most grotesque brutality: beheadings, throwing people off buildings, even burning people alive. He also sent text messages to his brother—before having any contact with the FBI—in which he included a beheading photograph and announced that "this would be a perfect time to do a istishadi (martyrdom) operation." (R. 88: Govt's Opp. Pd ID 658–59). He cannot blame that previous conduct on the FBI—or on any supposed cravings for affection. Abu-Rayyan's long-running commitment to ISIS thus confirmed that he was predisposed and committed to terrorism, long before anyone from the FBI ever contacted him.

*Second*, the Court should refuse to credit Abu-Rayyan's eleventh-hour assertions of remorse. (*See* R.104: Abu-Rayyan Sent. Memo.). Even today, and even in the letters that he attaches to his sentencing memorandum, Abu-Rayyan does not fully demonstrate remorse for what he did—hinting, instead, that he still blames the FBI. (*See id.*, PgID 803–04; *id.*, Attachment A, PgID 890 ("[T]his whole situation was because I wanted to get married.")). And his belated pleas of a changed heart have come only now, at sentencing, when his requested sentence would result in

14

immediate release from prison. Almost any defendant in Abu-Rayyan's shoes would be willing to express remorse—no matter how falsely—if doing so would result in his freedom.

Abu-Rayyan's reasons for desiring release are also ironic considering what his victims might have experienced if the FBI had not stepped in. A lot of innocent people might have "miss[ed] their family" far more than Abu-Rayyan does. (R.104: Abu-Rayyan Sent. Memo., PgID 805). Sons and daughters might have lost "the joys of playing catch," "attend[ing] Detroit Tigers, Pistons, and Lions games," or "home cooked meals" with their parents. (*Id.*). Bereaved parents might have "reminisce[d]," much more tearfully than Abu-Rayyan does, about their children "jumping on a trampoline" and other simple daily encounters that he stole from them. (*Id.*). Abu-Rayyan claims he just proposed those ideas to "impress." (*Id.*, 802). But anyone who has been victimized by a terrorist attack would find his ideas far less impressive.

*Third*, one of Abu-Rayyan's most recent excuses actually undermines, not helps, his request for leniency here. Abu-Rayyan claims that he only became enamored with ISIS propaganda because he thought of it like "adult pornography." (PSR ¶ 65). But that means he views torture and mass murder in the same way as other people view sexual arousal. That is not a point in his favor.

*Fourth*, Abu-Rayyan cannot blame his conduct on marijuana. (PSR ¶¶ 63–64; R.104: Abu-Rayyan Sent. Memo., PgID 810, 813–14). There is currently a national

15

debate raging about medicinal and recreational marijuana. But pretty much no one, anywhere, on any side of that debate, has concluded that marijuana makes the user susceptible to engaging in terrorism. So it seems highly unlikely that Abu-Rayyan's marijuana habit so "impacted" his "judgment" that it sparked his terrorism plans or affinity for ISIS. (PSR ¶ 63).

*Fifth*, and finally, Abu-Rayyan's years of supporting ISIS and then proposing a terrorist attack do not qualify as protected speech under the First Amendment. The First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). Here, by promulgating ISIS propaganda and announcing his martyrdom ideas, Abu-Rayyan showed that he was motivated by his commitment to ISIS and that he intended to follow through. Further, the Supreme Court has explained that "[a] defendant's membership in an organization that endorses the killing of any identifiable group" is relevant to determining "whether the defendant will be dangerous in the future." *Dawson v. Delaware*, 503 U.S. 159, 166 (1992). Abu-Rayyan's longstanding commitment to ISIS underscored his dangerousness. It is thus relevant to crafting his sentence here. *See id.*; 18 U.S.C. § 3553(a)(2)(C).

## Conclusion

The Court should sentence Abu-Rayyan to at least 96 months in prison.

>Respectfully submitted,
>
>Barbara L. McQuade
>United States Attorney
>
>
>*s/Ronald W. Waterstreet*
>RONALD W. WATERSTREET
>Assistant U.S. Attorney
>211 W. Fort St., Ste. 2001
>Detroit, MI 48226
>(313) 226-9100
>ronald.waterstreet@usdoj.gov

Dated:  March 2, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on Thursday, March 02, 2017, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of the filing to the counsel for the Defendant:

Todd Shanker

*s/Ronald W. Waterstreet*
RONALD W. WATERSTREET
Assistant U.S. Attorney
211 W. Fort St., Ste. 2001
Detroit, MI 48226
(313) 226-9100
ronald.waterstreet@usdoj.gov