UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


**UNITED STATES OF AMERICA,**

          Government,

    v.

**KHALIL ABU-RAYYAN,**

          Defendant.

**HONORABLE GEORGE CARAM STEEH**

**No. 16-20098**

_____/

**SENTENCING HEARING**

**Monday, March 13, 2017**


-   -   -


APPEARANCES:

For the Government:              RONALD W. WATERSTREET, ESQ.
                                Assistant U.S. Attorney


For the Defendant:              TODD A. SHANKER, ESQ.


-   -   -


_To Obtain Certified Transcript, Contact:_
_Ronald A. DiBartolomeo, Official Court Reporter_
_Theodore Levin United States Courthouse_
_231 West Lafayette Boulevard, Room 238_
_Detroit, Michigan  48226_
_(313) 962-1234_


_Proceedings recorded by mechanical stenography._
_Transcript produced by computer-aided transcription._

2

1                              **I N D E X**

2  _____ Page

3  Sentencing hearing                                          4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **E  X  H  B  I  T  S**

2    Identification_____ Offered     Received

3    Defense Exhibit A                        19

4    Defense Exhibit B                        26

5    Government Exhibit 1                      40

6    Government Exhibit 3                      42

7    Government Exhibit 4                      45

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*16-20098; USA v. KHALIL ABU-RAYYAN*

```
1                            Detroit, Michigan
2                            Monday, March 13, 2017
3
4                    -    -    -
5          THE CLERK:  Case Number 16-20098, United
6   States of America versus Khalil Abu-Rayyan.
7          THE COURT:  Okay.  Good afternoon.
8          MR. WATERSTREET:  Good afternoon, your Honor.
9   Ronald Waterstreet on behalf of the United States.
10         THE COURT:  Welcome.
11         MR. SHANKER:  Good afternoon.  Todd Shanker
12  on behalf of Mr. Khalil Abu-Rayyan who is standing to my
13  left.
14         THE COURT:  Thank you.
15        This is the date and time established for
16  sentencing in the case.  The Court has had the opportunity
17  to review the sentencing memoranda submitted by both
18  sides, along with the Pre-Sentence Investigation Report,
19  and there are a few issues that may go to the question of
20  the guideline calculation that I understand needs to be
21  resolved, is that right?
22         MR. SHANKER:  Yes, your Honor.  We would
23  stand by the objections that I filed in writing.  I have
24  nothing to add to that, but we did object to the two point
25  enhancement for possession of three additional guns on
```

*16-20098; USA v. KHALIL ABU-RAYYAN*

1      November 15, 2015, and we do object to not receiving the
2      final acceptance point, because Mr. Rayyan has been
3      complying throughout the proceedings, and I don't
4      understand why he is not getting that third point.
5                    THE COURT:  Okay.  As it relates to the first
6      argument, the three firearms, this deals with one of the
7      sentencing factors in relation to the charges in Count 2,
8      is that right, possession of a firearm by a prohibited
9      person?
10                   MR. SHANKER:  That's correct, your Honor.
11                   THE COURT:  Okay.  Mr. Waterstreet?
12                   MR. WATERSTREET:  Your Honor, we filed a
13     response.  I think Probation Department made a
14     recommendation to the Court concerning our response, that
15     the three additional firearms actually involved one
16     firearm in which he has a photograph of himself holding a
17     firearm that predated this particular offense, two other
18     firearms post-dated this offense, in which he was
19     possessing an AK-47 and an AR-15, and there was an
20     additional handgun that he used during his concealed
21     pistol license class.
22                   So there were actually five guns involved, plus
23     the additional gun that he attempted to purchase shortly
24     after he was arrested and tried to buy another gun again.
25                   So any number of those guns or combination of

                    *16-20098; USA v. KHALIL ABU-RAYYAN*

1   those guns clearly meet the requirement that he should get
2   two additional enhancement points.
3              THE COURT:  As it relates to the firearm with
4   the -- that appeared in the photograph, that was an AR --
5              MR. WATERSTREET:  One was an AK-47, and
6   there's another picture he posted that was an AR-15.
7   Those are both on the same day, November 17th.
8              THE COURT:  All right.
9              MR. SHANKER:  Your Honor, if I could respond.
10  I don't think the count of the number of guns is correct
11  there.  He was given two additional points for three
12  additional firearms.  One, they all occurred on the same
13  day, November 15th.  He attempted to buy a gun at a
14  sporting goods store on that day, and again, he was not
15  charged with any crime at this point, and that application
16  did not go through.  He did not get the gun, but he did
17  attempt later that day, the same day that he was taking a
18  CPL class.
19              At the CPL class, there was an AK and an AR that
20  were rented on the range, and one of them actually didn't
21  work, and that's why they ended up getting the second one,
22  but they did possess those firearms on that day for a
23  brief period of time, but it's three additional firearms.
24  I'm not sure what these other guns are that the prosecutor
25  is referring to.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1          **THE COURT:**  All right.  Mr. Waterstreet?

2          **MR. WATERSTREET:**  Your Honor, three

3    additional guns.  Four total is enough for the two point

4    enhancement.

5          **THE COURT:**  And the -- if one of those was

6    not operable, would that make a difference?

7          **MR. WATERSTREET:**  No.

8          **THE COURT:**  Okay.  All right.  Well,

9    probation also recommends that the Court apply the

10   enhancement based upon the facts that were known.  I think

11   it is appropriate under those circumstances, and we'll

12   side with the application of that enhancement, which would

13   leave us with a -- before dealing with the one level for

14   acceptance and responsibility that has not been awarded,

15   the Court will conclude -- I guess I should address that

16   first.

17         Mr. Waterstreet, what's your response to that?

18         **MR. WATERSTREET:**  Your Honor, the guideline

19   section which we are referring to for acceptance of

20   responsibility is very clear.  It's only upon the motion

21   of the United States for that third point that the

22   defendant is entitled to it, and the case law is rather

23   clear on whether the only way in which the Court can find

24   that it is inappropriate, is if the United States relies

25   upon unconstitutional reasons for denying that, and in

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    the -- and there's nothing unconstitutional about the

2    reason why the United States is denying this is because of

3    the additional amount of additional time the United States

4    had to -- and this Court -- had to involve itself in in

5    the resolution of this matter.

6          We had two detention hearings -- actually three

7    detentions hearing altogether, one before the magistrate

8    and two before your Honor -- and they were very lengthy.

9    The United States had to prepare as it similarly as it

10   would for trial for examination of their experts they

11   chose to put on, and the United States ended up filing a

12   pretrial motion anticipating trial before the defendant

13   entered his guilty plea.

14         So those are a number of difference reasons why

15   the third point is not applicable.

16             **THE COURT:**  All right.

17             **MR. WATERSTREET:**  And I believe the Probation

18   Department found that --  made that finding as well.

19             **THE COURT:**  Okay.  Any other argument, Mr.

