```
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF MICHIGAN
                        SOUTHERN DIVISION


UNITED STATES OF AMERICA,

                Government,
                                      HONORABLE GEORGE CARAM STEEH
   v.
                                      No. 16-20098
KHALIL ABU-RAYYAN,

                Defendant.
_____/
                   EXCERPTS OF SENTENCING HEARING

                      Monday, March 26, 2017

                             -  -  -

APPEARANCES:

For the Government:            RONALD W. WATERSTREET, ESQ.
                               Assistant U.S. Attorney


For the Defendant:             TODD A. SHANKER, ESQ.

                             -  -  -


         To Obtain Certified Transcript, Contact:
      Ronald A. DiBartolomeo, Official Court Reporter
       Theodore Levin United States Courthouse
        231 West Lafayette Boulevard, Room 238
               Detroit, Michigan  48226
                    (313) 962-1234

      Proceedings recorded by mechanical stenography.
   Transcript produced by computer-aided transcription.
```

1                           **I  N  D  E  X**

2  _____Page

3  Excerpts of sentencing hearing                                  3

4

5

6

7

8

9

10

11

12

13                        **E  X  H  B  I  T  S**

14  Identification_____Offered    Received

15

16                      N        O        N       E

17

18

19

20

21

22

23

24

25

*16-20098; USA v. KHALIL ABU-RAYYAN*

1
2                              Detroit, Michigan
3                              Monday, March 26, 2017
4                                   -   -   -
5            **THE COURT:**  Mr. Shanker?
6            **MR. SHANKER:**  Thank you, your Honor.
7            Your Honor, the first thing that I want to point
8    out is that we've heard a number of basically Khalil's
9    worst statements that he made to the undercover Jannah,
10   the second undercover, and I think it's interesting that
11   Mr. Waterstreet is -- the government is basically saying,
12   well, these are all true.  These are true statements, true
13   intent, and once again, the evidence -- other evidence in
14   this case all indicates to the contrary.
15           We have Dr. Tillbrook, government's own expert.
16   He found that Khalil -- that these were false statements.
17   He found that Khalil was credible in what -- in his
18   explanation of why he was making these statements to
19   Jannah.  He said that he did not -- he found that he did
20   not have the intent to harm anybody, and he talked about
21   just how uncomfortable Khalil was at that point in his
22   life, and we have to put this into perspective.
23           You know, he was -- had been arrested for the
24   first time in his life and charged.  So he was facing
25   that.  He had just gone through, what for him, was the

```
 1    greatest love relationship of his life with the
 2    government's first undercover Ghadda, who suddenly
 3    disappeared when the family was getting ready to go down
 4    and visit the undercover family in Columbus, Ohio.
 5           So there was no question that there was a lot of
 6    stress going on with Mr. Rayyan, and there's no doubt as
 7    all the experts in the case pointed out, he was suffering
 8    from depression, the substance abuse elements going on,
 9    but the major point here is he did not intend to hurt
10    anybody.  He was saying things that Jannah wanted to hear,
11    and that's why I really right now want to correct the
12    timeline that the government just gave about Jannah's --
13    you know, he basically says that she doesn't even talk
14    about committing jihad until late January.  That is
15    absolutely inaccurate.
16           We have submitted transcripts in our prior motions
17    from December.  In December, Jannah tells Khalil that she
18    is ready to commit jihad.  She says why?  She says my
19    husband was killed by anti-ISIS forces in Syria, and then
20    there's a very emotional moment -- again, this is a month
21    before the government is talking about.  This is December
22    2015 where she says, I just had two family members killed
23    by anti-ISIS forces in Iraq, and she's playing up the
24    Sunni Shite divide, and -- and so she's committed to this
25    from the very beginning.
```

