UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

          Plaintiff,

                                    CASE NO. 16-CR-20098
v.                                HON. GEORGE CARAM STEEH

KHALIL ABU-RAYYAN,

          Defendant.

_____/

### MEMORANDUM OPINION

Defendant Khalil Abu-Rayyan pled guilty to making a false statement to acquire a firearm, 18 U.S.C. § 922(a)(6), and possession of a firearm by a prohibited person, 18 U.S.C. § 922(g)(3).  On March 13, 2017 and continued on March 27, 2017, due to a building closure because of inclement weather, this court held a sentencing hearing which spanned approximately four hours.  In reaching its sentencing decision, the court has carefully considered the oral presentations of counsel for both sides at the sentencing hearing, the videotaped statement by Abu-Rayyan, Abu-Rayyan's personal statement made at the sentencing hearing, the sentencing memorandum filed by Abu-Rayyan and the government, the

-1-

sentencing addendum filed by Abu-Rayyan, and the presentence investigation report)("PSR"). The court is also intimately familiar with the facts of this case based on, among other things, the briefing and two expert reports regarding Abu-Rayyan's mental competence which have been filed under seal,[1] as well as Abu-Rayyan's two motions for release on bond. This Memorandum Opinion is meant to expand on the court's reasoning for granting an upward variance as discussed at the sentencing hearing held on April 6, 2017.  For the reasons set forth below, the court shall sentence Abu-Rayyan to 60-months imprisonment.

## A. Findings of Fact

1.     When Abu-Rayyan was 12 years old, he was referred to counseling because he told his teacher that he dreamed he had a gun and shot everyone in the class.  (Dr. Tillbrook's Report, Doc. 106-1 at PageID 997).

---

[1]Although filed under seal, counsel for both sides referred to the reports in open court during oral argument.  First, Dr. Danuloff testified at the first bond hearing and his opinions were discussed at length in open court.  (Doc. 68).  Second, both parties discussed Dr. Tillbrook's report at the competency hearing and during the hearing on defendant's renewed motion for revocation of detention order.  (Doc. 92).  Finally, both sides referred to those reports during the sentencing hearings.  (Doc. 109). Thus, the court finds it appropriate here to discuss those reports herein without sealing this order.

2.      While in school, Abu-Rayyan engaged in assaultive behavior requiring him to be suspended from school on three or four occasions for fighting.  *Id.*  At the age of 19, he also was in a fight with his brother, which resulted in the police being called and Abu-Rayyan being detained for 18 hours.  *Id.* at PageID 998.

3.      At the age of 17, Abu-Rayyan began using marijuana.  Between the ages of 19 and 21, Abu-Rayyan admitted he was smoking 10 to 15 marijuana blunts per day, every day.  *Id.* at PageID 999.

4.      Abu-Rayyan reports that his childhood was devoid of abuse and his necessities of life were provided, but he was bullied by his peers. (PSR ¶ 44-45).

5.       At least as early as November, 2014, Abu-Rayyan retweeted, liked, and commented on acts of terror and martyrdom on behalf of the foreign terrorist organization Islamic State of Iraq and Levant (formerly al-Qa'ida in Iraq) commonly referred to as "ISIL."[2] His conduct included seeking out internet links to gruesome ISIS videos, posting them on his Twitter accounts and posting positive comments after viewing the executions and killings depicted in the ISIS videos.  (PSR ¶¶ 50-51).

---

[2]The parties use the term ISIS throughout their papers and the court adopts this terminology as well.

6.     The propaganda on his Twitter account included videos of a Jordanian fighter pilot being burned alive, handcuffed people being executed by being thrown from a high-rise building, the beheading of a Christian in Egypt, and news of ISIS victories.  (PSR ¶ 51).

7.     On January 22, 2015, Abu-Rayyan added to his "favorites" on his Twitter account a photograph of a person about to have his throat slit with a knife.  (Doc. 88, Ex. A).

8.     On February 19, 2015, the FBI found a photograph uploaded on Abu-Rayyan's Twitter account showing him dressed in camouflage, with two similarly dressed individuals, holding a semi-automatic hand gun in his right hand, and making an ISIS symbol with his left index finger.  (Doc. 88, Ex. B).

9.     On October 5, 2015, Abu-Rayyan purchased a .22 caliber revolver from a sporting goods store.  In response to a question on a form required by the Bureau of Alcohol, Tobacco, and Firearms and Explosives ("ATF") whether he was an unlawful user of, or addicted to marijuana, Abu-Rayyan falsely stated that he was not.  (PSR ¶ 12).

