UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


**UNITED STATES OF AMERICA,**

                    Government,

                                          **HONORABLE GEORGE CARAM STEEH**

        v.
                                          **No. 16-20098**

**KHALIL ABU-RAYYAN,**

                    Defendant.
_____/

**SENTENCING HEARING**

**Monday, March 27, 2017**

                    -   -   -

APPEARANCES:

For the Government:              RONALD W. WATERSTREET, ESQ.
                                Assistant U.S. Attorney


For the Defendant:              TODD A. SHANKER, ESQ.

                    -   -   -


          *To Obtain Certified Transcript, Contact:*
      *Ronald A. DiBartolomeo, Official Court Reporter*
        *Theodore Levin United States Courthouse*
        *231 West Lafayette Boulevard, Room 238*
              *Detroit, Michigan  48226*
                *(313) 962-1234*

        *Proceedings recorded by mechanical stenography.*
      *Transcript produced by computer-aided transcription.*

1                           **I  N  D  E  X**

2    _____ Page

3    Sentencing hearing                                           3

4

5

6

7

8

9

10

11

12

13

14

15                      **E  X  H  I  B  I  T  S**

16    Identification_____ Offered    Received

17    Government Exhibit 1                    6

18    Government Exhibit 2                    7

19    Government Exhibit 3                    8

20    Government Exhibit 4                   11

21    Government Exhibit 5                   11

22    Government Exhibit 6                   12

23    Government Exhibit 7                   20

24

25

                    *16-20098; USA v. KHALIL ABU-RAYYAN*

1                                 Detroit, Michigan
2                                 Monday, March 27, 2017
3
4                         -    -    -
5               **THE CLERK:**  Case Number 16-20098, United
6      States of America call Khalil Abu-Rayyan.
7               **THE COURT:**  Good morning.
8               **MR. WATERSTREET:**  Good morning, your Honor.
9      Ronald Waterstreet on behalf of the United States, along
10     with U.S. Attorney's Office paralegal Darlene Secord.
11              **THE COURT:**  Welcome.
12              **MR. SHANKER:**  Good morning, your Honor.  Todd
13     Shanker on behalf of Mr. Abu-Rayyan who is standing to my
14     left.
15              **THE COURT:**  Okay.  Welcome.  You can take a
16     seat.  I want to say that I'm sorry for the delay in
17     getting started today.  Apparently, the transport was late
18     arriving, and so we have to have the defendant here of
19     course.  The Court has heard significant argument thus far
20     on the application of the sentencing factors to support or
21     not the government's request of the Court vary upwards
22     from a guideline of 15 to 21 months to impose a sentence
23     of 96 months, and the defendant, of course, has argued for
24     the Court to impose an advisory guideline range sentence
25     within the range of 15 to 21 months.

                    *16-20098; USA v. KHALIL ABU-RAYYAN*

1        Mr. Waterstreet, you were speaking, I think, when

2    we interrupted you and broke for the weather the last time

3    we were here.

4            **MR. WATERSTREET:**  Yes, I was.  Thank you.

5            **THE COURT:**  All right.

6            **MR. WATERSTREET:**  Your Honor, as a clerical

7    matter, I assume I'm going finish, the defendant is going

8    to speak.  Is there going to be any rebuttal for either

9    parties after the defendant speaks?

10           **THE COURT:**  I'm here if it take until noon,

11   but then food calls.  So I don't know at that point, but

12   yeah, I think you can present as much as you like.

13           **MR. WATERSTREET:**  Thank you very much, your

14   Honor.  And because we stopped about two weeks ago, I want

15   to make sure the Court recalls where I was at at the time

16   I sought the Court to sentence the defendant to at least

17   96 months because of his threat to the public, and I think

18   I believe I pointed out to the Court that the courts are

19   encouraged to vary upward when the guideline range does

20   not adequately represent the conduct of the defendant, and

21   I think I supported that with some case law that suggested

22   that the defendant is the person to be sentenced, not just

23   the crime to which he pleads guilty to.

24       And I outlined the four goals under 3553, which is

25   protection of the public, deterrence, reflect the

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    seriousness of the offense, and also to impose any

2    educational or other training that's required in order for

3    the defendant to be able to reintegrate into society, and

4    I focused on the two main ones in which the courts have

5    been consistent.

6         What I am talking about is protection of the

7    public and deterrence, and I pointed out to the Court why

8    the defendant himself is unable to, by relying on his

9    claim to the Court, that he is no longer a danger to the

10   community.  We know through his own actions that he lacks

11   the self-control, and I gave the Court examples of the

12   phone he used, and how he used that phone, and then got a

13   new phone and started downloading all of this -- these

14   documents, and I believe I presented to the Court as part

15   of a detention hearing, a sealed packet of the type of

16   items that he was downloading.  And the same thing, I gave

17   an example of him using firearms and his aggression and

18   his assaultive behavior.

19        Then I believe I turned -- and this is where I

20   was -- that we stopped the proceedings -- was when I

21   turned to the fact that we really cannot rely upon his

22   family or his father to protect the public and to deter

23   the defendant, because obviously he was in their care, and

24   they were fully aware of many of his plans, and they did

25   nothing to stop him, to deter him, and I understand, and I

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    believe I pointed this out that a family is put in a very

2    awkward position at that time.  A loved one of theirs is

3    professed their desire to engage in some horrific

4    activity, and there is the dilemma, do I go to law

5    enforcement and tell about my love one and get them in

6    trouble, or do I keep silent, and it's very clear what

7    they decided to do.  They decided to remain silent.

8         And so we cannot reply upon them, and I've

9    provided the Court some examples of even going beyond

10    that, for example, the father trying to provide a rosy

11    picture of the defendant's actions saying he's a gentle

12    individual, and he's never had any problems in school when

13    the Pre-Sentence Report says otherwise, and statements the

14    defendant made to his own doctors stated otherwise, and I

15    used that as Government Exhibit Number 1.  That was Page 4

16    of Dr. Danuloff's letter to this Court dated March 29,

17    2016.

18         Now I believe that I went through and started

19    marking exhibits, and I think I did a very horrible job of

20    making sure that the right numbers were correctly marked

21    on the exhibits, and I want to apologize to your court

22    reporter because I made his life a little bit more

23    difficult.

24         So what I would like to do is make it very clear

25    that one of the exhibits that I handed up was an excerpt

*16-20098; USA v. KHALIL ABU-RAYYAN*

1      of a conversation that he had on January 28, 2016 with the

2      undercover, in which he outlined the fact that his father

3      knew full well that he wanted to engage in this martyrdom

4      operation, and that he -- that the defendant supported

5      ISIS, which he referred to as dawlah, and that he wanted

6      to do a martyrdom operation, and I have the audio clip of

7      that, and I want to mark that and the transcript as

8      Exhibit Number 2.  I believe I have that.

9                    **MR. SHANKER:**  Your Honor, I would just point

10     out that the date on this, according to Mr. Waterstreet's

11     exhibit, is January 18th, not January 28th.

12                   **MR. WATERSTREET:**  I'm sorry.  It is the 18th,

13     your Honor.

14                       **THE COURT:**  Okay.  Thank you.

15                   **MR. WATERSTREET:**  Thank you very much.  I

16     appreciate that.

17          And I've already handed that up to the Court, but

18     I to make sure we don't awry again on the exhibit

19     numbering, and as well as the audio portion, and if the

20     Court wishes, I can play that audio clip.  We have it

21     queued up ready to go, but it says exactly what it says

22     here.

23          The defendant said, even my dad, he knows that I

24     support dawlah, the state, referring to ISIS.  You know,

25     he tells me everyday, you know, be careful.  Watch your

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    postings.  Be careful who you talk to.  You know, I told

2    him numerous times that I wanted to make jihad.  I do -- I

3    want to do an istishhadi, a martyrdom suicide operation.

4    I told my dad that.  He doesn't support it, of course, but

5    he tells me all the time -- and it's unintelligible.  I

6    have to listen to him first.

7         So we know that his family was aware of this, and

8    then I moved another exhibit, which was Government Exhibit

9    Number 3, which was showing that the family was well aware

10   of this going back to 2014 when there was a text message

11   on the defendant's old phone warning him that people are

12   watching you, political views.  Watch what you say when

13   you use -- when you did texting and go on the internet.

14        **MR. SHANKER:**  Your Honor, I did previous

15   object to this, and I object on a number of basis.

16        Number one, this is something that apparently has

17   been retyped from some source that we don't know where it

18   came from.

19        One of the things that's been interesting in this

20   case is that there was no forensic evaluation of the

21   phones.  So we don't have the detail information where

22   each message came from, and this is just -- I don't know

23   what this is.  I don't know who's speaking here, who wrote

24   these text messages, and I object to it.

25        There's no foundation for it on a number of

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    different levels, and that is my objection to it.

2              **THE COURT:**  Okay.  Mr. Waterstreet?