20   Shanker on that?

21             **MR. SHANKER:**  Your Honor, I would just say

22   that Mr. Rayyan has not caused any delay.  He did the

23   work.  There was one bond motion after the case initially

24   came to your Honor, and the government sought to have him

25   examined by a forensic examiner for a lengthy period of

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    time, 24 hours a day, and he underwent that examination

2    for several months.  He came back, and we sought a bond

3    again, but we didn't file any substantive motions, and I

4    was in plea negotiations with Mr. Waterstreet as soon as

5    he came back from Massachusetts from the BOP.

6           So I don't understand why that point is being

7    withheld, and even now within two days after his bond

8    hearing, we contacted the Court and said he's going to

9    plead guilty.

10          So I really -- I've never dealt with a situation

11   where a point has been withheld under these circumstances,

12   but Mr. Waterstreet is correct that it is within his

13   discretion.  It's my position that it's an abuse of

14   discretion.

15          **THE COURT:**  All right.  I think he's made out

16   a -- by his virtue of the statement, that is

17   Mr. Waterstreet, that explains his reasoning.  Whether we

18   agree with it or not, I think it is within the discretion

19   of the government to withhold the point for timely

20   acceptance, and the Court will, therefore, apply that

21   point that as well, which raises the guideline range to a

22   range of 15 to 21 months.

23          **MR. WATERSTREET:**  That's my understanding.

24          **MR. SHANKER:**  That's correct, your Honor.

25          **THE COURT:**  And so the Court will adopt that

*16-20098; USA v. KHALIL ABU-RAYYAN*

1   as the guideline range that the Court should consider in

2   determining an appropriate sentence in this case, along

3   with those factors that are enumerated in Section 3553(a),

4   and Mr. Shanker would you like to address those factors?

5              **MR. SHANKER:**  Yes, your Honor.  Could I

6   please get the shackles removed for Mr. Rayyan, or at

7   least the belly shackles?  I mean, he wants to make a

8   statement to the Court, and he's got papers that he wants

9   to hold.  I was wondering if we could get at least the

10  belly shackle removed?

11             **THE COURT:**  Does he have them around the

12  ankles as well?

13             **THE MARSHAL:**  Yes, your Honor.

14             **THE COURT:**  How about it?  Are you

15  comfortable with the ideal of removing them?

16             **THE MARSHAL:**  We can remove one.

17             **THE COURT:**  Okay.

18             **MR. SHANKER:**  Thank you.

19             **MR. WATERSTREET:**  In the interim, can the

20  Court inquire whether the defendant had the opportunity to

21  review the Pretrial Services Report, and whether there is

22  any other objections that he has beyond the two that's

23  been raised by counsel?

24             **THE COURT:**  Mr. Shanker to address it

25  first --

*16-20098; USA v. KHALIL ABU-RAYYAN*

1           **MR. SHANKER:**  Sure, your Honor.

2           **THE COURT:**  -- and I'll address it to the

3  defendant.

4           **MR. SHANKER:**  Mr. Rayyan and I did review the

5  PSR.  We have no additional objections.

6           **THE COURT:**  All right.  Mr. Rayyan, you heard

7  your lawyer indicate that you reviewed the Pre-Sentence

8  Investigation Report with your attorney?

9           **THE DEFENDANT:**  Yes, your Honor.

10          **THE COURT:**  And there are no other objections

11  that you're aware of at this point?

12          **THE DEFENDANT:**  No, your Honor.

13          **THE COURT:**  All right.  Go a head.

14          **MR. SHANKER:**  Thank you, your Honor.

15          As you just stated, Judge, you calculated the

16  guideline range of 15 to 21 months, and just so we don't

17  lose focus here, I want to state that he pled guilty to

18  making a false statement about his use of marijuana while

19  trying to obtain a firearm, and then obtaining that

20  firearm.  This is the same gun that he's also been

21  connected for at the state level, and he was punished for

22  two years probation on that, and again, this was

23  possession for two days, October 5th through October 7,

24  2015.  That's how long he was possessed that gun.

25          Despite the guideline of 15 to 21 months, the

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    government is asking for a sentence of eight years based

2    on its contention that Mr. Rayyan is a terrorist, and your

3    Honor, the government's request makes it appear that this

4    is a very difficult sentencing decision, and your Honor, I

5    don't think it is as difficult as it appears, because when

6    we look at actual facts of the case that have been proven,

7    when we compare this case to other cases in this district,

8    and we look at the opinions of the mental health experts

9    in this case, including the government's own expert, and

10    his extraordinarily detailed evaluation, when we look at

11    all of that, this case is not as difficult as it might

12    appear, because Mr. Rayyan is not a terrorist.  He never

13    intended to hurt anybody, and the great weight of the

14    evidence supports that.

15         The government's request for a variance in this

16    case, if granted, would gut the core principles of the

17    Constitution as they apply to Mr. Rayyan, including the

18    right to be presumed innocent, the right to due process,

19    both substantive and procedural due process, and the right

20    to a jury trial.

21         The government is asking for a sentence where the

22    sentencing tail would wag the charging dog, and the

23    Supreme Court for over 30 years has said that we have to

24    look these cases with extreme caution because of the

25    possible violation of rights, and that's goes all the way

*16-20098; USA v. KHALIL ABU-RAYYAN*

back to McMillian versus Pennsylvania in 1985.

Your Honor, Mr. Rayyan was an immature young man, who made poor decisions, made foolish and scary comments to an undercover agent who poses a love interest, and engaged in reckless attention seeking behavior online, and he is remorseful as can be about that, and I think the book of letters that we supplied to your Honor show how much thought he has put into his actions, and how much they embarrassed his family, his religion, himself, but he is absolutely not a terrorist or an attempted terrorist, and there is no proof to support that beyond a preponderance of the evidence or clear and convincing evidence.

Now, the first thing that I want to point out is that the Probation Department's guideline range was 15 to 21 months.  Probation did not find that there was any relevant conduct that warranted an upward departure.  So they found there was no preponderance of the evidence to warrant that departure.  The report specifically states this is in Paragraph 92.

Not only that your Honor, they included a section that analyzed the Section 3553 factors.  Not once does the report suggest that a variance would be necessary or reasonable under Section 3553, and beyond that, probation concluded that a sentence that is within the guideline

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    range would reflect the seriousness of the offense,

2    promote respect for the law, and provide just punishment.

3    That's a quote.

4         Your Honor, I agreed to two extensions of time for

5    the government to makes its objections in the Pre-Sentence

6    Report.  They did not object to the failure to apply a

7    departure.  They did not object to the assessment of the

8    3553 factors, and it is my position they've waived the

9    argument for a variance on the basis that they are asking

10   for it, namely that he is some sort of terrorist.

11        Secondly, your Honor, there's simply a failure of

12   proof here, and when we look at variances under Section

13   3553, the standard is the same as the guidelines.  They

14   have to have a preponderance of evidence to show his

15   intent, and all the evidence that we have indicates the

16   opposite.  Not just coming from his mouth, but the two

17   experts who analyzed him and who evaluated him and who

18   tested him.  They found that he did not intend to harm

19   anybody.