1            And I think it's interesting, you know, I agree at
2    the beginning of their conversations, she says I'm not
3    interested in marriage.  I agree with that.  That's
4    exactly why Khalil started shifting his statements, and
5    you know what, Judge?  We knows that these are horrible
6    statements, and he takes responsibility for it.  They were
7    reckless.  They were scary.  They are terrible statements,
8    but he didn't intend to commit any crime on anybody.  He
9    was trying to impress her.  The only way that he was
10   getting her attention is when he joined the conversation
11   about her family deaths at the hands of anti-ISIS forces,
12   and her devotion to being a jihadist.
13           And what's interesting as I pointed out, and the
14   government just left it off, is that there are numerous
15   times in December, January and February right before the
16   arrest where Khalil says, when she tries to get it down to
17   brass tacks and says, are you -- are you in?  She says I
18   have a connect name, Oum Maria in Syria, and I can make
19   this happen.  Are you in or are you out?  He says that
20   he's out.
21           When he is suicidal on February 1st, and she tries
22   to say well, you know what?  Committing suicide, that's
23   not good.  That's not in accord with Islam.  You need to
24   make it into an act of jihad, and we've submitted that
25   recording.  He says, I don't want to hurt anyone else.

1          **THE COURT:**  When was that?
2          **MR. SHANKER:**  That's February 1st.  So Judge,
3    the timeline as the transcript shows is very different,
4    and I think that's very, very important here.
5          There was also a reference by Mr. Waterstreet to
6    how -- well, you know, Dr. Tillbrook, all he was doing was
7    determining whether -- all he was doing is determining the
8    standard for civil commitment, and I think that's very
9    interesting because civil commitment, the standard is
10   whether he is a danger to himself or others on the
11   outside.  In a civil commitment standard, that's what
12   we're looking at, whether somebody on the outside who is
13   out in the public, needs to be basically put in custody
14   against their will for treatment because they are danger
15   to themselves other others.
16         And the bottom line is, Dr. Tillbrook went far
17   beyond just that finding.  As I've stated, he found that
18   Khalil did not intend to harm others, that he was a
19   credible -- after hours and hours of conversations, after
20   reviewing all the transcripts in the case, after reviewing
21   the discovery in the case, all of these items for 24 hours
22   a day observation with the staff for over a month -- he
23   came to the conclusion that the best thing for Khalil
24   would be community confinement -- or community treatment
25   in a dual program where he could get mental health

1   counseling and substance abuse treatment, and that's
2   significant.  I mean, that's the government's expert
3   there.
4           So I think it is very important to keep that in
5   mind when I'm talking about the evidence of terrorism in
6   the case.  We have his statements, but we have expert
7   findings that oppose that.
8           We have the search warrant.  I mean, it's not like
9   they announced two weeks ahead of time, we will be at your
10  house and your business and your car, and go through
11  everything that you own.  So start, you know, take care of
12  the evidence.  They showed up unexpectedly.  They searched
13  everything.  They took every computer, every electronic
14  device, everything that this family owned, and they still
15  have it, and they found nothing.  Nothing to show a plan.
16  Nothing to show that -- no guns, no knives, no ammunition.
17  It was a completely false statement what he said, and we
18  know that -- that he is under surveillance during this
19  time.  They are watching him the whole time, and there's
20  no -- if they had the evidence, they could put a person up
21  right now and say, we saw him walking around with his AK,
22  but he didn't.
23          The other thing Judge, the government mentioned
24  the findings of Judge Strong -- or mentioned that Khalil
25  made that statement to Judge Strong.  I'm not sure what

|   |   |
|---|---|
| 1 | the point is there, but I think it is important what Judge |
| 2 | Strong found because Khalil pled guilty and was sentenced |
| 3 | after the charges were out in this case.  There was a big |
| 4 | brouhaha around February 4, 2016. |
| 5 | February 16th is when he goes in and pleads in |
| 6 | front of Judge Strong and gets sentenced, and Judge Strong |
| 7 | found that in listening with his knowledge of the |
| 8 | situation, listening to Khalil's statement of allocution, |
| 9 | and looking at the evidence in the case -- and I just want |
| 10 | to remind the Court, this is the same gun that's involved |
| 11 | here -- he explicitly found that Khalil did not intend to |
| 12 | commit any kind of terrorist act; that he truly wanted a |
| 13 | gun for self-defense purposes. |
| 14 | His statement was as follows:  I believe you are |
| 15 | remorseful, and I believe the circumstances for which the |
| 16 | crime was committed.  He has strong family ties and is |
| 17 | working.  It looks like he was trying to do the right |
| 18 | thing, but he didn't do it the right way, but ignorance of |
| 19 | the law is not an excuse. |
| 20 | Well, that's -- I mean, I agree with that, and I |
| 21 | think the evidence that we now have supports that. |
| 22 | As I pointed out the last time, every time -- he |
| 23 | only had a gun on three days during the entire |
| 24 | investigation, and one was two days, October 7th and -- |
| 25 | 5th through 7th of 2015, and that was the .22, and then |