10.     On October 7, 2015, Detroit police pulled Abu-Rayyan over for speeding.  They found the .22 caliber revolver in the car, along with four

bags of marijuana.  Abu-Rayyan admitted he did not have a concealed pistol license.  Abu-Rayyan was arrested for carrying a concealed weapon in an automobile and possession of marijuana. (PSR ¶ 13).

11.    After his arrest, Abu-Rayyan replaced his cell phone and downloaded more disturbing images, including the ISIL flag, people with firearms with the ISIL flag, people who appeared to be burned alive.  His wallpaper on his new phone was the picture of a man making an ISIS symbol with his left hand and holding the severed head of a woman with his right hand.  (PSR ¶ 53).

12.    On November 15, 2015, Abu-Rayyan attempted to purchase another firearm from a different sporting goods retailer.  Again, Abu-Rayyan lied on the ATF form and denied that he was a marijuana user. Due to his pending criminal case, he was not allowed to purchase the firearm.  (PSR ¶ 15).

13.    Also, on November 15, 2015, Abu-Rayyan and another individual, went to a local firing range, rented an AK-47 and an AR-15, which they practiced shooting.  (PSR ¶ 15).

14.    In late November, 2015, Abu-Rayyan tweeted photographs of himself firing AK-47 and AR-15 type rifles.  He captioned one of the

photographs "Sahwat hunting." According to investigators, "Sahwat" is a term for Iraquis who oppose ISIS. (PSR ¶ 54, Doc. 88, Ex. D).

15.    Abu-Rayyan admits that at the time he practiced using an AK-47 and AR-15, two military type rifles, he was viewing and downloading ISIS propaganda. (Doc. 104 at PageID 808, PSR ¶ 50).

16.    On December 12, 2015, Abu-Rayyan sent his brother a message that "This would be a perfect time to do a istighadi [martyrdom/suicide] operation." (PSR ¶ 54, Doc. 88, Ex. E, Government's Sentencing Ex. 6).

17.    In December, 2015, Abu-Rayyan began communicating with an undercover FBI employee ("UCE") on social media about ISIS. (PSR ¶ 55, Doc. 104, PageID 808). He consistently expressed his support for ISIS and his desire to commit a martyrdom operation. (PSR ¶ 17). He provided detailed descriptions of his plans to behead people and skin them like sheep. (PSR ¶ 55).

18.    By mid-December, 2015, Abu-Rayyan claims he fell in love with the UCE(s) posing as Ghadda and that he believed he was engaged to be married to her. (Doc. 61 at PageID 374 and Ex. 2).

19.    During his conversations with the UCE, whom Abu-Rayyan called "Jannah," Abu-Rayyan stated his desire to shoot up a church near his place of employment.  He stated he had an AK-47 with a 40-round magazine and described the firearm as the type of machine gun ISIS fighters carry.  He told the UCE that his father discovered the items he had in his car to carry out the church shooting, including the AK-47, bullets, and a mask.  He told the UCE that he practiced loading and unloading the gun, and he was targeting the church because many people attend the church and church members were barred from carrying firearms inside. Investigators located the church matching the description given by Abu-Rayyan in his posts which could accommodate up to 6,000 people.  (PSR ¶ 55).

20.    When the UCE asked Abu-Rayyan if he regretted not committing the shooting at the church, he responded, "Honestly, I regret not doing it. . . if I can't do jihad at the middle (sic) wa. . . I would do jihad over here."  (Doc. 59 Attachment A at PageID 351.)

21.    In January, 2016, Abu-Rayyan also told the UCE that he wanted to conduct a martyrdom operation by killing the police officer who arrested him while the officer was in the hospital.  (PSR ¶ 17).

22.    In January, 2016, Abu-Rayyan also told the UCE that he it was his dream to behead someone, and that he is excited about shootings and death.  (PSR ¶ 17).

23.    On January 15, 2016, Abu-Rayyan pled guilty to the state charge of possession of marijuana and was pending trial on the concealed weapons charge.  The state case involves the same conduct involved in this case.  On February 26, 2016, Abu-Rayyan was permitted to withdraw his guilty plea for the charge of possession of marijuana to enter a plea of guilty to the reduced charge of carrying a concealed weapon.  (PSR ¶ 37).