3              **MR. WATERSTREET:**  Your Honor, those were

4    provided as part of an analysis.  There was a phone

5    analysis, and those were Government Exhibits -- from pages

6    on discovery of 790 to 799, and those are, in fact, a

7    forensic analysis of the phone, and that's how we ended up

8    getting these, and this is the ongoing conversation, the

9    back and forth between an individual and the defendant.

10             **MR. SHANKER:**  Your Honor, I would just point

11   out that first of all, providing something in discovery

12   from a phone does not -- is not equivalent of forensic

13   evaluation.  They dumped a number of things from phones

14   that had been seized as part of discovery.  That's not the

15   same thing as a forensic evaluation where you can actually

16   trace where the message came from.  It's not the same

17   thing as getting phone records that trace who sent the

18   message and from what region and what time.

19             **THE COURT:**  Let me interrupt for just a

20   minute.  So most of these are sent from a telephone number

21   that is identified here.  Is it your position that number

22   is not tied to your client?

23             **MR. SHANKER:**  I don't know if it is, but the

24   one thing that I also know is this is something that was

25   retyped.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1          **MR. WATERSTREET:**  I'm showing him the pages

2    of the forensic analysis that was shown and was sent to

3    the defendant's phone, and back and forth --

4          **THE COURT:**  Did you say sent to or from?

5          **MR. WATERSTREET:**  To.  The to and from the

6    defendant's phone.  The to part is, do not use the

7    internet for any political views.  Everyone is watching.

8    Then sent from his phone, he's claiming it's just

9    research.

10         **THE COURT:**  This is in the same call?

11         **MR. WATERSTREET:**  These are back and forth.

12   Time period is 7:50 p.m., 7:50 p.m., 7:51 p.m., 7:51 p.m.

13         **THE COURT:**  Are these text messages?

14         **MR. WATERSTREET:**  These are text messages

15   back and forth.

16         **THE COURT:**  I see.  So --

17         **MR. SHANKER:**  Just one moment.  This doesn't

18   make sense to me because the to and the from on this sheet

19   that he is showing me are from the same number.

20         **MR. WATERSTREET:**  One is sent to, and one is

21   sent from.  It sent to his phone, and then he sends it

22   from his phone.

23         **MR. SHANKER:**  Nowhere does it say who sends

24   the messages.

25         **MR. WATERSTREET:**  That's correct.  It does

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    not.

2           So obviously, two years ago somebody was very

3    concerned about him keeping his eyes open and not making

4    stupid decisions by putting his political views online.

5           Further proof that the family knew about his

6    activities and did not forewarn to protect the public, was

7    recovered from his new phone.  There is a forensic

8    analysis from that as well, which was an exhibit that we

9    attached from Government Exhibit 88, which is Exhibit C,

10   which I will mark as Exhibit Number 4, which is the ISIS

11   flag the defendant sent out on October 22nd, 2015.

12          Now the timing of this rather important because

13   this is right around the time that he just went and

14   practiced shooting with the AK-47, and indicated that he

15   was a follower of ISIS by also posting a photograph of

16   himself, posing with the AK-47, and making the ISIS sign

17   with his finger.

18          Then on October 25, 2015, which is again shortly

19   after his arrest by Detroit Police Department, he sent a

20   text photo to his brother Adam, which is Exhibit Number

21   5 -- and this is the one that I moved to have sealed, and

22   we have whited out Adam's cell phone number -- but this is

23   a picture that he sent to his brother on October 25, 2015,

24   which is again, now about a week and half after he

25   practiced shooting with that AK-47, and there are two

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    pictures attached to this exhibit, one is the actual email

2    as it appears -- I mean, the text message as it appears

3    with the image to his brother, as well as the image itself

4    that was found elsewhere stored on his cell phone, and

5    it's a very graphic photograph of a person cutting

6    somebody's head off, and this was -- the defendant felt

7    this was important enough to share with his brother.

8         Another example was a text message that he sent to

9    his brother, which was an exhibit again placed on -- in

10   filing our Number 88.  It was Exhibit E, but I'll mark for

11   this matter as Exhibit Number 6, and this is a message

12   dated December 12, 2015.  Again, this is before he began

13   speaking with the undercover employee, which happened a

14   few days later, in which the defendant says, this would be

15   a perfect time to do an istishhadi operation, which is a

16   martyrdom operation.

17        So the brother was sent a photograph of the ISIS

18   flag.  He's been shown and sent a graphic photo of

19   somebody being beheaded, and then being told that his

20   brother wants to do a martyrdom operation.  Yet, did not

21   provide any information to the authorities.  So we cannot

22   rely upon the family to warn and protect and stop and

23   deter the defendant.

24        And we know since the defendant can't control

25   himself, the family is unable or unwilling to protect the

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    public, your Honor I submit to the Court it would be

2    unfair to place that burden on the Probation Department.

3    They are not trained to equip -- or equip to deal with

4    ISIS inspired cases.  It really comes down to this Court

5    to step in and protect the public and deter the defendant,

6    because we know even when confronted by the FBI, the

7    father refused to talk to the FBI about his son.  So we

8    know the only person that is left is this Court.

9         Now if I may, I would like just spend a few

10   minutes responding to some of statements that were made

11   during defense counsel's colloquy to the Court.  The

12   reason why, there were some things that were said that

13   will perhaps leave a false impression in the Court's mind

14   of how the timing of events took place, and by making

15   reference to a statement that the undercover employee made

16   at the -- towards the very end of their discussions.  It

17   made it appear as if the defendant had no interest

18   whatsoever of being involved in this type of activity;

19   that it had been suggested on more than one occasion that

20   he was somehow entrapped into doing this.  We know his

21   past conduct, and what he has put online, and what he has

22   said to his family and his brother belie that.

23        But even if we look at the conversations back and

24   forth themselves, it's clear that that's just not the

25   situation.  This is something that was driven solely by

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    the defendant throughout this communication, and in order

2    to move quickly through this, I will paraphrase a lot of

3    this.

4         It wasn't until mid-December that the undercover

5    employee and the defendant began talking to each other,

6    and they were talking back and forth to each other from

7    about December 15th all the way up to about February 3rd,

8    and during that conversation, the first part of the

9    conversation, I would say from early December until --

10   until December 23rd, it was just general engaging

11   conversation, beginning to build a little trust with each

12   other, and at that point the parties began to reveal a

13   little bit more about their thoughts and what their

14   concerns weren't.

15        On December 23rd, they moved to an encrypted

16   method of communicating, which means up to this point it

17   was on Twitter, which depending upon the settings that you

18   place on Twitter, anybody could have read these

19   communication.

20        But it wasn't until December 23rd that they moved

21   to this encrypted method by which they could share their

22   thoughts openly to each other, but not openly to the

23   world; that we really begin to see a different side of the

24   defendant.

25        It was right on December 24th he began to reveal

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    his anguishes about how he had a physical fight with his

2    cousin, and how so upset he was that he had to work 90

3    hours a week, and that nobody cares about him, and he even

4    mentioned on the 24th that he want to do a martyrdom

5    operation.

6         Then on the 26th, the defendant starts talking

7    about marriage, and the undercover makes it clear from the

8    very beginning that she has no interest in marriage or

9    children.  He discusses that he wants to have a marriage

10   and a family, and the undercover says, if that's what you

11   want, I will be happy for you, brother, Akeem.  May Allah

12   grant you a good wife and child, and I respect your desire

13   to start a family, but I don't want to marry.  Don't

14   worry.  You'll meet somebody.

15        So it is clear from the very beginning, this is

16   not anything that the undercover is trying to entrap him

17   into, luring him into a love interest.  It is very clear

18   from the very beginning, the undercover has no interest in

19   marrying the defendant.

20        Then he says, don't you want to have children,

21   watch them grow up, and the undercover says, honestly, no.

22        Beginning in January without any encouragement,

23   without any statement of the undercover wanting to engage

24   in any violence, this is when the defendant reveals that

25   his father took the gun and outlines his plan to slaughter

1    the innocence at a church, and the undercover tries to get

2    him to rethink his plan, and all through this process, if

3    the Court were to read through the entire communications

4    between the two --

5             MR. SHANKER:  Excuse me.  What date are we

6    talking about here?  I mean, January 8th is when that

7    conversation about church takes place.

8             MR. WATERSTREET:  Right.

9             MR. SHANKER:  Okay.  I just want to make sure

10   that the date is on the record, because we went from the

11   23rd and 24th to January --

12            MR. WATERSTREET:  Well, I'm trying to move

13   quickly through this counsel.

14            MR. SHANKER:  Very good.

15            MR. WATERSTREET:  If the Court wishes, I can

16   go date by date, but I don't think we would gain much, and

17   I think I've maybe gained the ire of the Court by taking

18   so long.