20        Now one of the things that Mr. Rayyan did that was

21   disturbing in this case is that he was on the Twitter feed

22   for ISIS, and he owns that, your Honor.  He got into this

23   initially because he was depressed.  He was looking for

24   shock in all entertainment, and he was interested in ISIS.

25   He is not denying that, but your Honor, he never -- when

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    he's on Twitter, there's no evidence that he ever made any

2    threats.  He didn't join ISIS.  He doesn't have any

3    contacts at all with no one.  He doesn't know anyone in

4    ISIS.  He hasn't materially supported terrorism in any

5    way.  He has not flown to Syria to train.  He hasn't

6    trained.

7         Your Honor, what he did on Twitter, he apologizes

8    for, and he understands what an embarrassment that is, and

9    how exactly how it looks.  He understands that the FBI

10   would be interested in looking at somebody who is

11   re-tweeting violent jihadi videos.

12        Look, he owns that.  He understands that, but your

13   Honor, that is protected under the First Amendment.  I

14   know the government says it is not, but in U.S. v

15   Shehadeh, S-h-e-h-a-d-e-h, a 2013 case out of the Eastern

16   District of New York, in that case that defendant did the

17   same things as Mr. Rayyan on the Twitter feed, but he went

18   far beyond that.  He actually set up multiple websites so

19   that he could personally disseminate ISIS propaganda and

20   violent execution videos to thousand of other people.

21        The government in that case sought an upward

22   variance or departure based on his behavior, and the Court

23   found that the defendant's actions were legal and

24   protected by the First Amendment, and I'm quoting, the

25   Court stated:  The court does not find the fact that

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    Shehadeh created an administered website regurgitating

2    violent jihad's propaganda to be an appropriate basis for

3    punishment or enhancement consistent with the First

4    Amendment.

5    Your Honor, looking back, Mr. Rayyan, as you know

6    and as he stated in his video to you, he denounces ISIS.

7    He understands now that he was -- what he was seeing was

8    propaganda, and he understands that ISIS is basically

9    exploiting Islam, and he has learned I think through this

10   process, but your Honor, what he did was not illegal on

11   Twitter.

12   Your Honor, the next thing that I want to talk

13   about are the actual statements that he made that are the

14   subject of the government's request for this massive

15   variance.

16   First of all, there is a complete disconnect

17   between his possession of the gun in October of 2015, and

18   his statements about a church and an officer that were

19   made months later in January 2016.

20   In this entire investigation, in the 10 months of

21   investigation, he possessed a gun on exactly three days.

22   Three days.  Two were the days that he carried the .22

23   that he was arrested with.  That's a .22.  That is a six

24   shot, single loading gun, not the kind of gun that a

25   terrorist would use.  It's manual loading, and then the

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    other day was November 15th, and that was when he tried to

2    purchase the gun, a second gun, and that was because his

3    family told him that the only way he could get a CPL was

4    to take a class and follow the law and get the permit,

5    because remember, he's not charged with anything at this

6    point.

7         So he went to the range, and he did.  At the end

8    of the day, they rented AK-47's, he and his cousin, and

9    they fired them for a matter of minutes with a range

10   officer present, and that was it.

11        And so your Honor, I mean, when I look at that two

12   point enhancement, I almost think under 3553, there's a

13   basis for a variance downward, because it was very

14   fleeting possession, and the other gun he didn't even

15   touch, but whatever the case, the point is he never has a

16   gun when he's making these statements.  He's making these

17   statements because he gets himself into a situation with

18   these undercover informants posing as love interest -- and

19   I'm going to talk a little bit more about that in a

20   moment.

21        I want to take the time here because I think it is

22   very important.  When we were at our last bond hearing,

23   Mr. Waterstreet showed a photo and admitted a photo of

24   Khalil's father Ray holding an AK-47, and he didn't give

25   that to me ahead of time.  It happened right in court, and

                *16-20098; USA v. KHALIL ABU-RAYYAN*

1    it was sort of look at this.  Here's -- this is the gun

2    that he was talking about.

3            Your Honor, that gun we've submitted an affidavit

4    on that.  That photograph is over seven years old.  It is

5    a gun that belongs to his brother, Khalil's uncle, and Ray

6    states under oath that Khalil has never had access to that

7    gun, and your Honor, I think it is worth pointing out that

8    the search warrant in this case yields nothing.  They

9    don't finding any guns.  They don't find any swords, no

10   explosives, no Anwar Awlaki tapes.  The only ammunition

11   there is at the store is one box of ammunition for the .22

12   that he owned for two days.  That's it.

13           And so your Honor, I want to take this moment to

14   talk about a case in this district and compare it.  This

15   is the case of Sebastian Gregerson.  This individual was

16   charged with possession of a destructive device with the

17   intent to cause bodily harm.  So he's actually charged

18   with this unlike Khalil.  He is also charged with

19   unregistered possession of a destructive device.  He

20   possessed weapons of mass destruction.  He had grenades.

21   He had a machete.  He had multiple AK's, 16 guns,

22   thousands of rounds of ammunition, a book on snipper fire,

23   and this individual, like Khalil, threatened to kill the

24   infidels.  He threatened to kill people.

25           This individual has signed a plea agreement with

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    the government with a guideline range of 37 to 46 months.

2    Defense counsel has allowed to ask for a downward

3    variance, and the government has preserved the right to

4    argue for a departure of 14 months.  This very scary

5    individual is capped at 60 months.

6        Your Honor, there's no -- it makes no sense that

7    the government is asking for eight years, and this person,

8    Gregerson has a cap at five years.  It makes no sense,

9    because his case is far more scary.  His intent is far

10   more clear.  He has a military cash of weapons, and I

11   think it speaks volumes about where Mr. Rayyan's sentence

12   should be.  It should be lower than Gregerson's

13   guidelines, significantly lower, and I want to make that

14   point.

15       I want to admit to the Court as Exhibit A,

16   Mr. Gregerson's signed plea agreement.

17       Your Honor, so again, I just want to point out

18   Mr. Gregerson stated multiple times that he intended to

19   kill on behalf of ISIS.  He actually had contacts too.  He

20   was involved for years with real contacts in the radical

21   Islamic community.  So I use this case to compare with

22   Khalil's because I think it is important.

23       Now, the statements that Khalil made were not

24   true, your Honor.  They were not true threats.  They

25   weren't true.  The government didn't charge him with this.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    The government didn't seek a relevant conduct enhancement,

2    and the facts surrounding this are as follows:

3         Khalil was a very immature 21 year old, and he

4    comes from an Islamic home where he did not -- never had a

5    girlfriend.  He had never touched a woman, and he was

6    desperate for love of some sort.  That's what he was

7    looking for, and I think what's important, your Honor, is

8    to focus on the first undercover in this case who went by

9    Ghadda, because when you look at those transcripts, your

10   Honor, and we submitted much of them to the Court, but

11   what I can tell you, and I can tell you from the lack of

12   submissions by the government, this was purely a love

13   relationship.