1    the other day was November 15th of 2015, again, before he
2    is charged at the state level where he goes and tries to
3    buy a new gun, and that doesn't go through because the
4    initial arrest is still pending, but there's no charge.
5         And then he takes a class at the behest of his
6    parents who told him that he should follow the law.  If he
7    wants to get a CPL, he's got to take a class and pass it,
8    and so he takes the class afterwards.  For a matter of
9    minutes, he and his cousin fire off these big rifles with
10   a range officer present at the range, and that's it.
11   That's the extent of his weapon possession in this case.
12        Your Honor, I also -- Mr. Waterstreet discussed
13   the Shehadeh case, and I think the Shehadeh case is
14   actually very supportive of our position here.
15        In Shehadeh, first off, the government properly
16   objected to the guidelines and requested an enhancement
17   and variance, and they did that ahead of time, and if you
18   look at that opinion, there's a whole procedural matter
19   that happens before they even get to the sentencing
20   hearing, and the judge walks in and gives them notice
21   ahead of them that he considering a variance upwards.  So
22   unlike this case, I think everything was preserved there
23   to start.
24        Secondly in that case, there was overwhelming
25   evidence of terrorist intent, violent intent, and most of

1           it wasn't even opposed by the defendant.

2                   So, you know, there's no -- it's a completely

3           different situation than what we have here where the

4           evidence is weak, and there's experts opposing that

5           evidence, and there's a search warrant that goes against

6           any terrorist intent here.  So I think that's very

7           important when looking at Shehadeh.

8                   But even more significant, your Honor, I think is

9           the government is relying on a case in its memorandum, a

10          Fourth Circuit case called U.S. versus Lajqi, and the

11          government mentioned it when we last met, and mentioned it

12          again today.  That's a Fourth Circuit case, and I was

13          curious.  What are facts of this?

14                  The appellate case that was cited by the

15          government is actually a summary unpublished opinion, and

16          it has no real facts or explanation, but it does affirm

17          the district court's upward variance to 60 months in that

18          case.

19                  So I went back, and I found that there is a

20          transcript of the sentencing hearing and the district

21          court's findings that really details the reasoning, and I

22          want to put that on the record.  It's 10-CR-00502,

23          Document 40, May 23, 2011, and again, this is U.S. v

24          Lajqi, L-a-j-q-i.

25                  So let's compare the evidence in these cases.

1              In Lajqi, the defendant, along with an informant,
2    devised a terrorist plot, agreed to participate in the
3    plot, and most importantly, he never withdrew from the
4    plot.  So it's not like this case where Khalil is telling
5    the undercover, I don't want to hurt anybody.  No, that's
6    not the case in Lajqi.
7              In Lajqi, unlike this one, he actually goes and
8    spends hours casing buildings to bomb in downtown
9    Washington D.C. in front of witnesses.  So that's
10   evidence.  This is again, I'm going through the evidence
11   that allows a variance of this sort.
12             Third, Lajqi admitted that he was a member of a
13   terrorist organization for years, the Kosovo Liberation
14   Party, and he admitted over the years, he actively sought
15   U.S. forces in Kosovo.
16             Fourth, in Lajqi, there were no expert witnesses
17   who found that Lajqi didn't intend to commit acts of
18   terrorism like this case.
19             Here, we have two experts, including the
20   government's expert, and a state court judge who found
21   that Khalil did not intend to hurt people; that he was not
22   a substantial danger, and that he's amenable to community
23   treatment for substance abuse and mental health
24   counseling.
25             And finally, five, your Honor -- and this very