24.    On January 18, 2016, Abu-Rayyan and the UCE had the following conversation: "And even my Dad, he knows I support the dawlah (state, a known reference to the Islamic State [ISIS]), you know.  He tells me every day, you know, be careful, watch your posting.  Be careful who you talk to.  You know, I told him numerous times that I wanted to make Jihad.  I want to do an istishhadi (martyrdom/suicide) operation.  I told my dad that.  And he doesn't support it of course.  But tells me all the time – unintelligible – I have to listen to him first."  (Government's Sentencing Ex. 2).

-8-

25.    On January 25, 2016, the UCE known as "Jannah" told Abu-Rayyan that she wanted to die for the sake of Allah because of "seeing my sisters and brothers and young women die in Syria and Iraq like that." (Doc. 51, Ex. C at PageID 282).  The UCE also told Abu-Rayyan that "Jihad is my dream."  (Doc. 51, Ex. C at PageID 289).

26.    In January, 2016, Abu-Rayyan told the UCE that Satan speaks to him at night telling him to burn people alive, tie them up, and cut their tongues.  (PSR ¶ 56).

27.    On February 2, 2016, when Abu-Rayyan told the UCE that he was thinking about hanging himself with a rope, the UCE told him it is forbidden for a person to take his own life, but added that "Like I told you before, you know, . . . when it's for the sake of Allah, when it's jihad, or when it's on our aquida [creed] or for a cause, that's the only time Allah Subhanahu wa-ta-ala allows it.  But not to put your life to waste, and just hang yourself like you say you want to do."  (Doc. 61, Ex. B).  In that same conversation, Abu Rayyan tells the UCE that "I would not like to hurt somebody else."  *Id.*

28.    On February 4, 2016, investigators executed search warrants at Abu-Rayyan's residence and place of employment and his cell phone

and computer were seized.  Investigators did not find any weapons or ammunition.  (PSR ¶ 19).

29.    On February 4, 2016, a criminal complaint entered in this case charging Abu-Rayyan with possession of a firearm by an unlawful user of a controlled substance.  (Doc. 1).

30.    On February 16, 2016, Abu-Rayyan was charged in a two-count indictment for (1) making a false statement to acquire a firearm in violation of 18 U.S.C. § 922(a)(6), and possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(3). (Doc. 23).

31.    On March 16 and 24, 2016, Abu-Rayyan's expert witness, Lyle Danuloff, Ph.D., P.C., conducted clinical interviews of Abu-Rayyan in the Wayne County Jail at defendant's request.  (Doc. 106-2 at PageID 1016). On March 17, 2016, Dr. Danuloff interviewed Abu-Rayyan's father and step-mother with whom the defendant resides.  *Id.*  In conducting his evaluation, he also reviewed a number of other materials, including conversations between Abu-Rayyan and the UCE.  *Id.* at PageID 1016-17.

32.    During Dr. Danuloff's interview, Abu-Rayyan's father made false statements and denied that Abu-Rayyan had any trouble in school

and falsely claimed that Abu-Rayyan graduated high school without any suspensions or disciplinary actions against him.  *Id.* at PageID 1019.

33.    On March 25, 2016, in a letter addressed to the court, Dr. Danuloff opined that Abu-Rayyan was competent to assist in his own defense.  (PSR ¶ 60, Doc. 48-2 at PageID 206).

34.    On March 29, 2016, Dr. Danuloff issued his psychological evaluation of Abu-Rayyan.  He concluded that Abu-Rayyan did not exhibit any indications of severe psychological disorder or dysfunction.  (Doc. 106-2 at PageID 1018).  Dr. Danuloff also found that Abu-Rayyan has dependent personality disorder and cannibis dependence.  *Id.* at PageID 1021.

35.    At the bond hearing held on April 18, 2016, Dr. Danuloff testified.  (Doc. 68). Defendant proffered Dr. Danuloff's opinion on both Abu-Rayyan's competency and the safety of the community upon his release.  (Doc. 68 at PageID 490).  The court ruled that Dr. Danuloff was not a board certified forensic psychologist and was not qualified to testify on the issue of Abu-Rayyan's potential risk of safety of the community if released on bond.  (Doc. 68 at PageID 493).

36.     Dr. Danuloff found that defendant had "a deep sense of shame and remorse for all of his actions and strongly denied the intentions that his verbal behavior would indicate on the surface."  (Doc. 106-2 at PageID 1018).   He further found that Abu-Rayyan was "psychologically fixated, immature and lonely adolescent with compromised marijuana impacted judgment."  *Id.* at PageID 1020.

37.     On March 14, 2016, Abu-Rayyan was sentenced to two years of probation and 80 hours of community service on the state charges.  (PSR ¶ 37).