19         On January 8th, the undercover asked him to

20   rethink his plan, and what ends up happening, your Honor,

21   it is very clear that as each time the defendant brings up

22   these horrible ideas that he has in his plans, the

23   undercover does her best to try to redirect him, suggest

24   otherwise, defuse the situation and prevent him from doing

25   this, and it happens over and over again.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1          The undercover suggests that maybe he should

2     rethink this whole idea of the church, and suggest that,

3     you know, these women and children that you want to go

4     kill, perhaps one of these children will grow up and be a

5     Muslim, and you're going to end up killing a potential

6     Muslim and, he says, no, no.  I can't say what this person

7     is going to be in the future.  So I must do what I have to

8     do now.

9          And then the undercover says, well, aren't you

10    afraid of death?  I'm afraid to die.  I don't want to be

11    part of this, and then he chastised her.  If you're a true

12    believer, we cry for death, and she says -- tells him, I

13    don't know how to shoot anything, and he says, it takes

14    practice, and we know it takes practice because we saw

15    examples of him practicing with that weapon.

16         Mid-January of -- January 10th, he becomes upset

17    regarding his pending state offense.  He doesn't want to

18    go to jail for carrying a gun.  He says, I want to kill

19    someone so I go to jail for a good reason, and she pleads

20    him to calm down.  Please, calm down.  It's not healthy.

21    Then he responds, I'd rather kill myself than feel like

22    this, and the undercover says, please.  Don't say that.

23    It's haram  or a sin or to kill yourself.

24         Then he talks about his anger problems, about how

25    he wants to hurt people, stab them, shoot them, skin them

*16-20098; USA v. KHALIL ABU-RAYYAN*

1   like sheep, and the undercover says, you know, it's really

2   good Khalil that you're getting this out and admitting

3   that you need help.  Certainly, not encouraging him to

4   engage in any of this.

5        Then the undercover asks him, is this anger?  Is

6   this anger or is this jihad?  He said both.  There is no

7   jihad without anger.

8        And then this perhaps is rather troubling

9   conversation.  The undercover mentioned that a relative of

10  hers had some children, and this is a rather frightening

11  conversation, statements the defendant made concerning

12  that.  This was on January 17th.

13       The defendant says, I love babies, and the

14  undercover says, yes, indeed.  They bring hope into life,

15  a nice uplifting thought, and the defendant's first

16  response is when I have children, I'll make him a

17  mujahideen, which is basically an ISIS jihadist.  I will

18  teach him the dean.  I will train him physically and

19  mentally.  She says, wow.  How will you train him?  He

20  will be a baby.  I will start to train him to hold a toy

21  gun.  I will make sure he doesn't watch cartoons, just

22  dawlah videos.  I will dress him in mujahideen clothing.

23  Why would you do that when he is has to live with the

24  kuffar?  Khalil, it will be a hard life for him.  You're

25  right, but you always have to remind him, we don't belong

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    here.  When they are young, their mind is like a sponge.

2    We have to teach them early.

3         And what he wants to do is show these dawlah

4    videos, your Honor, and I referred to them before, and

5    they are part of Government Exhibit B as part of our

6    sentencing memo.  These are the videos that he delighted

7    in, and he wanted somebody to send to him.  And the video

8    that he asked them to be sent to him was "Kill Them

9    Wherever You Find Them"; a video which he agreed he never

10   smiled so much in his life when he was watching this

11   video; the same type of videos that he suggests that his

12   son will be shown instead of cartoons; a video of

13   executing captured people; a soldier with his hands bound

14   is begging for his life, and is executed by being shot in

15   the head.

16        The video also has people lying -- civilians --

17   people dressed in civilian clothes and with their arms

18   tided behind their back, lying down in a ditch and someone

19   is going by and shooting them in the head.  This is the

20   video that he wants to show his children.  He says, this

21   is going to be my fifth time watching it.  The video was

22   probably the best one yet.  Not a dull moment.

23        Your Honor, frankly, that second scene was as far

24   as I could watch.  As far as I could watch that particular

25   video, but this is the video that he wants to show his

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    children.

2          Towards the end of January, he is still concern

3    with the state case, and fears that an all white jury will

4    convict him based on his name and looks, and he says, just

5    want me to snap, and the undercover says, I'm here for you

6    to let out your feelings.  Don't blowup, and then she

7    tries to calm him.

8          He talks about suicide.  She tries to talk him out

9    of it by saying it's a sin to commit suicide.

10         He later talks about how -- he explains how Satan

11   talks to him.  He tells him to hurt people.  We'll have

12   fun hurting people.  He talks to me before I go to sleep.

13   He tells me to burn them alive.  Tie them up, cut out

14   their tongues, that you're doing my work, and she tries --

15   she doesn't try to encourage him.  She tries to discourage

16   him by giving him a prayer that he should say that would

17   make Satan go away.

18         Then he is upset that his case is being delayed

19   because one of the police officers who arrested him on his

20   firearm case had a heart attack was in the hospital, and

21   the defendant says, if I find out what hospital he is in,

22   I'm going to go there and kill him, and the undercover

23   points out that there's cameras everywhere, Khalil.

24   You'll never get away with it, and he says, I know I won't

25   get away with it.  It will be martyrdom operation.

                    *16-20098; USA v. KHALIL ABU-RAYYAN*

1        And I don't think you can be any clearer about not

2   encouraging the defendant to engage in anything than

3   Government Exhibit Number 7.

4        On January 21th, but that means you will die too,

5   Khalil.  Death is no joke.  You're life is ahead of you.

6   Why not change toward being a good son and praying and

7   working hard to be successful and reaching old age,

8   instead of having these filthy kuffar, make you pay your

9   life as a price for their Kufr, for their unbelieving?

10       So for counsel to suggest this was horrible that

11  the undercover was somehow trying to encourage him, that

12  every turn he makes mention of these horrible plans, the

13  undercover is discouraging him.

14       And his response is, the kuffar have won.  They

15  have let me become this way.  That was his explanation of

16  why he wasn't going to just pray hard, work hard and grow

17  old.

18       He talks about traveling to Libya.  He says it is

19  easier to travel.  There is mujahideen there, and he says,

20  I'm not going to stay here long.  I'll do a istishhadi

21  operation.  I'll get my car and blow myself up.  It was

22  this part that finally the undercover says, I'll go to

23  Libya with you.

24       Now what is going on at the same time is the

25  defendant is, through Twitter, the FBI is able to see that

1   he is speaking to somebody in Libya.  Who?  Do not know

2   whom, and he's also talking to this other woman on

3   Twitter.  Who?  The FBI does not know whom, and the

4   concern that the FBI has, and they make a tactical

5   decision that if he makes these plans to go to Libya, we

6   won't know about it.  If he decides to start talking to

7   this other woman and make plans with a woman who does want

8   to be married, does want to have children, that perhaps he

9   will get together with her, and he will engage in his

10   martyrdom operation that he has already outlined, and the

11   FBI will not be forewarn.  So it is at this point in time

12   that the FBI decides to make a tactical decision to say, I

13   will join you.

14        And it is at this point that the undercover says,

15   well, jihad is my dream too, and based upon the

16   conversations, it is very clear the defendant understands

17   that the undercover really doesn't personally believe to

18   engage in jihad, because shortly after that the undercover

19   talks about the fact that she was contacted by somebody

20   in -- from the Middle East, and at that point the

21   defendant concerned for her, now that he knows that she

22   may now travel with him, says, be careful.  They maybe a

23   spy.  Don't talk to them.  It is very easy to be caught up

24   and arrested, and then starts making plans of how he --

25   how they need to be careful when they go to the airport,

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    that he has to shave his beard, and that she has to wear a

2    scarf rather than a hijab because we can get stop at the

3    border.  But then he finally realizes, you know what?  He

4    comes to the realization that he can't leave right now

5    because he has a pending state case, and he makes that

6    clear.  He says we just can't leave right now, and if I

7    get a felony conviction, I will be on the no fly list, and

8    then he becomes depressed, and this what leads to the

9    conversation when we find out why he is depressed.

10           He is depressed because he tells the undercover in

11   a telephone conversation that he fears that law

12   enforcement will find the videos that he had on his first

13   cell phone, and he makes clear that there's a difference

14   between just watching videos and downloading them on your

15   phone because they know that you're part of that group.

16           So, your Honor, it is very clear that if you

17   follow the timeline, there's been no entrapment.  These

18   are all of the defendant's own ideas, his own plans, his

19   own intentions, and to say otherwise would be a

20   misstatement of the chronological order of these events.

21           During the defense counsel's statement, there was

22   a statement that he said that the doctors have found that

23   the defendant is not a danger, and I think perhaps defense

24   counsel may have misread this part of Dr. Tillbrook's

25   report because this Court has already concluded that the

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    other doctor lacks the training and background that render

2    any opinion concerning the defendant's dangerousness.