14        There's no discussions of jihad or criminal acts.

15   They don't talk about trying to commit jihad.  They

16   actually get to know each other.  They get to know about

17   each other's family.  They actually become engaged, and

18   they're talking about -- she's supposedly an accounting

19   major at Ohio State.  They're actually talking about

20   having her work for the family business, and Khalil's

21   father is about to drive down to Columbus, Ohio to meet

22   the family, when all of a sudden Ghadda disappears, and

23   Khalil is devastated understandably.  It may seem silly to

24   us and lot of other people who have had relationships and

25   had those connections, but he hadn't.  So it was a big

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    deal to him, but you would think if his idea was to commit

2    an act of terrorism, you would think he would discuss that

3    with Ghadda, because the government learns first and

4    foremost that he wants to be married from Ghadda and her

5    discussions with Khalil.

6         So what happens is as soon as Ghadda disappears,

7    they put in a second undercover young woman named Jannah.

8    Jannah holds herself out as an Iraqi Sunni whose husband

9    was murdered by anti-ISIS forces in Syria.  She tells

10   Khalil early in their conversations -- so this is late

11   December -- she tells Khalil that she just had two close

12   family members murdered by anti-ISIS forces in Iraq.

13        She holds herself out as a young girl.  She says

14   that she is 19 years old.  She says that she's ready to

15   commit jihad, but she's also very young and depressed.

16        So defendant's statements, they are false

17   statements.  Defendant's false statements about the church

18   and police officer are made because they impress her, and

19   you know what's interesting, is that the government --

20   there's a line in their memorandum where they say how

21   could this possibly be flirting?  But if you look at their

22   exhibit, if you look at the exhibit involving the church

23   statements, Jannah actually says, are you just saying

24   this, or is it all talk just to make me smile?

25        So there's no question that this was encouraged,

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    but even more telling than the inducement here -- and your

2    Honor, I've never in 25 years seen inducement like this,

3    to use emotional inducement on an individual.  I've seen

4    money.  I've seen other things, but I've never seen

5    this -- but beyond all of that, the most important thing

6    is when Jannah tries to nail him down and say to him,

7    let's do something, because she says that she has a

8    connect.  She has a connect, and that they can get to

9    Syria, and they can do this.  Every time he says no.  He

10   even tries to talk her out of it.  He says, you're young.

11   You're impressionable.  You don't know what you want.  I

12   think that speaks volumes, your Honor.

13        I also want to point out the government says that

14   it intervened before Mr. Rayyan could doing something that

15   was imminent.  Your Honor, the fact is those statements,

16   the statement about the church, that was on January 8th.

17   The statement about the police officer, that was on

18   January 21st.  The government didn't intervene.  They

19   intervened after a February 2nd conversation phone call,

20   and during that phone call Khalil told the undercover that

21   he was suicidal, that he was depressed, he wanted to kill

22   himself, and it's stunningly, the undercover says to him

23   well, that's not good under Islam unless -- unless you

24   make it into an act of jihad.

25        Khalil says I don't want to hurt anyone else.  He

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    says that he's ill, not feeling well, and he may go to the

2    hospital, and then within a day and a half he's arrested.

3    So that's when the arrest occurred in this case.

4            I think there was great concern that Mr. Rayyan

5    was going to talk about the undercover to people on the

6    outside, and I think they were concerned that he was going

7    to kill himself, but he was not agreeing to an act of

8    jihad.

9            And again, your Honor, nothing -- when they

10   searched, they found none of the things that he talked

11   about.  He said that he had an AK-47.  There is no AK-47.

12   There's no AK-47 ammunition.  He said that he had piles of

13   it.  He said that he listened to Anwar Awlaki tapes.

14   There's none.  There's simply in this case no evidence

15   that he was preparing or planning or intending to hurt

16   anyone, and the evidence is to the contrary.

17           Finally, your Honor, the expert opinions in this

18   case are unanimous, and I'm going to focus on the BOP

19   doctor, Dr. Tillbrook, because he really did an

20   extraordinary evaluation.  It lasted over a month.  They

21   observed him 24 hours a day.  They used staff to do that.

22   He reviewed all the discovery.  He reviewed all the

23   statements, the transcripts, all the arguments that the

24   government had made about Mr. Rayyan, and he found that

25   first of all, that Khalil was credible, treatable and not

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    dangerous.  He found that Mr. Rayyan did not intend to

2    hurt anybody, but that he made these statements to this

3    young woman because he was trying to impress her, and it's

4    basically out of the desperation to keep this -- it was a

5    girl.  It was another woman, and he felt that he didn't

6    want to let her.

7          So he continued that conversation in that way, and

8    those statements are awful, and he owns it, but he didn't

9    intend to hurt anybody, and I think this report is

10   fascinating, because Dr. Tillbrook discusses -- and this

11   is a quote -- how very uncomfortable Khalil was in these

12   conversations as they continued.

13         So, I mean, we can imagine, you know, between the

14   depression, the substance abuse, trying to avoid an

15   arranged marriage with his family, we can see why he would

16   say these things, and I think what's interesting in this

17   case it started almost as a fantasy for Khalil, and by the

18   end he found himself in this very uncomfortable position

19   where there was a young woman saying, let's do it.  Let's

20   make it a reality, and I think it made him sick, and he

21   refused.

22         So, your Honor, the experts here agreed.  He

23   didn't intend to hurt others.  He's not currently a

24   danger, but he needs help in the form of community

25   treatment, mental health counseling and substance abuse

                    *16-20098; USA v. KHALIL ABU-RAYYAN*

1        treatment, and Dr. Tillbrook found that that would be

2        ideal, the dual diagnosis community treatment.

3                Your Honor, I've made the comparison between

4        Mr. Gregerson's case and Mr. Rayyan's case, and it's so

5        out of whack, this plea agreement, that it makes me wonder

6        why it is happening, and it makes me ask is Khalil being

7        punished for being an Arab Muslim from Dearborn as oppose

8        to a Caucasian from the suburbs?  I don't know the answer

9        to it, but his case is night and day with Sebastian

10       Gregerson, and there's just no logical way that his

11       sentence should even approach Gregerson's guideline range.

12               Finally, your Honor, I want to discuss one other

13       case.  This is Deshawn Lanton.  Mr. Lanton was an

14       individual who was charged with going on a public Facebook

15       page, and threatening to bomb the police funeral for

16       Sergeant Kenneth Steil while hundreds of officers were

17       entering the church for the funeral.  That's when he made

18       these threats.

19               Unlike Lanton, Mr. Rayyan never communicated a

20       threat to try to instill fear in anyone.  He made dumb,

21       false statements to an undercover, but he didn't go and

22       try to scare so many people.  That's what Mr. Lanton did.

23               Mr. Lanton also illegally possessed a gun as a

24       felon, and he ended up with Rule 11 plea agreement, and

25       the charge that he ended up with was providing false or

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    misleading information with a guideline range of 15 to 21

2    months, and your Honor, I want to point out that the only

3    reason it's that high is because he had three prior felony

4    convictions.