|   |   |
|---|---|
| 1 | important to the judge's finding that they met their |
| 2 | burden of proof, this was crucial -- the FBI case agent in |
| 3 | Lajqi submitted a sworn multiple page affidavit testifying |
| 4 | to Lajqi's dangerousness, and why, and the facts in that |
| 5 | affidavit were largely uncontested by the defendant. |
| 6 | So for all of these reasons, none of which are |
| 7 | present in this case, the district court in Lajqi found |
| 8 | that there was strong evidence that Lajqi intended to |
| 9 | commit real acts of terrorism, and therefore, justified |
| 10 | the variance to 60 months. |
| 11 | **THE COURT:** Aren't the threats that are |
| 12 | claimed to be made by your client largely uncontested in |
| 13 | this case? |
| 14 | **MR. SHANKER:** No.  They are absolutely |
| 15 | contested.  I mean, he is contesting that they were |
| 16 | threats, that they are true threats.  They are false |
| 17 | statements, and that's the difference really. |
| 18 | I mean, he is saying, I didn't intend to hurt |
| 19 | anybody.  I made these stupid statements.  I was talking |
| 20 | to impress this undercover, this love interest, and he |
| 21 | owns that, but he absolutely opposes that these are true |
| 22 | threats, and there's evidence to support that. |
| 23 | **THE COURT:** Okay.  I'm not sure I get the |
| 24 | distinction.  When he's talking about killing people in a |
| 25 | church, you're argument is that he didn't mean it? |

1           **MR. SHANKER:**  Exactly.

2           **THE COURT:**  But you're not really arguing

3    that he didn't say --

4           **MR. SHANKER:**  I admit he made -- yeah, he

5    made the statement, and your Honor, he made the statement

6    about the church and the statement about the police

7    officer, and they were isolated statements.  He doesn't

8    mention it again.  So he talks about jihad with her

9    multiple times, but that's the only time that those come

10   up.

11          But back to Lajqi, the other important thing there

12   is that the court varied to 60 months in Lajqi because he

13   also found that due process concerns about notice and the

14   sentencing tail wagging the charging dog were alleviated

15   for the following reasons:

16          One, the -- first of all, the government preserved

17   the request for an upward variance under Section 3553 at

18   the time that the defendant entered his guilty plea, and

19   again when the PSI came out, neither of which are present

20   in this case.

21          Also in Lajqi, he was an illegal alien when he

22   committed the offenses of conviction, and therefore, the

23   court found that he had diminished due process rights when

24   it came to be sentenced on uncharged conduct.  Of course,

25   Khalil is a U.S. citizen.

1           The court also found it significant that the
2     confidential informant in that case had been disclosed to
3     the defense during the discovery process alleviating
4     credibility concerns.  In this case, not only we don't
5     have the identity of the confidential informant, the
6     government refused to tell us whether there were other
7     informants involved in the case, and, you know, we don't
8     know who else contacted him.
9           But in sum, the basis for the upward variance
10    based on uncharged conduct in Lajqi, is just not
11    comparable from a procedural or a substantive level to
12    Khalil's case for all of these aforementioned reasons.
13          **THE COURT:**  So that I'm clear, are you making
14    a procedural challenge to the Court even considering an
15    upward variance?  Are you asking that you be given more
16    time to prepare a response to that request, even though
17    the government has been asking for this from the
18    beginning, right?
19          **MR. SHANKER:**  Well, from the beginning since
20    it filed its memorandum?
21          **THE COURT:**  Right, prior to the sentencing
22    hearing that we last had.
23          **MR. SHANKER:**  Yes.  So no, my procedural
24    challenge is that first of all, that they've waived the
25    various by not objecting to the Pre-Sentence Report.  They