38.     On April 18, 2016, this court denied Abu-Rayyan's motion to be released on bond.  (Doc. 65).

39.     On the same date, this court ordered Abu-Rayyan to undergo a psychiatric examination for the purpose of determining competency pursuant to 18 U.S.C. § 4241(b), which was conducted while Abu-Rayyan was in the custody of Bureau of Prisons at the Federal Medical Center in Devens, Massachusetts.  (Doc. 66 and 75).

40.     Chad Tillbrook, Ph.D., a forensic psychologist, conducted the court ordered evaluation.  (Doc. 106-1).  On July 11, 2016, Dr. Tillbrook issued his evaluation and opined that Abu-Rayyan did "not reveal any

thought or speech disorganization indicative of a psychotic disorder." *Id.* at PageID 1003. Dr. Tillbrook reported that "Abu-Rayyan drew parallels between his interest in watching violent photos and videos produced by terrorists and his interest in watching adult pornography; "nothing more than curiosity and interest of something that is so different from [his] life." *Id.*

41.    Dr. Tillbrook diagnosed Abu-Rayyan with adjustment disorder, mixed anxiety, depressed mood, and cannabis use disorder. *Id.* at PageID 1004-05. He found Abu-Rayyan competent to stand trial. *Id.* at PageID 1006.

42.    Dr. Tillbrook also found that Abu-Rayyan "is not presenting with acute psychiatric symptoms and is not a substantial risk of causing bodily harm to others or serious damage of property to another due to mental illness, inpatient mental health treatment is not indicated at this time." *Id.* at PageID 1005.

43.    On August 2, 2016, the court held a competency hearing and the parties agreed that based upon Dr. Tillbrook's report, Abu-Rayyan was competent to stand trial. (Doc. 87).

44.    On August 30, 2016, the court heard oral argument on Abu-Rayyan's renewed motion to be released on bond and denied the motion.

45.    On September 13, 2016, Abu-Rayyan pled guilty to the charges of false statement to acquire a firearm and unlawful possession of a firearm.

## B. Discussion

The statutory maximum for each count of the Indictment is 10-years. 18 U.S.C. § 924(a)(2).  Probation has calculated a guideline range of 15-21 months.  Abu-Rayyan argues for a sentence of 15-months.  The government seeks a sentence of 96-months.  Although sentencing begins with the guidelines calculation, the court is required to consider the appropriateness of a guidelines sentence and whether a variance is warranted.  *See Gall v. United States*, 552 U.S. 38, 49-50 (2007); *United States v. Booker*, 543 U.S. 220 (2005).  For the reasons set forth below, the court shall impose a sentence of 60-months.

The court must impose a sentence that is sufficient to achieve the statutory purposes of punishment, which includes most importantly here, protecting the public from further crimes of the defendant and affording deterrence to criminal conduct, but the sentence imposed must not be

-14-

greater than necessary to achieve those ends.  18 U.S.C. § 3553(a).  A

district court has broad discretion in sentencing and there is "no limitation"

on "the information concerning the background, character, and conduct" of

the defendant that the court may consider.  18 U.S.C. § 3661.  In

determining the appropriate sentence here, the court accepts the

government's position than an above-guidelines sentence is necessary to

protect the public and to deter future criminal conduct.  The court

addresses each of the four § 3553(a) factors below.

**1.    An Above-Guidelines Sentence is Necessary to Protect the Public**

Section 3553(a)(2)(C) requires the court to impose a sentence which

is "sufficient, but not greater than necessary . . . to protect the public from

further crimes of the defendant."  Given Abu-Rayyan's prior conduct, dating

back to at least November, 2014, in which he expressed his support of

ISIS, his fascination with murder, beheadings, and savage terrorist attacks,

the court determines that a significant sentence is warranted here.  In

addition to his stated support of jihadist activities, Abu-Rayyan made

specific statements to the UCE that he planned to kill the police officer who

arrested him while he was in the hospital, and that he would "shoot up" a

large church near his place of employment.  He also e-mailed his brother

that "[T]his would be a perfect time to do a istighadi [martyrdom/suicide] operation."  After he was arrested and tried but failed to buy another gun illegally, he went to a shooting range, fired off an AK-47 and AR-54, and then posted pictures of himself holding the AK-47 and making an ISIS gesture.

The court is persuaded by the government's argument that Abu-Rayyan cannot be released, at least not in the near future, without posing a serious risk to the public.  If released, no one can ensure that Abu-Rayyan will not buy a firearm or weapon and carry out an ISIS terrorist attack like the ones he discussed with the UCE.