3            That only leaves Dr. Tillbrook's report, and the

4    report doesn't say that the defendant is not a danger to

5    the community.  It says it's based upon he is not a danger

6    to himself or the community based upon mental disease or

7    defect, and that's a big difference between the two.  It's

8    because the way the law is written, and Dr. Tillbrook was

9    trying to be very thorough in his report, and he did write

10   a very thorough report.

11           The interplay of 18 U.S.C. 4241 and 4246 is if the

12   defendant is sent away for a competency evaluation to the

13   custody of the attorney general, and in the process of

14   doing that custodial review if the doctor finds that

15   because of a mental disease or defect the defendant is a

16   danger to the community or danger to property -- or in the

17   words of the statute -- presently suffering from any

18   mental disease or defect as a result of which his release

19   would create a substantial risk of bodily injury to

20   another person or serious property damage to another, the

21   attorney general shall sent notice to this Court so the

22   Court can then conduct a hearing to determine whether

23   civil commitment is necessary to ensure the safety of the

24   public.

25           That is what Dr. Tillbrook's report is because on

                    *16-20098; USA v. KHALIL ABU-RAYYAN*

1    Page 11 of the 18 page report it says -- this is his

2    statement concerning about dangerousness -- given that

3    Mr. Abu-Rayyan is not presently -- is not presenting with

4    acute psychiatric symptoms, and is not a substantial risk

5    of causing bodily harm to another or serious property

6    damage to another, due to mental illness inpatient mental

7    health is not indicated at this time.  That is what he was

8    talking about when he said he is not a danger.

9          Counsel also suggests there was no evidence that

10   he really intended to follow through with any of these

11   things, and he says -- even the defendant's own words are

12   evidence.  The defendant's text messages to his brother

13   are evidence.  His statements to his brother are evidence.

14   The items that were found in the defendant's home are

15   evidence.  The photos that he posted on his Twitter

16   account are evidence.  Practicing with a gun he intended

17   to use in attack is evidence; in other words, other than

18   the evidence, there is no evidence.

19         The defense suggests the proof of lack of intent

20   is that since he didn't buy tickets to travel or didn't

21   have explosives or mass firearms, and he didn't train, he

22   really was not going to really follow through with this,

23   but frankly, your Honor, that argument misses the point,

24   because recent history has showed us that that's not

25   what's happening in the United States anymore.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1        People are not traveling from the United States

2    over to fight.  Not everybody is using explosives.  Not

3    everyone is amassing a stock pile of weapons.  We need to

4    look no any further than Orlando, Chattanooga, even

5    Columbus, Ohio at Ohio State University.  Even the

6    defendant acknowledged that he will commit my jihad here

7    if I cannot go to the Middle East.

8        He was trying to get guns.  They were seized.  He

9    tried to buy them again.  He was practicing with them.  He

10   took a photo of them and posted them on his Twitter

11   account.

12       He acknowledged for jihad on January 9th.  He can

13   use a knife.  He can use a car.  All he has to do is pick

14   a target, have a weapon, and we have found, your Honor,

15   there is no special triggering event that causes a person

16   to pursue their plan to murder.

17       Counsel referenced three cases in his statements

18   to the Court.  One was the Lanton case, the Gregerson case

19   and the Shehadeh case.

20       As to Lanton and Gregerson, people talking about

21   killing police officers and people talking about buying --

22   purchasing hand grenades are certainly very serious

23   matters, but I think counsel improperly attempts to

24   compare and contrast plea offers made to a defendant with

25   the government's sentencing recommendation to this Court,

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    because I believe counsel, as I say, is attempting to

2    equate apples with oranges.

3           Now I'm not the prosecutor on the Lanton case or

4    the Gregerson case.  From reading the documents that were

5    presented, I don't think defense counsel is, and this

6    Court certainly is not the court of review on either of

7    those cases, and so frankly, your Honor, to try to do a

8    factual analysis, none of us know enough about those facts

9    to do any type of distinction.

10          From my experience when it comes to plea offers

11   versus sentencing recommendations after a defendant pleads

12   guilty to -- like the defendant has here with no plead

13   agreement, there's a lot of factors -- a multitude of

14   factors that are non-3553 factors that go into what plea

15   offer to make, some that may or may not have existed in

16   the Lanton or Gregerson case.  Such as:

17          Was there a supression of critical evidence?

18   That didn't occur here.

19          Was there unavailability of witnesses?  We don't

20   have any proof of that.

21          Did the defendant agree to give up something in

22   exchange for something?  Sure, such as an appeal waiver or

23   agreed to be deported.

24          There was some new case law that may have

25   impacted the prosecution.  That does not appear here.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1              Was there exculpatory evidence or perhaps even

2      cooperation of the defendant, which may cause the

3      government to make a plea offer that it does?

4              And to clear up something else that counsel said

5      concerning the Gregerson matter, at one point counsel

6      misspoke, and I believe it was just that, a misstatement.

7      He suggested the government agreed to allow the defendant

8      to seek a downward departure.  The defendant in the

9      Gregerson has no right to seek a downward departure.  The

10     only issue is the upward departure.

11             And speaking of the Gregerson matter, in his

12     closing, defense counsel asked a rhetorical question,

13     clearly accusing the U.S. Attorney's Office of engaging in

14     unconstitutional conduct, and when he said, I certainly

15     hope that the offer on the Gregerson matter is not

16     impacted by the fact that he is a Caucasian versus the

17     fact that the defendant is a person of Middle Eastern

18     descent.

19             Now I'm sure the Court is well aware that cases

20     involving weighting matters such as the Gregerson and

21     Abu-Rayyan case are personally viewed by the U.S.

22     Attorney, and I'm compelled to defend the honor and the

23     integrity of Ms. McQuade for whom I work, and for whom I

24     advocate on her behalf from defense counsel's baseless

25     allegation take she is seeking a eight year sentence in

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    this particular case, based solely upon the defendant's

2    religion, ethnicity and or race.

3            He has offered no facts to support this, and

4    having failed to present any factual support, I can only

5    conclude, knowing the media is here right now, and has

6    been in the past, that the attacks on Ms. McQuade are

7    simply trying to inflame a certain segment of this

8    community, as I know this Court will never be moved by

9    such baseless allegations.

10           The last thing that I do want to talk about

11   concerning the cases that were brought up is the Shehadeh

12   case, and because defense didn't go deeply into the facts,

13   I was unable to recognize the case based solely on the

14   title, and that's United States versus Abdel Shehadeh,

15   2013 WL 6049001, out of the Eastern District of New York,

16   and it's a case that's similar to this case.

17           A defendant who posted pro-terrorist propaganda,

18   who expressed his desire to conduct a violent jihad, and

19   who was stopped by local and federal authorities before he

20   could follow through with his plan.  Rather than going and

21   planning to shoot up a church, it was Mr. Shehadeh's plan

22   to join the U.S. Army, and contemplating turning his

23   weapon on his potential future military comrades.

24           Just like this case, he was not charged with

25   materials -- attempted materials support of terrorism, but

*16-20098; USA v. KHALIL ABU-RAYYAN*

charged with making a false statement to the government.

The defendant was also charged -- this defendant

Mr. Abu-Rayyan was charged with making a false statement

to the government when he filled out that false document

for the firearm.

The charges in Shehadeh was making false

statements, 10O1 charges, making false statements to law

enforcement.  Two of the charges -- he was charged with

three charges, two of them involved terrorism, making a

false statement relating to terrorism, which would have to

deal with his planning to shoot up and kill U.S. military

personnel on behalf of ISIS, and one 10O1 charge, which

was not involving terrorism.

The statutory maximum for the 10O1 is eight

years per count, making a false statement not involving

terrorism is a five year statutory maximum.  There, the

government sought to have the terrorism enhancement under

4A1.3 to be enforced and therefore, the defendant's

guidelines would be 210 to 252 months or seek a variance.

Now we did not seek in our sentencing memorandum

for a sentencing enhancement under 4A1.3, but used it to

give the Court some idea of what it could do in going

upwards and what factors it could look to in fashioning a

correct sentence in this case.

Counsel in this case has suggested when he read

1    a footnote from that case, that a variance was

2    inappropriate in this instance because the defendant's

3    actions of re-tweeting jihad propaganda was legal and

4    protected by the First Amendment.

5            While in the Shehadeh case, the Court found that

6    the sentencing enhancement under 4A1.3 was inappropriate,

7    it clearly stated that he should be given an upward

8    variance.