5         So I want to admit -- I've marked it as Defense

6    Exhibit B, which is the Deshawn Lanton Rule 11 plea

7    agreement, your Honor.

8         So again, your Honor, I think -- I think it is

9    pushing it to put Rayyan in the same category as

10   Mr. Lanton, but I do think that in comparing the cases,

11   there's certainly no need here for a sentence above the

12   guideline range.

13        In conclusion, your Honor, the government has

14   conceded that there is not a preponderance of the evidence

15   to support relevant conduct enhancements.  Whether it be

16   terrorism, intent to cause harm, true threats, whatever it

17   is, they have said they don't have the evidence to support

18   it, but they are trying to back door it through Section

19   3553, and I think they are trying to lead this Court into

20   a sentence that would not be constitutional, and would not

21   be legal for the factors -- for the reasons that I've

22   discussed.

23        The overwhelming evidence in the case indicates

24   that he didn't intend to hurt anybody, but he made

25   horrible statements, and he owns it.  His expression of

*16-20098; USA v. KHALIL ABU-RAYYAN*

1      remorse, regret and responsibility has been extraordinary.

2      I've never seen anything like Rayyan's letters to his

3      family, that kind of self-reflection while locked up, and

4      I think it speaks volumes when talking about somebody this

5      young, because it is a developing brain, and I think he

6      learned a lot through this process.  You can see it in

7      those letters.

8              For all of these reasons, your Honor, I'm

9      requesting a sentence of 15 months.  Thank you.

10              **THE COURT:**  Thank you, Mr. Shanker.

11          Mr. Waterstreet, on behalf of the government?

12              **MR. WATERSTREET:**  Do you want to hear from

13      the defendant or me first?

14              **THE COURT:**  You first.

15              **MR. WATERSTREET:**  Okay.  Your Honor, because

16      Mr. Rayyan continues to present a danger to the community,

17      the government thinks a sentence of at least 96 months

18      would be appropriate, and as the Supreme Court said in

19      Williams versus New York, the defendant's sentence should

20      fit the offender, not merely the crime for which he is

21      charged and convicted of.

22              And as we've gone through and we've already

23      properly calculated the guidelines, that is just the

24      initial benchmark.  In the post-Booker world that we live

25      in, your Honor, that is just a benchmark that the Court

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    can look to, and it's not necessarily reasonable in and of

2    itself if the Court says I'm going to give a guideline

3    range because it is the guideline range.  We look at

4    factors under 3553, and there are four circumstances in

5    which are the goals of 3553.

6          One is to protect the public and community.  The

7    second is deterrence.  The third, reflect the seriousness

8    of his conduct and show respect for the law, and the last

9    is to provide the need and care and education.

10         Now actually courts are encouraged to vary upward

11   when the defendant's guidelines do not accurately and

12   fully reflect his conduct.

13         Now the defendant in this case is charged with a

14   person -- being a prohibited person in possession of a

15   firearm, and lying in order to obtain that firearm.  It

16   doesn't really reflect his professed desire to engage in

17   dangerous conduct in using a different firearm, nor does

18   it reflect the guideline at this point his attempt to

19   rearm himself after he was -- that firearm that he

20   purchased illegally was taken away.  It did not stop him

21   from lying once again claiming that he is not a drug user

22   or addict.  It does not reflect the practice of using the

23   type of gun that he wants to use to commit a violent act.

24         There is no limitation factors under 3553 and the

25   case law on the information concerning the background,

*16-20098; USA v. KHALIL ABU-RAYYAN*

1   character and conduct of a defendant that the court may

2   use in its sentencing, and that's embodied in 18 U.S.C.

3   3661, and that's because this Court is to not sentence him

4   just on the charge, but by his conduct.

5           And I think I referenced a case from the Fourth

6   Circuit, and it was a rather interesting case, in which

7   the defendant, he was driving around Washington D.C. with

8   a source of information and pointing out different

9   buildings that he intended to blow up, the White House,

10   the Capitol Building, but in the course of the

11   investigation, the United States found out that he made a

12   false statement, simply a false statement on an

13   immigration document.  He was charged with that

14   immigration document.  Never charged with the plans to

15   commit violence acts against people who he doesn't know.

16   Yet, the government sought and obtained an upward

17   variance, and the Fourth Circuit said it was perfectly

18   appropriate for the court to consider the defendant's

19   actions above and beyond the crime charged.

20           This Court is mandated by 3553 because Congress

21   used the word "shall," and it states under 3553(a), the

22   courts shall impose a sentence sufficient but not greater

23   than necessary to protect the public from further crimes

24   of the defendant, and it is regularly upheld upward

25   departures in guideline variances in U.S. versus Baines

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    and U.S. versus Bass which we put in our sentencing

2    memorandum.

3        Another one is to deter the defendant from acting

4    in the future, to deter this defendant specifically and

5    deter others who may want to step into his shoes and

6    engage in this type of conduct of planning out a violent

7    act, and the government intervening just in time or too

8    early from the defendant be charged with the terrorist

9    act.

10        Now why do I say protection of the community and

11    deterrence are important in this case?  They are paramount

12    when you consider this defendant and crime that he was

13    charged with and the crime he intended to commit.

14        It is clear the defendant is dangerous.  Mr.

15    Shanker and I obviously see two different sides of a very

16    thin pancake.  He says he's nothing more than a confused

17    individual who was suggested to engage in this activity by

18    two women; one he claimed he only wanted to have a

19    marriage act, and there was no chance whatsoever they even

20    discussed engaging in any terrorist acts, but I suggest

21    that counsel refer to the very first page.  In the second

22    contact that the defendant had with Ghadda, in which he

23    says, after all my legal issues with the Kafir -- and

24    Judge, we're the Kafir.  We're the unbelievers -- the

25    defendant said honestly, I'm going to do a martyrdom

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    operation.  Totally out of the blue he comes up with this.

2    This is the woman that he said wanted to marry, but he

3    starts off the marriage with explaining, I want to do

4    martyrdom operations to kill the unbelievers.

5        He told us what he has dreams of doing.  This is

6    not something that was suggested to him.  This was not

7    something that the government said why don't we go get a

8    church?  Why don't we go and shoot up a church?  This was

9    something that he dreamt up.  How do we know this?

10   Because he told us this is what he dreamed about.  He

11   dreamed about jihad.

12       He not only thought about it, he told his family

13   members about it.  He told his brother, his father,

14   strangers on the internet, and the undercover employee

15   that this is what he wanted to do, engage in jihad.

16       He had prepared himself by looking at the carnage

17   of others who engaged in this type of behavior.  He

18   expressed approval of others who chose such a barbaric

19   method of killing people.  He kept reminders of the

20   carnage on his phone to inspire him to not give up on his

21   plans.  This was all before he met the undercover, or even

22   began speaking with Ghadda or the undercover.