1   have waived it.
2           I think more importantly, they failed to meet the
3   burden of proof to obtain the variance that it's
4   requesting.
5           I mean, we have -- I've tried to not just lay out
6   the facts in this case as they've come in, but also, you
7   know, looking at these other cases that are very
8   comparable.
9           The Gregerson case, you know, his guidelines are
10  37 to 46 months with a cap of 60, and his facts are
11  shockingly more incriminating than Khalil's case.
12          **THE COURT:**  When you say a cap of 60, you
13  mean the government agreed and the defendant agreed that
14  any sentence up to 60 would be -- would be within the
15  range by which the government would be precluded from
16  withdrawing and the defendant likewise?
17          **MR. SHANKER:**  Could not appeal.
18          **THE COURT:**  Right.
19          **MR. SHANKER:**  But it's based on --
20          **THE COURT:**  Sixty was above the advisory
21  range in that case.
22          **MR. SHANKER:**  That's true, and basically what
23  happened was the government preserved -- and I've admitted
24  these into evidence, both of these Rule 11 agreements,
25  your Honor -- but with Gregerson they preserved very

1   specifically -- which didn't happen here -- but they
2   preserved an enhancement that they were seeking under the
3   guidelines that move it to 60 months.
4           **THE COURT:** So Mr. Waterstreet distinguishes
5   that, as well as the Lanton case, as distinguishable
6   because of the cooperation that was promised by the
7   defendant largely.
8           **MR. SHANKER:** I don't know anything about any
9   cooperation, and there's not the standard language in the
10  Rule 11 that would make reference to any other agreement.
11  So I don't know if there is or is not.
12          **THE COURT:** So if we don't know, how do I
13  treat that as a -- supporting your argument is essentially
14  that the -- these are comparable for purposes of
15  determining whether an unwarranted disparity in a given
16  sentence would exist, right?
17          **MR. SHANKER:** Well, we have the four corners
18  of the agreement, and I think that alone is telling.
19          Now certainly he could get a below guideline range
20  sentence if there is a 5K in the case. That happens, but
21  this is just based on his plea. That agreement, the four
22  corners of that agreement, are about his plea to that
23  charge. And remember, he was actually charged with
24  possession of destructive devices with the intent to cause
25  bodily harm, and, you know, actually appended to the

1    agreement is the stunning list of weaponry that he
2    possessed, and what we know about Mr. Gregerson is that he
3    had these connections.  He had real connections.  He made
4    similar statements, but he apparently was either able to
5    back it up or intended to back it up, one of the two,
6    unlike Mr. Rayyan.
7        And Mr. Lanton's guideline range was 15 to 21
8    months, and it was only that high because he had three
9    prior felony convictions, and again, this is somebody that
10   threatened to bomb a police funeral while it was happening
11   on a public Facebook page.  So I mean, it was clearly
12   intended to scare people.
13       Khalil's statements were private with this
14   undercover, and they've certainly come back to haunt him,
15   but, your Honor, he didn't intend to hurt anybody.
16       Your Honor, when we look at all of these cases,
17   including Lajqi as well, when we look at the reports of
18   the two government experts, and when we look at Judge
19   Strong's opinion, when we look at the results of multiple
20   search warrants, all the computers that were searched, all
21   the uncontested facts about the undercover operation,
22   which basically commodified a young man's desire for love
23   into an inducement to join a jihad operation, I think,
24   your Honor, the guideline range is appropriate.  It allows
25   for a sentence that is not greater than necessary, and it

1    takes into account the detailed findings of psychologists
2    who have spent far more time with Mr. Rayyan frankly than
3    any of us, and this is their expertise.
4            And so, your Honor, I respectfully request a
5    sentence of 15 months.
6            Thank you, your Honor.
7            **THE COURT:**  All right.  Thank you, Mr
8    Shanker.
9                         -   -   -

*16-20098; USA v. KHALIL ABU-RAYYAN*

**C E R T I F I C A T I O N**

  I, Ronald A. DiBartolomeo, official court reporter for the United States District Court, Eastern District of Michigan, Southern Division, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings in the above-entitled cause on the date hereinbefore set forth.

  I do further certify that the foregoing transcript has been prepared by me or under my direction.

_____      _____
Ronald A. DiBartolomeo, CSR           Date
Official Court Reporter

      - - -

*16-20098; USA v. KHALIL ABU-RAYYAN*