Abu-Rayyan argues that when he viewed and expressed his support of ISIS terrorist activities and stated his intention to commit his own ISIS terrorist inspired attacks, these were merely the thoughts of an immature, depressed, and marijuana dependent adolescent who has reformed his life and his intentions after spending more than the last year in prison.  He claims that his incarceration has allowed him to withdraw from drug abuse and clarified his thought process.  Furthermore, Abu-Rayyan argues that Dr. Daniloff and Dr. Tillbrook's evaluations support his claim that he poses no threat to the public.

The court cannot agree with that characterization. First, as to Dr. Danuloff, the court previously found that he is not qualified to testify on the issue of Abu-Rayyan's potential risk of safety to the community because he is a non-certified forensic psychiatrist, and for other reasons as well, as stated on the record by the court at the bond hearing, (Doc. 68, PageID 493). Second, as to Dr. Tillbrook, he did not find that Abu-Rayyan posed no risk to the public, only that Abu-Rayyan did not have a psychological disorder that would risk him causing harm to others or that would require inpatient mental health treatment. In other words, Abu-Rayyan could very well harbor evil intentions and a desire to act on those ill motives, but those intentions are not rooted in or caused by a psychological disorder.

Dr. Tillbrook's analysis that Abu-Rayyan does not suffer from "acute psychiatric symptoms" is likely of little relief to the parishioners of the church Abu-Rayyan stated he would like to "shoot up" or to the police officer he planned to kill while the officer was in the hospital. Not all criminal conduct can be explained by psychiatric disorders. In fact, when criminals are deemed insane, they are not held responsible for their criminal activity. Here, the fact that Dr. Tillbrook found that Abu-Rayyan was competent to stand trial and did not require inpatient mental health

-17-

treatment, does not explain away his cell phone screen saver photograph of an ISIS terrorist holding the severed head of a woman by her hair, or the countless other ways he expressed his support of ISIS jihadist activities over the past several years.

Blaming Abu-Rayyan's obsession with ISIS activities on his depression, as he has done in his sentencing memorandum and at oral argument, does not alleviate the court's concerns about the real risk he poses to the community if he is released soon. There may be some correlation between an individual's depression and that individual's willingness to participate in a martyrdom suicide mission. But Abu-Rayyan has not convinced this court that his incarceration has allowed him to overcome his depression sufficiently that he no longer poses a threat to the community. It is certainly a good thing that Abu-Rayyan is no longer using marijuana because he is incarcerated, but there are no guarantees that Abu-Rayyan would not return to marijuana use upon his release, or that he would no longer be depressed because of the time he has so far spent in prison. Also, although it is likely true that Abu-Rayyan's habit of smoking 10-15 blunts of marijuana per day impacted his judgment, Abu-Rayyan has not come forward with any medical information or explanation that would

support his attempts to blame marijuana for sparking his affinity for ISIS propaganda.

The court has carefully considered the video statement that Abu-Rayyan submitted with his sentencing memorandum, as well as his personal statement made at the sentencing hearing, in which he expressed his deep remorse and shame over his criminal conduct, and gave assurances that he never meant to hurt anyone and never would do so. In addition, the court has considered the many letters Abu-Rayyan sent to family members while imprisoned to show his remorse and rehabilitation. The government points out that there were no letters to the court written by any others on his behalf asking for leniency.

In his statement to the court, he stated that he purchased the gun solely to protect himself when delivering pizzas in Detroit. He further stated that he accepted full responsibility for the reckless and foolish things he said and viewed, but that he never meant any of the things he said, apparently in regard to his support of ISIS and his intentions to participate in terrorist inspired activities. Abu-Rayyan expressed his profuse apologies to his family and especially to his father, and lamented that he had let them down and deviated from the true meaning of Islam, which he stated is a

peaceful religion which has nothing to do with ISIS.  He expressed his view that he had been raised in a good family and that his father is the epitome of the American dream.

Abu-Rayyan's statement at sentencing that he was raised by a good family living the American dream, makes his choice to view and support ISIS jihad propaganda while stating his intentions to shoot up a church and kill a police officer, all the more disturbing.  Just as mental illness cannot explain away his conduct, he cannot blame an abusive or neglected childhood for his conduct either.  Abu-Rayyan's statements that his incarceration over the past year has allowed him to clear his mind and that he has never posed and will never pose a threat to the public is self-serving.  While this court certainly hopes that Abu-Rayyan's statements of remorse and rehabilitation are in fact true, they are too little and too late to persuade the court that a guideline sentence is sufficient to protect the public.  As the government points out in its sentencing memorandum, the court should not give much weight to Abu-Rayyan's eleventh-hour assertions of remorse as any prisoner in his shoes would be willing to do the same.  Also, even considering the letters he drafted to his family from prison which he asserts show his genuine remorse, one of those letters

hints at blaming the FBI UCE for his predicament, stating "this whole situation was because I wanted to get married."  (Doc. 104, Ex. A PageID 890).