9            As the Court noted because of the diligence of

10   federal and local officers, the defendant could not commit

11   his contemplated act, just like in this matter, and to

12   quote the court, it says, the stumble bum nature of

13   Shehadeh's conduct may have saved him from enhancement for

14   promoting the commission of such crimes under 4A1.3.  It

15   does not however diminish his serious, malevolent intent,

16   nor hold him harmless from considerations of what might

17   have been in determining the sentence imposed based upon

18   the totality of the circumstances, and the floodlight of

19   Section 3553.

20           The court went onto state, that good

21   investigative work and luck may have frustrated the

22   defendant's plans, and preventing the imposition of a

23   sentencing enhancement does not bar consideration by the

24   court of the serious and heinous objects of the

25   defendant's offenses.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1          It's stated, while the defendant Shehadeh

2    displayed a significant level of immaturity, there is no

3    question that his conduct was extremely serious, and

4    warrants a substantial period of incarceration, and citing

5    the factors of deterrence and protection of the community,

6    the court varied upward, sentenced him to 13 years, eight

7    years above his guideline range, running his two terrorism

8    cases the statutory maximum, each running them

9    concurrently, and adding a consecutive five year sentence

10   on the other false statement for a total of 13 years.

11         Your Honor, Mr. Abu-Rayyan cannot be released,

12   at least not in the near future without seriously

13   endangering the public.  Outside of prison, no one can

14   monitor him around the clock.  We know is family is not

15   willing to forewarn authorities to protect the public.

16         Counseling will not work.  Counseling -- when he

17   said that he dreamed of getting a gun and bringing it to

18   shoot everybody in church -- counseling has not worked;

19   that when he was clear that he couldn't buy a gun, he

20   tried to go out and buy another gun.  Practicing with a

21   gun, wanting to shoot up a church, knowing and completely

22   preventing him from acquiring a AK-47 and other dangerous

23   weapons, and no one can stop him from hatching new ISIS

24   inspired ISIS terrorism plan.  Thus, no one can guaranty

25   the public's harm from him.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1              Now I know the defendant will address the Court,

2       and I just want to talk about one more thing.

3              Counsel has made significant points on the

4       maturity that the defendant has gained over the 13 months

5       that he has been in custody, and citing solely the letters

6       that he -- self-serving letters that he has written to

7       family members to show that maturation process, and how

8       having been arrested in February that suddenly he matured,

9       and today he understands that he should be humbled by what

10      he did, and what he said was wrong, and what he planned

11      was wrong, and that he didn't intend to break the law,

12      but, your Honor, I submit that is a false argument, and I

13      will tell you why.

14             We've heard that same argument in the past.  One

15      month, just one month after he was arrested, he made a

16      sentencing colloquy, a sentencing allocution to Judge

17      Strong in the state case, where he said, I apologize.  I'm

18      a humbled man.  I embarrassed my family.  I didn't intend

19      to break the law.  This wasn't after a 13 month period of

20      maturation.  This was one month later in which he was

21      making self-serving statements to the court to try to get

22      him a break.

23             But the question is, if he claims it was only to

24      impress a woman, why is he sending beheading photos to his

25      brother?  Why is he texting his brother this is a good day

*16-20098; USA v. KHALIL ABU-RAYYAN*

1     to do a martyrdom operation?  If he claims all I was

2     trying to do is get attention from somebody, how do you

3     get attention from somebody by downloading gruesome

4     photos, the same photos that I presented before to the

5     Court?  How do you get attention by putting a screen saver

6     of a ISIS fighter holding a severed woman's head?  That is

7     for him and him alone.  There is no attention getting from

8     doing that act.

9           As I said, defendant's conduct has proved that

10    there is a compelling justification for the above

11    guideline sentence of at least 96 months.

12          And in closing, I just want to make one more

13    comment.  I had an opportunity as a result of the extra

14    two weeks to read over a little more closely some of the

15    statements that were made, and there was one statement, to

16    say it is shocking compared to all of the other shocking

17    things, I don't know how much more shocking it could be,

18    but this is what he said after explaining his plan to

19    murder all the innocent people at this church, after the

20    undercover suggested that perhaps he would be murdering

21    young Muslims, and he said it would be a bloodbath, and

22    why he picked the church, because they couldn't defend

23    themselves.  They wouldn't allow them to have guns there,

24    and then he explained how his father took this gun away

25    from him.  This is the thing that he said, and it's --

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    ironically enough, it appears on the last page of

2    Government Exhibit 107 -- I mean, Exhibit C of the

3    government's sentencing memorandum, the last page.  It is

4    a very chilling statement, which I previously overlooked.

5         He says, maybe down the line I can try again.

6    Maybe down the line, I can try again.

7         **THE COURT:**  Before you step down, assuming

8    the Court agrees an upward variance is called for, how do

9    you arrive at 96 months?

10        **MR. WATERSTREET:**  Well, your Honor, as the

11   Shehadeh case, and also there was another case that I

12   think -- it's the Lajqi case, which is 457 Fed App 246.

13   It's a Fourth Circuit case which affirms an upward

14   variance based upon just his claim, and that was a case in

15   which it was -- the guidelines were zero to six months,

16   and they approved -- affirmed a 60 month above a guideline

17   range.

18        The defendant's guideline range is -- we're asking

19   slightly above that 60 month additional guideline range,

20   and also if we look at the Shehadeh case for some

21   reference, a case like I said is strikingly similar, that

22   was a case in which the court went to the statutory

23   maximum on both counts.  I'm not asking for the statutory

24   maximum, your Honor.  The statutory maximum in this case

25   is 20 years.  I'm asking just shy of the statutory maximum

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    of one of those charges.

2             **THE COURT:**  Twenty not 10?

3             **MR. WATERSTREET:**  It's 10 years plus 10

4    years.  It's the 10 years for making the false statement

5    in the document, and 10 years for possessing the firearm

6    as a prohibitive person.  So the statutory maximum is 20

7    years.  Ms. McQuade did not ask for 20 years.  She

8    suggested eight years at least.

9         Any other questions, your Honor?

10            **THE COURT:**  Nope.

11            **MR. WATERSTREET:**  Thank you.

12            **THE COURT:**  Let's take a couple of minutes.

13

14                (Recess taken.)

15

16              (Proceedings resumed.)

17

18            **THE COURT:**  Mr. Shanker?

19            **MR. SHANKER:**  Thank you, your Honor.

20        Your Honor, the first thing that I want to point

21   out is that we've heard a number of basically Khalil's

22   worst statements that he made to the undercover Jannah,

23   the second undercover, and I think it's interesting that

24   Mr. Waterstreet is -- the government is basically saying,

25   well, these are all true.  These are true statements, true

*16-20098; USA v. KHALIL ABU-RAYYAN*

1      intent, and once again, the evidence -- other evidence in

2      this case all indicates to the contrary.

3            We have Dr. Tillbrook, government's own expert.

4      He found that Khalil -- that these were false statements.

5      He found that Khalil was credible in what -- in his

6      explanation of why he was making these statements to

7      Jannah.  He said that he did not -- he found that he did

8      not have the intent to harm anybody, and he talked about

9      just how uncomfortable Khalil was at that point in his

10     life, and we have to put this into perspective.

11           You know, he was -- had been arrested for the

12     first time in his life and charged.  So he was facing

13     that.  He had just gone through, what for him, was the

14     greatest love relationship of his life with the

15     government's first undercover Ghadda, who suddenly

16     disappeared when the family was getting ready to go down

17     and visit the undercover family in Columbus, Ohio.

18           So there was no question that there was a lot of

19     stress going on with Mr. Rayyan, and there's no doubt as

20     all the experts in the case pointed out, he was suffering

21     from depression, the substance abuse elements going on,

22     but the major point here is he did not intend to hurt

23     anybody.  He was saying things that Jannah wanted to hear,

24     and that's why I really right now want to correct the

25     timeline that the government just gave about Jannah's --

*16-20098; USA v. KHALIL ABU-RAYYAN*

1   you know, he basically says that she doesn't even talk

2   about committing jihad until late January.  That is

3   absolutely inaccurate.

4           **THE COURT:**  We have submitted transcripts in

5   our prior motions from December.  In December, Jannah

6   tells Khalil that she is ready to commit jihad.  She says

7   why?  She says my husband was killed by anti-ISIS forces

8   in Syria, and then there's a very emotional moment --

9   again, this is a month before the government is talking

10  about.  This is December 2015 where she says, I just had

11  two family members killed by anti-ISIS forces in Iraq, and

12  she's playing up the Sunni Shite divide, and -- and so

13  she's committed to this from the very beginning.

14          And I think it's interesting, you know, I agree at

15  the beginning of their conversations, she says I'm not

16  interested in marriage.  I agree with that.  That's

17  exactly why Khalil started shifting his statements, and

18  you know what, Judge?  We knows that these are horrible

19  statements, and he takes responsibility for it.  They were

20  reckless.  They were scary.  They are terrible statements,

21  but he didn't intend to commit any crime on anybody.  He

22  was trying to impress her.  The only way that he was

23  getting her attention is when he joined the conversation

24  about her family deaths at the hands of anti-ISIS forces,

25  and her devotion to being a jihadist.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1          And what's interesting as I pointed out, and the

2     government just left it off, is that there are numerous

3     times in December, January and February right before the

4     arrest where Khalil says, when she tries to get it down to

5     brass tacks and says, are you -- are you in?  She says I

6     have a connect name, Oum Maria in Syria, and I can make

7     this happen.  Are you in or are you out?  He says that

8     he's out.