23       Now the defense has suggested that it is only

24   crazy talk, and he really didn't mean it, but he has shown

25   us how much thought he put into it, and coming up with a

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    plan.  He selected a place.  Not a general place, but a
2    specific place, a place he had no connection with, or
3    reason to destroy lives of others, but to commit a general
4    idea, and that general idea is to commit, kill innocent
5    people.
6         He had no ill-will towards these people, a
7    particular person that patronized this church, but he
8    desired to make a statement.  It was not his church.  It
9    wasn't a church in his neighborhood, but he knew it to be
10   one of the largest churches in Detroit with a very large
11   congregation.  He never said that he knew any people in
12   there or visited it, but it is not a place that he passed
13   going to and from work.  As a matter of fact, it was a
14   place that he had to go out his way to go see.
15        We don't know how many times he went there before
16   he started telling people about his plan, but he did know
17   the people in that church would not be able to defend
18   themselves because he specifically said people are not
19   allowed to carry guns in church.  They would not be
20   expecting this.  They wouldn't be prepared to stop him.
21   He told others that -- he told others so he can get credit
22   for the deed.  He told others that it would make the news,
23   and how he planned to kill especially women and children,
24   and that it would be a bloodbath.  He didn't try to hide
25   his plans.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1          He knew what he needed to accomplish that goal,

2     and he was very specific in what he needed.  He needed a

3     gun, not just his small .22 that he initially purchased,

4     but a gun that would be capable of causing mass casualties

5     and destruction.  He was going to use his AK-47, using his

6     words.  His AK-47 that carried 40 bullets, and he told how

7     he bought the bullets, how he practiced with it, loading

8     and unloading it, and we know that he went and practiced

9     with an AK-47 because he had a picture of it, and he has a

10    picture of himself giving the sign that he supports ISIS,

11    holding the AK-47, and saying that he's ready to hunt the

12    Sahwat, those who oppose ISIS, and I will have you note

13    that happened on the 17th of November, long before he had

14    his very first conversation with the undercover.

15         He began taking steps to complete his act.  He

16    began carrying a gun that he purchased, becoming familiar

17    with it, the way it would feel carrying a firearm, maybe

18    to get over the nerves when the day that he would go and

19    shoot up that church.

20         While it's true that we never found the gun that

21    he was going to use in that church, we don't know whether

22    when his father said he took the gun away from him,

23    whether his father gave it to somebody else because we did

24    not find it when we executed the search of their home.  We

25    don't know if it's with another friend or family member,

*16-20098; USA v. KHALIL ABU-RAYYAN*

1       or maybe we just didn't know where to look.

2              The defendant has said to the undercover, you

3       know, it's really not that tough to get a gun here in

4       Detroit.  I can get one.  People come to, and he stopped

5       his sentence.  It's like buying candy over here.  People

6       from the street want to sell me a gun everyday.  It's not

7       hard to get.  We don't know where he picked up that AK-47

8       that his father took away from him.  We know that he

9       didn't buy it through a licensed firearms dealer.  That's

10      all we know, but if we listen to what the defendant says,

11      we know a lot more.

12             Now he is attempting to convince this Court that

13      this Court need not worry about protecting the community,

14      need not worry about deterrence because I've learned my

15      lesson, and we see it over and over in the stack of

16      letters that he said that he submitted to his family.

17             Now to be honest with you, your Honor, this is

18      kind of a twist on what we typically see in letters

19      submitted to the Court.  The vast majority of my years of

20      practice is people who know the defendant write letters of

21      encouragement on his behalf, asking the Court to be

22      lenient because they know him better than the Court, and

23      that they recommend that perhaps a break should be given.

24      There's not one letter submitted by any of those people.

25      The only letters are the self-serving letters by the

                    *16-20098; USA v. KHALIL ABU-RAYYAN*

1    defendant, who knew he would have to face sentencing one

2    day, and simply says, I've learned my lesson.

3        While I'm hoping that even the most unrepented

4    person wouldn't say I've learned my lesson to not get out,

5    because that's what defense is basically asking for, is a

6    time served sentence.  By the time we calculate the good

7    time and the amount of time that he's been in, a 15 month

8    sentence will allow him out, and I also assume that when

9    I've learned my lesson means I'm not going to do it again.

10    I'm done.  I'm never going to do this again.

11        However, if we look at defendant's past conduct,

12    we know him saying, I'm done, doesn't mean he's done.  He

13    lacks the self-control.  And I'm sorry.  I don't agree

14    with defense counsel that he's suddenly become a boy to a

15    man.  He's a man when he went into jail, and he was a man

16    that was making decisions leading up to the time that he

17    went into jail because the defendant lacks self-control.

18        A prime example is his cell phone.  Defense

19    counsel brought up the fact that he was claiming that he

20    wanted to commit suicide.  If the Court will recall, the

21    whole reason he was saying that he wanted to commit

22    suicide is he feared the Detroit Police Department

23    would -- had downloaded his images that were on his cell

24    phone when arrested back in October 7, 2015, and because

25    he -- and he specifically told the undercover, there's a

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    big difference between watching videos and downloading

2    them, because when you're downloading them, that means you

3    support ISIS, and that's what he was so worried about, and

4    that's why he wanted to kill himself because he didn't

5    want to have to face the day in which he would be held

6    accountable for his actions of supporting ISIS, and

7    following through with his plans.

8         So what did he do?  He went out and bought a new

9    phone, and what did he do after he got that new phone

10   start?  He started downloading the very same things.  He

11   can't control himself.  He downloaded -- and I've provided

12   these documents to the Court, a packet that were under

13   seal the last time we were at a detention hearing, a

14   detention review, and this was the large packet that had

15   the severed heads, the dead bodies.  These were all

16   downloaded within days of him getting the new cell phone.

17        To say that he learned his lesson, again, your

18   Honor, I disagree, and another example is here he is

19   arrested with a firearm, carrying a concealed firearm,

20   knowingly carrying a concealed firearm.  The reason we

21   know he knows it is because when he made his statement to

22   the Detroit Police Department on the day that he was

23   arrested, he knew where that gun was suppose to be.  He

24   realized, I made a mistake.  I was suppose to put it in

25   the trunk of my car, and that's what he says in a

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    handwritten statement to Detroit Police Department.

2            But, of course, when he goes to be sentenced in

3    front of Judge Strong, well, you know, I've learned a

4    lesson here, and that's relied upon what a salesman in

5    a -- I want to make sure I get the quote right -- I just

6    want to show you, Mr. Strong -- and he is referring to

7    Judge Strong -- that I have good intentions.  My advice to

8    anyone who wants a firearm is to consult an attorney, not

9    a gun store owner, implying that he got bad advice on how

10   to handle that firearm.

11           But in his statement that he made on October 7,

12   2015, he says, I just forgot to put it-- it says, I knew

13   when I got in the car with it, I was wrong.  I just forgot

14   to put it in the trunk.  I only had it for two days.  So

15   he knew what the law was the day he was arrested, but when

16   it came time for sentencing, he implied to the judge that

17   I've learned my lesson, and you know what?  If somebody

18   didn't give me bad advice, I probably wouldn't even be

19   here.