Along these lines, the court considers Abu-Rayyan's argument in his sentencing memorandum and at the sentencing hearing that he was essentially entrapped by the UCE to make incriminating statements he did not really mean in order to impress the informant whom he believed was ready to commit Jihad because her husband had been killed in Syria by anti-ISIS forces, and that another family member was killed by Shiite (anti-ISIS) forces in Iran.  (Doc. 104 at PageID 802, R. 61 and exhibits).  There is a significant problem with this argument.  Abu-Rayyan began viewing and expressing his support of ISIS terrorist activities at least one year before the informant entered the picture.  Prior to contact with the UCE, Abu-Rayyan attempted to buy the gun at issue here, went to the shooting range and fired an AK-47, and then posted pictures of himself with the AK-47 with the caption: "Sahwat hunting."  Prior to contact with the UCE, Abu-Rayyan sent his brother a text message including a beheading photograph and announcing that "this would be a perfect time to do a istishadi (martyrdom) operation."  While it is true that Abu-Rayyan begged the UCE

not to hurt herself, he also discussed with her his plan to shoot up a church and assassinate a police officer.  As the government aptly points out, Abu-Rayyan may claim he made the disturbing statements merely to "impress" the UCE, but anyone who has been victimized by a terrorist attack would find his ideas far from impressive.

The court is also persuaded by the government's argument that the guideline range here does not reflect the threat that he poses to public safety.  The guidelines range in this case is based solely on possessing guns while addicted to marijuana.  (PSR ¶¶ 24-35).

## 2.    An Above-Guidelines Sentence Will Deter Others

A defendant's sentence must "afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(B).  As the Sixth Circuit has observed, it is a defendant's sentence, as much as his conviction or negative publicity, that provides deterrence.  *United States v. Robinson*, 669 F.3d 767, 777 (6th Cir. 2012).  Deterring those contemplating terrorist activities is vindicated by imposing an above-guidelines sentence here.  While many terrorists may be contemplating their own martyrdom operation, as Abu-Rayyan was in this case, sending the public a message that even the first steps to commit acts of terrorism carry serious consequences, may deter

-22-

those planning such operations from doing so.  If Abu-Rayyan is sentenced to the little over a year that he seeks, the court would be sending the message that those who take the initial step toward planning a terrorist attack will face only a slight jail time and then will be quickly released so they can try again.

Abu-Rayyan argues that the time he has spent in prison is sufficient to deter him from participating in the conduct that has put him in the predicament in which he now finds himself.  Whether or not Abu-Rayyan has been sufficiently deterred from repeating his criminal activity, however, is only one part of the equation.  The other part is whether *others* are sufficiently deterred, the concept known as "general deterrence." *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) (citing *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010)).  Given the conduct at issue here, the court finds that a 15-month sentence simply is not sufficient to deter others from engaging in similar criminal conduct.

**3.    The Seriousness of the Offense Warrants an Above-Guidelines Sentence**

Another factor that the court considers in determining an appropriate sentence is the seriousness of the offense.  18 U.S.C. § 3553(a)(2)(A).  Here, defendant pled guilty to making a false statement to acquire a firearm

in violation of 18 U.S.C. §§ 922(a)(6), and possession of a firearm by a

prohibited person.  18 U.S.C. §§ 922(g)(3).  These violations were based

on Abu-Rayyan's admitted use of marijuana and his lying about it on an

ATF form and his illegally possessing a gun while using marijuana.  Abu-

Rayyan blames his marijuana habit for making him depressed and

impeding his judgment.  In fact, he claims his addiction to marijuana, in

addition to his immaturity and depression, (Doc. 104 at PageID 810)

caused him to support ISIS terrorist activities and to discuss with the UCE

shooting up a church and killing the police officer who arrested him.  Under

the circumstances where Abu-Rayyan was using marijuana while buying

and possessing a firearm, while viewing and positively commenting on

gruesome ISIS terrorist such as beheadings, torture, and burning people

alive, his crime becomes much more serious than if he was just buying a

gun for personal protection, as he argued he was doing at sentencing.