9          When he is suicidal on February 1st, and she tries

10    to say well, you know what?  Committing suicide, that's

11    not good.  That's not in accord with Islam.  You need to

12    make it into an act of jihad, and we've submitted that

13    recording.  He says, I don't want to hurt anyone else.

14              **THE COURT:**  When was that?

15              **MR. SHANKER:**  That's February 1st.  So Judge,

16    the timeline as the transcript shows is very different,

17    and I think that's very, very important here.

18          There was also a reference by Mr. Waterstreet to

19    how -- well, you know, Dr. Tillbrook, all he was doing was

20    determining whether -- all he was doing is determining the

21    standard for civil commitment, and I think that's very

22    interesting because civil commitment, the standard is

23    whether he is a danger to himself or others on the

24    outside.  In a civil commitment standard, that's what

25    we're looking at, whether somebody on the outside who is

*16-20098; USA v. KHALIL ABU-RAYYAN*

1   out in the public, needs to be basically put in custody

2   against their will for treatment because they are danger

3   to themselves other others.

4           And the bottom line is, Dr. Tillbrook went far

5   beyond just that finding. As I've stated, he found that

6   Khalil did not intend to harm others, that he was a

7   credible -- after hours and hours of conversations, after

8   reviewing all the transcripts in the case, after reviewing

9   the discovery in the case, all of these items for 24 hours

10  a day observation with the staff for over a month -- he

11  came to the conclusion that the best thing for Khalil

12  would be community confinement -- or community treatment

13  in a dual program where he could get mental health

14  counseling and substance abuse treatment, and that's

15  significant. I mean, that's the government's expert

16  there.

17          So I think it is very important to keep that in

18  mind when I'm talking about the evidence of terrorism in

19  the case. We have his statements, but we have expert

20  findings that oppose that.

21          We have the search warrant. I mean, it's not like

22  they announced two weeks ahead of time, we will be at your

23  house and your business and your car, and go through

24  everything that you own. So start, you know, take care of

25  the evidence. They showed up unexpectedly. They searched

*16-20098; USA v. KHALIL ABU-RAYYAN*

1     everything.  They took every computer, every electronic

2     device, everything that this family owned, and they still

3     have it, and they found nothing.  Nothing to show a plan.

4     Nothing to show that -- no guns, no knives, no ammunition.

5     It was a completely false statement what he said, and we

6     know that -- that he is under surveillance during this

7     time.  They are watching him the whole time, and there's

8     no -- if they had the evidence, they could put a person up

9     right now and say, we saw him walking around with his AK,

10    but he didn't.

11            The other thing Judge, the government mentioned

12    the findings of Judge Strong -- or mentioned that Khalil

13    made that statement to Judge Strong.  I'm not sure what

14    the point is there, but I think it is important what Judge

15    Strong found because Khalil pled guilty and was sentenced

16    after the charges were out in this case.  There was a big

17    brouhaha around February 4, 2016.

18            February 16th is when he goes in and pleads in

19    front of Judge Strong and gets sentenced, and Judge Strong

20    found that in listening with his knowledge of the

21    situation, listening to Khalil's statement of allocution,

22    and looking at the evidence in the case -- and I just want

23    to remind the Court, this is the same gun that's involved

24    here -- he explicitly found that Khalil did not intend to

25    commit any kind of terrorist act; that he truly wanted a

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    gun for self-defense purposes.

2         His statement was as follows:  I believe you are

3    remorseful, and I believe the circumstances for which the

4    crime was committed.  He has strong family ties and is

5    working.  It looks like he was trying to do the right

6    thing, but he didn't do it the right way, but ignorance of

7    the law is not an excuse.

8         Well, that's -- I mean, I agree with that, and I

9    think the evidence that we now have supports that.

10        As I pointed out the last time, every time -- he

11   only had a gun on three days during the entire

12   investigation, and one was two days, October 7th and --

13   5th through 7th of 2015, and that was the .22, and then

14   the other day was November 15th of 2015, again, before he

15   is charged at the state level where he goes and tries to

16   buy a new gun, and that doesn't go through because the

17   initial arrest is still pending, but there's no charge.

18        And then he takes a class at the behest of his

19   parents who told him that he should follow the law.  If he

20   wants to get a CPL, he's got to take a class and pass it,

21   and so he takes the class afterwards.  For a matter of

22   minutes, he and his cousin fire off these big rifles with

23   a range officer present at the range, and that's it.

24   That's the extent of his weapon possession in this case.

25        Your Honor, I also -- Mr. Waterstreet discussed

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    the Shehadeh case, and I think the Shehadeh case is

2    actually very supportive of our position here.

3         In Shehadeh, first off, the government properly

4    objected to the guidelines and requested an enhancement

5    and variance, and they did that ahead of time, and if you

6    look at that opinion, there's a whole procedural matter

7    that happens before they even get to the sentencing

8    hearing, and the judge walks in and gives them notice

9    ahead of them that he considering a variance upwards.  So

10   unlike this case, I think everything was preserved there

11   to start.

12        Secondly in that case, there was overwhelming

13   evidence of terrorist intent, violent intent, and most of

14   it wasn't even opposed by the defendant.

15        So, you know, there's no -- it's a completely

16   different situation than what we have here where the

17   evidence is weak, and there's experts opposing that

18   evidence, and there's a search warrant that goes against

19   any terrorist intent here.  So I think that's very

20   important when looking at Shehadeh.

21        But even more significant, your Honor, I think is

22   the government is relying on a case in its memorandum, a

23   Fourth Circuit case called U.S. versus Lajqi, and the

24   government mentioned it when we last met, and mentioned it

25   again today.  That's a Fourth Circuit case, and I was

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    curious.  What are facts of this?

2         The appellate case that was cited by the

3    government is actually a summary unpublished opinion, and

4    it has no real facts or explanation, but it does affirm

5    the district court's upward variance to 60 months in that

6    case.

7         So I went back, and I found that there is a

8    transcript of the sentencing hearing and the district

9    court's findings that really details the reasoning, and I

10   want to put that on the record.  It's 10-CR-OO502,

11   Document 40, May 23, 2011, and again, this is U.S. v

12   Lajqi, L-a-j-q-i.

13        So let's compare the evidence in these cases.

14        In Lajqi, the defendant, along with an informant,

15   devised a terrorist plot, agreed to participate in the

16   plot, and most importantly, he never withdrew from the

17   plot.  So it's not like this case where Khalil is telling

18   the undercover, I don't want to hurt anybody.  No, that's

19   not the case in Lajqi.

20        In Lajqi, unlike this one, he actually goes and

21   spends hours casing buildings to bomb in downtown

22   Washington D.C. in front of witnesses.  So that's

23   evidence.  This is again, I'm going through the evidence

24   that allows a variance of this sort.

25        Third, Lajqi admitted that he was a member of a

1   terrorist organization for years, the Kosovo Liberation

2   Party, and he admitted over the years, he actively sought

3   U.S. forces in Kosovo.

4           Fourth, in Lajqi, there were no expert witnesses

5   who found that Lajqi didn't intend to commit acts of

6   terrorism like this case.

7           Here, we have two experts, including the

8   government's expert, and a state court judge who found

9   that Khalil did not intend to hurt people; that he was not

10  a substantial danger, and that he's amenable to community

11  treatment for substance abuse and mental health

12  counseling.

13          And finally, five, your Honor -- and this very

14  important to the judge's finding that they met their

15  burden of proof, this was crucial -- the FBI case agent in

16  Lajqi submitted a sworn multiple page affidavit testifying

17  to Lajqi's dangerousness, and why, and the facts in that

18  affidavit were largely uncontested by the defendant.

19          So for all of these reasons, none of which are

20  present in this case, the district court in Lajqi found

21  that there was strong evidence that Lajqi intended to

22  commit real acts of terrorism, and therefore, justified

23  the variance to 60 months.

24          **THE COURT:**  Aren't the threats that are

25  claimed to be made by your client largely uncontested in

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    this case?

2              **MR. SHANKER:**  No.  They are absolutely

3    contested.  I mean, he is contesting that they were

4    threats, that they are true threats.  They are false

5    statements, and that's the difference really.

6         I mean, he is saying, I didn't intend to hurt

7    anybody.  I made these stupid statements.  I was talking

8    to impress this undercover, this love interest, and he

9    owns that, but he absolutely opposes that these are true

10   threats, and there's evidence to support that.

11             **THE COURT:**  Okay.  I'm not sure I get the

12   distinction.  When he's talking about killing people in a

13   church, you're argument is that he didn't mean it?

14             **MR. SHANKER:**  Exactly.