20           He also lacks self-control.  Another example is

21   with marijuana.  Now I think if I read the defense

22   sentencing memorandum correctly, they claim he used drugs,

23   quit drugs, used drugs and continued to use drugs.  Yet,

24   he told the Detroit Police Department and the FBI that he

25   quit after he's arrested on October 7th and never used

1    drugs again.  But then he has to use drugs to be able to

2    convince this Court that he had a drug out of mind when he

3    was talking to the undercover, but what he was saying with

4    the undercover is the same thing he was saying long before

5    he met the undercover.

6            He was even told by the Detroit Police Department

7    that he was going to be tested when they interviewed him

8    on November 30, 2015, and that he knew that he would be in

9    trouble.  He told Pretrial Services when he arrested that

10   he, when he was arrested in February, he actually stopped

11   using drugs a month ago, which would have made it January.

12           So he can't even stop using the drugs when he's

13   been told that it's going to be a problem with Judge

14   Strong if he continues to use drugs.  He continued to use

15   drugs, and he acknowledged that.  He acknowledged that to

16   the two doctors, and he acknowledged that to Pretrial

17   Services.  He has no self-control, your Honor.

18           So we can't rely upon him to protect the

19   community.  We can't rely upon him for deterrence, and

20   unfortunately, your Honor, we can't rely upon his family,

21   and I say this with some hesitation because as a father,

22   brother, sister and stepmother, I can understand their

23   desire to help out their loved one.  I truly do.  I truly

24   do, but unfortunately, we can't rely upon them to protect

25   the public.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1          For a long period of time, the family has been
2     aware of the defendant's problems.  The brother said so
3     that he had mental problems, and he's been supporting ISIS
4     for several years, and he talked about doing jihad and
5     supporting terrorists.  His talked sister talked about
6     problems.  His stepmother talked about issues that he had
7     with mental problems and assaultive behavior.
8          Speaking of assaultive problems, we know the
9     defendant has been involved in assaultive behavior, and he
10    can't control himself, and it appears as if the family is
11    unable or unwilling to do anything about it as well.
12         Now we know about the -- and it's in the
13    Pre-Sentence Report about the incident when he was going
14    to school at Starr Academy, in which he went in and told
15    his teacher that he dreamed of bringing in a gun and
16    shooting everybody in the class.  As a result of that, he
17    was suspended from school, had to go to counseling, and
18    the defendant acknowledges this when he spoke to the
19    doctor, his own doctor and Dr. Tillerson (sic), but we
20    know that the family is not willing to intervene because
21    his father paints a rosy picture of the defendant to their
22    hired expert.
23         On Page 4 of the letter that Dr. Danuloff wrote to
24    your Honor on March 29, 2016 -- I'll give the Court a copy
25    of that.  I've got a highlighted one as well, and I'll

                    *16-20098; USA v. KHALIL ABU-RAYYAN*

1    mark this as Government Exhibit 1 for this hearing --

2    second paragraph down, it begins, my interview with his

3    father and stepmother.  Can you see that?

4            **THE COURT:**  This is from what now?

5            **MR. WATERSTREET:**  This is from a letter to

6    your Honor of March 29, 2016 from Dr. Lyle Danuloff, and

7    this is Lyle Danuloff informing your Honor his

8    conversations that he had with Mr. Abu-Rayyan's father.

9    This is Page 4.  It is the second full paragraph

10   beginning, my interview with his father.

11           **THE COURT:**  Yes.

12           **MR. WATERSTREET:**  Okay.  It says, the second

13   sentence:  Mr. Rayyan Rayyan, who is the defendant's

14   father, described Khalil as a gentle child and young man

15   who is always well-behaved.

16       Skip down to the next sentence:  He asserted that

17   his son never got into any trouble -- got into trouble,

18   and that he graduated high school without any suspensions

19   or disciplinary actions against him.

20       Well, the probation officer has found otherwise,

21   and that's in the probation report.  We know through a

22   police report that -- which is Paragraph 58 of the

23   Pre-Sentence Report -- the defendant got into fight.  The

24   police were called.  A fight with his own brother.  Police

25   were called, and those charges were dismissed after his

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    brother refused to pursue the charges, but in the
2    Pre-Sentence Report, Paragraph 72, it says the school
3    documented inappropriate conduct, including but not
4    limited to the following:  When the defendant was in
5    school, he was incident of shoving another student, two
6    incidents of throwing a chair against a classroom wall and
7    at another student, verbal intimidation of another
8    student, attempting to instigate a fight against another
9    student, and general disruptive behavior of the class, and
10   this, based upon the father's statement is that he is a
11   gentle child and young man who has never had any problems
12   with school.
13        We know that the family was fully aware that he
14   supported ISIS ideas and wanted to commit violent acts,
15   because he told the undercover employee that his father
16   knew that he supported ISIS.
17        On January 28, 2016, there's a telephone call
18   between the undercover and the defendant, and one little
19   snippet of that conversation -- and here's an excerpt of
20   that, and I have the audio of the Court wishes to hear
21   that -- and I realize that I'm dragging on a little bit
22   here, your Honor, and I apologize -- but it says, even my
23   dad, he knows I support Dawla, which is the state known --
24   which references the Islamic state or ISIS.  You know, he
25   tells me everyday, you know, be careful.  Watch your

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    postings.  Be careful who you talk to, you know.  I told

2    him numerous times that I wanted to make jihad.  I want to

3    do an astarte operation, which is a martyrdom or suicide

4    operation.  I told my dad that, but he doesn't support it,

5    of course, but he tells me all the time -- then it is

6    unintelligible.  I have to listen to him first.

7         So while the father doesn't necessarily wish to go

8    out and commit jihad, he's fully aware of what the

9    defendant's desires are, and we know that this took place

10   because we confirmed this from a text message back and

11   forth with the defendant in 2014.  When he seized his cell

12   phone, we were able to get his cell phone that he had with

13   his prior -- one of his prior cell phones, and there were

14   messages back and forth, and a text message on August 4,

15   2014, a message to the defendant --

16        MR. SHANKER:  Objection.  I would like to

17   have a copy of that.

18        MR. WATERSTREET:  Sure.  I'll make that

19   Government Exhibit Number 3.

20        MR. SHANKER:  Where's the actual discovery

21   you gave me, because this is something that is--

22        MR. WATERSTREET:  Right.  It is part of the

23   discovery.

24        MR. SHANKER:  What page of the discovery is

25   this?

*16-20098; USA v. KHALIL ABU-RAYYAN*

1              **MR. WATERSTREET:**  I did not memorize the page

2      of the discovery.  It is part of the discovery.

3              Do not use internet for political views.  Everyone

4      is watching, and the defendant responds back, it's just

5      research, educational purposes.  Then keep your eyes open.

6      Don't make stupid decisions, and then he says, I'm

7      learning about the Haij.  That's all.