When the court considers all of the facts surrounding Abu-Rayyan's

illegal purchase and possession of a gun while heavily using marijuana, his

crimes are a matter of significant seriousness.  The most compelling

aggravating factor in assessing the seriousness of his offense is that

shortly after Abu-Rayyan was arrested, he attempted to buy another

firearm and went to a firing range, practiced using an AK-47, and then posted pictures of himself holding the AK-47 with the label "Sahwat hunting."  Given this conduct, his illegal possession of a firearm and his false denial of his marijuana use to acquire a firearm, are serious offenses which require a significant upward variance from a guideline sentence, especially because these behaviors occurred while defendant was engaged in the threatening conversations discussed above.

### 4.    Need and Care and Education

Finally, Section 3553(a)(2)(D) instructs the court to consider providing the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  The court is mindful, however, as Abu-Rayyan points out, that imprisonment is "not an appropriate means of promoting correction and rehabilitation."  18 U.S.C. § 3582(A); *Tapia v. United States*, 564 U.S. 319, 321 (2011).  Both Dr. Danuloff and Dr. Tillbrook recommended mental health counseling.  The PSR noted that Abu-Rayyan has a significant substance abuse history for which treatment may be beneficial.  (PSR ¶ 100).  The court may recommend that Abu-Rayyan receive mental health and substance abuse

treatment while incarcerated, and in this way improve the expectation that

defendant can be safely released into the community at a future date.

**5.    Plea Agreements of other Defendants Irrelevant**

Abu-Rayyan seeks to rely on two Rule 11 Plea Agreements: one filed

in this district (Defendant's Sentencing Exhibit B, *United States v. Lanton*,

16-20679 (Doc. 22)), the other an unfiled document which, until introduced

at the sentencing hearing in this case, was not a matter of public record.

(Defendant's Sentencing Exhibit A, *United States v. Gregerson*, 16-20552).

Abu-Rayyan argues these plea agreements support the imposition of a

guideline sentence here in order for him to be sentenced in parity with

those sentenced for similar crimes.  The government responds that this

court cannot rely on those Rule 11 Plea Agreements in determining an

appropriate sentence here as the court simply does not have enough facts

regarding those agreements before it.  As the government points out, those

plea agreements may be based on many factors, such as the

inadmissibility of evidence, the unavailability of witnesses, whether the

defendant was facing deportation, whether new case law impeded

prosecution, whether exculpatory evidence existed, and whether the

defendant was cooperating.  Based on the plethora of information that may

have informed those plea agreements, for which the parties and the court are not privy, those plea agreements are not relevant here and do not form a basis for the court's sentencing decision in this case.

After the sentencing hearing in this case, defense counsel filed an addendum under seal. (Doc. 111). The court refers to that addendum here without sealing this order as there is no reason why the matter should not be a matter of public record. In that addendum, defense counsel states that the record in *United States v. Gregerson*, 16-20552, now indicates that the plea agreement in that case pending before Judge Tarnow did not involve cooperation by the defendant. True or not, the plea agreement in *Gregerson* has no bearing on the instant matter. Gregerson is not a co-defendant and is not charged with the same crimes.

### 6.    First Amendment Concerns

At oral argument, defendant argued that his conduct was protected

by the First Amendment, relying on *United States v. Shehadeh*, No. 1:10-

CR-1020 (ENV), 2013 WL 6049001 (E.D.N.Y. Nov. 14, 2013).  *Shehadeh*

does not support counsel's argument that a guidelines sentence is

warranted here.  In *Shehadeh*, a jury convicted Shehadeh of "three counts

of making material false statements to government agents, . . . and for lying

repeatedly to federal agents about his attempt to travel to Pakistan in 2008

to join a violent insurgent group of Islamist terrorists."  *Id.* at *1.  At

sentencing, the court granted an upward variance from the guidelines

range because of the seriousness of Shehadeh's conduct, which involved

attempting to join the army while stating his intention to two friends that he

was doing so to join violent international jihad, and to gun down his

comrades.  *Id.*

It is true, as defense counsel quoted at the sentencing hearing, the

sentencing judge in *Shehadeh* specifically noted that "the Court does not

find the fact that Shehadeh created and administered websites

regurgitating certain jihadist propaganda to be an appropriate basis for

punishment consistent with the First Amendment."  *Id.* at *4, n.5.  But the

defendant's statements to his friends about his evil intentions to commit jihad, combined with the steps he took toward that end by attempting to join the army, was sufficient to support an upward variance.  *Id.* at *4.  Although the sentencing guidelines called for a sentence of between 63 to 78-months, the court imposed an above-guidelines sentence of 156 months, amounting to approximately 8 years over the advisory range.  *Id.* at **1, 4.