15             **THE COURT:**  But you're not really arguing

16   that he didn't say --

17             **MR. SHANKER:**  I admit he made -- yeah, he

18   made the statement, and your Honor, he made the statement

19   about the church and the statement about the police

20   officer, and they were isolated statements.  He doesn't

21   mention it again.  So he talks about jihad with her

22   multiple times, but that's the only time that those come

23   up.

24        But back to Lajqi, the other important thing there

25   is that the court varied to 60 months in Lajqi because he

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    also found that due process concerns about notice and the

2    sentencing tail wagging the charging dog were alleviated

3    for the following reasons:

4         One, the -- first of all, the government preserved

5    the request for an upward variance under Section 3553 at

6    the time that the defendant entered his guilty plea, and

7    again when the PSI came out, neither of which are present

8    in this case.

9         Also in Lajqi, he was an illegal alien when he

10   committed the offenses of conviction, and therefore, the

11   court found that he had diminished due process rights when

12   it came to be sentenced on uncharged conduct.  Of course,

13   Khalil is a U.S. citizen.

14        The court also found it significant that the

15   confidential informant in that case had been disclosed to

16   the defense during the discovery process alleviating

17   credibility concerns.  In this case, not only we don't

18   have the identity of the confidential informant, the

19   government refused to tell us whether there were other

20   informants involved in the case, and, you know, we don't

21   know who else contacted him.

22        But in sum, the basis for the upward variance

23   based on uncharged conduct in Lajqi, is just not

24   comparable from a procedural or a substantive level to

25   Khalil's case for all of these aforementioned reasons.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1          **THE COURT:**  So that I'm clear, are you making

2     a procedural challenge to the Court even considering an

3     upward variance?  Are you asking that you be given more

4     time to prepare a response to that request, even though

5     the government has been asking for this from the

6     beginning, right?

7          **MR. SHANKER:**  Well, from the beginning since

8     it filed its memorandum?

9          **THE COURT:**  Right, prior to the sentencing

10    hearing that we last had.

11         **MR. SHANKER:**  Yes.  So no, my procedural

12    challenge is that first of all, that they've waived the

13    various by not objecting to the Pre-Sentence Report.  They

14    have waived it.

15         I think more importantly, they failed to meet the

16    burden of proof to obtain the variance that it's

17    requesting.

18         I mean, we have -- I've tried to not just lay out

19    the facts in this case as they've come in, but also, you

20    know, looking at these other cases that are very

21    comparable.

22         The Gregerson case, you know, his guidelines are

23    37 to 46 months with a cap of 60, and his facts are

24    shockingly more incriminating than Khalil's case.

25         **THE COURT:**  When you say a cap of 60, you

*16-20098; USA v. KHALIL ABU-RAYYAN*

mean the government agreed and the defendant agreed that

any sentence up to 60 would be -- would be within the

range by which the government would be precluded from

withdrawing and the defendant likewise?

        **MR. SHANKER:**  Could not appeal.

        **THE COURT:**  Right.

        **MR. SHANKER:**  But it's based on --

        **THE COURT:**  Sixty was above the advisory

range in that case.

        **MR. SHANKER:**  That's true, and basically what

happened was the government preserved -- and I've admitted

these into evidence, both of these Rule 11 agreements,

your Honor -- but with Gregerson they preserved very

specifically -- which didn't happen here -- but they

preserved an enhancement that they were seeking under the

guidelines that move it to 60 months.

        **THE COURT:**  So Mr. Waterstreet distinguishes

that, as well as the Lanton case, as distinguishable

because of the cooperation that was promised by the

defendant largely.

        **MR. SHANKER:**  I don't know anything about any

cooperation, and there's not the standard language in the

Rule 11 that would make reference to any other agreement.

So I don't know if there is or is not.

        **THE COURT:**  So if we don't know, how do I

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    treat that as a -- supporting your argument is essentially

2    that the -- these are comparable for purposes of

3    determining whether an unwarranted disparity in a given

4    sentence would exist, right?

5              MR. SHANKER:  Well, we have the four corners

6    of the agreement, and I think that alone is telling.

7         Now certainly he could get a below guideline range

8    sentence if there is a 5K in the case.  That happens, but

9    this is just based on his plea.  That agreement, the four

10   corners of that agreement, are about his plea to that

11   charge.  And remember, he was actually charged with

12   possession of destructive devices with the intent to cause

13   bodily harm, and, you know, actually appended to the

14   agreement is the stunning list of weaponry that he

15   possessed, and what we know about Mr. Gregerson is that he

16   had these connections.  He had real connections.  He made

17   similar statements, but he apparently was either able to

18   back it up or intended to back it up, one of the two,

19   unlike Mr. Rayyan.

20        And Mr. Lanton's guideline range was 15 to 21

21   months, and it was only that high because he had three

22   prior felony convictions, and again, this is somebody that

23   threatened to bomb a police funeral while it was happening

24   on a public Facebook page.  So I mean, it was clearly

25   intended to scare people.

                    *16-20098; USA v. KHALIL ABU-RAYYAN*

1        Khalil's statements were private with this

2   undercover, and they've certainly come back to haunt him,

3   but, your Honor, he didn't intend to hurt anybody.

4        Your Honor, when we look at all of these cases,

5   including Lajqi as well, when we look at the reports of

6   the two government experts, and when we look at Judge

7   Strong's opinion, when we look at the results of multiple

8   search warrants, all the computers that were searched, all

9   the uncontested facts about the undercover operation,

10   which basically commodified a young man's desire for love

11   into an inducement to join a jihad operation, I think,

12   your Honor, the guideline range is appropriate.  It allows

13   for a sentence that is not greater than necessary, and it

14   takes into account the detailed findings of psychologists

15   who have spent far more time with Mr. Rayyan frankly than

16   any of us, and this is their expertise.

17        And so, your Honor, I respectfully request a

18   sentence of 15 months.

19        Thank you, your Honor.

20            THE COURT:  All right.  Thank you, Mr

21   Shanker.

22            MR. WATERSTREET:  I will try to beat that

23   12:00 deadline, your Honor.

24        As to the waiver variance, it was a matter that

25   was not brought up, but a plea offer was made in this

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    case, and the plea offer was for the government to be able

2    to make an upward variance, and defense to make a downward

3    variance.  So he knew from the getgo that this was

4    something that the United States wanted to do.

5         As to the statements of Judge Strong, your Honor,

6    I encourage the Court to look at the -- look at that

7    transcript, and I can provide it to the Court.  Frankly,

8    your Honor, there was no evidence at all presented about

9    terrorism, and for him to suggest that Judge Strong made a

10   finding that there was no terrorism involved, is just not

11   factually correct.  As a matter of fact, the defendant

12   wanted to go into it, and his own attorney said no, no.

13   Don't talk about the federal case.

14        As to my last comment, as Mr. Shanker was up here

15   trying to convince the Court that the defendant didn't

16   really have the intent, he suggested it was just one time

17   that the defendant mentioned about this church incident.

18   Well, that's not accurate either, because he made mention

19   of it on January 8th, and again on February 1st just

20   before he was arrested.

21        On February 1st, they were talking -- there was a

22   discussion between the undercover and the defendant, and

23   the undercover said is he, your father, scared because you

24   told him that you wanted to do an istishhadi operation

25   basically?  He said, yeah, big time -- and I'm leaving out

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    the undercover's name -- especially when he found my gun

2    and a bunch of bullets.  He thinks that I will do

3    something, and he's right.  Oh, he did?  I told him one

4    time I wanted to do an istishhadi operation, and he's been

5    watching me ever since.  He looked through my car and

6    found the mask, my gun and a bunch of bullets, and I told

7    him it was just to go hunting for animals, but he didn't

8    believe.  Oh, you wanted to do an istishhadi operation for

9    the kuffar church.

10           So this isn't an isolated incident.  He referenced

11   it again that he was stopped by his father because his

12   father was watching him, because he said in the past --

13   evidence, facts -- that he wanted to do martyrdom

14   operation, and it's clear the family has done everything

15   within their power to not advise authorities, and he is

16   still a danger, your Honor, and because of that we think

17   at least eight years is appropriate.

18           Thank you.

19              **THE COURT:**  All right.  Thank you.

20              **MR. SHANKER:**  Your Honor, may I make two

21   quick points?

22              **THE COURT:**  Yes.

23              **MR. SHANKER:**  Okay.  Judge, as far as the

24   findings of Judge Strong, my point is is that he found

25   that Khalil tried to get the gun for self-defense

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    purposes.  If you do get that transcript, you will see

2    that he talks about the dangers of delivering pizzas in

3    that particular neighborhood, and what had happened with

4    certain employees, including himself.  So that's all with

5    that.

6         And the other thing that I wanted to point out

7    too, is again, you know, Mr. Rayyan, Ray, the father,

8    submitted an affidavit in the beginning of this case, and

9    he said there was never any gun or any ammunition or any

10   giant sword -- because these are all things that are

11   talked about in the statement -- that he supposedly had in

12   the car.