8              Two days later he sends a message, Dawlat Al Islam

9      Baqiyah, which basically means Islamic state everlasting.

10             So right after he's told don't engage in this

11     conversation, don't make these postings, just like his dad

12     told him -- when he said his dad has told him before when

13     he was talking to the undercover on January 28, 2016, he

14     says, he tells me everyday, you know, be careful.  Watch

15     your postings, and then we find the very --

16             **THE COURT:**  I'm sorry.  I may not be

17     understanding.  The messages that start in August 2014 are

18     coming from who?

19             **MR. WATERSTREET:**  Well, your Honor,

20     unfortunately, the information would not allow us to

21     identify to whom was sending it to him, but what I'm

22     saying it is consistent with his father always telling

23     him, watch your postings, and that's why he says in that

24     particular message watch --

25             **MR. SHANKER:**  Your Honor, I object to the

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    admission of this exhibit.  First of all, we don't have a

2    interpreter here.

3          Second of all, it doesn't have any names on it at

4    all.  It doesn't say who's talking to whom.  We don't know

5    who this is, and so I object to Exhibit 3.

6                **THE COURT:**  The telephone numbers here, which

7    among those do you attribute to the defendant?

8                **MR. WATERSTREET:**  The defendant is area code

9    (313)320-5844, and the reason we know that, he makes that

10   statement to the Detroit Police Department when he's

11   arrested back on October 7th.  So he's the one that is

12   sending out -- he said, it's just research, educational

13   purposes, and then on that same cell phone, he's reading,

14   keep your eyes open.  Do not make stupid decisions.  He's

15   also reading, do the not use the internet for political

16   views.  Everyone is watching.

17         So that is his read text message, but I'll move

18   on, your Honor.

19         Further, the family knew, and did not forewarn the

20   authorities to protect the public, because when we

21   recovered his new phone, we found examples of him sending

22   out pictures of the ISIS flag -- again long before he

23   started talking to undercover employee -- photos of having

24   a person's heat cut off to his brother.  That was on

25   October 25th, 2015, and these are part of -- the one on

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    October 22nd, the ISIS flag was part of Government's

2    opposition to defendant's motion for revocation of

3    detention order.  It was Exhibit C, and I will mark it as

4    Exhibit 4, and I will ask this Court to please move to

5    seal -- I'm moving to seal this because of the graphic

6    nature.

7          The photo that he sent his brother Adam that we

8    found not only in the text message that was sent and the

9    image that was sent, but also in another location on his

10   phone -- and I apologize to the Court.  This is what the

11   defendant felt was important to tell his brother he wanted

12   to do on October 25, 2015.

13         **THE COURT:**  Hold on for just a second.

14         **MR. WATERSTREET:**  I know I'm probably causing

15   you to run late on another matter.

16         **MR. SHANKER:**  Your Honor --

17         **THE COURT:**  We were late to begin with and I

18   should have apologized at the very outset of this hearing

19   given the length of the prior hearing that I had, and I

20   have been told they closed the building as of 4:00.  That

21   must be weather related.

22         **MR. WATERSTREET:**  Beauty of not having any

23   windows in here.

24         **THE COURT:**  Right.  But it is pretty apparent

25   that they think the weather event is going to continue.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1          I'm going want to spend some time thinking about

2     some of the arguments that I've heard today, and those

3     comments will lead to more discussion than we have time

4     for this afternoon, given I kept everybody here this

5     afternoon after the building itself has been supposedly

6     closed.

7          So I'm incline to say that we should put this over

8     to conclude on another day.  It would probably -- my

9     articulation of the reasons for sentence will probably --

10    if we ended it this moment without hearing from the

11    defendant, I think we would go beyond five, and we have

12    the question of whether folks who have parked in various

13    lots can retrieve their cars as late of 5:30.  I don't

14    know how that works.  I know we have had problems with

15    that in the past.

16         So I'm reluctant because I know people have taken

17    time out of their lives to be here, hoping to see this

18    through to a conclusion, but given the amount of time that

19    we need to spend concluding it, and my own desire to have

20    time to think about the arguments made on both sides, I

21    think we should probably break and resume to conclude the

22    sentencing hearing another day.

23         I'm starting a jury trial tomorrow morning, and so

24    I think we may have to put it over -- I don't know how

25    long they project that trial --

                  *16-20098; USA v. KHALIL ABU-RAYYAN*

```
 1                    THE CLERK:  Five full days.
 2                    MR. SHANKER:  I will be out of town until the
 3      22nd.
 4                    THE COURT:  Okay.  Mr. Waterstreet?
 5                    MR. WATERSTREET:  I did not bring my
 6      calendar.
 7                    THE COURT:  Look at the 23rd, but let us
 8      know.
 9                    MR. WATERSTREET:  The 23rd?
10                    THE CLERK:  A Thursday.
11                    MR. WATERSTREET:  I'll write it down and
12      talk --
13                    MR. SHANKER:  I don't have my calendar here.
14                    THE COURT:  Give us at least a couple of
15      hours.
16                    THE CLERK:  Morning of the 23rd or the 27th.
17                    THE COURT:  Mr. Shanker, do you have a
18      preference?
19                    MR. SHANKER:  I have to take a look at my
20      calendar.  I'm guessing the 27th is the one that works
21      better.
22                    MR. WATERSTREET:  In the afternoon?
23                    THE CLERK:  In the morning.
24                    THE COURT:  So we will continue with the
25      arguments and hearing on that day, and again, I'm sorry.
```

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    I don't think I realized how much material the Court would

2    be asked to consider, and how lengthy the arguments would

3    be, but I want to give both sides a full opportunity to

4    say everything that they believe the Court should consider

5    in passing judgment on the sentence.  So we'll give them

6    that time.

7           All right.  So we'll tentatively -- Mr. Shanker

8    you might be available on the 23rd?

9           **MR. SHANKER:**  I think the 27th is going to be

10   better based on what I know, given I will be out of town

11   before that.

12          **THE COURT:**  All right.  Then tentatively we

13   will pick the date on the 27th at 9:30.  Let me know if

14   that works.

15          **MR. SHANKER:**  9:30?

16          **THE CLERK:**  Yes.

17          **MR. WATERSTREET:**  I will contact you if I

18   have any problems.

19          **THE COURT:**  Thanks.

20

21               (Proceedings adjourned.)

22                   -   -   -

23

24

25

                    *16-20098; USA v. KHALIL ABU-RAYYAN*

1                    **C E R T I F I C A T I O N**

2              I, Ronald A. DiBartolomeo, official court

3      reporter for the United States District Court, Eastern

4      District of Michigan, Southern Division, appointed

5      pursuant to the provisions of Title 28, United States

6      Code, Section 753, do hereby certify that the foregoing is

7      a correct transcript of the proceedings in the

8      above-entitled cause on the date hereinbefore set forth.

9              I do further certify that the foregoing

10     transcript has been prepared by me or under my direction.

11

12     s/a Ronald A. DiBartolomeo              March 20, 2017

13     Ronald A. DiBartolomeo, CSR                    Date

14     Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

                    *16-20098; USA v. KHALIL ABU-RAYYAN*