Like *Shehadeh*, here the sentencing variance is not based on Abu-Rayyan's mere trolling of ISIS propaganda, but is based on the fact that he was posting and stating his support of ISIS terrorist activity at the same time he purchased a gun, attempted to purchase another gun, practiced shooting an AK-47 at a firing range, then posted pictures of himself doing so captioned as "Sahwat hunting," while at the same time telling a government UCE that he wanted to shoot up a mega-sized church near his place of employment, and was planning to kill the police officer who arrested him while the officer was in the hospital.  This is not merely viewing or maintaining an ISIS website, as the *Shehadeh* court found was insufficient, standing alone, to support an upward variance.  2013 WL 6049001, at *4 n.5.  Rather, this is the sort of serious conduct that the

*Shehadeh* court found was sufficient to vary upwards to give an above-guidelines sentence.

The Supreme Court has held that a defendant may be subject to an enhanced sentence because his crime is based on the race of his victim, and has rejected arguments that such consideration penalizes offensive thought in violation of a defendant's First Amendment rights. *Wisconsin v. Mitchell*, 508 U.S. 476, 487-89 (1993). The Supreme Court has observed that the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Id.* at 489. So too here. It is appropriate for the court to consider Abu-Rayyan's Twitter tweets and the ISIS propaganda downloaded to his cell phone, which included wallpaper on his phone showing an ISIS fighter holding the severed head of a woman, as it informs the court's consideration of what Abu-Rayyan may have intended when he purchased and attempted to purchase a firearm, when he practiced shooting military type weapons, when he told his brother he wanted to participate in a martyrdom operation, and when he expressed his plans to murder innocent victims to the UCE.

As the Supreme Court has noted, "[a] defendant's membership in an organization that endorses the killing of any identifiable group" may be

relevant to the determination "into whether the defendant will be dangerous

in the future." *Dawson v. Delaware*, 503 U.S. 159, 166 (1992). While

defense counsel is correct that the First Amendment may protect the mere

viewing and dissemination of ISIS propaganda, when that viewing is

combined with conduct suggesting an intention to carry out jihadist

activities, the court is well within its realm when it considers those

background facts to inform the court's determination of the defendant's

motives and intent.

## 7.    Waiver

Finally, the court considers defense counsel's argument made at the

sentencing hearing on March 13, 2017, that the government waived the

argument for an upward variance because the government did not file

formal objections to the PSR which recommended a guideline sentence.

Notice that the government is seeking an upward variance is sufficient

when set forth in the government's prehearing submission. Fed. R. Crim.

P. 32(h). The notice need not be in formal objections to the PSR; notice in

a sentencing memorandum will suffice. Fed. R. Crim. P. 32(h); *see United

States v. Gleason*, 277 F. App'x 536, 543 (6th Cir. 2008) (affirming upward

variance based on bad-conduct after offense discussed in the

-31-

government's sentencing memorandum).  The government filed a
sentencing memorandum on March 2, 2017 seeking an upward variance
and asking for a sentence of 96-months.  Abu-Rayyan responded to that
sentencing memorandum at two sentencing hearings, the first held on
March 13, 2017, the second two weeks later, on March 27, 2017.  The two
sentencing hearings spanned nearly four hours.  Defense counsel spoke at
great length.  In addition to his thorough sentencing memorandum and
argument at the two sentencing hearings, defense counsel also submitted
an addendum in support of his sentencing memorandum on March 20,
2017, which this court has duly considered.  Under these circumstances,
Abu-Rayyan had sufficient notice that the government intended to seek an
upward variance, and there is no prejudice to Abu-Rayyan because the
notice was given in a sentencing memorandum rather than in objections to
the PSR.

In reaching its decision here, the court recognizes that the advisory
range is 15-21 months, and this range still serves as grounding for the
specific period to be chosen by the court in determining the length of
confinement.  Abu-Rayyan's significant work history, strong family support,
and his expressions of abject remorse supports the idea that a sentence

can be effective to accomplish the purposes of § 3553(a) with a period that is less than that asked for by the government, but significantly more than that advocated by Abu-Rayyan.   In sum, the above-guidelines sentence of 60-months is no greater than necessary and is sufficient to realize the objectives of § 3553(a) to protect the public, to deter criminal conduct, and to recognize the seriousness of the offense.

**IT IS SO ORDERED**.

Dated:  April 6, 2017

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on April 6, 2017, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

---