13        We know that's a false statement what Khalil said.

14   We know it because he was under surveillance during that

15   entire time.  We know that he didn't have a gun.  The

16   government has not presented any evidence that he had a

17   gun after November 15th, and we know that, and we also

18   know from the results of the search warrant.  They don't

19   final any of these things.

20        So again, your Honor, the government's argument I

21   think just underscores our point, that these are false

22   statements.  They are terrible statements, but they are

23   false statements, and he did not intend to hurt anybody,

24   your Honor, and that's why we request a guideline

25   sentence.

                    *16-20098; USA v. KHALIL ABU-RAYYAN*

1          Thank you, your Honor.

2               **THE COURT:**  Thank you, sir.

3          Okay.  Mr. Abu-Rayyan, the Court has had the

4     opportunity to watch and listen to the tape that was

5     provided, which included your statement to the Court.

6     You're welcome, if you have any other comments that you

7     would like the Court to consider before imposing sentence.

8

9               **THE DEFENDANT:**  May I approach?

10              **THE COURT:**  Yes, you may.

11              **THE DEFENDANT:**  Judge Steeh, today is the day

12    I get to speak on my own behalf.  Today is also the day I

13    get to show the government, the United States and you,

14    Judge, just how remorseful I truly am.  I've been looking

15    forward to this moment for a long time, and now I am

16    finally here.

17         Your Honor, I want you to know first and foremost,

18    I never intended to hurt anyone.  I never would hurt

19    anyone.  I couldn't hurt anyone.

20         Your Honor, my life and my family's life is

21    forever changed.  I have put my family through so much

22    suffering, and I only have myself to blame.  I am taking

23    full responsibility for my scary, reckless and foolish

24    things that I've said, and the things that I viewed.

25         Judge, I never meant any of the disturbing things

*16-20098; USA v. KHALIL ABU-RAYYAN*

1      that I've said.

2              Judge, I know that I didn't tell the truth when I

3      applied for the gun.  However, your Honor, I want to make

4      it perfectly clear, that was purely for self-defense only

5      and nothing else.  The only reason why I was trying to get

6      a gun was for protection.  Being the delivery guy in

7      Detroit can be dangerous, especially at night.  In the

8      past, we had our drivers robbed, assaulted, and even

9      almost killed.  So by owning a legal firearm, it was to

10     prevent those things from happening to me.

11             Your Honor, those pictures of myself carrying

12     those guns was so stupid and reckless, it didn't have any

13     meaning whatsoever.

14             Your Honor, my behavior caused embarrassment to

15     myself, to my family, to my community, and my religion.  I

16     was so blind, that my actions was not only hurting me, it

17     was hurting my family as well.

18             I messed up, your Honor.  I have made the biggest

19     mistake of my life.  Every moment I am paying for what I

20     did.  In fact, not a month or a week, a day or even a

21     second goes by when I don't kick myself for what I did.  I

22     am so ashamed, your Honor.  I have humiliated myself.  If

23     I could give this world and everything in it to take back

24     what I did, I would do that in a heartbeat.  I just wish

25     that I could take it all back, your Honor.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1          Judge, I was so depressed and really looking for

2     an escape, that viewing those violent videos was as far

3     from my real life.  Looking back at it today, I wish I

4     never laid my eyes on those videos.  That conduct is not

5     who I am, nor what I believe in.  It's not.  It's about

6     peace, tolerance and acceptance.

7          ISIS has nothing to do with Islam.  I have shamed

8     my faith, and I have ashamed all the Muslim people.  That

9     mistake goes beyond any level of incarceration, and I have

10    to live with that for the rest of my life.

11         Your Honor, I have brought grief to my family.  I

12    have brought all this unwanted attention.  There are no

13    words to describe how awful I feel about that.  Every

14    single member of my family has been affected by my

15    mistake.  If I had hours to talk about how my actions

16    impacted my family individually, I would do that, but one

17    member of my family who has been hurt the most by my

18    wrongdoing is my father.

19         My father has blamed himself for what I have done.

20    He has lost so much weight.  He has aged.  My father would

21    always smile, but now because of me, that smile has been

22    replaced with sadness and heartache.  He doesn't have to

23    tell me anything.  I can see the pain in his eyes.

24         You know, your Honor, this whole experience will

25    never be forgotten, but one particular moment that I will

*16-20098; USA v. KHALIL ABU-RAYYAN*

1    never forget is when my dad came to visit me at the old

2    Wayne County Jail.  That was my first visit since I was

3    arrested.  We looked at each other through a glass.  All

4    of a sudden my father burst into tears, and every time I

5    close my eyes, I remember that moment.

6              Your Honor, I don't think I can forgive myself for

7    what I put him through.

8              Your Honor, I have the best dad.  My old man came

9    to America with a few dollars in his pocket and the

10   clothes on his back.  He struggled to get where he is at

11   today, so that the family doesn't have to go through what

12   he went through.

13             I love my dad so much.  There is a special and

14   unbreakable bond between a father and son.  My dad is the

15   definition of the American dream, and this is how I repay

16   him.  I so, so sorry dad.  I promise to spend the rest of

17   my life making it up to you.

18             Your Honor, there is nothing like losing

19   everything to understand how much I had everything.  I

20   lost sight of the things that mattered most in life.  I

21   had a great job.  I had a whole business I could call my

22   own.  I had an awesome pickup truck.  I had a beautiful

23   house, and above all I had the best family anyone could

24   ask for.

25             I have learned a huge lesson.  I will never

1    forget.  When I came in, I was this ignorant, naive and

2    immature kid.  This journey has made a man out of me.  I

3    have had a lot of time to think about what I have done.

4    Being locked in a cell has made me to never take anything

5    for granted again.  I have a new look on life.  Freedom is

6    a blessing.

7         Your Honor, I never intended to hurt anyone.  I

8    understand the FBI's concern about my behavior, and the

9    things I was saying online.  I completely understand your

10   concerns but, your Honor, I never intended to hurt anyone.

11        Judge, actions speak louder than words.  I cannot

12   wait to move on with my life.

13        Your Honor, I have so many goals that I would like

14   to accomplished.  I want to go back to college.  I want to

15   marry a woman who loves me for who I really am, and that's

16   a kind, sweet and gentle person, and most importantly, I

17   want to make my family proud of me. I cannot wait to end

18   this chapter of my life.

19        Your Honor, I would like to apologize to the

20   United States.  America has been great to my family and I.

21   I apologize to all the Muslim people that I have

22   embarrassed.  I apologize to everyone to my offensive and

23   foolish statements and behavior, and I a deeply apologize

24   to my family, and Judge Steeh, I am so, so sorry.

25        Thank you for your time, Judge.

*16-20098; USA v. KHALIL ABU-RAYYAN*

1          **THE COURT:**  All right.  Thank you, sir.

2          **MR. SHANKER:**  Should we remain at the podium?

3          **THE COURT:**  No.  I'm going to -- I have

4    several things that have been brought to the Court's

5    attention to read that I have not read as yet.  I think

6    that perhaps my reasoning and the disposition of the case

7    would best be set forth in writing as well.

8          So I will take the sentencing decision under

9    advisement, and when the Court is -- when I've completed

10   working on the findings and conclusions that will

11   represent the sentence of the Court -- I have not done

12   this before.  So I don't know that it's sufficient for the

13   Court to simply publish the reasoning, and then enter

14   judgment without the parties present.  I think I probably

15   ought to have you all come back for that.  Do you agree?

16         **MR. WATERSTREET:**  Yes, your Honor, because

17   there are some other procedural matters, making sure the

18   defendant understands his appellate rights, if there's any

19   Bostick issue, anything of that nature that needs to be

20   resolved.

21         **THE COURT:**  Right.  You agree, Mr. Shanker?

22         **MR. SHANKER:**  I agree, your Honor.

23         **THE COURT:**  Okay.  All right.  Well, it maybe

24   a week or so, but we'll contact both parties to identify a

25   convenient date once we're when ready to go, okay?

*16-20098; USA v. KHALIL ABU-RAYYAN*

1       **MR. SHANKER:**  Thank you, your Honor.

2

3               (Proceedings concluded.)

4                     -   -   -

5

6               C E R T I F I C A T I O N

7          I, Ronald A. DiBartolomeo, official court

8     reporter for the United States District Court, Eastern

9     District of Michigan, Southern Division, appointed

10    pursuant to the provisions of Title 28, United States

11    Code, Section 753, do hereby certify that the foregoing is

12    a correct transcript of the proceedings in the

13    above-entitled cause on the date hereinbefore set forth.

14          I do further certify that the foregoing

15    transcript has been prepared by me or under my direction.

16

17

      s/Ronald A. DiBartolomeo
18    _____           _____
      Ronald A. DiBartolomeo, CSR                    Date
19    Official Court Reporter

20                     -   -   -

21

22

23

24

25

                    *16-20098; USA v. KHALIL ABU-RAYYAN*